1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF OREGON

3   UNITED STATES OF AMERICA,          )
                                       )   Case No. 3:16-CR-00051-BR
4              Plaintiff,              )
                                       )
5   v.                                 )   October 4, 2016
                                       )
6   AMMON BUNDY (1),                   )
    RYAN BUNDY (5),                    )
7   SHAWNA COX (7),                    )
    DAVID LEE FRY (13),                )
8   JEFF WAYNE BANTA (14),             )
    KENNETH MEDENBACH (16),            )
9   NEIL WAMPLER (20),                 )
                                       )
10             Defendants.             )
    _____)   Portland, Oregon

11

12            EXCERPTED TRANSCRIPT OF PROCEEDINGS

13                 (Excerpts of Testimony)

14       BEFORE THE HONORABLE ANNA J. BROWN, DISTRICT JUDGE

15

16

17

18

19

20

21

22   COURT REPORTER:        AMANDA M. LeGORE
                            CSR, RDR, FCRR, CRR, CE
23                          U.S. Courthouse
                            1000 SW Third Avenue, Suite 301
24                          Portland, OR  97204
                            (503)326-8184

25

```
 1   APPEARANCES:
     FOR THE PLAINTIFF:          GEOFFREY BARROW
 2                               CRAIG GABRIEL
                                 ETHAN KNIGHT
 3                               Assistant U.S. Attorneys
                                 U.S. Attorney's Office
 4                               1000 SW Third Avenue, Suite 600
                                 Portland, OR  97204
 5                               (503)727-1000

 6

 7   FOR DEFENDANT AMMON
     BUNDY:                      J. MORGAN PHILPOT
 8                               JM Philpot Law
                                 1063 E. Alpine Drive
 9                               Alpine, UT 84004
                                 (801)810-8369
10
                                 MARCUS MUMFORD
11                               Marcus R. Mumford, PC
                                 405 S. Main Street, Suite 975
12                               Salt Lake City, UT 84111
                                 (801)428-2000
13
     FOR DEFENDANT RYAN
14   BUNDY:                      RYAN BUNDY
                                 Pro se
15                               79400-065

16                               LISA LUDWIG
                                 Standby Counsel
17                               811 SW Naito Parkway, Suite 500
                                 Portland, OR  97204
18                               (503)223-5570

19
     FOR DEFENDANT SHAWNA
20   COX:                        SHAWNA COX
                                 Pro Se
21
                                 TIFFANY HARRIS
22                               Standby Counsel
                                 121 SW Salmon Street, Suite 1420
23                               Portland, OR  97204
                                 (503)546-2927
24

25
```

```
 1   APPEARANCES:
     FOR DEFENDANT DAVID
 2   FRY:                        PER OLSON
                                 Hoevet Olson Howes, PC
 3                               1000 SW Broadway, Suite 1500
                                 Portland, OR  97205
 4                               (503)228-0497

 5   FOR DEFENDANT JEFF
     BANTA:                      ROBERT SALISBURY
 6                               330 South 1st Street
                                 PO Box 1272
 7                               St. Helens, OR  97051
                                 (503)397-9000
 8


 9
     FOR DEFENDANT KENNETH
10   MEDENBACH:                  KENNETH MEDENBACH
                                 Pro Se
11                               25795-086

12                               MATTHEW SCHINDLER
                                 Standby Counsel
13                               501 4th Street #324
                                 Lake Oswego, OR  97034
14                               (503)699-7333

15

16   FOR DEFENDANT NEIL
     WAMPLER:                    LISA MAXFIELD
17                               Pacific Northwest Law, LLP
                                 1420 World Trade Center
18                               121 SW Salmon
                                 Portland, OR  97204
19                               (503)222-2661

20   ALSO PRESENT:               RUSS BRETON
                                 RENA RALLIS
21                               MR. ROOTS

22

23

24

25
```

INDEX


Witness Index

| FOR THE DEFENDANT: | Direct | Cross | ReDirect | ReCross |
|---|---|---|---|---|
| William Fry | 7 | | | |
| John Witzel | 24 | 33 | | |
| John Witzel | | 33 | | |
| John Witzel | | 33 | | |
| John Witzel | | 37 | | |
| John Witzel | | 38 | | |
| John Witzel | | 43 | | |
| Linsay Tyler | 44 | 55 | | |
| Linsay Tyler | | 58 | | |
| Linsay Tyler | | 60 | | |
| Linsay Tyler | | 60 | | |
| Chris Briels | 82 | 99 | | |
| Chris Briels | | 104 | | |
| Chris Briels | | 106 | | |
| Chris Briels | | 108 | | |
| Chris Briels | | 119 | | |
| Chris Briels | | 124 | | |
| Chris Briels | | 126 | | |
| Ammon Bundy | 134 | | | |
| Lee Rice | 192 | 202 | | |
| Lee Rice | | 203 | | |

-oOo-

```
 1              (The following excerpted proceedings

 2              were held on October 4, 2016, at 9:09 a.m.)

 3              THE COURT:  Fair enough.

 4              All right.  Would you like to move, Mr. Olson?  You

 5   and Mr. Fry?  Would you please move over?

 6              MR. OLSON:  Yes.  I was just asking -- or alerting

 7   the deputies to the fact that we're moving over.

 8              THE COURT:  Yes.  Thank you for doing that.

 9              And then let's ask Mr. Fry, senior, in, please, so

10   he's at the witness stand when the jurors come in.

11              And, Ms. Graham, go ahead and get the jurors lined

12   up.

13              Please check before you bring them in.

14              (Pause.)

15              THE COURT:  Good morning, sir.  Come on all the way

16   up here to the witness chair.

17              In a minute, the -- you can take a seat, right now.

18              (Witness taking the stand.)

19              THE COURT:  In a minute, the jurors will come in.

20              We'll all stand for the jurors.  And then everyone

21   else will be seated, but I would ask that you please remain

22   standing, so that you'll be sworn.  And then you'll be asked to

23   identify yourself in the jury's presence.  Okay?

24              THE WITNESS:  Yes, ma'am.

25              THE COURT:  Very good.
```

1          (Pause.)

2          THE COURT:  Please rise for the jury.

3          THE CLERK:  They're coming in.

4          (Jurors enter at 9:12 a.m.)

5          THE COURT:  All right.  Thank you.  Everyone please

6   be seated.

7          Good morning, jurors.

8          THE JURORS:  Good morning.

9          THE COURT:  Has anything crossed your path about this

10  case in any form since we adjourned yesterday?  Anybody?

11         THE JURORS:  No, ma'am.

12         THE COURT:  All right.  Are we all ready to go?

13         THE JURORS:  (Nodding heads.)

14         THE COURT:  All right.  The defendants' next witness

15  is William Fry.

16         Sir, would you please stand.  Please face the jury

17  and the deputy there, and raise your right hand to be sworn.

18         THE CLERK:  Please raise your right hand.

19         (Witness sworn.)

20         THE WITNESS:  Yes, ma'am, I do.

21         THE CLERK:  Please be seated, and pull your chair all

22  the way forward.

23         THE COURT:  When you're close to the mic there, tell

24  us your full name, sir, spelling all of it.

25         THE WITNESS:  William Rudolph Fry, Jr.

7

Fry - D - By Mr. Olson

1       THE COURT:  Spell it.

2       THE WITNESS:  W-I-L-L-I-A-M, R-U-D-O-L-P-H, F-R-Y.

3  Jr.

4       THE COURT:  Thank you.

5       Counsel.

6       MR. OLSON:  Thank you, your Honor.

7                   DIRECT EXAMINATION

8  BY MR. OLSON:

9  Q.  Mr. Fry, how are you this morning?

10 A.  Good.

11 Q.  Where do you reside?

12 A.  I live in Blanchester, Ohio.

13 Q.  Do you recognize this man to my right?

14 A.  That's my son.

15 Q.  Okay.  And what's your occupation?

16 A.  I manage a dental practice.

17 Q.  All right.  And who is your spouse?

18 A.  Sachio Fry.

19 Q.  And is she --

20 A.  She's right back here (pointing).

21 Q.  Okay.  Is she the mother of David Fry?

22 A.  She is.

23 Q.  And was David living with you in Ohio before he came out

24 here to the refuge?

25 A.  Yes, he was.

Fry - D - By Mr. Olson

1    Q.   And how old is David?  Mr. David Fry?

2    A.   He's 28 now.   (Laughing.)

3    Q.   Do you have any other kids?

4    A.   I have a son that's three years older, in the marines.   And

5    he's just transferred to Okinawa, Japan.

6    Q.   What's his name?

7    A.   His name is Daniel Fry.

8    Q.   Okay.   Can you tell us a little bit about your own

9    background?

10        Do you have a history in the military?

11   A.   Yes.   My father was in the marines.   I've traveled all over

12   the United States as a child with that.   In fact, I went to

13   nine different schools by the time I graduated high school.

14        And then once I graduated high school, I joined the

15   marines.   So my family has a lot of -- my brother is a marine,

16   my son is a marine.   There's marines in my uncles and cousins.

17   We have just an entire family full of marines.   And our family

18   goes all the way back to the Revolutionary War; at Valley

19   Forge, Bunker Hill.   And even the French and Indian war, prior

20   to our nation being established.

21   Q.   So a long history of being involved in the military in your

22   family?

23   A.   That's correct.   Most every war.

24   Q.   And did you -- what -- what -- you said you were a marine.

25   What rank did you finish when you were finished with the

9

Fry - D - By Mr. Olson

1  marines?

2  A.  I retired in 1997 as a gunnery sergeant in the marines.

3  Q.  How many years did you spend in the marines?

4  A.  20 years.

5  Q.  Did you move around a lot as a result of that?  Being

6  stationed in different places?

7  A.  Yes, I did.

8  Q.  And where were you when you met your wife Sachio?

9  A.  I was stationed in Iwokaneja (phonetic), Japan, at the

10  time.

11  Q.  And she was a Japanese citizen at the time?

12  A.  Correct.  She still is.

13  Q.  And so when were you stationed there?

14  A.  1983, '4, and '5, was the first time.

15  Q.  Okay.  And where was your son David Fry born?

16  A.  He was born in Yuma, Arizona, when we were station there.

17  Q.  All right.  And can you just briefly describe the different

18  places he's lived, growing up?

19  A.  Yeah.  Well, he was born in Yuma, and then I think he was

20  around one year old when we moved to Japan.  I got sent back to

21  Japan.  Iwokaneja, again.  And we stayed there for three years.

22  After Japan -- in fact, David, growing up in Japan, his first

23  language that he spoke was Japanese.  And so my two sons spoke

24  two different languages when they were playing together.  That

25  was a headache to deal with.  But we moved to California, after

Fry - D - By Mr. Olson

1    that.  And then, from California, when I retired from the

2    marines, we came to Ohio.

3    Q.    Okay.  Is David Fry, your son, is he still fluent in both

4    languages, Jap --

5    A.    He is.

6    Q.    So how old was he when you moved to Ohio, roughly?

7    A.    Third or fourth grade, I'm getting too old to remember all

8    of the details like that.

9    Q.    Okay.  And has he pretty much lived there ever since?

10   A.    Yes, he has.

11   Q.    And did he graduate from high school in Ohio?

12   A.    He did.  Although his last two years in high school, he

13   actually went to college for his last two years of high school

14   because a lot of problems with racism at the school, and I had

15   to get him out of there.

16            The principal told me, What do you want me to do

17   about it?  And I realized the problem was the entire school.

18   So I put him in college in the 11th grade because he had passed

19   high school -- the proficiency test that they have to take

20   and -- when he was in eighth grade, he passed it.  So we just

21   put him in college, and got him out of that school program --

22   or the school system that we had problems with okay.

23   Q.    Okay.  And that was in -- was that in Blanchester, Ohio?

24   A.    It's -- well, actually it's our local school for our

25   county, for that area.  But it's in Morrow, Ohio, is actually

Fry - D - By Mr. Olson

1  where it's at.

2  Q.  Okay.  And is that a rural part of Ohio?

3  A.  Yes.  It's very rural.

4  Q.  Okay.  So was he -- did he kind of stand out as being half

5  Japanese?

6  A.  There was five nonCaucasians in the school.  Two of them

7  were my boys.

8  Q.  Okay.  So did that cause some problems for him, when he was

9  in that -- in high school age?

10  A.  Major problems.  Both of my boys, they -- you know, the

11  racism there was just incredible.  Even -- even girls in school

12  were joining in on it, too, to attack both of my sons.  So it

13  was ugly.

14  Q.  Okay.  All right.  So you -- you now manage a dental

15  practice.  How long have you been doing that?

16  A.  Since February 15th, 2002.

17  Q.  Okay.  And does your wife also work at the dental office?

18  A.  She does.

19  Q.  And has -- has the defendant, your son, also worked at that

20  clinic?

21  A.  Since he was in high school.  He would work during the

22  summertime, part time.  And then once he came out of -- once he

23  got out of college, then he came back home, he worked full time

24  from then on.

25  Q.  All right.  And was he -- he was working there before he

1  came out here to Oregon?

2  A.   That's correct.

3  Q.   And, at that point, what -- what sort of tasks was he

4  doing?  What sort of job responsibilities did he have there at

5  the clinic?

6  A.   He would fill in as a dental assistant, suctioning.  But

7  mainly his job was the technical side.  He took care of our

8  computers, repaired the equipment, ran the sterilization

9  machines.  You know, any kind of, you know, small repairs that

10  needed to be done on any of the equipment, he would handle some

11  of those things.  He just generally could do anything we needed

12  him to do, he's been there so long.  He is pretty adept at all

13  of it.

14  Q.   Did he also assist in making, like, retainers, and molds --

15  A.   Right.  He did most of our lab work.  You know, making --

16  pour impressions, making retainers or mouth guards or night

17  guards, different types of things.  TMJ appliances.

18  Q.   Okay.  And so what -- what sort of things would your son do

19  in his free time?

20  A.   He was big into computer games.  That was, you know,

21  probably one of his big hobbies.  And he built computers, also,

22  for relatives.  And -- and repair people's computers; you know,

23  family and friends.  And he just did that out of the goodness

24  of his heart.  He didn't charge anybody.  But he also was --

25  was on the Internet.  You know, exploring the Internet, of

Fry - D - By Mr. Olson

1    issues and things that he was more concerned with.  Abortion,

2    Fukushima, those sort of things that he was very concerned

3    with.

4    Q.   What is Fukushima?

5    A.   Fukushima is -- there's -- it's a place in Japan.  It's a

6    city.  And they had the huge earthquake back in March of 2011

7    that took out their nuclear reactors.  They have six nuclear

8    reactors there.  And three of them had a complete meltdown of

9    the cores, that are down into the ground now.  They've gone

10   through the entire housing unit and are now down to the

11   groundwater, pouring out radiation every single day.  And the

12   technology to fix it is going to be 40 years out.  And so the

13   Pacific Ocean is being contaminated with that radiation every

14   day.

15   Q.   And is that something that Mr. Fry spent a lot of time

16   being concerned about and talking about and expressing concern

17   about?

18   A.   He's very concerned about it.

19          His brother was actually in Tokyo the day the

20   earthquake hit.  And, you know, so this was a -- well, being

21   half Japanese, and -- that already makes it his -- his other

22   home.  And then his brother was over there and suffered through

23   that earthquake.  And then as a marine, he's also fluent in

24   both languages.

25          His -- the marines went up to assist with the

Fry - D - By Mr. Olson                    14

1    recovery of -- and repair and salvage up in Japan, up in

2    northern Japan, where the earthquake hit and the tsunami hit.

3            And so he was the translator for -- between the U.S.

4    Marines and the navy military -- or the Japanese military.  And

5    he was up there on two different occasions.

6    Q.  So your son, David, David Fry, would you say that he's got

7    strong political views?

8    A.  He has strong views as towards the corruption in

9    government.  That's where he -- he gets frustrated with the

10   amount of corruption that we have in our government today.

11   Q.  Has he ever taken to the streets in protest or

12   demonstration?

13   A.  No.  Well, except for this particular situation here.

14   Q.  Okay.  Now, were -- were you aware that your son, Mr. Fry,

15   was -- was thinking of coming out to Oregon to join the protest

16   that was happening at the Malheur refuge?

17   A.  I was.  We were leaving for a trip to Costa Rica.  And it

18   was 7:30 at night, eight o'clock at night.  And he came

19   downstairs -- we were leaving the next morning.  And he came

20   downstairs and said he was coming out to Oregon.

21   Q.  Okay.  Did you have a conversation with him about that?

22   A.  Yes, we did.  I tried to keep him from coming out, you

23   know, personally.  Me and my wife both had that conversation

24   with him.

25   Q.  Why were you not wanting him to come out?

Fry - D - By Mr. Olson

1   A.   You know, I had believed some of the stories I had seen in

2   the paper that these people were a bunch of racists, and stuff

3   like that.  And I fell for that --

4          MR. KNIGHT:  Your honor, I'm going to object --

5          THE COURT:  Excuse me, Mr. Fry.

6          MR. KNIGHT:  I apologize.  I'm going to object to

7   relevance.

8          THE COURT:  The objection is sustained.

9          Jurors, disregard the question and the answer.

10         The fact that there was an attempt to persuade

11  Mr. Fry from coming is admissible but not the reasons why.

12  BY MR. OLSON:

13  Q.   Okay.  Well, let me skip to something slightly different.

14         Do you own firearms in your home?

15  A.   Yes, I do.

16  Q.   And how are they stored in your home?

17  A.   I have a gun safe.

18  Q.   And is it -- were any of those firearms missing from your

19  home after Mr. Fry left?

20  A.   No.  In fact, when David left, he had a backpack and a

21  computer and phones and a bunch of cables and programs for --

22  he was -- it was all media stuff, is all he took.

23  Q.   Does -- does your son, David Fry, does he have any firearms

24  of his own that he owns?

25  A.   He has three.

Fry - D - By Mr. Olson

1   Q.   And were -- were those -- do those firearms remain in your

2   house -- do they remain in your house after he left?

3   A.   Yes.

4   Q.   And where did he get those -- those firearms?

5   A.   One of them was a gift from his grandfather.  It still

6   remains unassembled, unfired.

7           One -- and the other two were gifts from me.  One is

8   a shotgun, and it's still unfired.  And then a .22 rifle.

9   Q.   Okay.  Of those guns, to your knowledge, which -- which

10  ones have -- has Mr. Fry ever fired or used?

11  A.   When he was in high school, after we bought those, him and

12  his brother and their friend -- we always refer to him as our

13  third son.  He's also in the marines, too.  Would come over.

14  You know, they would all get together on the back porch, and I

15  think my older son would say, "Let's shoot the .22s," and they

16  would go out and shoot the .22s in the backyard.

17          And David just wasn't really -- David -- wasn't ever

18  really into firearms.

19  Q.   Okay.  Before we came into court here, did I show you some

20  photographs of some of the guns that have been admitted into

21  evidence in this case?

22  A.   Yes, you did.

23  Q.   And let's just look at a couple of them.

24          MR. OLSON:  Could you pull up Exhibit 418.

25  BY MR. OLSON:

Fry - D - By Mr. Olson

1    Q.  Sir, is that a firearm from your house?

2    A.  It is not.  I have nothing like that.

3    Q.  Do you own a Mossberg?

4    A.  I do.

5    Q.  Is -- but does your Mossberg look like that?

6    A.  No, it does not.  Do I need to describe mine?

7    Q.  No, that's okay.

8    A.  Okay.  It does not look anything like that.

9          MR. OLSON:  Okay.  Could you go to 425.

10   BY MR. OLSON:

11   Q.  Does that look like a firearm that is from your house?

12   A.  No, it's not.  Nothing.  I don't have anything like that.

13   Q.  And 429.

14          How about that one?

15   A.  Absolutely not.

16          THE COURT:  What's the exhibit number?

17          MR. OLSON:  Sorry.  That's 429.

18          THE COURT:  Thank you.

19          MR. OLSON:  Okay.  Can you take those down.

20   BY MR. OLSON:

21   Q.  Now, I showed you a number of other photographs of guns

22   with exhibit stickers that have been admitted in this case.

23   Correct?

24   A.  Correct.

25   Q.  Any of those look familiar to you at all, as far as --

Fry - D - By Mr. Olson

1    A.    None.

2    Q.    Okay.  And as far as you know, would David have access to

3    any other firearms in the community there that he could -- he

4    could have taken with him to bring to Oregon?

5    A.    Well, he doesn't have the combination to my safe.  There's

6    no way he could have been able to get into any of the weapons.

7    Q.    Okay.  And anyone else in the community there that --

8    A.    The only other person that has a combination is my

9    brother-in-law.

10   Q.    Okay.  To your knowledge has David ever purchased a

11   firearm?

12   A.    No.

13   Q.    So the ones that he has are ones that were given to him at

14   various times?

15   A.    Correct.

16   Q.    Now, is your son -- would you consider him a supporter of

17   Second Amendment rights?

18   A.    He supports all of the Bill of Rights.

19   Q.    Okay.  Now, but would you consider him a gun -- gun

20   enthusiast?

21   A.    No, I would not.  He's -- like I say, he's got guns that's

22   never been assembled or even fired.

23   Q.    Does he ever carry a firearm around with him?

24   A.    No, he does not.

25   Q.    Or in his vehicle?

Fry - D - By Mr. Olson                19

1   A.   No, he does not.

2   Q.   Does he subscribe to any *Guns & Ammo,* or any other

3   magazines that are for gun enthusiasts?

4   A.   Computer magazines.  He's a computer wizard.  That's what

5   he's into.

6   Q.   Does he have a working knowledge of -- of how different

7   firearms operate?

8   A.   Very limited.  I noticed when they were at the refuge that

9   they couldn't figure out what gun required what ammo, what

10  magazine went with the gun.  He couldn't figure them out.

11  Which is just indicative of how little he knows about guns.

12  Q.   To your knowledge, has he ever gone to a shooting range?

13  A.   We -- we have a target in my backyard that we use.  He's

14  only used it five or six times.

15  Q.   Did he have -- you're familiar with his -- his vehicle that

16  he -- he owns?

17  A.   Yes, I am.

18  Q.   What's -- do you know the make and model of that vehicle?

19  A.   It's a 1988, I believe, Lincoln.

20  Q.   So he had purchased that, obviously, sometime before he

21  came out to Oregon?

22  A.   Correct.

23  Q.   Did that have a bumper sticker on the back of it, when he

24  came out to Oregon?

25  A.   No, it did not.

Fry - D - By Mr. Olson                              20

1   Q.  Going back, just -- I want to cover -- you testified you

2   were aware of the fact that he came out here, and you testified

3   about you not really being too thrilled about that.

4           Did -- did David talk to you about why he wanted to

5   come out and join this protest?

6   A.  Yeah, there were several reasons.

7           You know, he thought --

8           MR. KNIGHT:  I'm going to object to hearsay, your

9   Honor.

10          THE COURT:  The objection is sustained.

11          MR. OLSON:  Your Honor, it goes to 803(3), intent,

12  which I think has been -- similar to evidence that's been

13  introduced in this case.

14          THE COURT:  But when -- the witness was talking about

15  the impact of an out-of-court statement on the witness's state

16  of mind, not on the defendant's state of mind.  So articulate

17  how this gets in through the rules of evidence, please.

18          MR. OLSON:  Well, I would like this witness to

19  testify as to what Mr. Fry told him --

20          THE COURT:  I know what you want him to say.  I'm

21  asking to you analyze, under Rule 803 exceptions, how it is

22  admissible.  Because the argument you made applied when a

23  witness is on the stand, wanting to introduce another person's

24  statements for its impact on the witness's state of mind.

25  So --

Fry - D - By Mr. Olson

1          MR. OLSON:  This is -- this is for the defendant's

2   state of mind, why he wanted --

3          THE COURT:  He doesn't get to testify as to the

4   defendant's state of mind.  He doesn't get to introduce the

5   defendant's statements for that purpose.

6          I'm missing your point.

7          How does it get in under Rule 803?

8          MR. OLSON:  Well, it's -- it's the defendant's

9   statement but it's offered to prove the defendant's state of

10  mind, as to why he came out here.

11          THE COURT:  All right.  What's the Government's

12  objection here?

13          MR. KNIGHT:  Well, twofold, your Honor.

14          First, that is a contortionist's understanding of

15  803(3) in the sense that it's a state of mind being offered

16  through the witness, not through the defendant.

17          Secondly, it's clearly for the truth of the matter.

18  The form of the question was the reasons for going out to

19  refuge.  And it's our position that the manner in which that

20  question is asked and the answer it requires goes to the truth

21  of why he's going out here.

22          THE COURT:  Rephrase your question to fit within an

23  expression of state of mind, and then I'll remind the jury that

24  it's admissible only for its state-of-mind effect and not for

25  truth.

Fry - D - By Mr. Olson

1    Please rephrase your question.

2         MR. OLSON:  All right, your Honor.

3    BY MR. OLSON:

4    Q.  Did Mr. Fry tell you -- or -- or state to you what his

5    intent was in coming out to the refuge?

6    A.  He wanted to support some ranchers who had been charged as

7    terrorists for setting backfires.  And he wanted to get out

8    there and bring his Internet material out there, so that he

9    could broadcast that out, so people could understand the issues

10   and -- because most -- you know, as David's sitting in Ohio,

11   he's one voice in Ohio.  He felt like, you know, you needed to

12   have a group of people and get somewhere where the world is

13   listening.  And, of course, that was a big deal.  So he thought

14   that there would be a lot of people listening, and he would be

15   able to get his voice out on the Internet and explain what was

16   going on.

17   Q.  Did he also state that he intended to talk about other

18   issues as well?

19        MR. KNIGHT:  Objection, leading.

20        THE COURT:  The objection is sustained.

21        Rephrase your question.

22   BY MR. OLSON:

23   Q.  Were there other issues that he stated that he wanted to

24   talk about?

25   A.  Absolutely.  He wanted to cover Fukushima, and he wanted to

Fry - D - By Mr. Olson

1   cover abortion.  You know, he -- he -- he didn't know what

2   partial birth abortions were.  And when he found out about

3   that, he -- he wanted to get people to understand that.

4            MR. OLSON:  Okay.  I have no further questions, your

5   Honor.

6            THE COURT:  All right.  Any defense questions of

7   Mr. Fry?

8            Cross-examination?

9            MR. KNIGHT:  Nothing, your Honor.  Thank you.

10           THE COURT:  Thank you, Mr. Fry.  You're free to go.

11           Next witness, please.

12           MR. SALISBURY:  The defense calls John Witzel.

13           THE COURT:  Thank you.

14           THE CLERK:  Come forward.

15           THE COURT:  Please come all the way up here, sir, to

16   the witness chair.  Watch your step coming up the steps, and

17   then remain standing, please.

18           Please face the jury and the deputy, there, to your

19   right.

20           Raise your right hand to be sworn.

21           (Witness sworn.)

22           THE WITNESS:  Absolutely.

23           THE CLERK:  Please be seated, and pull your chair all

24   the way forward.

25           THE COURT:  Please tell us your full name, sir, and

Witzel - D - By Mr. Salisbury                    24

1    spell all of it.

2              THE WITNESS:  And spell it?

3              THE COURT:  State and spell your full name, please.

4              THE WITNESS:  John F. Witzel, Jr.

5              John, J-O-H-N, F., Witzel, W-I-T-Z-E-L, Jr.

6              THE COURT:  Thank you.

7              Counsel.

8              MR. SALISBURY:  Thank you, your Honor.

9              THE COURT:  Mr. Salisbury.

10                      DIRECT EXAMINATION

11   BY MR. SALISBURY:

12   Q.  Good morning, Mr. Witzel.

13              Could you please tell the jury where you are from.

14   A.  I'm from Frenchglen, Oregon.

15   Q.  And where is that?  Where is Frenchglen?

16   A.  It is about 60 miles south of Burns, Oregon.

17   Q.  And how far south of the Malheur National Wildlife Refuge?

18   A.  Approximately 30 miles.

19   Q.  And what do you do out there in Frenchglen for a living?

20   A.  I do a variety of things.  I am in the livestock business.

21   I have a small manufacturing business, a custom fertilizer

22   applicating business.

23   Q.  What do you do in the livestock business?

24   A.  I graze livestock.  Typically custom grazing.

25   Q.  I want to talk to you about a video that you made, and that

Witzel - D - By Mr. Salisbury              25

1  has been talked about in this case.

2              Do you recall a video that you made in the summer

3  2012?

4  A.  Regarding the Miller homestead fire?

5  Q.  Yes.

6  A.  I did document some of that event with video.

7  Q.  Okay.  And I'm going to ask you to kind of just talk about

8  the video in general terms.

9              Can you start, perhaps, with the -- so you -- you

10  recorded this video yourself?

11  A.  Yes.

12  Q.  What did you use to record the video?

13  A.  Just a small handheld camcorder.

14  Q.  Okay.  And so you held it up like -- like a camcorder

15  (indicating) and shot the video yourself?

16  A.  Yes.

17  Q.  And why did you shoot the video?

18  A.  Just to document the event and what was going on.

19  Q.  And what was the event, again?

20  A.  The Miller homestead fire.  It was a fire that was

21  lightning started and then further intensified by BLM

22  personnel.

23              MR. BARROW:  Your Honor, I'm going to object.  This

24  is what we dealt with pretrial.

25              THE COURT:  The objection is sustained.

Witzel - D - By Mr. Salisbury

1          Jurors, disregard the witness's answer and question.

2          Please stay within the scope of what was directed

3     earlier.

4     BY MR. SALISBURY:

5     Q.   Do you know how long the video is?  You say it's

6     approximately 17 minutes, or so, total?  Ten minutes?

7     A.   Well, my videoing happened over the course of several days,

8     so there's different clips that last different durations.

9     Q.   Okay.  I just want to focus you on the portion where you

10    were driving down to Gary Miller's ranch.

11         And if you can just describe generally what you saw

12    when you were making the video, as you approached Gary Miller's

13    corral.

14    A.   Yeah, Gary Miller had asked me if I could come help protect

15    his cattle and -- at a corral.  And, on the way there, I

16    observed probably a half a dozen -- excuse me -- half a dozen

17    BLM vehicles gathered together in an intersection.  That was

18    about a mile from his corral.

19         Drove on to his corral facilities.  There was no fire

20    in the area at that time.  It had pretty much went out

21    overnight.  Just a few smolders here and there.

22         I got to the corral.  His ranch hands were gathering

23    cattle in -- or had gathered cattle in to the corral.  A lot of

24    those cattle were burnt.

25         His personnel said the fire --

Witzel - D - By Mr. Salisbury                      27

1              THE COURT:  Excuse me, sir.  Don't talk about what

2    other people say.

3              The question is what did you see.  Go on.

4              THE WITNESS:  The fire was basically out, just a few

5    smolders here and there.  And we were at the corral a few

6    moments, talking with his crew, and -- we were there a few

7    minutes.  And then we saw smoke -- big bellows of smoke start

8    upwind of us, just --

9    BY MR. SALISBURY:

10   Q.  And that fire was started up while you were there?

11   A.  Yes.  And so we observed the BLM fire vehicles going two

12   different directions from where they had been gathered and

13   lighting fire with hand torches.

14             MR. BARROW:  Your Honor, again, I'm going to object.

15   This is what we talked about prior to his testimony.

16             THE COURT:  No, that's not consistent.

17             The Court will permit the witness to describe

18   generally what he -- what he videoed.

19             Let me tell you the purpose for which this is

20   offered, jurors.

21             Some other witnesses have talked about a so-called

22   Witzel video.  This witness is talking about making the video.

23   This is Mr. Witzel.  So it's here for corroborating evidence

24   that the video existed.  But the fact of the video is before

25   you -- before you for its bearing on the state of mind of any

Witzel - D - By Mr. Salisbury                      28

1    of the defendants, not for the truth of what's recorded in the

2    video.   This is not a trial about the so-called Miller fire.

3    It's about the defendants' state of mind.

4              So to the extent you hear evidence that a defendant

5    viewed the video or saw it and it impacted that defendant, then

6    you may consider this for its bearing on the defendants' state

7    of mind; not for the truth of whatever those issues involved.

8              Everybody clear?

9              All right.   Mr. Salisbury, go ahead.

10             MR. SALISBURY:   Thank you, your Honor.

11   BY MR. SALISBURY:

12   Q.   So back to what you were saying, so the cows were in a

13   place where the fire had been started?   What you witnessed?

14   A.   Well, when -- when they lit the fire, it was upwind of us

15   on two different sides.   And so the cattle were in a corral,

16   which is void of vegetation.

17             The vegetation came up to the corral.   So our job was

18   to stop the fire that came to the corral.   And it did.   And

19   once the fire had got to the corral, we got it put out, so

20   that -- that was at Gary Miller's corral.

21   Q.   And you said you saw -- what did you observe with the cows?

22   A.   There was a lot of burnt cattle or -- that had severe burns

23   on them.

24   Q.   Now, did you see -- did the fire impact anything else in

25   that area, that you saw?

Witzel - D - By Mr. Salisbury

1    A.   Mobile home.   Somebody's property, mobile home.   And some

2    other -- looked like -- corral facilities were burnt up.   That

3    was one of the first things that burnt after the BLM ignited

4    the fire, was that mobile home area.

5    Q.   Now, you -- after you made the video, did your ex-wife post

6    it to YouTube, on the Internet?

7    A.   I think she's the one that -- evidently posted it, yeah.

8    Q.   But you're aware that it was posted to the Internet?

9    A.   I was.

10   Q.   Okay.   Okay.   I want to move you to late January 2016.

11            Now, can you just describe briefly for the jury --

12   you live in Frenchglen.   Where do you go to -- to visit a

13   doctor, for instance?

14   A.   Our closest town with services is Burns, 60 miles to the

15   north of us.

16   Q.   Okay.   And at that time, in late January 2016, did you have

17   a doctor's appointment where you headed north, up towards

18   Burns?

19   A.   I did.

20   Q.   And what did you encounter in the way of FBI roadblocks?

21   A.   There was two roadblocks set on -- Highway 205 goes from

22   Frenchglen to Burns.   And there was two separate roadblocks

23   that we had to go through to get to Burns, to go to doctors, or

24   whatever.

25   Q.   Okay.   Now, when you came across the first roadblock, what

Witzel - D - By Mr. Salisbury                      30

1    happened?  Did you get through?

2    A.  No, I did not.  We were met by individuals at gunpoint, and

3    asked to get out of our vehicles.

4            MR. BARROW:  And I'm going object to anything further

5    about the roadblock.

6            THE COURT:  The objection is sustained.

7            Point's made.  Move on.

8    BY MR. SALISBURY:

9    Q.  That was -- that roadblock, with the snipers, was south of

10   the refuge?  South of Sodhouse Lane?

11   A.  Yes.

12   Q.  Was there -- and you didn't get through that roadblock?

13   A.  No, they told me --

14           MR. BARROW:  Your Honor, I'm going to renew my

15   objection.

16           THE COURT:  The objection is sustained.

17           Please don't characterize the witness's testimony in

18   the form of your question, which you did.

19           Move on now.

20           MR. SALISBURY:  Thank you, your Honor.

21   BY MR. SALISBURY:

22   Q.  So what did you do after that?

23   A.  I went home and then one of the fellows that was -- talked

24   to me at the roadblock, the FBI agents called me and said,

25   "Okay we'll give you clearance to go through now."  And so -- I

Witzel - D - By Mr. Salisbury        31

1   live approximately 20 minutes from that roadblock.

2              I returned back to the roadblock, and then went

3   through the procedures of getting out.  And -- and, again, at

4   the roadblock.  Then they let me drive through.  But then

5   there's a second roadblock you have got to go through.  So the

6   same thing there.

7   Q.  Where was the second roadblock that you had to go through?

8   A.  It is north of the Malheur National Wildlife Refuge, on

9   Highway 205.

10  Q.  And that Highway 205 is the road that goes straight north

11  up to Burns?

12  A.  Correct.

13  Q.  What happened at the second roadblock?

14  A.  We were asked to exit our vehicles.  There -- and then,

15  again, at gunpoint we were asked to walk backwards for about a

16  hundred yards to --

17              MR. BARROW:  Your Honor, this is the same objection.

18              THE COURT:  The objection is sustained.

19              Jurors, disregard the answer.

20              Ask the question in a way that makes a point without

21  getting into the material that I've ruled inadmissible.

22  BY MR. SALISBURY:

23  Q.  Were -- did you get through that roadblock?

24  A.  It took about 20 -- 20 minutes more at that roadblock to

25  get through before we were allowed to move on.

Witzel - D - By Mr. Salisbury

1  Q.  Why was that?

2  A.  Just --

3          MR. BARROW:  Objection.

4          THE COURT:  The objection is sustained.

5          Ask another question.

6  BY MR. SALISBURY:

7  Q.  So that was, again, the second roadblock north of Sodhouse

8  Lane.

9  A.  Um-hmm.

10 Q.  You said it took 20 minutes.

11         And then you were able to get through that roadblock?

12 A.  I was.

13         MR. SALISBURY:  No further questions.

14         THE COURT:  Please establish the date.  I don't think

15 you got the particular date.

16         You just said late January.

17         MR. SALISBURY:  Thank you, your Honor.

18 BY MR. SALISBURY:

19 Q.  Are you sure of the date, other than late January?  Or what

20 is your --

21 A.  I'm not exactly sure the date.

22         I mean, it's not something I actually jotted down.

23 But around the 27th, or something like that.  28th.

24         MR. SALISBURY:  Okay.  Thank you, Mr. Witzel.

25         THE COURT:  Any other defense questions of the

Witzel - X

1  witness?

2         MS. MAXFIELD:  Just one, your Honor.

3         THE COURT:  Go ahead, Ms. Maxfield.

4                  CROSS-EXAMINATION

5  BY MS. MAXFIELD:

6  Q.  Mr. Witzel, had you ever visited the refuge during the

7  protest?

8  A.  No, I did not.

9         MS. MAXFIELD:  No further questions.

10        THE COURT:  Mr. Schindler?  Mr. Schindler?

11        MR. SCHINDLER:  Yes.  Thank you.

12                 CROSS-EXAMINATION

13  BY MR. SCHINDLER:

14  Q.  Mr. Witzel, were you carrying a firearm during your trip to

15  the doctor?

16  A.  No, I was not.

17        MR. SCHINDLER:  Thank you.  I have no further

18  questions.

19        THE COURT:  Ms. Cox?

20        DEFENDANT SHAWNA COX:  Yes.

21                 CROSS-EXAMINATION

22  BY DEFENDANT SHAWNA COX:

23  Q.  Mr. Witzel, do you recall meeting me?

24  A.  Excuse me?

25  Q.  Do you recall when you first met me?

Witzel - X - By Defendant Cox                    34

1    A.   Yes.

2    Q.   Where was that?

3    A.   In Frenchglen, at my residence.

4    Q.   And what was taking place there?

5    A.   Yourself and -- and some other individuals had been out

6    touring the area, as I had been told, and stopped by to visit

7    with me.

8    Q.   Do you recall Ammon Bundy being there?

9    A.   I do.

10   Q.   And what was our conversation, do you recall, about this

11   video?

12             MR. BARROW:   Objection, your Honor.

13             THE COURT:   The objection is -- there's an objection,

14   so I need to rule on it before the witness answers.   Excuse me,

15   sir.

16             State your objection.

17             MR. BARROW:   Relevance and calls for hearsay, your

18   Honor.

19             THE COURT:   What's the purpose for which this is

20   offered?

21             (Pause, Ms. Harris and Defendant Cox conferring.)

22             DEFENDANT SHAWNA COX:   Sorry.

23             (Pause Ms. Harris and Defendant Cox conferring.)

24             DEFENDANT SHAWNA COX:   Judge, may I ask a different

25   question?

Witzel - X - By Defendant Cox                35

1          THE COURT:  Please.

2          DEFENDANT SHAWNA COX:  Okay.

3   BY DEFENDANT SHAWNA COX:

4   Q.  Do you remember what the purpose of our visit was?

5   A.  I believe it was asked that if I had ever had any --

6          MR. BARROW:  Objection, your Honor.

7          THE COURT:  Let him answer the question.  I don't

8   know where this is going.

9          Go ahead, sir.

10          THE WITNESS:  If I had ever had any dealings with

11   BLM, and obviously, I have because I'm a permittee holder.

12          MR. BARROW:  I would object, your Honor.

13          THE COURT:  Basis?

14          MR. BARROW:  To relevance and it's calling for

15   hearsay.

16          THE COURT:  No, the objection is overruled.  That

17   answer can stand.

18          Go on.

19          THE WITNESS:  And if I had ever had any --

20          THE COURT:  No, sir, I meant to Ms. Cox.

21          THE WITNESS:  I'm sorry.

22          THE COURT:  She needs to ask a question, and then you

23   can answer.

24          (Pause, Ms. Harris and Defendant Cox conferring.)

25   BY DEFENDANT SHAWNA COX:

Witzel - X - By Defendant Cox

1   Q.  As a result of that conversation, did we take any further

2   steps?

3   A.  No.  Not that I'm aware of.

4   Q.  Did I ask you for a copy of the video?

5   A.  I don't believe so.  I didn't have a copy of the video.

6   Q.  Okay.  Did you show us something -- did you show us the

7   video?

8   A.  I believe that Ammon had it on his phone, and he showed me,

9   asked me if that was a video that I had filmed.

10  Q.  Okay.  And the --

11          (Pause, Ms. Harris and Defendant Cox conferring.)

12  BY DEFENDANT SHAWNA COX:

13  Q.  So did we discuss the video, from your perspective?

14  A.  Yeah, I believe so.  I believe it was asked of me.  You

15  know, different -- of different situations I had been in,

16  living out there with BLM.

17  Q.  And did you tell us about your experiences that you had had

18  with the BLM?

19          MR. BARROW:  Objection, your Honor.

20          THE COURT:  Don't -- don't explain the experiences,

21  but you can answer yes or no, whether you conveyed those to

22  them.

23          THE WITNESS:  Yes.

24  BY DEFENDANT SHAWNA COX:

25  Q.  Had you had many problems with the BLM over the years?

Witzel - X - By Defendant Ryan Bundy          37

1              MR. BARROW:  Objection, your Honor.

2              THE COURT:  You can answer that question, sir.  Yes

3   or no.

4              THE WITNESS:  I think that any time you're dealing

5   with working with someone, you're going to have differences and

6   sometimes problems, yes.

7              DEFENDANT SHAWNA COX:  No further questions.

8              THE COURT:  All right.  Any other questions?

9              Mr. Bundy, yes, go ahead.

10                     CROSS-EXAMINATION

11  BY DEFENDANT RYAN BUNDY:

12  Q.  Mr. Witzel, how are you today?

13  A.  Very good.  Thank you.

14  Q.  Have we met before?

15  A.  I don't believe so.

16  Q.  Did you ever come to the refuge while we were there?

17  A.  I did not.

18  Q.  Did not.

19              Okay.  After you were getting through the roadblocks

20  you were telling us about a minute ago, did you notice other

21  police presence in Burns?

22  A.  In Burns?

23              MR. BARROW:  Objection, relevance, your Honor.

24              THE COURT:  Overruled.  Go ahead.

25              THE WITNESS:  Yes.

Witzel - X - By Mr. Mumford                    38

1   BY DEFENDANT RYAN BUNDY:

2   Q.  Was it substantially more than normal?

3   A.  Yes.

4           THE COURT:  Mr. Bundy, establish the time period

5   you're referring to, please.

6   BY DEFENDANT RYAN BUNDY:

7   Q.  Again, that -- that date -- you said late January, January

8   27th or 28th, is what I'm referring to.

9           THE COURT:  Can you confirm that, sir?  Is that what

10  your answer related to?  It wasn't clear to me from the record

11  about the time.

12          THE WITNESS:  Yes, that's what I was referring to.

13          THE COURT:  Thank you.

14          Go ahead, Mr. Bundy.

15          (Pause, Mr. Roots and Defendant Ryan Bundy

16          conferring.)

17          DEFENDANT RYAN BUNDY:  That's fine.  I don't have any

18  other questions.

19          THE COURT:  All right.

20          Any other questions?

21          Yes, Mr. Mumford.

22                      CROSS-EXAMINATION

23  BY MR. MUMFORD:

24  Q.  Good morning, Mr. Witzel.

25          You -- when did you first meet Mr. Bundy?

Witzel - X - By Mr. Mumford

1   A.   I don't remember the exact date.  It would be when Ms. Cox

2   had just asked me about -- the group had stopped by my home

3   residence in Frenchglen.

4   Q.   Did you have an understanding as to why they stopped by

5   your home?

6   A.   I was assuming that they were -- they asked me if I had

7   ever had any dealings with BLM or had any problems with BLM.   I

8   think they were just out scoping, seeing if anyone in the area

9   had had any troubles with the BLM or other agencies.

10  Q.   And without -- without getting into the specifics of

11  anything, is -- is that a -- would you say that's a pretty --

12  pretty common concern?

13          MR. BARROW:   Objection, your Honor, relevance.

14          THE COURT:   The objection is sustained.

15  BY MR. MUMFORD:

16  Q.   And approximately -- I -- I was a little unclear.  When did

17  you say this meeting -- first meeting took place?

18  A.   I don't remember the exact date.  It was -- I -- I mean, I

19  really don't.  It was mid-January.  Mid, early January.  I --

20  yeah.

21  Q.   Were you aware of -- of -- of -- of them at the -- at the

22  refuge by that point?

23  A.   I had been told that they were holding a protest at the

24  refuge.

25  Q.   Okay.  And do you recall approximately how -- in -- in

Witzel - X - By Mr. Mumford

40

1    proximity to that -- the time that you first found out about

2    that, do you remember approximately when it was?  How -- how

3    much further time had passed before this first meeting?

4    A.   I would have to estimate.  Oh, maybe in a week's time, or

5    something.

6    Q.   Okay.  At that meeting -- at that meeting, did the subject

7    of the Hammonds come up?

8    A.   I don't -- I don't exactly recall.  But it -- it likely

9    did, with the different fire issues that we discussed.

10   Q.   Did you -- did you -- did you have other meetings with

11   Mr. -- Mr. Bundy after that?

12   A.   I did not.

13   Q.   Okay.  So getting back to that meeting, approximately how

14   long did it -- did it last for?

15   A.   I think that they were at my residence approximately an

16   hour, or something like that.

17   Q.   Did it look like -- and -- is it -- was it fair to

18   characterize them as sort of doing some -- part of their

19   investigation, perhaps, into -- into some things?

20   A.   Yeah.  I took it as an information gathering visit.  I

21   mean, just -- yeah.

22   Q.   Had you been familiar with the Hammonds' case, prior --

23   prior --

24            MR. BARROW:  Objection, relevance, your Honor.

25            THE COURT:  The objection is sustained.

Witzel - X - By Mr. Mumford                41

1  BY MR. MUMFORD:

2  Q.  When you heard about the occupation, did you -- did you get

3  an understanding as to what the motivations of those behind the

4  occupation were -- was?

5           MR. BARROW:  Objection, your Honor.  Calls for

6  speculation.

7           THE COURT:  I'm sorry?

8           MR. BARROW:  Objection.  Speculating the motives of

9  other people.

10           THE COURT:  No, it asks for a yes-or-no answer.  But

11  he's already testified about this point, so the objection is --

12  the Court is sustaining this on a cumulative ground.

13           Please move on.

14  BY MR. MUMFORD:

15  Q.  Okay.  In -- in the course of that -- in the course of that

16  discussion about -- about motivations of the occupation, did --

17  did the subjects -- did the subject of -- of trying to prevent

18  any -- any -- any -- like the -- the Fish & Wildlife employees

19  at the refuge from doing their carp studies, did that ever come

20  up?

21  A.  No, it did not.

22  Q.  Did -- did -- did they even talk about who the employees of

23  the refuge were?

24  A.  Did not hear them mention the employees at all.

25  Q.  These -- this -- this -- this video that you -- that you

Witzel - X - By Mr. Mumford                    42

1    describe about the -- the -- the -- the burning, you said -- in

2    your previous testimony, you said it was your -- your job -- it

3    was your job to stop the fire that came to the -- the --

4    corral.

5              Do you recall that?

6    A.  The owner of the corral area and the cattle area asked if I

7    could help his crew protect that facility.

8    Q.  And how did you do that?

9              MR. BARROW:  Objection, your Honor, to relevance.

10             THE COURT:  Sustained.

11             MR. MUMFORD:  Are you familiar with a back burn, sir?

12             THE WITNESS:  Yes.

13             MR. BARROW:  Objection, your Honor.

14             THE COURT:  Sir, this is irrelevant, his acts around

15   the fire.  The witness is here for purposes of authenticating

16   that he did a video, as to the defendants' state of mind; not

17   what he actually did there, sir.

18             Please move on.

19             MR. MUMFORD:  Thank you.

20   BY MR. MUMFORD:

21   Q.  These -- these cattle that you describe as being burned,

22   how do you know what -- what caused those injuries?

23             MR. BARROW:  Objection, your Honor.

24             THE COURT:  The objection is sustained.

25             MR. MUMFORD:  Hold on, a moment, your Honor.

Witzel - X - By Mr. Barrow

1    (Pause, Mr. Mumford and Defendant Ammon Bundy

2    conferring.)

3  BY MR. MUMFORD:

4  Q.  When you -- when -- when you described the fires in -- in

5  this video that you took, what were -- what -- what was the BLM

6  using to start those -- those -- those fires?

7    MR. BARROW:  Objection, your Honor.

8    THE COURT:  The objection is sustained.

9    MR. MUMFORD:  Thank you, your Honor.  No more --

10    THE COURT:  Any questions of the witness from the

11  Government?

12    CROSS-EXAMINATION

13  BY MR. BARROW:

14  Q.  Just one, sir.  The fire you described, the fire you

15  filmed, that was in July of 2012?

16  A.  That -- yes.

17    MR. BARROW:  No further questions.

18    THE COURT:  Thank you, sir.  You're free to go.

19    All right.  Next witness, please.

20    MS. HARRIS:  Linsay Tyler.

21    THE COURT:  Ask her in, please.

22    Ms. Tyler, would you come here, please, to the

23  witness chair.  Come all the way up.  Watch your step coming on

24  up.  And remain standing.

25    Please face the jury and the deputy there.  Raise

Tyler - D - By Ms. Harris                    44

1    your right hand -- there you go -- to be sworn.

2                (Witness sworn.)

3                THE WITNESS:  I do.

4                THE CLERK:  Please be seated and pull your chair all

5    the way forward.

6                THE COURT:  Bring yourself close to the microphone,

7    please.

8                Tell us your full name, and spell all of it.

9                THE WITNESS:  Linsay Tyler.  L-I-N-S-A-Y, T-Y-L-E-R.

10               THE COURT:  Thank you.

11               Ms. Harris.

12                        DIRECT EXAMINATION

13   BY MS. HARRIS:

14   Q.  Good morning, Ms. Tyler.

15   A.  Hello.

16   Q.  Can you tell the jury where you're from.

17   A.  I'm from Burns, Oregon.

18   Q.  Born and raised?

19   A.  Born and raised.

20   Q.  Who lives out there with you?

21   A.  My husband and my children.  My whole family lives in

22   Burns.

23   Q.  What do you do for work in Burns?

24   A.  I currently work at a cell phone company and am an agent.

25   Prior to that, I was a stay-at-home mom.

Tyler - D - By Ms. Harris

1   Q.   What does your husband do?

2   A.   He's a rancher.

3   Q.   Last year, toward the end of 2015, did you become involved

4   in an effort to help the Hammonds?

5   A.   I got involved on December 22nd.  I went to a meeting that

6   was at Ye Old Castle.

7   Q.   Could you tell us, first, what's the -- for those of us who

8   are not from Burns, what's Ye Old Castle?

9   A.   It's a restaurant that's across the street from Safeway.

10  Q.   And about how many people were at this meeting?

11  A.   I would say there was probably close to 25 or 30 people at

12  that meeting.

13  Q.   Were those all people from town or elsewhere?

14  A.   People from town, ranchers, loggers.  Sheriff Ward was

15  there, Lucas McLain, Ammon.

16  Q.   And what did you understand the focus of that meeting to

17  be?

18  A.   My understanding, the focus of the meeting was that it was

19  to address the redress -- the redress of a grievance.  And

20  Sheriff Ward had no response when it was brought up in the

21  meeting, how come he had never addressed it.

22  Q.   And at that point, what did you understand this redress of

23  grievances to be about?

24  A.   My understanding of it, they were trying to get answers of

25  as to why the Hammonds were --

Tyler - D - By Ms. Harris

1          MR. GABRIEL:  Objection, your Honor.

2          THE COURT:  Hold on.  Hold on.  When there's an

3  objection, you need to stop so I can rule.  State --

4          MR. GABRIEL:  This witness's understanding of the

5  redress of grievances is not relevant.

6          THE COURT:  The objection is sustained.

7          Jurors, disregard the answer.  Let's focus on what's

8  admissible, please, Ms. Harris.

9  BY MS. HARRIS:

10 Q.  What was the -- what was the question being posed at the --

11 at the meeting, of the sheriff?

12 A.  Why it wasn't addressed.

13 Q.  Did -- what was the -- generally speaking, what was the

14 atmosphere like at this meeting?

15 A.  It was good.  It was welcoming.  It was just like sitting

16 there talking.

17 Q.  And what got you interested in coming to this meeting in

18 the first place?

19 A.  Because the Hammonds were serving a -- their second term in

20 prison for a crime that federal employees do every day.  That's

21 why.  It's absolutely wrong what happens to the ranchers.

22 (Crying.)

23 Q.  So after this -- do you need a minute?

24 A.  No.  I'm good.  Thank you.

25 Q.  Sure.  So after this meeting, did your involvement in this

Tyler - D - By Ms. Harris

1    cause, let's say, continue?

2    A.   Yes.

3    Q.   Did you attend a rally --

4    A.   I did.

5    Q.   -- in Burns in January?

6    A.   Yes.

7    Q.   Who went with you to that?

8    A.   I went with my brother and my husband and a friend of my

9    brother's and my dad.

10   Q.   Had you been sort of a marcher or protestor kind of person

11   before this?

12   A.   No, I wasn't, but finding out what happened to the Hammonds

13   and talking to Ammon, I have become one.

14   Q.   After the -- the March through Burns, did you wind up at

15   the fairgrounds?

16   A.   I did.

17   Q.   Can you tell us what was happening out there?

18   A.   Just a bunch of talking, trying to figure out what had

19   happened.

20        I don't really remember everything about being at the

21   fairgrounds.  There was a lot of people.  There was a few

22   different speakers.

23   Q.   At that point, when you're at the fairgrounds, did the

24   subject of the -- the Malheur National Wildlife Refuge come up?

25   A.   The subject had came up yes.

Tyler - D - By Ms. Harris

1  Q.  And was that through people you were standing with or

2  speakers who were using a bullhorn?  Or can you tell us how

3  that came about?

4  A.  Some of it was speakers, because nobody really knew for

5  sure, you know what had happened.  So some of it had come out

6  through speakers and we just weren't understanding, you know,

7  what had taken place.

8  Q.  At some point after this -- after the marching part of the

9  rally, did you understand or become aware that protestors had

10  shown up at the refuge?

11  A.  I was aware, yes.

12  Q.  And did you eventually go out and visit the refuge?

13  A.  I did.  I went out on January 4th, January 6th, and then

14  one other time that was later on; I think in the second week of

15  January.

16  Q.  Okay.  So let's talk about your first visit, for a second.

17         Who went out there with you?

18  A.  It was family that went out there with me on the first

19  visit.

20  Q.  And tell us what happened when you first -- well, were you

21  all in the same car or were you --

22  A.  Yes.  No, we were all in the same car, the first time I

23  went to the refuge.  My sister-in-law and I actually got out of

24  the pickup, walked down to the refuge by ourselves, just from

25  the top, main road right there.  Walked in.  And upon arriving

Tyler - D - By Ms. Harris                    49

1    there, Commissioner Dan Nichols was standing outside, talking

2    on the telephone.  We walked into the building, sat down.

3    Everything was -- it was a great atmosphere.

4            And then Dan Nichols had came in and sat down, and

5    Buck Taylor, a local rancher was sitting next to him.

6    Q.  So let's back up a little bit.

7            Did you encounter anyone when you first entered?  Was

8    there like a check-in station or a place where you needed to

9    get through in order to access the refuge?

10   A.  There may have been somebody up there.  But if there was,

11   it wasn't a problem.  It wasn't an issue getting down there to

12   go talk to Ammon.

13   Q.  Were you nervous when you were first walking in?

14   A.  No, not at all.

15   Q.  And so you saw -- who -- who's Dan Nichols?

16   A.  He's the commissioner of Harney County.

17   Q.  And at that point, when you first saw him, he was talking

18   on his cell phone?

19   A.  He was talking on his cell phone, outside the building,

20   when I first saw him.

21   Q.  And did you later see him inside the building?

22   A.  Inside the building, yes.

23   Q.  Can you tell us which -- to the best of your recollection,

24   which building that was?  Or just describe it?

25   A.  There was, I believe, a wooden desk.  There was stairs that

Tyler - D - By Ms. Harris

1  led to an upstairs.  And then there was -- it was like a

2  kitchenette-type deal.  It had some cupboards and a sink and

3  had a bathroom to the right-hand side, when you walked in, to

4  the door.

5  Q.  So this was an area, based on what you could see, that had

6  a staircase leading to an upper -- like a loft area?

7  A.  Um-hmm.

8  Q.  And so inside this office, what did you see happening?

9  A.  People talking.

10  Q.  And who was it that was talking with the commissioner?

11  A.  Ammon.

12  Q.  Did you stay, or did you feel like you were intruding and

13  then did you back out?

14  A.  No.  I didn't feel like I was intruding at all.  My husband

15  and my brother and my sister-in-law stayed.

16  Q.  And what was the -- what was the atmosphere like in this

17  meeting?

18  A.  It was good.  Positive.  There was some laughs, and it

19  was -- it was a good atmosphere.

20  Q.  Was the commissioner arguing with Mr. Bundy?

21  A.  No.  I -- I don't believe that he was arguing.  He was -- I

22  would say that he was curious, asking questions.

23  Q.  Was Mr. Bundy explaining anything about sort of the reason

24  for being there or the mission of the group?

25  A.  I -- I believe so.  And I -- I think is what he was

Tyler - D - By Ms. Harris                    51

1   explaining that day --

2             MR. GABRIEL:  Objection, your Honor.

3             THE COURT:  Basis?

4             MR. GABRIEL:  The basis is hearsay.  The question has

5   been answered that Mr. Bundy was explaining why -- why he was

6   there.

7             THE COURT:  The objection is sustained.

8             MR. GABRIEL:  Beyond that --

9             THE COURT:  Move on.

10  BY MS. HARRIS:

11  Q.  Was Mr. Bundy using anything like a visual aid or a diagram

12  or anything like that?

13  A.  He did have a -- a big sheet of paper that he was using to

14  explain things.

15  Q.  And about how long did you stay?

16  A.  I would have to say we were there probably around two

17  hours.

18  Q.  The next time you were there, that was January 6th?

19  A.  Um-hmm.

20  Q.  Did you bring anything with you to this visit?

21  A.  I did.  I had had some friends that had made cakes and

22  cupcakes, and I took them with me to the refuge.  And I brought

23  friends with me that time, when I went back to the refuge.

24  Q.  So did you see anyone you knew from town at this visit?

25  A.  Yes.

Tyler - D - By Ms. Harris                    52

1    Q.  Who -- who was that?

2    A.  I -- well, I had actually had people meet me there, and I

3    had traveled with three other friends down to the refuge.

4    Q.  Are -- is your neighbor a person who's on the committee of

5    safety?

6    A.  Yes, he is.

7    Q.  And do you have an understanding of who, from town, is --

8    is on the committee of safety?

9    A.  Yes.

10   Q.  Did you recognize people from the committee of safety on

11   this --

12   A.  Yes.

13   Q.  -- on the 6th, when you went to the refuge?

14   A.  I did.

15   Q.  Did you -- did you know why they were there that day?

16          MR. GABRIEL:  Your Honor, objection.

17          THE COURT:  The objection is sustained.

18          Move on.

19   BY MS. HARRIS:

20   Q.  Did you have a chance to talk with anyone from the

21   committee of safety that day on the 6th?

22   A.  I did.  I had a chance to talk with some people from the

23   committee of safety and they had --

24          THE COURT:  Don't say what they said.

25          MR. BARROW:  (Standing.)

Tyler - D - By Ms. Harris                    53

1          THE COURT:  The answer is you've had a chance.  Don't

2     elicit the witness's conversation.

3               Move on, please.

4     BY MS. HARRIS:

5     Q.  And without going into the substance of their conversation,

6     did you -- did you understand them to be having a meeting?

7     A.  Yes.

8     Q.  Okay.  Did you -- did you meet Shawna Cox during this

9     visit?

10    A.  I did.

11    Q.  What was she up to?  What was she doing?

12    A.  Walking around, being a Chatty Cathy.

13    Q.  Was she armed?

14    A.  No.

15    Q.  What was the atmosphere like at this -- there during this

16    visit?

17    A.  It was great.

18    Q.  After your visit to the refuge on the 6th, did Ms. Cox

19    follow -- follow you into town from the refuge?

20    A.  Yes, she did.  She stopped to get bird seed at a local feed

21    store.

22    Q.  Do you know where she was headed after that?

23    A.  She was going to the town hall meeting that was at the

24    fairgrounds that night.

25    Q.  We've had a -- I think we've talking a little bit about

Tyler - D - By Ms. Harris                    54

1    some of the meetings that happened in town.

2            Did you go to that meeting also?

3    A.   I did.

4    Q.   Was this the meeting where there was sort of a show of

5    hands or a vote about folks at the refuge?

6    A.   You mean a trick question?  Yeah.

7            MR. GABRIEL:  Your Honor, I'm going object to this

8    line of questioning, your Honor.

9            THE COURT:  What's the basis, please?

10           MR. GABRIEL:  Well, as Ms. Harris said, it's done.

11   It's done.  We'll take it up outside -- outside the presence of

12   the jury.

13           THE COURT:  Is there an objection or is there not?

14           MR. GABRIEL:  There is not an objection.

15           THE COURT:  All right.  Continue, please.

16   BY MS. HARRIS:

17   Q.   Sure.  Just wanted to clarify the purpose of that meeting.

18           So was there -- the last time you went, was that

19   mid-January sometime?

20   A.   Yeah, I can't remember the exact date, but it was that

21   following week.

22   Q.   And who went with you and what were you -- what were you

23   doing that time?

24   A.   I had went with my friend, BJ Soper.  And we had just made

25   a brief stop at the refuge.  And I think we had dropped off

Tyler - X - By Defendant Bundy                    55

1    coffee, and that was it.

2    Q.  Dropped off coffee?

3    A.  Coffee, yeah.

4    Q.  At any of these visits, did you see people wearing

5    camouflage outfits?

6    A.  No.

7    Q.  Did you see people carrying rifles?

8    A.  You know, I -- I -- I wouldn't remember if I did, because

9    I've grown up around firearms, and it's not something that

10   would stand out to me.

11   Q.  Since the -- well, did you hear any of the folks at the

12   refuge making any threats toward federal employees?

13   A.  No.

14   Q.  Since the occupation, have you become more involved in the

15   committee of safety?

16             MR. GABRIEL:  Objection to relevance, your Honor --

17             THE COURT:  Sustained.

18             MS. HARRIS:  Thank you.  That's all I have.

19             THE WITNESS:  Thank you.

20             THE COURT:  Other defense questions of the witness?

21             DEFENDANT RYAN BUNDY:  (Raising hand.)

22             THE COURT:  Yes, Mr. Bundy.

23                      CROSS-EXAMINATION

24   BY DEFENDANT RYAN BUNDY:

25   Q.  Ms. Tyler, how are you doing today?

Tyler - X - By Defendant Bundy

1    A.   Good.   How are you?

2    Q.   I'm doing all right.

3              While we were at the refuge -- well, let me ask you

4    this.

5              Do you know any -- personally know any employees of

6    the Fish & Wildlife Service or BLM?

7    A.   My sister-in-law's boyfriend works for the refuge.

8    Q.   Thank you.

9              Did any of them -- or I guess he -- since he's the

10   only one you knew -- ever ask if it was safe to go to work out

11   there?

12             MR. GABRIEL:  I'm going to object, your Honor, to

13   basis of knowledge.

14             THE COURT:  The objection is sustained.

15             DEFENDANT RYAN BUNDY:   Okay.

16   BY DEFENDANT RYAN BUNDY:

17   Q.   Did you hear any of the occupiers talking about stopping

18   the workers from coming to work?

19   A.   No.

20             MR. GABRIEL:  Objection.  This is cumulative as well.

21             THE COURT:  The objection is sustained.  That was

22   already covered.  Please cover something new.

23   BY DEFENDANT RYAN BUNDY:

24   Q.   While you were visiting at the refuge with us, did you ever

25   participate in prayer?

Tyler - X - By Defendant Bundy

1    A.   Yes.   Every time I was there.

2    Q.   Um-hmm.   Did you observe whether the protesters brought --

3    brought poverty or prosperity to the businesses of Burns?

4    A.   Prosperity.

5                 MR. GABRIEL:   Objection, your Honor.

6                 THE COURT:   The objection is sustained.

7                 Jurors, disregard the question and the answer.

8                 Next question, please.

9    BY DEFENDANT RYAN BUNDY:

10   Q.   Sure.   Were you aware there were undercover agents

11   throughout the town?

12   A.   It wouldn't have been until after the occupation.

13   Q.   Okay.   Did you ever become aware that some of those

14   undercover agents were posing as patriots?

15                MR. GABRIEL:   I'm going to object on relevance

16   grounds.

17                THE COURT:   The objection is sustained.

18   BY DEFENDANT RYAN BUNDY:

19   Q.   Can you contrast for us the atmosphere at the refuge with

20   the atmosphere of -- in town?

21                MR. GABRIEL:   Objection, relevance.

22                THE COURT:   The objection is sustained as cumulative.

23   We've had six witnesses talking about this.

24                So please ask something new.

25   BY DEFENDANT RYAN BUNDY:

Tyler - X - By Mr. Salisbury                58

1   Q.  Where were you more comfortable?

2   A.  The refuge.

3           MR. GABRIEL:  You know, your Honor, these lines of

4   questioning have been sustained time and time again, and the

5   defense continues to ask that.

6           THE COURT:  The objection is sustained again.

7           Jurors, disregard the answer and the question.

8           Mr. Bundy, please ask a question that has not been

9   the subject of multiple rulings.

10          Ask a new question.

11  BY DEFENDANT RYAN BUNDY:

12  Q.  Did you meet me while you visited the refuge?

13  A.  I did.

14  Q.  Did I treat you well?

15  A.  You did.

16  Q.  Did you witness me treating anybody unfairly, unright?

17  A.  Never.  No.

18          DEFENDANT RYAN BUNDY:  Thank you.  I don't have any

19  other questions right now.

20          THE COURT:  All right.  Other defense questions of

21  the witness?

22          Yes, Mr. Salisbury.

23          MR. SALISBURY:  Thank you.

24                      CROSS-EXAMINATION

25  BY MR. SALISBURY:

Tyler - X - By Mr. Salisbury

1  Q.  Good morning, Ms. Tyler?

2  A.  Hello.

3  Q.  I'm curious.  You said about the first time you went to the

4  refuge that you saw one of the county commissioners there --

5  A.  Yes.

6  Q.  -- at the refuge.

7          And who was that?

8  A.  Commissioner Dan Nichols.

9  Q.  Okay.  Does the -- what do the commissioners do in Harney

10  County?

11          MR. GABRIEL:  I'm going to object to relevance, your

12  Honor.

13          THE COURT:  The objection is sustained.  It's a basic

14  fact of government.  You don't need to go into that now.

15          Ask the witness of her factual knowledge, please, and

16  let's move on.

17  BY MR. SALISBURY:

18  Q.  When you saw the county commissioner talking to Ammon

19  Bundy, what was your impression of the protest?

20          MR. GABRIEL:  Objection, relevance.

21          THE COURT:  The objection is sustained.

22          Next question, please.

23          MR. SALISBURY:  No further questions.

24          THE COURT:  Other defense questions?

25          Mr. Schindler?

Tyler - X - By Mr. Mumford

1          MR. SCHINDLER:  Yes, please.  Thank you, your Honor.

2                       CROSS-EXAMINATION

3    BY MR. SCHINDLER:

4    Q.  Good morning, Ms. Tyler.

5          During the times that you were at the refuge, did you

6    see anyone damaging refuge property?

7    A.  No.  They were actually shoveling off the side walk, so I

8    don't believe that they would be damaging government property.

9    Q.  And how many total hours would you say you spent out at the

10   refuge during the occupation?

11   A.  I would say probably a total of around six to eight hours.

12   Q.  Did you ever hear any gunshots during the time that you

13   were there?

14   A.  No.

15   Q.  When you brought cakes to the refuge, did you believe you

16   were providing material support to criminal conspirators?

17          MR. GABRIEL:  I'm going to object, your Honor.

18          THE COURT:  The objection is sustained as

19   argumentative.

20          Please, Mr. Schindler.

21          MR. SCHINDLER:  Thank you, your Honor.  No other

22   questions.

23          THE COURT:  Other questions?

24          Yes, Mr. Mumford.

25                       CROSS-EXAMINATION

Tyler - X - By Mr. Mumford                    61

1  BY MR. MUMFORD:

2  Q.  You mentioned that you saw Commissioner Nichols there.

3         Did you see other political leaders during your

4  visits to the refuge?

5  A.  No, I didn't.

6  Q.  You mentioned that he was talking with Mr. Buck Taylor.

7  A.  Um-hmm.

8  Q.  And is -- is that significant?

9         MR. GABRIEL:  I'm going to object, your Honor.

10        THE COURT:  I don't know where it all is going.  I

11  can't tell until I hear the answer.

12        Go ahead and answer, if you understand what's being

13  asked of you.

14        THE WITNESS:  I believe that Buck Taylor used to

15  serve on the hospital board.  It was probably about five years

16  ago.  And he's a very prominent rancher in Harney County.

17  BY MR. MUMFORD:

18  Q.  Now, do you have experience with ranching, then?

19  A.  I really don't.  My husband does.  But I was a stay-at-home

20  mom, so I couldn't do much.

21  Q.  Okay.  And what does your husband do?

22        MR. GABRIEL:  Objection to relevance.

23        THE COURT:  The objection is sustained.

24        Let's move on, please.

25        MR. MUMFORD:  Okay.

1   BY MR. MUMFORD:

2   Q.  Was -- did you -- do you have any involvement or exposure

3   to the committee of safety prior to the -- well, I guess, when

4   was your first exposure to that?

5   A.  My first --

6             MR. GABRIEL:  Your Honor, I'm going to object.  We

7   covered the committee of safety exhaustively yesterday, and I

8   would object to it as being cumulative to other witness's

9   testimony.

10            THE COURT:  Don't yet know if it's cumulative.

11            This is a foundational question.  You may answer this

12   question:  When were you first exposed to it?

13            THE WITNESS:  I was first exposed to the committee of

14   safety the -- my second visit to the refuge, which would have

15   been January 6th.  And then it was after that that I had

16   started going to the meetings.

17   BY MR. MUMFORD:

18   Q.  And did you -- you got involved.  Why -- why did you get

19   involved with the committee of safety?

20            MR. GABRIEL:  Objection to relevance, your Honor.

21            THE COURT:  Sustained.

22   BY MR. MUMFORD:

23   Q.  Were you -- did you participate in meetings with the

24   committee of safety when you were out there?

25   A.  I did.

Tyler - X - By Mr. Mumford

1    MR. GABRIEL:  I'm going to object to relevance and --

2    THE COURT:  Get to the point, please, Mr. Mumford, or

3    we need to move on to another question.

4    This cumulative nature of this testimony has already

5    been established.  I've sustained two objections.

6    Now, if there's something new about this witness's

7    involvement, you may ask it; but, otherwise, we need to move

8    on.

9    MR. MUMFORD:  I think it goes to the --

10    THE COURT:  Ask the question that establishes

11    something new, or move on, please.

12    BY MR. MUMFORD:

13    Q.  And what was -- what was the meeting of the committee of

14    safety out at the refuge?  And why did that interest you?

15    A.  The meeting that the committee of safety had went to for

16    the refuge, a couple of -- they had drafted a letter.  And

17    something about they were going to possibly ask Ammon to leave,

18    but they were split.  They couldn't come to a decision.

19    Q.  And -- (pause, referring).

20    MR. MUMFORD:  Excuse me, sorry, your Honor.

21    BY MR. MUMFORD:

22    Q.  Ms. -- Ms. -- Ms. Tyler, does the committee of safety put

23    out a -- a newsletter?

24    MR. GABRIEL:  Object to relevance.

25    THE COURT:  The objection is sustained.

1    BY MR. MUMFORD:

2    Q.  What -- what would you say your involvement in this --

3              THE COURT REPORTER:  I'm sorry.  I can't --

4              THE COURT:  I can't hear you at all, Mr. Mumford.

5              MR. MUMFORD:  Sorry, your Honor.

6              I was asking the witness what would you say your --

7    your -- your position in this movement is, at this point?

8              MR. GABRIEL:  Objection, relevance.

9              THE COURT:  The objection is sustained.

10             MR. MUMFORD:  It goes --

11             THE COURT REPORTER:  I'm sorry.  I can't hear you.

12             MR. MUMFORD:  It goes to credibility here, your

13   Honor.

14             THE COURT:  No, it does not.  The objection is

15   sustained.

16             Let's get going, please.

17   BY MR. MUMFORD:

18   Q.  You -- you -- you made a passing reference to a trick

19   meeting?

20   A.  Um-hmm.

21   Q.  Why do you call it that?

22             MR. GABRIEL:  I'm going to object, your Honor.

23             THE COURT:  The objection is sustained.

24             You may argue the point from the evidence already in

25   the record.  The witness's answer is already in the record.

Colloquy

1    We're not going to elaborate on it.

2            Move on, please.

3            MR. MUMFORD:  Thank you, your Honor.

4            Thank you, Ms. Tyler.  That's --

5            THE COURT:  All right.  Questions?

6            MR. GABRIEL:  No cross-examination.  Thank you,

7    Ms. Tyler.

8            THE COURT:  Thank you.  You're free to go.  Step on

9    down.

10           All right.  Jurors, we'll take the morning recess

11   now.  Please leave your notes on the chair.  Remember, do not

12   talk about the case or anything it involves.

13           Enjoy about 15 minutes, and we'll be back with you

14   then.

15           Everyone stand for the jurors, please.

16           Watch your step.

17           (Jurors exit at 10:23 a.m.)

18           THE COURT:  Thank you, everyone.  Please be seated.

19           All right.  So, Mr. Mumford, is the next witness

20   Mr. Bundy?

21           MR. MUMFORD:  I don't know, your Honor.  We have

22   to -- I need a moment to -- to -- to discuss --

23           THE COURT:  All right.  Very well.

24           If that's the case, however, after the recess he

25   should be seated at the witness stand, so he's there when the

Colloquy

1    jurors come in.  All right?

2            You may confer.

3            Ms. Ludwig, were you about to stand?

4            MS. LUDWIG:  No, your Honor.

5            THE COURT:  All right.  Who was?

6            MS. LUDWIG:  I will.

7            THE COURT:  No, it seemed like somebody was trying to

8    get my attention here.

9            All right.  Yes, Mr. Mumford?

10           MR. MUMFORD:  I was wanting to get your attention,

11   your Honor.  Two things.

12           I -- I had understood that the Court's ruling was

13   that with Mr. Witzel, we could ask about the details of the

14   video because it wasn't coming into evidence.

15           THE COURT:  What I said was he could give a general

16   description and not the details.

17           I'm not revisiting that issue.  Do you have another

18   point?

19           MR. MUMFORD:  Well, obviously we -- we do reserve our

20   objection.

21           Second, the -- the -- it isn't cumulative.  You know,

22   these -- these objections are coming in before -- before we

23   even get a chance to -- you know, to hear what these witnesses

24   have.  And just because -- just because they present, you know,

25   this presentation of -- of -- of photos and -- and guns that

Colloquy

 1    are misleading, concerning the occurrences there -- and they --

 2    they want to suggest that it was that way the whole time.

 3          That doesn't mean that -- I mean, there were 27 days

 4    of occupation here that are being -- that have been

 5    characterized.  And so for -- and so for the Government to

 6    stand up every time and stop examination when it's -- it's

 7    different days, it's different people, it's different events,

 8    it's different -- it's different meetings.  That -- that's --

 9    that is not -- that cannot be cumulative.

10          We -- we must be able to present our -- our -- our

11    defense case here, which is a rebuttal, and -- and -- and to --

12    and -- and negation of their case here, your Honor -- here,

13    your Honor.  So -- so that is my objection.

14          And they have -- they have spanned this -- this

15    alleged conspiracy over -- over the course of two months, here,

16    with -- with all sorts of insinuation, with -- with -- with --

17    with -- you know, with nothing.

18          I think that we counted, your Honor, other than

19    federal agents, and federal agents who don't know anything,

20    there were three people, is all, and two of those people were

21    paid.  And the other one said -- he said almost just the exact

22    opposite of -- of -- of what they put him on the stand to say.

23    So we've got to be able to present our defense here.

24          Thank you.

25          THE COURT:  Does the Government care to respond?

Colloquy

1    MR. GABRIEL:  Your Honor, I'll just simply say that

2  we're not -- we're not objecting to cumulative questions on

3  different meetings.  We're objecting to cumulative questions

4  from different lawyers.

5    So that's our position, and I think that the Court

6  understands what's happening.

7    THE COURT:  Well, part of the difficulty is

8  determining what is relevant to the case and what is

9  unnecessary repetition.

10    So I sustained a number of objections yesterday

11  afternoon talking about the character of this committee on

12  safety.  That was already established.

13    Witnesses' perceptions about what was going on at the

14  refuge are being allowed in.  I'm not sustaining objections

15  there.

16    So what I need the parties to do is to be sure that

17  they're offering the jury new perspectives and new matters

18  about things that are contested.

19    The fact of the existence of the committee of safety

20  is not a contested issue.  It's been established repeatedly.

21    So take care that when you're asking questions, you

22  make the point that it's something new or that reflects

23  corroboration that is different than what's already in the

24  record, and I'll consider the issue accordingly.  But I'm not

25  going to permit repeated questions that cover matters that have

Colloquy

1  already been adequately established.  By my count, now, we've

2  had six witnesses talking about the conditions of the refuge,

3  and I've permitted all of them.

4           So we'll take a ten-minute recess.  Well, we'll take

5  a recess.

6           Let Mr. Bundy, Mr. Bundy, and Mr. Fry leave.  And

7  then as soon as they're ready, the marshals should bring them

8  back.  And then Mr. Mumford needs an opportunity to speak,

9  finally, with Mr. Bundy.

10          MR. MUMFORD:  And that was my question.  How -- how

11  can I arrange that?  Is that --

12          THE COURT:  You can't do it right where you are?

13          MR. MUMFORD:  We -- we can.

14          THE COURT:  As soon as Mr. Bundy's finished, he'll

15  come back, and you'll have a chance to confer.

16          MR. MUMFORD:  Thank you.

17          THE COURT:  All right.  We're in recess.  But

18  everybody stay seated please.  Everybody stay seated, please.

19  Everybody.

20          All right.  We're in recess.

21          (Recess taken at 10:29 a.m.)

22          (Conclusion of first excerpt.)

23          (Sealed proceedings reported and not transcribed

24          herein.)

25                            -0-

Colloquy

```
 1              (Second excerpt.)

 2              (Audience members enter courtroom at 10:50 a.m.)

 3              THE COURT:  Pam.

 4              (Pause, the Court and clerk conferring.)

 5              THE COURT:  All right.  Mr. Salisbury, go ahead.

 6              MR. SALISBURY:  Yes, your Honor.

 7              Looks like for today we had Chris Briels, Michelle

 8      Fiori.  I show potentially Jason Patrick.  And that was in

 9      addition to Mr. Bundy, obviously.

10              For tomorrow, Brandon Rapolla.  Becky --

11              THE COURT:  Would you spell the last, please.

12              MR. SALISBURY:  Sure.  R-A-P-O-L-A [sic].  Rapolla.

13              MS. HARRIS:  Two Ls.

14              MR. SALISBURY:  Oh, R-A-P-O-L-L-A.

15              Becky Kingen, K-I-N-G-E-N.  Charmagne (phonetic)

16      Edwards.  Rodney Cooper, Christy Cooper.  Jenice.  Jenice

17      Tobias.

18              THE COURT:  Spell that, please.

19              MR. SALISBURY:  Oh, Janice.  First name is

20      J-A-N-I-C-E.  Last name, T-O-B-I-A-S.

21              THE COURT:  Thank you.

22              MR. SALISBURY:  Sue Bush and Ed Snipes.

23              For Thursday, Sheriff Mack.  Lindsey Taylor.

24              THE COURT:  She already testified.

25              MR. SALISBURY:  Is that different?
```

Colloquy

```
 1              THE COURT:  Tyler.

 2              MR. SALISBURY:  Different person?  A different

 3     person, your Honor.

 4              Lindsey Taylor, T-A-Y-L-O-R.  Buck Taylor.  Chuck

 5     Stephenson, who is the expert.  Linda Gainer.  Anna Jo Server.

 6     Rusty Hammond.  And Jeanette Finicum.

 7              THE COURT:  Go on.

 8              MR. SALISBURY:  Would you like to hear.  That's

 9     Thursday.  So next week would be Tuesday.

10              Louis Smith.  Holly Hansard, H-A-N-S-A-R-D.  Todd

11     McFarland.

12              (Pause, conferring.)

13              MR. SALISBURY:  Oh, Jimmy O'Hagan.  Don Cox, C-O-X.

14     Lynette Foster.  Dianne Holthaus, H-O-L-T-H-A-U-S.  And Sheila

15     Dutton for next Tuesday.

16              For next Thursday.  Would you like that one, your

17     Honor?

18              THE COURT:  Please continue.

19              MR. SALISBURY:  Dr. Michelle Guyton.  Marsha

20     Bostedor.  That's B-O-S-T-E-D-O-R.  Terry Linnel, L-I-N-N-E-L.

21     Sandy Potter.  Christy Davis.  Carl Koenig -- Koenig,

22     K-O-E-N-I-G.

23              I'm just the messenger, your Honor.

24              THE COURT:  I don't know what that means.

25              MR. SALISBURY:  Oh, I don't know how to pronounce a
```

Colloquy

1    lot of these names.  I'm doing my best, though.

2          THE COURT:  Go ahead.

3          MR. SALISBURY:  That was for next Thursday.  That's

4    all I have for now, your Honor.

5          There's other names here.  I don't know whether we

6    knew we were -- what we were doing for next Friday.

7          THE COURT:  Well, we're in session because Monday is

8    a holiday.  We are in session.  That's been part of the Court's

9    management orders for quite a while.

10          MR. SCHINDLER:  Well, Mr. Medenbach will be

11   testifying at some point, your Honor.

12          THE COURT:  Okay.

13          MR. SCHINDLER:  And I suspect his -- his testimony is

14   going to take several hours.

15          THE COURT:  Mr. Kohlmetz, you started to rise, when

16   your client's name was stated.

17          MR. KOHLMETZ:  Your Honor, I -- I've heard rumbling

18   that Mr. Patrick might be subpoenaed.  I have heard nothing

19   specific.  I will do my best to make myself available, should

20   he choose to testify, but it would be my advice that

21   Mr. Patrick stand on his Fifth Amendment privilege and not

22   testify in this proceeding.

23          I might request a brief in camera hearing before,

24   so -- but I need to know.

25          THE COURT:  Well, of course, you do.  Of course, you

Colloquy

1  do.

2          So he -- it's certainly not a situation that can be

3  resolved this morning as a witness to be called for now.

4          And, so before anyone mentions Mr. Patrick's name in

5  the presence of the jury, Mr. Kohlmetz needs to be consulted

6  and a schedule needs to be worked out with me so that I can

7  address the matter as Mr. Kohlmetz and Mr. Patrick need me to

8  do, potentially outside the presence of the parties or not.

9  But we need to respect those issues.

10          So he clearly isn't someone potentially on tap for

11  today.

12          So there were two other witnesses mentioned for today

13  besides Mr. Bundy.  Mr. Briels and Ms. Fiori.

14          MR. SALISBURY:  Correct.

15          THE COURT:  Are they here?

16          MR. SCHINDLER:  I think Mr. Briels is on his way.  I

17  think that was the witness that was a few blocks from the

18  courthouse.  So he should be here any minute.  We can

19  proceed --

20          THE COURT:  All right.  Has there been a proffer to

21  the Government on Mr. Briels and Ms. Fiori?

22          MR. GABRIEL:  Your Honor, we have a proffer with

23  respect to Mr. Briels but not with Ms. Fiori.

24          THE COURT:  Somebody -- whoever is calling Ms. Fiori

25  needs to meet with a prosecutor right now, out in the hall, and

Colloquy

1   get this accomplished.

2        MR. BARROW:  And, your Honor, while -- Mr. Knight, I

3   believe, is going to do that.  The proffer we have for

4   Mr. Briels is indistinguishable from prior witnesses.  The

5   proffer is that he had several visits to the refuge and he

6   would testify to the cleanliness of the refuge, and the

7   nonthreatening nature of those who were at the refuge and that

8   the town was filled with law enforcement, and the courthouse

9   was a fortress.  That's my understanding of what he would

10  offer, and we believe that's cumulative.

11       THE COURT:  Mr. Schindler?

12       MR. SCHINDLER:  The Government is correct that

13  Mr. Briels went to the refuge.  He was a member of the

14  committee of safety.  He visited on at least four different

15  occasions.  So he's going to testify to his personal

16  perceptions of what was going on at the refuge.

17       The other fact that's important for us is that

18  Mr. Briels apparently identified FBI agents that were in town,

19  posing as something else, which would only be -- is only

20  relevant because Mr. Briels went down to the refuge and then

21  conducted a press conference in conjunction with many of the

22  defendants in this room.

23       And so one of the issues is to what extent do these

24  defendants understand about this militarization that's going on

25  around them, in terms of their own possession of weapons in

Colloquy

1  this matter, your Honor.

2          So Mr. Briels would offer limited testimony about

3  this experience and about his perception of the military

4  quality to what was going on around town only as it relates to

5  the fact that he then went to the refuge and conducted a press

6  conference to discuss those things.

7          I don't intend to put on evidence of the entire press

8  conference.  But literally, after he gets done telling this

9  story, Ammon Bundy steps up to the microphone.

10          So -- and then Shawna Cox is visible, and it's clear

11  that a number of defendants are present for his discussion of

12  these FBI issues in town.

13          And so it goes to their awareness of that, in the

14  town, and the fact that that may have contributed to the

15  presence of firearms.

16          MR. BARROW:  Your Honor, of course it was

17  Mr. Schindler that filed a lengthy motion in limine to exclude

18  all of this evidence in the Government's presentation.  And I

19  believe the Court granted that motion in part because there

20  would be a trial within a trial about whether the response

21  to -- the law enforcement response was appropriate.

22          As for Mr. -- Mr. Briels testifying about confronting

23  FBI undercover agents, you know, there's certainly -- that

24  would be entirely his speculation that people were working with

25  the FBI.

Colloquy

1        In the interview I heard from him, that I got from

2  the defense, certainly had nothing to suggest that they were

3  FBI agents.  So we don't even think that's relevant.

4        It would lead to 403 problems.  And perhaps the

5  biggest 403 problem of all is all of this testimony about what

6  happened in town.

7        THE COURT:  So, Mr. Schindler, what's the basis of

8  Mr. Briels speaking about FBI?  Tell me what he would say, if

9  asked.

10        MR. SCHINDLER:  He would say there were federal

11  agents in the town of Burns that refused to identify

12  themselves, that lied to him about the status -- their status

13  in town.

14        That he later confirmed through a license plate check

15  that this was a federal vehicle, or was registered to a

16  federal -- to the federal government.

17        And that he then communicated about the situation in

18  Burns with the defendants, which then goes to their awareness

19  of this military response to their protest.  And that awareness

20  is part of what we intend to argue to the jury is -- justified

21  the possession of their weapons.

22        THE COURT:  So how are you going to make that

23  argument regarding timing?

24        MR. SCHINDLER:  It happened on January 14th.  So

25  the -- the --

Colloquy

1          THE COURT:  So we have --

2          MR. SCHINDLER:  Mr. Briels has -- I'm sorry.

3          THE COURT:  My question is, it -- I'm putting

4   together from fragments that defendants are offering to me that

5   there seems to be a theory of the case developing that the

6   evidence presented in the Government's case-in-chief as to

7   firearms and ammunition there is explained away not by an

8   inference that the Government asks the jury to draw.  That

9   there was a presumptive armed presence there that was part of

10  this underlying conspiracy.  But, instead, it was either

11  anticipatory in a defensive way to an anticipated show of force

12  by the government, or, fragmentally, I'm trying -- I guess I'm

13  thinking what you're saying is that as the conspirators were --

14  alleged conspirators were hearing about an increased presence,

15  then that added to the -- the counter-response.

16          Is that close?

17          MR. SCHINDLER:  Yeah.  They were afraid.  They were

18  afraid of getting killed and they weren't afraid --

19          THE COURT:  But they brought guns in the first

20  instance by admission is the point.

21          MR. SCHINDLER:  Yeah.

22          THE COURT:  And here I'm -- sorry?

23          MR. SCHINDLER:  I said, yes, that's correct.

24          THE COURT:  Um-hmm.

25          Well, with respect to Mr. Briels -- I want to talk

Colloquy

1    about two things.  I want to talk about how many witnesses will

2    be permitted to say the same thing, which is that the refuge

3    was a peaceful place.  It was clean and tidy and so forth.

4         I'm -- I'm prepared to allow a few more, but we're

5    not going to have 20.  We're not going to have this entire list

6    of people talk about that.

7         So with respect to every name on the list, defendants

8    need to give the Government a proffer about the subject of the

9    testimony or I'm going to be forced to sustain objections to it

10   being cumulative.

11        There already are six witnesses who have talked about

12   this.  I'll allow a few more, just out of the good of the

13   order, but we're not going to bring in dozens of them for the

14   same point.  It's a waste of the jury's time.

15        You have already an adequate foundation from which to

16   argue that the presence that the environment at the refuge was

17   not that which would -- that which the Government depicted in

18   its case-in-chief.  All of which, by the way, is not even

19   direct evidence of the crime.  The crime is a crime of

20   conspiracy.  It's completed when there's an agreement.

21        These circumstances about guns and ammunition and a

22   hostile environment potentially for anyone who came, refuted by

23   defendants' witnesses, saying it was very easy to get in, it

24   was hospitable and the like, that's all circumstantial evidence

25   and not primary evidence and, at some point, I'm going to cut

Colloquy

1    off.

2              And so the defendants need to figure out how many

3    more they must have.  And then, if there's a dispute about it,

4    I'll rule.  But we're not going to have all of these people

5    that Mr. Salisbury called off for that purpose.

6              If there are other articulated purposes, they need to

7    be specified first to the Government, and then I'll go through

8    those things.

9              With respect to Mr. Briels, I'm going to allow the

10   defendant to -- defendants to develop this theory about a

11   responsive reaction with respect to force and this notion of --

12   and it plays back to the Bunkerville kind of evidence, with

13   which I have to again note the Government started.

14             So the defendants' perspective -- whether it's

15   accepted by the jury or not -- is they expected a use of force.

16   Because they had a use of force in Bunkerville that they saw,

17   potentially; if that's what ends up being presented in the

18   videos that I've already reviewed.  And they're carrying

19   firearms and they're bringing firearms and they're asking for

20   people to bring their arms not because they have an intention

21   to impede and prevent Fish & Wildlife and BLM workers from

22   performing their official duties but because they want to

23   prepare under their Second Amendment rights to -- to be -- they

24   want to exercise their Second Amendment rights to be prepared

25   in the possession of firearms and then to defend themselves if

Colloquy

 1  unlawful use of force is used against them.  If that's the

 2  defendant's theory, they get a chance to develop it in bits and

 3  pieces.

 4          So Briels can testify on those -- on those fronts.

 5  But he needs to have a personal knowledge basis and he needs

 6  not to be talking about other people's statements.

 7          MR. SCHINDLER:  Understood.

 8          THE COURT:  Now, that's going to take 15 minutes.

 9          So what -- we need to -- we need address the noon

10  hour.

11          I can take an early lunch, if that will be of help.

12  But the -- the proffer for Ms. Fiori needs to go to the

13  Government, and then we need witnesses for this afternoon.  And

14  if it's not going to be Ammon Bundy, then -- defendants, you

15  need to get your people together.  You need to do this.

16          You can't just count on someone else or we're going

17  to rest.  Okay?  You put up evidence or you rest.  So you need

18  to get ready to do that.

19          Now, Mr. Schindler, are you the on-deck person for

20  Mr. Briels?

21          MR. SCHINDLER:  I will be conducting --

22          THE COURT:  Get him in here, then.  Let's go.

23          MR. SCHINDLER:  Will do.  Will do.

24          THE COURT:  Mr. Mumford, I know you've been

25  conferring with your client.  I just want you to be aware we're

Colloquy

1   going to bring in Mr. Briels and get on with the jury.  And

2   then, depending on how that goes, I may recess early.  But

3   we'll -- for lunch.  We'll see what we need to do.

4           MR. MUMFORD:  Okay.  Thank you, your Honor.

5           MR. SCHINDLER:  Go through this door, and then you're

6   going to walk around and up to the front.  Here, I'll show you

7   where.

8           (Pause.)

9           MR. SCHINDLER:  So just come up here and up there, to

10  the front.

11          THE COURT:  Mr. Briels, come on up here to this

12  chair.  Okay?

13          THE WITNESS:  Yes, ma'am.

14          THE COURT:  Watch your step coming on up.

15          THE WITNESS:  How are you?

16          THE COURT:  And in just a few minutes, the jury will

17  be coming in.  And, at that point, we'll all stand.

18          You need to remain standing, at that point, because

19  then I'll ask you to face the jury and the deputy to be sworn,

20  then you'll take a seat to testify.  But right now you can take

21  a seat.

22          THE WITNESS:  Good.  Because I was at Powell's

23  bookstore about 15 minutes ago.  That's why I --

24          THE COURT:  Okay.  Are we ready for the jury, folks?

25          MR. SCHINDLER:  Yes, please.

Briels - D - By Mr. Schindler                    82

```
1              THE COURT:  All right.  Bring them in.
2              (Pause.)
3              THE CLERK:  Jurors coming in.
4              (Jurors enter at 11:10 a.m.)
5              THE COURT:  All right.  Thank you, everyone.  Please
6    be seated.
7              All right, jurors.  All set?  Yes?
8              This is the defendants' next witness, Mr. Briels.
9              Sir, would you face the jury there and the deputy.
10             Turn to your right, please.  Raise your right hand to
11   be sworn.
12             (Witness sworn.)
13             THE WITNESS:  Yes, I do.
14             THE CLERK:  Please -- be seated and pull your chair
15   all the way forward.
16             THE WITNESS:  Okay.
17             THE COURT:  Sir, tell us your full name, please, and
18   spell all of it.
19             THE WITNESS:  My name is Chris Allen Briels.
20   C-H-R-I-S, A-L-L-E-N, B-R-I-E-L-S.
21             THE COURT:  Thank you.
22             Mr. Schindler.
23             MR. SCHINDLER:  Thank you, your Honor.
24                          DIRECT EXAMINATION
25   BY MR. SCHINDLER:
```

Briels - D - By Mr. Schindler

1    Q.   Mr. Briels, can you hear me okay?

2    A.   Yes, sir.

3    Q.   Okay.  Great.

4            So where do you live?

5    A.   I live in Burns, Oregon.

6    Q.   Now, do you live right in Burns or outside of Burns?

7    A.   I live right in town.

8    Q.   And how long have you lived there?

9    A.   Since 1978.

10   Q.   And what did you do during the time that you lived in

11   Burns?

12   A.   I was a welder for quite some time.  Then I wound up being

13   an EMT and a fire chief.  I was a Burns fire chief for 24

14   years, the county fire chief for a little longer than that.

15   I've been involved in search and rescue, and lots of things.

16   Q.   So I want to take you to the end of 2015, the beginning of

17   2016.

18           Did you end up becoming a member of something called

19   the committee of safety?

20   A.   Yes, sir, I did.

21   Q.   And what was that?

22   A.   What was the committee of safety?  It was a group of local

23   individuals that were concerned.  That met to maybe address

24   some issues with the federal government, to maybe do some

25   negotiations on changing the way things have been being done.

Briels - D - By Mr. Schindler                    84

1    Q.  And in the course of that, did you come to meet Ammon

2    Bundy?

3    A.  Yes, sir, I did.

4    Q.  Did you meet any of the other defendants that you see here

5    in court?

6    A.  Yes, I did.

7    Q.  Which ones?

8    A.  I met Neil.  I met Shawna.  I met --

9    Q.  If you could -- if you know their last names -- is that

10   correct, Shawna Cox, you're --

11   A.  Oh, I'm sorry, sir.  Yeah, Shawna Cox.

12   Q.  And that would be Neil Wampler?

13   A.  Neil Wampler.  Ammon Bundy.  Ryan Bundy.  That's --

14   Q.  Did you ever meet Mr. Medenbach at -- during your visits to

15   the refuge?  Does he look familiar to you?

16   A.  The gentleman in the back left?

17   Q.  This -- this gentlemen right here.

18            DEFENDANT MEDENBACH:  (Raising hand.)

19            THE WITNESS:  Oh, no.  No, no, sir.  I don't remember

20   that face, sorry.

21   BY MR. SCHINDLER:

22   Q.  Okay.  And so was your initial involvement related to kind

23   of public meetings?

24   A.  Yes, sir.

25   Q.  Okay.  And did you end up attending a protest in Burns on

Briels - D - By Mr. Schindler

1    January 2nd?

2    A.   Yes, sir.

3    Q.   Okay.  And what was that protest about, from your

4    perspective?

5    A.   It was in support of the Hammond family.

6    Q.   Did you know the Hammonds?

7    A.   Yes, sir.

8    Q.   And during that protest, did you see people carrying

9    weapons?

10   A.   Yes.

11   Q.   Is someone carrying a gun -- is that an unusual thing in

12   Burns?

13   A.   No, sir.

14   Q.   Do you own firearms?

15   A.   Yes, sir.

16   Q.   And so after the protest, did you end up having reasons to

17   meet additionally with Mr. Bundy?

18   A.   Yes, sir.

19   Q.   And how did you accomplish that?

20   A.   He's been to my home.  I've been out -- I went out to the

21   refuge several times.

22            I met him at meetings in town.

23   Q.   All right.  Let's talk about the first time, then.

24            He came to your house?  He came to your home?

25   A.   Yes.  After -- after I was a -- a member of the committee

Briels - D - By Mr. Schindler                86

1   of safety.

2   Q.  And was that in December or was that in January?  Was that

3   before the protest or after?  Do you remember?

4   A.  After.  After.

5   Q.  Okay.  So the first time you met him was after that

6   protest?

7   A.  No, the first time I met him was at the meeting, when I

8   became a member of the committee of safety.

9   Q.  And that initial meeting, do you remember when it took

10  place?

11  A.  In December, around the 14th, or something like that.

12  Q.  And how did you get invited to that meeting?

13  A.  Ah, by word of mouth and by Facebook.  We have no radio

14  station, so our only media was Facebook.

15  Q.  And -- and what motivated you to go to that meeting?

16  A.  I've lived there since 1978, and I heard that there was

17  something going on, and I wanted to see because I'm very

18  concerned about my county and my community.

19  Q.  And had you ever attended a meeting like that before?

20  A.  Not like that one.

21  Q.  I'm not going to ask you about everything that was said at

22  that meeting, but I think there are some specifics.

23         Was there anything said during that meeting about,

24  you know, any threats made to government employees, to BLM,

25  anything like that?

Briels - D - By Mr. Schindler    87

1   A.   No, sir.

2   Q.   And -- and would it be fair to say that the general tone

3   was focused on kind of political issues?

4   A.   Yes.

5   Q.   And so what happened, coming out of that meeting?  Were you

6   made a member of the committee of safety?

7   A.   Yes, sir.  I was nominated by a group of my peers.

8   Q.   Why did you accept that?

9   A.   I accepted that because I have been in -- heavily involved

10  in Harney County since I've been there.  I was a fire chief.  A

11  lot of things.

12          I -- I -- I had heard that the committee of safety --

13  we -- we learned a lot of history about it.  And it said that

14  the committee of safety could have the authority to call in the

15  militia, and that kind of scared me.  And I thought I -- I

16  don't want any kind of violence.  So, yes, if there's going to

17  be something that has that kind of authority, I want to be on

18  it because I don't believe in the violence.

19  Q.   Well, and --

20  A.   I didn't know.

21  Q.   And had you perceived that this was about violence, would

22  you have become involved?

23  A.   No, sir.

24  Q.   So when was it that you first traveled to the refuge?

25  A.   Probably a couple of days after the occupation started.

Briels - D - By Mr. Schindler

1  Q.  Okay.  Around --

2  A.  Well, I --

3  Q.  Okay.

4  A.  I've been to the refuge different times, down through the

5  years.  I want to make sure that's accurate.  The first time

6  after --

7  Q.  I understand.  So you've used the refuge as a member of the

8  public?

9  A.  Yes, sir.

10  Q.  Have you ever hunted at the refuge?

11  A.  Yes, sir.  Pheasants.

12  Q.  Did you do that with a gun?

13  A.  Shotgun.

14  Q.  Thank you.

15        So the first time you go to the refuge is within a

16  couple of days of this occupation beginning.  Is that fair to

17  say?

18  A.  Yes, sir.

19  Q.  Okay.  And how did you get to the refuge?

20  A.  I drove my vehicle out there.

21  Q.  You weren't concerned for your safety?

22  A.  No, sir.

23  Q.  Did you travel with other people to the refuge at that

24  time?

25  A.  Not that particular day, but there were other days that I

Briels - D - By Mr. Schindler

1    did.

2    Q.   So you were alone?

3    A.   Yes.

4    Q.   Did you bring a firearm with you?

5    A.   No, sir.

6    Q.   So as you approached the refuge, was there a vehicle that

7    was parked in front of the road?

8    A.   Yes, sir.

9    Q.   What was that -- what did that vehicle look like?

10   A.   I don't know.  Some kind of a -- I think it was a white

11   pickup.

12   Q.   And were there individuals that were standing at the front

13   gate?

14   A.   Yes, sir.

15   Q.   Can you describe them generally?

16   A.   They were just people like you and I.  They were standing

17   there by the gate.

18   Q.   Did they have firearms?

19   A.   Some of them did.

20   Q.   And how were they holding their firearms?

21   A.   Just at ease.  They -- they weren't in the ready position,

22   or anything.  They were just -- they were just keeping them

23   with them.

24   Q.   And -- and so by "at ease," you mean the guns were kind of

25   down by their side?

Briels - D - By Mr. Schindler

1    A.   Yes, sir.

2    Q.   Okay.  And no guns were pointed at you?

3    A.   No.

4    Q.   So why don't you just describe the interaction that you had

5    with the men at the front gate before you went into the refuge.

6    A.   I just went over there, and I said, "Hey, my name is Chris

7    Briels.  I came and I want to talk to Ammon Bundy."

8                And they said -- he got on the radio, and he said,

9    "Okay, go on down."

10   Q.   And -- and as you entered the refuge, did you see other

11   people there?

12   A.   Yes.

13   Q.   How many did you see?

14   A.   I honestly didn't count them, but there was probably 40 or

15   more.

16   Q.   I mean, at that initial entry to the refuge, did it

17   perceive to be -- did you perceive it to be a threatening

18   environment?

19   A.   Absolutely not.

20   Q.   And -- and did you explain to the men at the front what it

21   was you intended to talk to Ammon Bundy about?

22   A.   No, I just told him I was here to see Ammon Bundy.

23   Q.   So the men didn't ask you any questions about that?

24   A.   Not really.  He got on the radio and he said, okay, go.

25   Q.   Did you show any ID?

1    A.   No.

2    Q.   So once you got down into the refuge, how did you get in to

3    meet with Mr. Bundy?

4    A.   I drove my vehicle.  They moved the pickup, and I drove in.

5    And I walked around and asked, "Where's Ammon."  And somebody

6    said, and so I went.

7    Q.   And -- and was that in an office or in one of the

8    buildings?

9    A.   It was in one of the buildings.  I think it was like an

10   office-type building.

11   Q.   When you went into that building, did it appear that there

12   was any damage that had been done to that building?

13   A.   Oh, absolutely not.

14   Q.   And how long did you have an opportunity to meet with

15   Mr. Bundy that first time?

16   A.   Probably a couple hours.

17   Q.   And who else was present, if you know?

18   A.   From what I remember, Ryan Payne was there, Ryan Bundy was

19   there.  I think Shawna was in the area.  There were several

20   other individuals, but I didn't really know anybody yet.

21   Q.   So -- so I guess that's my next question.  I mean, you went

22   into this situation, and you didn't know anybody other than

23   Mr. Bundy?

24   A.   I -- I had met Ammon and Ryan and Ryan at the meeting at

25   the fairgrounds.

Briels - D - By Mr. Schindler                    92

1   Q.   Okay.

2   A.   And there was another gentleman.  I forgot his name.  He's

3   not here.

4   Q.   And so that initial meeting that takes place -- again, I'm

5   not going to talk to you about the specifics of what was said.

6   But was there any discussion that you can recall about impeding

7   or obstructing or threatening Fish & Wildlife people?

8   A.   No, sir.

9   Q.   Was there any discussion about obstructing or impeding or

10  threatening BLM employees?

11  A.   No, sir.

12  Q.   Would it be fair to say that the overall tone of that

13  meeting was an ongoing discussion about legal and political

14  matters?

15          MR. BARROW:   Objection, your Honor, leading

16  questions.

17          THE COURT:   The objection is sustained, and it's

18  already been asked and answered.

19          MR. SCHINDLER:   Thank you, your Honor.

20          THE COURT:   Please move on.

21          MR. SCHINDLER:   I will.

22  BY MR. SCHINDLER:

23  Q.   Mr. Briels, after that first meeting that you had, did you

24  end up going to the refuge additional times after that?

25  A.   Yes, sir, I did.

Briels - D - By Mr. Schindler

1    Q.   Okay.   Do you recall when the next time was that you went

2    to the refuge?

3    A.   It was probably in another couple of days.

4    Q.   And when you came to the refuge that time, was your entry

5    more or less the same?

6    A.   Pretty much.

7    Q.   Did they still call somebody on a radio?

8    A.   Yes.

9    Q.   Were the men at the front armed?

10   A.   Yes.

11   Q.   And when you went into the refuge, what did you do?

12   A.   We went as a committee of safety.   And we went and we met

13   with Ammon and Ryan Bundy and Ryan Payne, and we talked about

14   the Constitution.

15   Q.   How many -- at these meetings -- were there a lot of people

16   at these meetings, or was it just this group of people that

17   you've identified?

18   A.   Oh, sometimes, maybe ten people, when the committee of

19   safety of people went with us, you know, and --

20   Q.   And how long did that second meeting go on?

21   A.   Probably an hour or two.

22   Q.   And at any point during that meeting, was there any threats

23   made against government employees?

24   A.   No, sir.

25   Q.   During your second visit to the refuge, did you see anyone

Briels - D - By Mr. Schindler

94

1  damaging any refuge property?

2  A.   Quite in reverse of that.

3  Q.   What do you mean?

4  A.   Well, when I was there that time, there was a gentleman

5  replacing an outside light on the porch.  In -- in -- I noticed

6  a lot of activity.  People taking stuff to the dumpster, just

7  cleaning up.

8  Q.   And so it appeared to you that work was being done at the

9  refuge?

10  A.   Yes.

11  Q.   At some point after this second visit to the refuge, during

12  the time that you were in town, did you come to believe that

13  there were federal agents in Burns?

14  A.   Oh, yes, sir, I did.

15  Q.   And how did that come about?

16  A.   I followed a couple of them from our arm -- armory, and

17  asked them what they were doing.

18  Q.   Well, why would you do that?

19  A.   A friend of mine -- I had stopped to talk to him and he

20  said --

21          THE COURT:  Don't -- don't tell us what your friend

22  said.

23          THE WITNESS:  Oh, sorry.

24          THE COURT:  Ask the question in a way that doesn't --

25          THE WITNESS:  Oh, I'm sorry, ma'am.

Briels - D - By Mr. Schindler                95

BY MR. SCHINDLER:

Q.   That's my fault.  It was a bad question.

     What concerned you about these individuals?

A.   They were lurking around our armory.

Q.   What's an armory?

A.   It's where the National Guard meets and keeps their
equipment.

Q.   And how -- how were you aware of the armory and what it
does?

A.   I have lived there since 1978.

Q.   And so you saw these people that were suspicious to you,
and what did you do then?

A.   I drove over there and asked them what they were doing, and
they drove off.  And so I followed them.

Q.   And were you ever able to get information from them about
who they were or what they were doing?

A.   The vehicles split up.  I followed one of them until they
finally parked.  And I got out, and I introduced myself.  I
shook their hands, told them what my name was.

     They gave me their first names.  And I said you were
hanging around the armory, and I would like to know why.

     And they said --

     MR. BARROW:  Objection to what they said.

     THE COURT:  The objection is sustained.

     MR. SCHINDLER:  I'm sorry, your Honor, it's not

Briels - D - By Mr. Schindler    96

1  offered for the truth of what they said.

2            THE COURT:  The objection is sustained.  Let's get to

3  the point, please.

4            MR. SCHINDLER:  Thank you, your Honor.

5  BY MR. SCHINDLER:

6  Q.  And -- and -- and at the end of all of this, did you come

7  to believe that these were federal agents?

8  A.  Yes, sir.

9  Q.  And so -- and did you notice elsewhere in Burns a

10 heightened police presence?

11 A.  Yes, sir, definitely.

12 Q.  And did you perceive that to be Harney County sheriffs?

13 A.  No.

14 Q.  So after these incidents in town, you end up going back to

15 the refuge.  Is that fair to say?

16 A.  Yes.

17 Q.  And you participated in a press conference?

18 A.  Yes, I did.

19 Q.  Do you remember that?

20 A.  The one at the refuge?

21 Q.  Yes.

22 A.  Yes.

23 Q.  And why did you do that?

24 A.  Because I was asked if I could come and make the

25 announcement that we wouldn't be able to use the all-purpose

Briels - D - By Mr. Schindler

1   building at the fairgrounds.

2   Q.   Okay.   And -- but before we get to the -- the -- the

3   building at the fairgrounds, you also addressed, during your

4   press conference, some these other issues.   Right?

5           MR. BARROW:   This is a leading question, your Honor.

6           THE COURT:   It does appear to be a leading question,

7   but it's a transitional one, so I'll allow it.

8           And then let the witness testify, please,

9   Mr. Schindler, not you.

10          MR. SCHINDLER:   Thank you.

11          THE COURT:   Answer the question.

12          THE WITNESS:   Can you restate the question, please.

13  BY MR. SCHINDLER:

14  Q.   Sure.   Mr. Briels, did you discuss this experience with

15  the -- these men in town during this press conference?

16  A.   Yes.

17  Q.   Why?

18  A.   They asked me.

19  Q.   Did you feel it was important?

20  A.   Yes.

21  Q.   And who else was present at the time that you participated

22  in this press conference?

23  A.   At the press conference?

24  Q.   Yes.

25  A.   Shawna -- Shawna Cox was there, Ryan Bundy, Ryan Payne,

Briels - D - By Mr. Schindler                              98

1  LaVoy Finicum.   There were --

2  Q.   Was Mr. Wampler present?  Do you remember?

3  A.   I believe he was.

4  Q.   And so they were all present when this announcement for

5  when you were discussing these things?

6  A.   Yes.

7  Q.   Okay.  So you mentioned that there was another matter that

8  was discussed during this press conference, and that was

9  related to your use at the fairgrounds?

10  A.   Yes, sir.

11  Q.   Why did you want to use the fairgrounds?

12  A.   We wanted to have a public meeting for the committee of

13  safety, and Ammon had asked if he could speak at our meeting,

14  to outline his exit strategy.  He wanted to go home.

15  Q.   And -- and so there was a plan in place, from your

16  perspective, for these men to leave the refuge?

17  A.   Yes, sir.

18  Q.   And -- and so what role was the fairgrounds going to play

19  in that?

20  A.   It was going to be a meeting place.

21  Q.   Okay.

22  A.   For a public meeting.

23  Q.   Okay.  And why didn't that happen?

24  A.   Judge Steve Grasty put a stop to it.

25  Q.   Well, did he explain what the basis was for not allowing

99

Briels - X - By Defendant Ryan Bundy

1   you to hold a public meeting?

2          MR. BARROW:  Objection.

3          MR. SCHINDLER:  I'm sorry.  That calls for hearsay.

4   BY MR. SCHINDLER:

5   Q.  What do you believe about why the meeting wasn't held?

6          MR. BARROW:  Objection, your Honor.  His beliefs

7   about why the meeting --

8          THE COURT:  The evidence about the meeting not being

9   held has already come in through another witness about Judge

10  Grasty's declination to allow the fairgrounds building use.

11          This is cumulative.  Move on.

12          MR. SCHINDLER:  Thank you, your Honor.

13  BY MR. SCHINDLER:

14  Q.  To your knowledge, was a meeting ever held where Mr. Bundy

15  announced an exit strategy?

16  A.  No, sir.

17          MR. SCHINDLER:  I have -- I have no further

18  questions, your Honor.

19          THE COURT:  All right.  Other defense questions for

20  Mr. Briels?

21          Mr. Bundy?

22          DEFENDANT RYAN BUNDY:  Yeah, I do.

23          THE COURT:  Go ahead.

24                    CROSS-EXAMINATION

25  BY DEFENDANT RYAN BUNDY:

100

Briels - X - By Defendant Ryan Bundy

1   Q.  Mr. Briels, how are you today?

2   A.  Fine, thank you.

3   Q.  Okay.  I want to go ahead and talk a little bit more about

4   the men that you discovered inspecting the armory.

5           Were they dressed in any official uniform?

6           MR. BARROW:  Objection, your Honor, irrelevant.

7           THE WITNESS:  No.

8           THE COURT:  The objection is sustained.  It doesn't

9   really matter.  The witness has already identified people he

10  thought were FBI agents.

11          Ask another question.

12          DEFENDANT RYAN BUNDY:  He didn't know they were FBI

13  agents at that point --

14          THE COURT:  Sir, he has testified about what he saw

15  and did in its conclusion.  The fact that they are or are not

16  in uniform is not relevant.

17          Move to another question, please.

18          DEFENDANT RYAN BUNDY:  It is relevant.

19          THE COURT:  I'm not permitting it.

20          Ask another question, please.

21  BY DEFENDANT RYAN BUNDY:

22  Q.  How were the men dressed?

23          MR. BARROW:  Your Honor, this is the same question.

24          THE COURT:  The objection is sustained.

25          Ask another question, please.

Briels - X - By Defendant Ryan Bundy          101

1              (Defendant Ammon Bundy and Defendant Ryan Bundy

2              conferring.)

3    BY DEFENDANT RYAN BUNDY:

4    Q.  Were the men dressed?

5    A.  Yes.

6              (Laughter.)

7              THE COURT:  All right.  I mean it now, folks.

8              You must not ask another question about their

9    dressing.  I've ruled.  Ask another question.

10             And I am alerting you folks for the last time.  You

11   need to be quiet or you're leaving the courtroom, every last

12   one of you.

13             Ask your next question.

14             (Pause, Defendant Ryan Bundy and Mr. Roots

15             conferring.)

16             DEFENDANT RYAN BUNDY:  The truth has to come out.

17             THE COURT:  Would you ask a question, please.

18             (Pause, Defendant Ryan Bundy and Mr. Roots

19             conferring.)

20   BY DEFENDANT RYAN BUNDY:

21   Q.  Yeah.  Did you -- the vehicle that they were driving, did

22   it have official markings on it?

23   A.  No.

24   Q.  Did they seem to act covertly?

25   A.  Yes.

Briels - X - By Defendant Ryan Bundy          102

1    Q.  Did they appear to be someone besides FBI?

2              MR. BARROW:  Your Honor --

3              THE WITNESS:  Yes.

4              MR. BARROW:  -- I'm going to object to this entire

5    line --

6              THE COURT:  Besides FBI?  I don't have any idea what

7    that means.

8              Rephrase your question.

9    BY DEFENDANT RYAN BUNDY:

10   Q.  Okay.  Did they appear to be someone besides federal

11   agents?

12   A.  Yes.

13   Q.  Did they give you identification when you stopped them?

14   A.  No, sir.  First names only.  I asked for their second name,

15   and they just gave me their first names again.

16   Q.  What you observed from their actions, did they seem to be

17   setting up a frame?

18             MR. BARROW:  Your Honor, this is a leading question.

19             THE COURT:  The objection is sustained.

20   BY DEFENDANT RYAN BUNDY:

21   Q.  What did you observe from -- in your opinion, what did they

22   appear to be doing?

23             THE COURT:  I'll allow that.

24             Go ahead.

25             THE WITNESS:  They were being dishonest.

Briels - X - By Defendant Ryan Bundy

1              THE COURT:  That's not an answer.  That's stricken.

2              THE WITNESS:  I'm sorry.

3              THE COURT:  You were asked what were they doing.

4              THE WITNESS:  They told me they were --

5              THE COURT:  Sir, you were asked what were they doing.

6    Not what did they say.

7              THE WITNESS:  They were standing by their vehicle

8    after I introduced myself.

9              THE COURT:  I think the question was back at the

10   armory, but I'll let you --

11   BY DEFENDANT RYAN BUNDY:

12   Q.  It started at the armory.

13   A.  Oh, oh, oh.  I'm sorry.  I'm sorry.

14              They were just out, walking around the building.

15   Q.  Okay.  From your observation, can you tell why?

16              THE COURT:  The objection is sustained.  It calls for

17   speculation.  Even if there's no objection, I'm not going to

18   let the witness speculate.

19              Let's get on with this, Mr. Bundy.

20              DEFENDANT RYAN BUNDY:  All right.  We'll move on from

21   that.  The truth will come out.

22   BY DEFENDANT RYAN BUNDY:

23   Q.  You mentioned speaking at a press conference inside the

24   refuge.  Is that correct?

25   A.  Yes, sir.  At the top of the hill, yes, sir.

Briels - X - By Mr. Salisbury                    104

1   Q.   Okay.  So were there press inside the refuge?

2   A.   At times there was.

3   Q.   Okay.  Did you detect any effort by anyone at the refuge to

4   keep anyone out?

5   A.   No.

6   Q.   What about government -- officers?

7   A.   No.

8   Q.   You yourself were a government officer.  Is that correct?

9   A.   I was.

10              (Pause, Defendant Ryan Bundy and Mr. Roots

11              conferring.)

12              DEFENDANT RYAN BUNDY:  I'm not going to ask any

13   further questions right now.

14              THE COURT:  All right.  Mr. Olson, any questions?

15              MR. OLSON:  No questions, your Honor.

16              THE COURT:  Mr. Salisbury, any questions?

17              MR. SALISBURY:  Yes, your Honor.  Thank you.

18              THE COURT:  Go ahead.

19                         CROSS-EXAMINATION

20   BY MR. SALISBURY:

21   Q.   Mr. Briels, you were -- I think you mentioned you were the

22   fire chief in Harney County?

23   A.   I was the Harney County fire chief.  I -- I did that at the

24   same time that I was the Burns fire chief.

25   Q.   How long were you the fire chief?

Briels - X - By Mr. Salisbury

1    A.   For Burns, 24 years.

2    Q.   What about Harney County?

3    A.   It would have wound up being longer than that.  I didn't --

4    haven't done the math.  Till this year.

5    Q.   Do you work --

6    A.   It --

7            THE COURT:  Hold on.  Everybody's talking at once.

8            Ask your question.

9    BY MR. SALISBURY:

10   Q.   Thank you, your Honor.

11           As the fire chief for Harney County, do you work in

12   conjunction with the BLM on fire issues?

13   A.   Yes, sir.

14   Q.   Are you familiar with the Miller homestead fire?

15           MR. BARROW:  Objection to relevance, your Honor.

16           THE COURT:  The objection is sustained.

17           MR. SALISBURY:  Just a moment, your Honor.

18           (Pause, Mr. Salisbury and Defendant Banta

19           conferring.)

20   BY MR. SALISBURY:

21   Q.   Mr. Briels, in relation to this protest here, did you think

22   it was detrimental or beneficial to --

23           MR. BARROW:  Objection, your Honor.

24           THE COURT:  The objection is sustained.  Relevance.

25           MR. SALISBURY:  No further questions.

Briels - X - By Ms. Maxfield

1          THE COURT:  All right.  Any other questions?

2          Ms. Maxfield?

3          MS. MAXFIELD:  Yes, your Honor.

4                        CROSS-EXAMINATION

5    BY MS. MAXFIELD:

6    Q.  Good afternoon.  I'm Lisa Maxfield.  I represent Neil

7    Wampler.

8          You said that you visited the refuge several times.

9    A.  Yes, ma'am.

10   Q.  And on most of those occasions, did you have a chance to

11   talk with Mr. Wampler?

12   A.  Yes.

13   Q.  Was he in those leadership meetings or the meetings with

14   the leadership that you said you had?

15   A.  No, he was in the kitchen.

16   Q.  Okay.  And that's usually where you would encounter him.

17   Is that right?

18   A.  Yes.

19   Q.  And did you go to the refuge on January 20th?  Do you

20   recall?

21   A.  I believe -- I believe so, for a barbecue.

22   Q.  Um-hmm.  Well, was there -- there was one barbecue where

23   you roasted a big.  Is that right?

24   A.  Yes.

25          MR. BARROW:  That's a leading question, your Honor.

Briels - X - By Ms. Maxfield

1          MS. MAXFIELD:  Well, I'm --

2          THE COURT:  She's trying to orient him to a

3   particular barbecue.

4          THE WITNESS:  Yes.

5   BY MS. MAXFIELD:

6   Q.  And you talked with Mr. Wampler at that?

7   A.  Yes.

8   Q.  Was there a time later in the month where you visited the

9   refuge -- maybe around January 20th -- where you did not see

10  Mr. Wampler?

11  A.  There was a day that he was not there.

12  Q.  Okay.  So he was there, there, there, and then not there?

13  A.  Yes, ma'am.

14  Q.  And when I asked you whether that was on or around January

15  20th, is that consistent with your memory?

16  A.  Yes, ma'am.

17  Q.  Okay.  Did there appear to be sort of a social aspect to

18  what was happening in the kitchen?

19  A.  Yes, very definitely so.

20  Q.  And -- and did Mr. Wampler seem to enjoy that aspect?

21          MR. BARROW:  Your Honor, that's objectionable because

22  it's leading and it calls for speculation about whether

23  Mr. Wampler --

24          THE COURT:  It does not call for speculation.  It is

25  not leading.  Those objections are overruled.

Briels - X - By Defendant Cox

1            You may answer.

2   BY MS. MAXFIELD:

3   Q.   Did Mr. Wampler seem to be enjoying the social aspect?

4   A.   Yes.

5   Q.   You testified about approaching these men at the armory.

6            When you approached them, did you assume that they

7   were militia members?  Is that why you were concerned?

8   A.   I thought maybe they were.

9   Q.   And it was -- was that based on how they were dressed?

10  A.   No, by their activities.

11           MS. MAXFIELD:  (Pause.) I think I'm done.

12           Just one sec.

13           Yeah, I have no further questions.

14           Thank you.

15           THE WITNESS:  Thank you.

16           THE COURT:  Ms. Harris, any questions?

17           Ms. Cox?

18           Go ahead.  Go ahead.

19                      CROSS-EXAMINATION

20  BY DEFENDANT SHAWNA COX:

21  Q.   Mr. Briels, at any time were you aware of a conspiracy in

22  Harney County?

23           MR. BARROW:  Objection, your Honor.

24           THE COURT:  The objection is sustained.

25           Ms. Cox, please ask questions that are factual and

Briels - X - By Defendant Cox

1    don't call for a legal conclusion.

2    BY DEFENDANT SHAWNA COX:

3    Q.   You said you attended the protest rally for the Hammonds?

4    A.   Yes.

5    Q.   When you marched by the courthouse, was it barricaded?

6    A.   No.

7    Q.   When would you say the courthouse was barricaded?

8            MR. BARROW:   Objection, relevance, your Honor.

9            THE COURT:   The objection is overruled.

10           But it's first to be established that it was

11   barricaded.

12   BY DEFENDANT SHAWNA COX:

13   Q.   At what time did you notice that the courthouse had been

14   barricaded?

15   A.   A couple of days after the occupation.

16   Q.   How was it barricaded?

17   A.   With chain-link fence and concrete barricades and guarded

18   with men with automatic weapons.

19   Q.   Are those men that you had seen around town before?

20   A.   No, I -- I can't -- I can't say no because I didn't really

21   pay attention to them.   There had been more presence earlier,

22   and I'm not sure who all was there.

23   Q.   Are they -- are they men that you recognized from your

24   local law enforcement?

25   A.   No.

Briels - X - By Defendant Cox

1  Q.  You said that you had done some investigation on a couple

2  of vehicles that were at the armory?

3  A.  Yes.

4  Q.  After you confronted the men, what did you do?

5  A.  I took a picture of their license plate, and went to the

6  sheriff's office.

7  Q.  And did someone tell you -- did someone try to stop you

8  from going there?

9  A.  Yes.

10  Q.  Who was that?

11  A.  The guard there, up front.  I just said I wanted to go talk

12  to Dave Ward, and he said no.

13  Q.  So don't you know just about everyone in town?

14  A.  Yes, ma'am.

15  Q.  So why do you think someone would tell you that you

16  couldn't see the sheriff?

17          MR. BARROW:  Objection, your Honor.

18          THE COURT:  The objection is sustained.

19  BY DEFENDANT SHAWNA COX:

20  Q.  Did you have daily or -- how often did you communicate with

21  the sheriff as being the fire chief?

22  A.  I would see him probably on a weekly basis, depending on

23  what was going on.  I was also involved with search and rescue,

24  so I would see him more often if we had a search going on.

25  Q.  So it was pretty open communication --

1              MR. BARROW:  Objection, relevance, your Honor.

2              THE COURT:  The objection is sustained.

3                  (Pause, Ms. Harris and Defendant Cox conferring.)

4    BY DEFENDANT SHAWNA COX:

5    Q.  So was it unusual that you could -- that you were told that

6    you could not see the sheriff?

7    A.  Highly unusual.

8    Q.  So what did you do?

9    A.  I called the direct line to the dispatch and gave them the

10   license plate number, and told them about the activity that I

11   had just witnessed.  And asked them if maybe somebody could go

12   check it out because there was something not quite right going

13   on.

14   Q.  Did the dispatch unit -- dispatch tell you to do something?

15             MR. BARROW:  Objection, your Honor, hearsay.

16             THE COURT:  Sustained.

17   BY DEFENDANT SHAWNA COX:

18   Q.  What did the dispatch tell you?

19             MR. BARROW:  Objection.

20             THE COURT:  The objection is again sustained.

21             DEFENDANT SHAWNA COX:  Oh, sorry.

22                 (Pause, Ms. Harris and Defendant Cox conferring.)

23   BY DEFENDANT SHAWNA COX:

24   Q.  Where did you go from there?

25   A.  Back to the armory.

Briels - X - By Defendant Cox

1    Q.   What did you find there?

2    A.   Two police officers, a Burns police chief, and a Harney

3    County sheriff deputy.

4    Q.   Did you know who they were?

5    A.   Yes.

6    Q.   What did they tell you?

7              MR. BARROW:   Objection, your Honor, hearsay.

8              DEFENDANT SHAWNA COX:   I can't --

9              THE COURT:   The objection is sustained.

10   BY DEFENDANT SHAWNA COX:

11   Q.   Uhm.   What did you learn from the conversation that you had

12   with them?

13             THE COURT:   It's the same objection, same ruling.

14   BY DEFENDANT SHAWNA COX:

15   Q.   Did you attend a meeting that same evening?

16   A.   Yes.

17   Q.   Where?

18   A.   At the high school.

19             MR. BARROW:   This has been asked and answered, your

20   Honor.

21             THE COURT:   It has.   We need something new, please,

22   Ms. Cox.

23             DEFENDANT SHAWNA COX:   Your Honor, I'm coming into

24   that.   Sorry.

25             THE COURT:   Then get to the new material, please.

Briels - X - By Defendant Cox

1    BY DEFENDANT SHAWNA COX:

2    Q.   Okay.  Who facilitated the meeting?

3    A.   Steve Grasty.

4    Q.   Were there lots of people there?

5    A.   Yes.  The gymnasium was full.

6    Q.   How many would you guess?

7    A.   I would roughly guess 600.

8    Q.   Was it an open-mic meeting?  Could anyone speak?

9    A.   Yes.  If you raised your hand, they would give you the mic.

10   Q.   Did you notice any outside person that was -- that was --

11   that spoke there?

12   A.   Yes.

13   Q.   Is Judge Grasty a real judge?

14   A.   His title is judge.  He's actually, I believe, like the

15   chairman of the county commissioners.

16   Q.   Did he say anything at that meeting about the commission of

17   safety?

18   A.   Yes, he did.

19   Q.   Could you explain that.

20   A.   He opened up his meeting, saying that there was a Harney

21   County committee of safety.  And that we were in no way, shape,

22   or form affiliated with Harney County.  He said that we had a

23   website that had the county logo on it, and that was without

24   the county's permission.

25   Q.   Did that prompt you to go to -- have a visit with him

Briels - X - By Defendant Cox

1   later?

2   A.   It prompted me to ask for the mic.

3   Q.   Did you go to his office the next morning?

4   A.   Yes, I did.

5   Q.   Were there any law enforcement there?

6   A.   Yes.

7   Q.   How many?

8   A.   Probably a dozen in the courthouse.

9   Q.   Did you recognize any of them?

10            MR. BARROW:   Your Honor, I'm going to object to this

11   on relevance grounds.

12            THE COURT:   Sustained.

13   BY DEFENDANT SHAWNA COX:

14   Q.   How many strangers would you say there were roaming around

15   the town at that time?

16            MR. BARROW:   Objection, irrelevance, your Honor.

17            THE COURT:   Overruled.   Go ahead.

18   BY DEFENDANT SHAWNA COX:

19   Q.   How -- I'm sorry.   How many strangers would you say were

20   roaming around the town about that time?

21   A.   I would say several hundred.

22   Q.   Did you see people in uniforms?

23   A.   Sometimes.

24   Q.   What types?

25   A.   Military uniforms, sheriff deputy uniforms, state police

1    uniforms.

2    Q.   Where did you see them?

3    A.   Mostly around the courthouse.  But driving up and down the

4    streets, also.

5    Q.   Were people intimidated by their appearance?

6              MR. BARROW:  Objection, your Honor.

7              THE COURT:  The objection is sustained.

8              That's argumentative.

9    BY DEFENDANT SHAWNA COX:

10   Q.   Were you intimidated?

11             MR. BARROW:  Objection to relevance.

12             THE COURT:  The objection is sustained.

13   BY DEFENDANT SHAWNA COX:

14   Q.   Did a lot of people drive by the courthouse, do you know?

15             MR. BARROW:  Objection, relevance, your Honor.

16             THE COURT:  The objection is sustained.

17   BY DEFENDANT SHAWNA COX:

18   Q.   How many entrances were available to the public at the

19   courthouse?

20             MR. BARROW:  Objection, relevance, your Honor.

21             THE COURT:  This is not relevant.  The objection is

22   sustained.

23   BY DEFENDANT SHAWNA COX:

24   Q.   Did you meet someone at the courthouse?

25   A.   Yes.

Briels - X - By Defendant Cox

1    Q.    Who?

2    A.    Steve Grasty.

3    Q.    What was your purpose in going to visit Steve Grasty?

4            MR. BARROW:    This has been asked and answered by

5    Ms. Cox.

6            THE COURT:    It has been.    Let's move to something

7    new, please, Ms. Cox.

8    BY DEFENDANT SHAWNA COX:

9    Q.    You said he had a -- in your conver -- well, how am I going

10   to say that?

11           (Pause, Ms. Harris and Defendant Cox conferring.)

12   BY DEFENDANT SHAWNA COX:

13   Q.    Did you have a disagreement with Judge Grasty?

14   A.    Yes, ma'am.

15   Q.    Would you tell us about that, please.

16           MR. BARROW:    Objection, relevance, your Honor.

17           THE COURT:    Sustained.

18   BY DEFENDANT SHAWNA COX:

19   Q.    What was the context?

20           MR. BARROW:    Same objection, your Honor.

21           THE COURT:    What is the purpose?

22           DEFENDANT SHAWNA COX:    Wait a minute.

23   BY DEFENDANT SHAWNA COX:

24   Q.    What -- what is the context of that message that -- did you

25   quit your job?

Briels - X - By Defendant Cox

1  A.  Yes.

2  Q.  Could you tell us about that, please.

3          MR. BARROW:  Objection, relevance, your Honor.

4          THE COURT:  Overruled.

5          State briefly the reason why you quit your job.

6          THE WITNESS:  I was verbally harassed.  I was told

7  that I was an old man, harmless, intimidated; mistreated in

8  several different verbal ways.  And that we could not use the

9  fairgrounds for the meeting.

10  BY DEFENDANT SHAWNA COX:

11  Q.  Was this harassment associated with your investigation?

12          MR. BARROW:  Objection, relevance.

13          THE COURT:  Overruled.

14  BY DEFENDANT SHAWNA COX:

15  Q.  Into -- with your investigation of the vehicles that were

16  at the armory?

17  A.  Yes, part of it was.

18          (Pause, Ms. Harris and Defendant Cox conferring.)

19  BY DEFENDANT SHAWNA COX:

20  Q.  Okay.  Did you base your conclusion that the men at the

21  armory were federal agents, on the conversations you had with

22  the dispatch center?

23  A.  Yes, with the dispatch and the sheriff deputy.

24          (Pause, Ms. Harris and Defendant Cox conferring.)

25  BY DEFENDANT SHAWNA COX:

Briels - X - By Defendant Cox

1    Q.  Did they give you information that helped you reach that

2    conclusion?

3                MR. BARROW:  Objection, your Honor.

4                THE COURT:  The objection is sustained.  This is

5    cumulative.

6                Please wrap it up, Ms. Cox.

7                DEFENDANT SHAWNA COX:  Okay.

8    BY DEFENDANT SHAWNA COX:

9    Q.  When you were refused to use the public facilities, was

10   there an offer from someone else to allow you to have that

11   meeting?

12   A.  Not right away.

13   Q.  Eventually?

14   A.  We had talked about maybe in a barn, or something.

15   Q.  Why wouldn't you want to meet in a barn?

16   A.  It was in the middle of the winter and it was very cold,

17   and there's no seating or heating.

18   Q.  When you say cold, how cold?

19   A.  It was down below zero at some times.  Usually below

20   freezing.

21               Mr. Grasty said we could meet in an open field

22   somewhere if we wanted to.

23   Q.  If an employee wanted to go to work at the refuge, could

24   they?

25               MR. BARROW:  Objection, your Honor.

Briels - X - By Mr. Mumford                119

1          THE COURT:  The objection is sustained.

2          Lack of this witness's knowledge for those employees.

3          Ms. Cox.

4          DEFENDANT SHAWNA COX:  I have no further questions,

5     your Honor.

6          THE COURT:  All right Mr. Mumford.

7                        CROSS-EXAMINATION

8     BY MR. MUMFORD:

9     Q.  This meeting where you had the -- you grabbed the mic, what

10    did you do with it?

11    A.  You mean at the high school?

12    Q.  Yeah.

13    A.  I spoke about the Harney County committee of safety, our

14    involvement, and that -- I reaffirmed that we were not a law --

15    a member of Harney County government, nor would we ever want to

16    be.  And that the website had been purchased by Ammon Bundy,

17    and we --

18          MR. BARROW:  Objection to hearsay.

19          THE COURT:  The objection is sustained.

20          THE WITNESS:  I'm sorry.

21          THE COURT:  That's all right.  That was a very broad

22    question.

23          Ask a question without calling for hearsay, and let's

24    proceed, please.

25    BY MR. MUMFORD:

Briels - X - By Mr. Mumford

1    Q.  Well, you addressed the -- the meeting.  Right?

2    A.  Yes.

3    Q.  And -- and what did you tell the -- the people that were

4    there?

5              MR. BARROW:  Your Honor, this has been asked and

6    answered.

7              THE COURT:  The objection is sustained.

8    BY MR. MUMFORD:

9    Q.  You told the meeting about the folks at the armory?

10   A.  Yes.

11             MR. BARROW:  Objection.

12             THE COURT:  We've covered this, Mr. Mumford.  Please

13   ask something new.

14   BY MR. MUMFORD:

15   Q.  You said there were -- later, some differences developed

16   between you and Judge Grasty?

17   A.  Yes.

18   Q.  What were those?

19             MR. BARROW:  This has been objected to and sustained,

20   your Honor.

21             THE COURT:  And also described.  He also described,

22   already, that it ultimately led, in part, to his resigning.

23             Now, let's ask something new, please.

24   BY MR. MUMFORD:

25   Q.  Mr. -- Mr. Briels, did -- did you suffer repercussions as a

Briels - X - By Mr. Mumford                121

1    result of being on the -- of your involvement with the -- the

2    committee of safety?

3    A.   Yes, sir.

4    Q.   What were those?

5                MR. BARROW:  This has been asked and answered, your

6    Honor.

7                THE COURT:  If it's anything more than what you've

8    already described, you may answer.

9                Don't repeat yourself, sir.

10               THE WITNESS:  Are you talking to me?

11               THE COURT:  Yes.

12               THE WITNESS:  I'm sorry.

13               Just people describing my character on Facebook

14   and -- and, I guess, slandering me.  Just attacking me

15   verbally.

16   BY MR. MUMFORD:

17   Q.   Do you have an understanding of why people would have a

18   problem with you being on the committee of safety?

19               MR. BARROW:  Objection, your Honor.

20               THE COURT:  The objection is sustained.

21               We're now beyond relevance here.  So please ask the

22   witness something new and relevant.

23   BY MR. MUMFORD:

24   Q.   If -- do people -- do some people in Harney County now

25   refer to you as a --

Briels - X - By Mr. Mumford

1    THE COURT REPORTER:  As a what?  I'm sorry.

2    MR. MUMFORD:  Now refer to you as a hero?

3    MR. BARROW:  Objection to relevance.

4    THE COURT:  The objection is sustained.

5  BY MR. MUMFORD:

6  Q.  Other than this meeting at the high school, where you

7  shared the experiences that you had investigating these guys at

8  the armory, were there other instances where you shared that?

9  Did -- that -- that -- that encounter?

10  A.  Yes.

11  Q.  What were those?

12    MR. BARROW:  Your Honor, those aren't relevant, based

13  on the proffer of why the testimony --

14    THE COURT:  The form of the question is problematic.

15    Rephrase the question to ask for something

16  relative -- relevant and noncumulative, please.

17    MR. MUMFORD:  Thank you, your Honor.

18  BY MR. MUMFORD:

19  Q.  Were -- were those -- were some of those in meetings where

20  Mr. Ammon Bundy was in attendance?

21  A.  Yes.

22  Q.  When did you share -- when did you share that experience

23  that you had had in the investigation with Mr. Ammon Bundy?

24  A.  I believe it was the day that I resigned, if not the day

25  before.  I had the encounter the day before, and then after the

Briels - X - By Mr. Mumford

1  meeting with Grass -- with Grasty, and I went to the refuge --

2  Q.   Um-hmm.

3  A.   -- for the press conference.

4  Q.   And you met -- how long did you meet with Mr. Bundy before

5  the -- the -- the press conference -- press conference?

6  A.   Several hours, at different times.

7  Q.   And what -- what was it that you shared with him about the

8  conclusions you had come to regarding your investigation into

9  those -- those -- into those guys?

10           MR. BARROW:   I'm going to object on hearsay, your

11  Honor.   We already covered the basic fact of what he was told.

12           THE COURT:   Rephrase your question to get a concise

13  answer.   We are not going to go through everything he told

14  Mr. Bundy that you contend later may be a basis for his state

15  of mind.   You need to be pointed here with your question.

16           Rephrase it.

17           MR. MUMFORD:   Thank you.

18  BY MR. MUMFORD:

19  Q.   In your -- at this conversation with Mr. Bundy, you told

20  him about your investigation into those acts --

21  A.   Yes.

22  Q.   -- at the armory.   Right?

23           Without going too long here, what did you tell

24  Mr. Bundy that you had concluded as a result of your

25  investigation into those guys?

Briels - X - By Mr. Barrow    124

1    A.   That the fear was coming from the FBI and not the patriots.

2              MR. MUMFORD:  Thank you, Mr. Briels.  Thank you, your

3    Honor.  No more questions.

4              THE COURT:  All right.  Any questions?

5              MR. BARROW:  Very briefly, your Honor.

6                        CROSS-EXAMINATION

7    BY MR. BARROW:

8    Q.   Mr. Briels, you testified about your visits to the refuge

9    during the occupation.

10   A.   Yes.

11   Q.   And when you approached the front entrance to the refuge,

12   there was an individual or individuals parked in a white truck

13   that were blocking the entrance?

14   A.   Yes.

15   Q.   And they had firearms?

16   A.   Yes.

17   Q.   And that was true for every time you went to the refuge

18   during the occupation.  Isn't that right?

19             MR. SCHINDLER:  These questions were asked and

20   answered by this man.  Objection.

21             MR. BARROW:  Your Honor, it's cross-examination.

22             THE COURT REPORTER:  One person.

23             THE COURT:  Will you stop arguing and take a seat.

24             MR. SCHINDLER:  Sure.  Thank you.

25             THE COURT:  The number of times he went, it was not

Briels - X - By Mr. Barrow

1  established that each and every time there were people with

2  guns.  It was established there were people with guns.

3          He may ask this question in cross.

4          Ask the question.  Move on, then.

5          MR. BARROW:  Thank you.

6  BY MR. BARROW:

7  Q.  Mr. Briels, and each time you visited the refuge, was there

8  someone with guns at the front gate?

9  A.  Yes, it was a routine.

10  Q.  Now, sir, you've lived in Harney County for 30-plus years?

11  A.  Yes, sir.

12  Q.  And prior to the occupation -- in other words, before

13  January of 2016, you had visited the refuge as a member of the

14  public dozens of times.  Is that right?

15  A.  I wouldn't say dozens.  I would say a half a dozen.

16  Q.  Half-a-dozen times.

17          And in those visits prior to the occupation, you were

18  never met by an individual in a pickup truck, blocking the

19  entrance with weapons, were you?

20          MR. SCHINDLER:  Objection, foundation.

21          THE COURT:  Well, the question calls for the

22  foundation.  In that respect, it's overruled.

23          If you have a different objection --

24          MR. SCHINDLER:  Well, he never said he went to refuge

25  headquarters at any point in time.

Briels - X - By Mr. Mumford

1              THE COURT:  Counsel, that wasn't the form of the

2    question.

3              MR. SCHINDLER:  Okay.  Thank you.

4              THE COURT:  But it is argumentative.

5    BY MR. BARROW:

6    Q.  Sir, let me ask you this way.

7              In your visits to the refuge prior to January of

8    2016, did you enter the refuge through the front entrance?  The

9    front gate?

10   A.  A couple of times, yes.

11   Q.  Did you ever encounter an individual in a white pickup

12   truck or individuals in a white pickup truck with firearms

13   prior to January 2016?

14   A.  No.

15             MR. BARROW:  No further questions, your Honor.

16             THE COURT:  All right.  Thank you, sir.

17             You may step down.

18             MR. MUMFORD:  Your Honor, I've got one more.

19             THE COURT:  Well, if it's responsive only to this

20   cross, nothing more.

21             Go ahead.

22                           CROSS-EXAMINATION

23   BY MR. MUMFORD:

24   Q.  You -- in answer to the question, you said part of the

25   routine, right?

Briels - X - By Mr. Mumford

1  A.   Um-hmm.

2  Q.   How come you call it the routine?

3  A.   Because it was always the same.  It was just -- it was just

4  a procedure that you went to -- to go in there.

5  Q.   Um-hmm.  And so you would pull up.  How long would this

6  routine take?

7  A.   Maybe a minute.

8  Q.   And -- and at no point during the routine, anyone pointing

9  anything at you, right?

10  A.   Absolutely not.

11  Q.   And -- and -- and as soon as they radioed down, you would

12  go through.  Right?

13  A.   Yes.

14  Q.   Thank you.

15  A.   They would move the vehicle, and I would go through.

16        MR. MUMFORD:  Thank you.  Nothing further.

17        THE COURT:  Okay.  Now, Mr. Briels, you're free to

18  go.  Thank you, sir.

19        THE WITNESS:  Thank you.

20        THE COURT:  And, ladies and gentlemen --

21        Go ahead and step on down.

22        Ladies and gentlemen, we'll take the noon break now.

23        Please leave your notes on the chair.  Don't discuss

24  the case.  Enjoy the break.  We'll be back in session about

25  1:15, or so.  As soon as I'm sure we're ready.  All right?

Colloquy

1              Let's all stand for the jurors.

2              Don't discuss the case or anything it involves during

3    your break, or otherwise.

4              (Jurors exit at 12:01 p.m.)

5              THE COURT:  Thank you, everyone.  Please be seated.

6              So, Mr. Mumford, may I have an update, please?

7              MR. MUMFORD:  Yes, your Honor.

8              Is it possible for us to meet during the lunch hour,

9    because I think Mr. Bundy will probably take the stand after --

10             THE COURT:  Define "us."  I don't know what you mean

11   by "us."  You mean, you and Mr. Bundy?

12             MR. MUMFORD:  Me and Mr. Bundy.  Yes, your Honor.

13   Could we meet -- perhaps if we could meet on the fourth floor,

14   that would be --

15             THE MARSHAL:  (Nods head.)

16             THE COURT:  Yes, the marshal will help work that out.

17             And so your plan, then, is for him to testify after

18   the noon recess?

19             MR. MUMFORD:  That is -- that is the current --

20             THE COURT:  We'll verify it, but I just wanted to be

21   sure.

22             Then the only other witness ready for today may be

23   Ms. Fiori.  Is that right?

24             MR. MUMFORD:  I believe --

25             THE COURT:  So that needs to happen, the conferral,

Colloquy

1    so the Government can address this.  If it turns out Mr. Bundy

2    doesn't choose to testify, we need defense evidence ready to

3    go, to fill the afternoon.

4              So counsel have a job to do over the noon hour.

5              Mr. Knight?  Yes.

6              MR. KNIGHT:  Thank you, your Honor.

7              Just going forward, now that we've got some idea of

8    anticipated testimony.  The Court mentioned this yesterday.

9    The Government would not be opposed to filling up the week in

10   some fashion, if it works for all of the parties -- including

11   the jury, obviously -- but later Thursday or Friday, given our

12   short week next week.  That would be our preference, so I put

13   that out there.

14             THE COURT:  We're having trouble filling up Tuesday

15   right now, potentially.  So I'm going to assess the situation

16   tonight and tomorrow.

17             The jury has been counting on having Friday off.

18   What I might suggest to them is we work another hour on

19   Thursday.  When I explained to them -- they yet don't know that

20   the court won't be in session next Wednesday because of the

21   Jewish holy day.  And so they may be willing to spend another

22   hour on Thursday before adjourning.  But then that starts to

23   cut into the travel time for jurors who come a long way, and I

24   don't want to put anybody at risk; unless they were willing to

25   work a whole day and spend the night and go.

Colloquy

 1          But, you know, buying another hour or two doesn't

 2   look like it's going to change, really, the overall

 3   presentation.

 4          What I -- what I think needs to happen is an

 5   assessment of what these other witnesses are going to say and

 6   the extent to which we're covering new material.  But that --

 7   I'll leave that to all of you.

 8          So it's five after 12:00.  We'll resume -- I would

 9   like everybody in their places at 1:20, so we can be sure we

10   have a plan for when the jurors come out at 1:30.

11          Anything else for the record, right now?

12          Okay.  Mr. Bundy, Mr. Bundy, Mr. Fry may leave.

13          (Pause.)

14          THE COURT:  You know, Mr. Mumford, you need to stay

15   seated, please, while this is happening.  I've asked

16   repeatedly.

17          MR. MUMFORD:  I thought I had given them enough of a

18   head start.  Sorry.

19          THE COURT:  I want to note for the record that the

20   session we had that was in camera -- that is to say, without

21   the members of the public appearing -- is sealed for the record

22   until further order of the Court.

23          We'll be in recess, now.

24          (Recess taken at 12:05 p.m.)

25          (Conclusion of second excerpt.)

Colloquy

131

1              -0-

2              (Colloquy was reported, but not transcribed herein.)

3              (Third excerpt.)

4              (Jurors enter.)

5              THE COURT:  All right.  Thank you, everyone.  Please

6    be seated.

7              Jurors, welcome back.

8              Anything you need to bring to my attention?

9    Everybody ready to go?

10             All right.  I want to read to you an amplified

11   statement of judicial notice regarding the *Hammond* case.  I

12   read part of this to you earlier in the case, but I've made one

13   addition to it that I want you to have in mind.  And then I'm

14   going to reread to you the stipulation that was read into the

15   record about the so-called Bunkerville incident.  I'm doing

16   that simply as an aid for context as we continue to hear about

17   the situation and the issues involving the state of mind of the

18   various defendants relative to the Hammonds.

19             So with respect to the Hammonds, on June 21, 2012,

20   Dwight and Steven Hammond were convicted of use of fire to

21   damage and destroy property of the United States, arson, by a

22   jury in the District of Oregon.

23             Dwight Hammond was convicted of one count of arson on

24   land belonging to the Bureau of Land Management in Harney

25   County, Oregon.

Colloquy

1    Steven Hammond was convicted of two counts of arson

2 on land belonging to the Bureau of Land Management and land

3 belonging to the Malheur National Wildlife Refuge in Harney

4 County, Oregon.

5    On October 30th, 2012, a U.S. district judge

6 sentenced Dwight Hammond to three months in prison and Steven

7 Hammond to 12 months and a day in prison.

8    On February 7, 2014, the Ninth Circuit Court of

9 Appeals overturned the district judge's sentences.  The

10 Hammonds appealed to the United States Supreme Court, which

11 denied review of their case.

12    On October 7, 2015, a U.S. district judge sentenced

13 Dwight and Steven Hammond to serve mandatory five-year terms of

14 imprisonment.

15    On January 4, 2016, the Hammonds reported to a

16 Federal Correctional Institution in California to serve the

17 remainder of their sentences.

18    The arson statute that the Hammonds were found guilty

19 of violating is included in a wide-ranging provision Congress

20 passed in 1996 titled, The Anti-terrorism and Effective Death

21 Penalty Act of 1996; AEDPA, A-E-D-P-A.

22    AEDPA addresses a variety of topics including

23 provisions regarding criminal law such as arson, terrorism

24 crimes, death penalty litigation procedures, and mandatory

25 minimum sentences.

Colloquy

1        The five-year mandatory minimum sentences which the
2    Hammonds are now serving are required by a provision in the
3    AEDPA titled, Enhanced Penalties for Use of Explosives or Arson
4    Crimes.

5        Now, with respect to the Bunkerville issue or
6    incident and the phrase "Bunkerville and Bundy Ranch event,"
7    the parties entered into a stipulation that I read to you
8    previously.  And I'm reading it again, so that you have context
9    for additional evidence.

10        Bunkerville is a small town in Clark County, Nevada.
11    In April of 2014 the Bureau of Land Management initiated an
12    operation to execute federal court orders to impound cattle
13    belonging to Cliven Bundy, Ammon and Ryan Bundy's father, on
14    grounds that the cattle were unlawfully grazing on federal
15    public lands.

16        About a week after initiating the impoundment, the
17    BLM suspended operations after receiving information that
18    hundreds of people had traveled to Bunkerville, Nevada, to
19    support Cliven Bundy and to confront the BLM in an effort to
20    force the cessation of the impoundment.

21        Hundreds of Cliven Bundy supporters, including many
22    openly carrying firearms, converged on the impoundment site,
23    demanding that the BLM personnel leave the site immediately and
24    release the impounded cattle.  Due to the BLM safety concerns,
25    the BLM did in fact leave the site and release the impounded

Ammon Bundy - D - By Mr. Mumford

1    cattle.

2              Defendants David Fry, Jeff Banta, and Kenneth

3    Medenbach were not present at Bunkerville; nor were they

4    associated with the events there in April of 2013.

5              So, again, that's just background.

6              Now, the defendant's next witness is Mr. Ammon Bundy.

7              Sir, would you stand, face the jury and the deputy

8    there, raise your right hand to be sworn.

9              (Witness sworn.)

10             THE WITNESS:  Yes.

11             THE CLERK:  Please have a seat.

12             THE COURT:  Please bring yourself close to the

13   microphone, sir.  And tell us your full name, spelling it all.

14             THE WITNESS:  Ammon Edward Bundy.  A-M-M-O-N,

15   E-D-W-A-R-D, B-U-N-D-Y.

16             THE COURT:  Thank you.

17             Mr. Mumford.

18                      DIRECT EXAMINATION

19   BY MR. MUMFORD:

20   Q.  Mr. Bundy, where do you live?

21   A.  I live at the Multnomah County jail, maximum security, just

22   across the street.

23   Q.  How long?

24   A.  I've been there for 8 1/2 months.

25   Q.  What happened on January 26?

Ammon Bundy - D - By Mr. Mumford

1  A.   January 26, I was on my way with several others to a

2  community meeting in John Day, Oregon.  They invited us and

3  organized that meeting.  It was our understanding there would

4  be two to four hundred people there, including the county

5  sheriff and his deputies; County Sheriff Palmer.  And they

6  asked us to come out and to share what we had been sharing --

7          MR. KNIGHT:  I'm going to object to the

8  description --

9          THE WITNESS:  -- and it was my understanding --

10         THE COURT:  Hold on, Mr. Bundy, please.

11         When there's an objection, I just need to hear what

12 it is, please.

13         What's the objection?

14         MR. KNIGHT:  The description of the events in Grant

15 County as irrelevant.

16         THE COURT:  The objection is overruled.

17         Go ahead, Mr. Bundy.

18         THE WITNESS:  So --

19 BY MR. MUMFORD:

20 Q.   I think we were at there were going to be two to four

21 hundred people there.  And what did you anticipate?

22 A.   They -- several members of their county had come to the

23 refuge and had gone through presentations that we were giving

24 there about land rights, individual rights, the federal

25 limitations on -- on owning land inside a state.  And they

Ammon Bundy - D - By Mr. Mumford

1   found that this presentation was -- it was my understanding

2   that they found that this presentation was accurate and that

3   the people of Grant County needed to hear it.  And so they

4   organized a meeting there, and we were on our way to that

5   meeting.

6   Q.  And -- and -- and what happened?

7   A.  We left in a group -- I guess it was two vehicles.  There

8   was other vehicles in front of us, several minutes in front of

9   us.  And once we started climbing into the -- the pine trees

10  there, we were pulled over by several different vehicles.  And

11  the -- LaVoy's vehicle was in front of us.  LaVoy and Ryan and

12  Shawna Cox and Ms. Sharp was in one vehicle.  And myself with

13  Ryan Cavalier and Mark was in another one, and they pulled us

14  over.

15  Q.  And -- and when we -- we can get back to that in -- in --

16  in -- in -- in a bit here.

17          Is -- is -- is that the day of your -- the shooting

18  death of your friend, LaVoy Finicum, then?

19  A.  That is correct.  That is the day they shot him, and -- and

20  the day they arrested us.

21  Q.  As we get started, cover some background.  How -- how old

22  are you?

23  A.  I'm -- I just turned 41 years old September 1st.

24  Q.  Where are you from?

25  A.  I'm from Southern Nevada, just outside of Mesquite, Nevada.

Ammon Bundy - D - By Mr. Mumford

1    I grew up on a ranch about 15 miles south of Mesquite, Nevada,

2    just north of -- of the Lake Mead.

3    Q.   Is that the Bunkerville that we've heard so -- so much --

4    A.   Yeah.  Bunkerville is the closest little town that we go to

5    church in and that -- we basically have a lot of relatives that

6    live there.  But there's actually no stores or anything there,

7    so we have to go into Mesquite to shop.  And if we need to do

8    any serious shopping we have to go into St. George, Utah.  And

9    that's where I grew up, on a ranch out --

10   Q.   Showing you what's been marked as Exhibit 1232.  What is

11   it?

12   A.   I can't see -- oh, there.

13            That's my beautiful little family.

14   Q.   How -- what's your wife's name?

15   A.   Lisa.

16   Q.   How many kids you got?

17   A.   I've got six children.

18            THE JUROR:  Your Honor, we aren't seeing it.

19            THE COURT:  Hold on.  You're not seeing it?

20            MR. MUMFORD:  Sorry.  It should have been published.

21            THE COURT:  It should be published.  It's received.

22            Thank you for letting us now.

23            Go ahead, Mr. Mumford.

24   BY MR. MUMFORD:

25   Q.   You said your -- your -- your -- introduce us to your

Ammon Bundy - D - By Mr. Mumford

1   family again, now that the jury can see it.

2   A.   So my wife, Lisa.   The oldest is my little girl, standing

3   between the two of us, is Halley.   Then Hayden is in front of

4   me.   And Bowen is in front of Halley.   And then Brinkly, and

5   then Emery is the little girl on the left.   And then my little

6   boy, Elias.

7   Q.   Backing up a little bit.

8           Can you briefly describe for the jury the

9   environment -- environment that you grew -- grew up in, both in

10  terms of your home and your -- your -- your family's ranch?

11  A.   So, again, we -- we live on about 160 acres of deeded

12  property where we farmed.   We raised hay.   We raised melons.

13  And then on the mountains we raise cattle, a cow/calf

14  operation.   We have about 600 head of cattle.   And they run

15  over a vast area of the desert.   It takes about 100 acres to

16  just feed enough for one cow.

17          So we have a large area that we are -- our cattle run

18  on, just -- just to feed them.   And we have a watering system

19  up there that come from 11 different springs up on the

20  mountains.   And over the years, they've been piped down through

21  all -- all through the area, about a 30-mile span, to water the

22  cattle.

23          They also -- there's a great benefit to the wildlife,

24  as well.   Because the quail and the -- the deer and even the

25  coyotes and the desert tortoise all benefit from that water

Ammon Bundy - D - By Mr. Mumford

 1   system that goes throughout there.

 2          And this -- these -- this water system was

 3   established by my forefathers five generations ago.  First

 4   started in 1877.  And which runs about 100 -- 100 -- now,

 5   today, about 138 years.  And we've run cattle that long and --

 6   on that range.

 7   Q.  As you were describing that, you used a phrase I don't

 8   think people hear that often.

 9          How come you used the phrase "deeded property"?

10   A.  Well, because there is a difference between a deeded real

11   estate.  As far as private property, a lot of people will call

12   it private property.  And then there's public property, where

13   it's public land.  Where people have rights to camp, they have

14   a right to hike on it, they have rights to access it.  But

15   there's also other rights that are attached to that, such as

16   grazing rights.

17          MR. KNIGHT:  Your Honor, I'm going to be --

18          THE COURT:  Excuse me, sir.

19          MR. KNIGHT:  Your Honor, I'm going to object to the

20   relevance of the witness opining about the legal nature of land

21   rights.

22          THE COURT:  Please rephrase the question in terms of

23   the witness's state of mind relevant to the crime here.

24          And, jurors, you'll remember that when a witness

25   talks about issues of law, it has to do with his belief, as

Ammon Bundy - D - By Mr. Mumford                    140

1    opposed to what the state of the law is.

2              Go ahead, Mr. Mumford.

3              MR. MUMFORD:   That is not necessarily suggesting that

4    they're different though, right?

5              THE COURT:   The witness is not allowed to instruct

6    the jury on the law.   And as they hear his testimony, they need

7    to take it -- ladies and gentlemen -- with respect to what he

8    believes the law is.

9              Go ahead, Mr. Mumford.

10             MR. MUMFORD:   Thank you.   Thank you very much, your

11   Honor.

12   BY MR. MUMFORD:

13   Q.   It -- is it fair to say that's just how people talk when --

14   when they -- when -- when -- when they grow up in a small town

15   like that in a ranching community?

16   A.   Yeah, I think it's fair to say those that understand, those

17   that know.   Those that have those established rights on the

18   land.   And we've had to fight for them.   We've had to learn

19   what they are.   We've had to learn what they mean.   We've had

20   to learn and understand how they were established.

21             And they have been -- you know, it's constantly a

22   battle to try to keep those and hang onto those and have

23   those -- not to have those taken from us.   So we've learned, in

24   great depth, that -- what it takes and what it is to own

25   that -- those rights.   And it's something that -- that is very

Ammon Bundy - D - By Mr. Mumford

1  real to us.  It's our heritage.  And is something that is the

2  lifeblood of our -- of our operation and the lifeblood of

3  what -- what the ranch is.

4  Q.  Did you work on this ranch with your siblings, growing up?

5  A.  Yeah, I did.  I -- I was born in St. George, at the

6  hospital in St. George.  But then -- I'm sure a few days after

7  that, they took me home.  And I've been there ever -- ever --

8  well, until I moved away as -- as a young man.  Yes, I worked

9  with my brothers, my sisters, and we did everything on the

10  ranch.

11  Q.  Is one of your brothers here in the courtroom today?

12  A.  He is.  My brother Ryan.

13  Q.  You and Ryan grow up together?

14  A.  Yes, we did.  We grew up on the ranch that I'm talking

15  about.  My father actually grew up on the -- in the same home

16  that I grew up in.  My grandfather built that home in 1940, and

17  I grew up in the same home as my father.

18  Q.  How would you describe your relationship with -- with Ryan,

19  growing up?

20  A.  Most of the time we got along.  There was five of us boys

21  and so -- and we were always working.  We were always -- I felt

22  expected to carry a man's load most of the time when we were

23  even young men, as far as work goes.  And we always -- we

24  didn't always get along.  But for the most part, we -- we began

25  to understand each other quite a bit and always stood with each

Ammon Bundy - D - By Mr. Mumford

1    other.  And we -- we did a lot of things together.

2    Q.  Is he older than you or younger?

3    A.  He's three years older than me.

4    Q.  Do they give him the hassle about being the good looking

5    one?

6    A.  Sure.  Yeah.  Why not?

7    Q.  How about your father?  We've heard a little bit about your

8    father.  What -- what kind of relationship did you have with

9    him?

10   A.  My father, ever since I was little, took us with him

11   wherever he went.  And so whether it was on a horse or whether

12   it was in a cattle truck or whether it was on a piece of

13   equipment or whether we were fixing water lines or water tanks,

14   or whatever it is, my dad took us with him everywhere he went.

15        Now, of course, he did have to go to do construction

16   in Las Vegas to supplement, sometime, when we didn't have

17   enough money to pay the bills.  And he would go do construction

18   then, and he wasn't allowed to take us.  But besides those

19   time, he took us everywhere and taught us how to work, taught

20   us how to be good to each other, taught us how to treat other

21   people.  And he was a good father.

22   Q.  How old are you?  How old were you when you started to work

23   on the ranch?

24   A.  I don't remember how old I was.  I was young enough that I

25   don't remember a lot of those things.

Ammon Bundy - D - By Mr. Mumford                    143

1   Q.  Tell us about your education.  Do you -- graduate from high

2   school, attend college?

3   A.  I graduated from high school.  Attended college for just

4   one year.  And I desired to stay on the ranch.  But my dad,

5   when I was about 15 years old, made it pretty clear that he's

6   got a lot of boys and a lot of kids.  And the ranch just wasn't

7   going to be able to produce enough income for all of us.

8              So that I was going to have to, you know, go find a

9   living.  And -- and so I started a business to try to get me

10  through college.  A fleet maintenance business, where I manage

11  and maintain commercial trucks.  And struggled, trying to

12  figure out how to make that business work and put me through

13  school.

14             And then it kind of took off.  And so I had to make a

15  decision whether I was going to continue in school, which was

16  business management; or whether I was just going to go manage

17  my business and do the best I can.  And, ultimately, I decided

18  to just manage my business, and I've done that ever since.

19  It's almost -- in July of this year, on -- July next year, so

20  2017, will be 20 years.

21  Q.  What's the name of that business?

22  A.  Valet Fleet Service.

23  Q.  And that's -- the name of that business has come up in this

24  trial, hasn't it?

25  A.  Yeah, it has several times.

Ammon Bundy - D - By Mr. Mumford

1    Q.   How?

2    A.   Well, other -- it's my main source of income.  I think

3    they've talked about it in, like, our pretrial release, and

4    that kind of stuff, about me being, you know, connected to the

5    community.  I -- I have --

6              MR. KNIGHT:  I'm going to object to -- well,

7    relevance, nonresponsive, and the narrative form of the answer.

8              THE COURT:  The issues at pretrial release and -- are

9    not issues for the jury.  So to the extent this issue about the

10   name of the business is coming up in the trial is relevant.

11   You can ask him about that but not pretrial proceedings.

12             Please continue.

13   BY MR. MUMFORD:

14   Q.   It's come up in the -- in the trial.  I think you -- the --

15   the -- the truck was -- was -- the truck you drove to the

16   refuge was -- was in that name?

17   A.   That's correct.  My -- the truck is registered in the name

18   of the business.  That's correct.

19   Q.   You talked about going to college, getting a business.

20             When did you get married?

21   A.   I got married in 2001.

22   Q.   And how old would you have been then?

23   A.   I was almost 26 years old.  So I was 25, about a month away

24   from my 26th birthday.

25   Q.   Your -- you and your wife build the business together,

Ammon Bundy - D - By Mr. Mumford

1  then?

2  A.  Yeah, I had started it and had it for a couple -- about

3  three years before that.  But she actually brought some good

4  sense to me.  And we actually did -- I did much better and have

5  continued to do, you know, better with her by my side.  So,

6  yes.

7  Q.  Jumping forward a minute, pertaining to you coming to

8  Oregon in 2015.

9          Prior to 2015, have you ever traveled to Oregon?

10  A.  I did one time for business actually -- well, excuse me,

11  twice.  One time for business.  I was only in Oregon, right in

12  Ontario, for about an hour.  And then I also came because I had

13  a dear friend, a mission president that passed away from here.

14  And I flew in and went to his funeral and went to the temple,

15  and then flew back out.  So those are my experiences with

16  Oregon before that time.

17  Q.  Now, you just -- you used a few -- a few words there the

18  jury might not understand:  A mission president and temple.

19          What are you talking about?

20  A.  Well, I served an LDS mission when I was 19 years old.

21  Between 19 and 21, two years.  And they have a -- usually an

22  older gentleman, member of the church, of course, that presides

23  over that mission.  And he's -- gives the guidance and

24  leadership.  And -- and I became very good friends with -- with

25  this man.

146

Ammon Bundy - D - By Mr. Mumford

1   Q.   Where were you living in the fall of 2015?

2   A.   In the fall of 2015?  I was living in Emmett, Idaho.

3   Q.   And explain sort of what was -- what was your -- your --

4   what was your routine, would you say, on a daily basis, at that

5   point in time?

6   A.   Well, I still had my business, actually, in Arizona.  And

7   so -- but my wife and I -- we bought a little orchard in

8   Emmett.  And I wanted to get my children out of the city,

9   further away from the city.  And so we moved to Emmett.

10           And then about once a week I would fly down to

11   Arizona and take care of my business down there and then fly

12   back.

13           And besides that, you know, I was working on the

14   phone and computer and also taking care of the orchard and

15   raising kids.

16   Q.   Now, prior to the fall of 2015, did you have any

17   connections to Burns, Oregon, or Harney County, Oregon?

18   A.   No, none at all.

19   Q.   Did you know Dwight or Steven Hammond?

20   A.   No, I did not.

21   Q.   Did you know their family?

22   A.   No.  Knew nothing about them.  Nothing.

23   Q.   At some point did you become aware of their -- the

24   situation regarding the Hammonds?

25   A.   I did.  I -- I had -- just -- my dad had called me a couple

Ammon Bundy - D - By Mr. Mumford

1   of times -- well, we were just talking and just -- you know,

2   normal conversation.

3   Q.   Well, and give us -- give us a time frame here.

4   A.   This would be, like, you know, the summer of 2000 -- 2015,

5   here and there.  And he would ask me what I knew about the

6   Hammonds.  And I responded that I didn't know anything.

7          And he had just received, you know, different

8   headlines and people asking about the Hammonds.  And I think it

9   was probably at the beginning of October he asked me again, and

10  I told him that I didn't know anything about them.  And he

11  expressed, well, I'm afraid what's happening to them (pause) --

12         I'm sorry.  He said, I'm afraid that what's happening

13  to them -- (pause, crying) -- was the same thing that happened

14  to us.

15         And I told him at that time -- I said, "Dad, I can't

16  fight another battle."  I go, "We're doing the best we can to

17  try to keep -- keep our family from going to prison because of

18  what these people are saying about us for just doing what we've

19  been doing for 138 years."  And I just told him I -- I -- I

20  just -- I couldn't -- I couldn't get involved.  And that's

21  where I left it.

22  Q.   Did that change at some point?

23  A.   Yes, it did.

24  Q.   When was that?

25  A.   At the beginning of November.  I think it was the 2nd of

Ammon Bundy - D - By Mr. Mumford

1    November.  I was laying in bed, and someone sent me a message

2    on my -- my phone.  And I was tired.  It was evening, late.

3    And I reached over and grabbed my phone.  And I clicked on the

4    message, and it opened up to an article about the Hammond

5    family.

6              And at that moment -- it's hard to describe.  This

7    overwhelming feeling of -- that -- that it was my duty to get

8    involved and to try to protect this family.  And I'm sorry.  I

9    don't want to come off (pause) -- anyway.  And I tried to

10   suppress that feeling a little bit.  Tried to fight it.  Say

11   no, it wasn't my responsibility.  But it continued to press

12   upon me until I couldn't -- couldn't lay in bed any longer.

13             And I got up --

14   Q.  I was going to ask, so what happened next?

15   A.  I got up, and I began to go to the Internet and to every

16   article I could and read about the Hammonds.  I read everything

17   I could, even pieces of the transcripts about their --

18   transcripts about their -- on -- on their -- their court

19   transcripts.  I read all of the articles I could get my hands

20   on.  I read everything, all through the night, and really began

21   to try to understand what was happening to them because I had

22   no idea.  And I didn't want to know, to be honest with you,

23   until that time.

24             And so I studied and -- all through the night, and I

25   didn't sleep that night.

149

Ammon Bundy - D - By Mr. Mumford

1    Q.   And -- and you didn't sleep.   And what did you do, instead?

2    A.   Well, in -- it was probably 3:00, 4:00 in the morning.   I

3    began to feel like I was supposed to write something.   And I

4    began to try to write what I was feeling, but I -- because of

5    my concern for the Hammonds, because I had learned -- I thought

6    I felt like I had a good beginning of what was going on.   And I

7    could see that it was very similar to what had happened to my

8    family and what happened to many other people that I knew in --

9    in the ranching and agricultural community.   And I began to try

10   to write this down.

11            And -- but I had a lot of emotions, I guess.   And so

12   I asked the Lord if I -- if he would help me clear my mind and

13   give me the words it say.

14            And that did happen, shortly after that, and I was

15   able to write.   And I wrote that first article that -- I think

16   it's addressed to government officials and aware citizens.

17            And once I wrote that, I asked my wife if she would

18   proofread it for me.   She did.   And then I sent it out to as

19   many people as I had contacts to, which was quite a bit because

20   of the -- what happened at the Bundy Ranch.   And I sent it out

21   to several thousand people.

22   Q.   Showing you what's been -- been marked as Exhibit 1234.

23   Mr. Bundy, do you recognize it?

24            MR. MUMFORD:   Your Honor, I would -- let's -- let's

25   just show it to the witness only at this point.

Ammon Bundy - D - By Mr. Mumford

1   BY MR. MUMFORD:

2   Q.   Mr. Bundy, do you recognize it?

3   A.   Yeah, that's -- the lower part of that is the beginning of

4   that letter I wrote.

5   Q.   And this is a letter you wrote and posted on -- what?   Your

6   blog?   Is that what --

7   A.   Yeah.   This is the Bundy Ranch blogspot.

8              MR. MUMFORD:   Your Honor, I would move to admit.

9              MR. KNIGHT:   No objection.

10             THE COURT:   All right.   It's received.

11             MR. MUMFORD:   Let's scroll back up to the top.

12  BY MR. MUMFORD:

13  Q.   So this is the -- what blogspot, now?

14  A.   Bundy Ranch blogspot.

15  Q.   Okay.   Did you often post here?

16  A.   I -- I did but -- yes, I did.

17  Q.   Others, too?

18  A.   Yeah, there's several others that, I guess, are

19  administrators on this.   I didn't -- this was our blogspot --

20  or the ranch's blogspot way before the Bundy Ranch, the --

21  before the whole incident in 2014, all of that.

22             So my mother and my sisters would put family stuff on

23  there.   Then it kind of got popular -- well, it did get popular

24  when the whole -- when the Bureau of Land Management came down

25  upon my family in 2014 and many became aware of us.   And

Ammon Bundy - D - By Mr. Mumford

1    they -- and so they were looking for sources, and this is one

2    of the ones that we found -- they found, and so we began to use

3    it to inform people.

4    Q.   When you said you sent -- sent this to several -- did you

5    say several thousand?

6    A.   Yes, thousands.

7    Q.   How -- how did you do that?

8    A.   Well, first of all, this was one source but -- you know, I

9    don't know how many people, other than there's reports that

10   show how many people read it.  And I don't remember the results

11   of that.

12          But then I also have e-mails that we've collected

13   over the last couple years and in a constant contact account.

14   And we sent it out to them.  And there's several thousand

15   e-mails that goes out to.

16   Q.   You say you've collected them.  How -- how -- how?  Why?

17   A.   Well, at the -- when all of the protesters and stuff came

18   to the Bundy Ranch -- again, in 2014 -- we had a way that they

19   could text.  This was set up by actually a county commissioner

20   out of Utah.  And he set it up where they could text a number,

21   and then it asked them for their e-mail.  And then they put in

22   their e-mail address and it creates this -- these accounts.  I

23   guess, all of these e-mails.

24          And then you -- from there on, you can send e-mails

25   out to them and communicate with them that way.

Ammon Bundy - D - By Mr. Mumford

1    Q.  Why did you start collecting e-mails?

2    A.  Well, after our experience at Bundy Ranch -- at the Bundy

3    Ranch -- I say that almost like -- it's -- it's a phrase thing,

4    now.  It's crazy.

5           But after what we experienced in 2014 and the threats

6    that came to us after that from the government saying that this

7    was not over, we -- we felt that we had to continue to keep the

8    eye on our family.  And continue to keep people and educate

9    people of what was going on, of why we stood.  How we weren't

10   anti-government.  How we believe in government very much.  What

11   the Constitution is about.  How we -- it stands to protect us.

12          And so we began to use all of these methods, I guess,

13   to communicate this to the people and to keep our family safe

14   through people being aware.  And so that's why I had access to

15   all of these e-mails and all of -- you know, that's why we

16   created the Bundy Ranch Facebook page and why we used the

17   blogspot, and all of that; to keep people informed, so that the

18   same thing wouldn't happen again.

19   Q.  Can you -- can -- can you -- can you, scroll -- scroll

20   through this letter.

21          Mr. Bundy, can you just characterize briefly sort of

22   what you were trying to accomplish with -- with -- by posting

23   this letter and sending it to -- to so many folks?

24   A.  You mean just the one on the Hammonds?

25   Q.  Yeah.

153
Ammon Bundy - D - By Mr. Mumford

1   A.  Well, first of all, I was trying to help people understand

2   that the -- the Hammonds were prosecuted.  That they served

3   their sentence, according to a federal judge.  And that that

4   wasn't enough.  The prosecutors had to go after them for more.

5   That they were resentenced and that they were headed back to

6   prison for the remainder of five years for -- and all of this

7   was done under an anti-terrorism act.  And they were charged as

8   terrorists under this act, as arson -- I should say, they were

9   charged as arsons under this terrorist act.  And this

10  clearly -- this act and these arson charges were clearly, in my

11  opinion, intended for terrorists, and that's why it had the

12  five-year minimum sentence on it.  Because it was intended for

13  terrorists that go and either blow up a federal building or

14  start a fire to it and --

15          MR. KNIGHT:  Your Honor, I'm going to object to the

16  characterization of the statute at this point.

17          THE COURT:  I'm going to overrule the objection to

18  the extent the answer has been given, but end it here.

19          Please move on.

20  BY MR. MUMFORD:

21  Q.  Did you also publish this on -- do you -- do you also --

22  does the Bundy Ranch have a Facebook page as well?

23  A.  That's correct.  Pretty much just cut and pasted into the

24  Facebook page and -- and on this.  And I think I drafted it

25  originally on Word.  So, yeah.

Ammon Bundy - D - By Mr. Mumford

1  Q.  And how many -- how many -- how many followers does the --

2  does the Bundy Ranch Facebook page have?

3  A.  Now?

4  Q.  Yeah.

5  A.  Well, I know -- I'm not sure exactly.  I know that when we

6  were at the refuge, we were hitting up in the 6 million range

7  of people that were, you know, looking at it.  And I don't know

8  exactly how they calculate those numbers, to be honest with

9  you.

10  Q.  You haven't been able to look -- look at your Facebook

11  page?

12  A.  No, it's been a while.  Eight and a half months.

13  Q.  So this is -- this is November 3rd, then.

14          What did you do -- I mean, that -- that's -- that's a

15  lot -- that's a lot for one day.

16          What happened next?

17  A.  Well, after I sent the information out, I started getting a

18  lot of phone calls from people and e-mails back.  And I

19  communicated with several different people about what went on.

20  I actually found that some people had already done more

21  research than I had, and they had sent me some of those -- that

22  research and had more details than I had.  And so I added that

23  and read that and understood that.

24          But then I began to feel pretty strongly that I

25  needed to go out and meet the Hammonds.  I needed to go and see

1   who they really were, to see if maybe they antagonized this.

2   Maybe they deserved -- or maybe at least they -- anyway, I

3   needed to see what type of people they were.  I needed to

4   understand who they were.  So I -- I planned a trip and went

5   out there, I think, on the 3rd or the 4th.  I think it was the

6   3rd.

7   Q.  Now, prior to that, had you ever written or spoken or been

8   involved in any kind of activism in Eastern Oregon?

9   A.  No.  No.  In fact, I had never -- until the Bundy Ranch

10  thing, I had never been involved in anything until then.

11  Q.  Well, and -- and had -- had you been involved in some --

12  what people might consider to be activism since the Bundy Ranch

13  in 2014?

14  A.  Yeah, almost nonstop, it feels like.  I felt that we had to

15  in order to keep them, again, from coming down upon my family.

16  Especially my parents.

17  Q.  "Keep them," referring to who?

18  A.  To the federal government.  The agent -- mainly the

19  agencies of the executive branch from coming down, as they did

20  before.  It was five agencies involved that we know of.  And

21  they came down on my family after being there, again, for 138

22  years, five generations.

23  Q.  What -- what -- what form did this activism take, from --

24  in the intervening time between Bundy Ranch in 2014 and this

25  letter to the -- regarding the Hammonds in November 2015?

Ammon Bundy - D - By Mr. Mumford

1    A.  Well, a lot of different forms.  Different groups would

2    ask -- ask me to come speak, ask family members to come speak.

3    But also we had done a lot of research and -- and a lot of

4    understanding of what rights were before this because -- before

5    the whole Bundy Ranch incident.  And so we were asked -- I was

6    asked to speak at different seminars.  I was asked to speak at

7    different academies, even high schools, about land rights and

8    about how rights were established, how they're maintained, and

9    how they're transferred; and also what the role is of

10   government in those things.  And so I -- I was doing that a

11   lot.

12   Q.  You -- you -- you say you were doing that a lot.

13          How -- how would those opportunities to give

14   presentations, how would those generally come about?

15   A.  All of them, that I know of, are by invitation.  They would

16   contact somebody and then ultimately get ahold of us and get

17   ahold of me and my wife.  And then ask if we -- if I would come

18   and present to them.  And -- and so mostly by invitation.

19   Q.  And you -- you say you never had experience with Eastern

20   Oregon.  Where did these -- where did these opportunities take

21   place?

22   A.  I guess maybe I need to get on -- maybe on the same page

23   with you.

24          Are you talking about when we're in Oregon, or are

25   you talking about before Oregon?

Ammon Bundy - D - By Mr. Mumford

157

1  Q.  Before Oregon, yeah, sorry.

2  A.  So can you ask the question again?

3  Q.  Yeah.  These presentations that you were asked to give,

4  where were they, before Oregon?

5  A.  Well, large -- I guess, small and large groups of people

6  would rent a venue, rent a facility, and ask me to give my

7  presentations.

8         Also, I had academies ask me to come and give

9  presentations.  I would do that through -- through the -- the

10  whole day, different classes.  Sometimes several days in a row.

11         And then even different groups, like church groups,

12  and so forth, would ask me to come and give presentations.

13         And that's -- that's how I was invited, mostly.

14  Q.  Did you receive any compensation?

15  A.  No, I -- I didn't do it for any -- for money, no.

16  Q.  Did you also get involved politically in that time period?

17  A.  Yeah, again, it was kind of a neglect but --

18  Q.  I'm sorry.  It was kind of what?

19  A.  I mean, I kind of -- I'm sorry.  I -- I reluctantly did.

20  I -- not that I didn't want to but I, again, was -- I have a

21  family, small children, and a business.  And it was very hard

22  to divide my time in doing all of these things, but I felt that

23  it was important that people were educated on what was

24  happening and -- and how rights were established, and so forth.

25         And so I guess to answer your question -- and maybe

Ammon Bundy - D - By Mr. Mumford

1  I'm nonresponsive at this point, right?

2          But to answer your question, some elected

3  representatives came to the ranch when -- in 2014, when we --

4  Q.  This is --

5  A.  At Bunkerville, yeah.  Bunkerville.  And we continued to

6  have a dialogue and -- with them.  And in 2000 -- the beginning

7  of 2015, Nevada went into the legislative session.  And they

8  only do it every other year.

9          And so these elected representatives and myself and

10  others felt that it was the time that we could create some

11  legislation to prevent the federal government from doing what

12  they did to our family; to protect others' families, and to

13  protect our -- our family, from them doing it again.  And so we

14  did go through an exhaustive amount of energy in drafting a

15  bill, AB408.

16  Q.  I'm sorry.  That was what?

17  A.  AB408.

18  Q.  What's "AB" stand for?

19  A.  Assembly Bill 408.

20  Q.  For the Nevada?

21  A.  For the Nevada assembly, that's correct.

22  Q.  And what -- what was the -- what was the purpose of the --

23  of the legislation that you helped put together?

24  A.  The purpose was -- is to basically protect these resource

25  rights on public land.  And also to ensure that the federal

Ammon Bundy - D - By Mr. Mumford

1  government follow the state law and follow the constituted laws

2  found in the United States Constitution in owning and

3  controlling lands inside the state.

4       And we understood that if we were able to get that

5  right, that the people's rights would be protected, and then no

6  longer could the federal government come down upon them and,

7  you know, bring their men and do everything that they did to us

8  at -- at Bunkerville.

9  Q.  You talked about resource rights.  What do you mean by

10  that?

11  A.  Well, again, on public land, there's different rights that

12  are -- that are established on public lands.  The public has

13  access rights to camp, to hunt, to, you know, fish and to hike

14  and to access.  And those are their rights and they've

15  established those rights.

16       They should not ever be taken away.  But there's also

17  other rights on the land, and that's grazing rights, logging

18  rights, mineral rights.  And it doesn't mean that they own the

19  land.

20       MR. KNIGHT:  Your Honor, I'm going to object to the

21  form of the answer.  It's cumulative, and it's also not bearing

22  upon this witness's state of mind.  It's a description of the

23  law.

24       THE COURT:  I'm going to sustain the objection here.

25  And ask you, Mr. Mumford, to direct the witness to a concise

Ammon Bundy - D - By Mr. Mumford

1    point, as opposed to these more narrative lectures, so that we

2    don't run afoul of the -- and I need to interrupt him.  So

3    please rephrase the question.

4            Disregard the last answer.  Ask a new question.

5    BY MR. MUMFORD:

6    Q.  The -- the resource rights, how -- how was AB408

7    specifically going to protect these resource rights and --

8    and -- that you saw there?

9    A.  Well, I'm going to take a little jab right here, and just I

10   want to recognize that this is the very dangerous part that the

11   federal government doesn't -- doesn't want people to know.  And

12   the reason why we've been objected every time it's been brought

13   up.  And it's because we do have rights to these lands and they

14   are property rights.  They are vested property rights.  You can

15   trade them, you can borrow against them, you can sell them.

16   They are just as if you owned your home.

17           They -- they're water rights, they're grazing rights,

18   they're logging rights, they're mineral rights.  But they are

19   vested property rights and they're -- and there's been an

20   active -- in my belief and -- and I daresay in many, many

21   others -- that there has been a very strategic effort in the

22   federal government in taking these rights.  By, one, saying,

23   first, we don't have them.  And then by, two, simply not

24   recognizing them.  And then, three, using the courts to take

25   them away.

Ammon Bundy - D - By Mr. Mumford

161

1  Q.  And so how would -- how would AB408 -- how was that going

2  to -- going to protect those rights?

3  A.  What it would do is it was going to create a registry where

4  all of these rights can be registered in the state registry.

5          Addition -- there are -- most of them are already

6  registered in the state registry.  But then that would require

7  the state to -- to defend these rights when the federal

8  government come to take them away.  And so, what would happen

9  is if -- if they're registered with the State of Nevada, which

10  is -- we were creating a -- a -- a -- the NRR, Nevada rights --

11  Resource Rights Registry, is what it was called.  We could

12  create that registry.  People would document those registry --

13  or those rights in there, meaning their grazing rights, their

14  mineral rights, their logging rights, their water rights.  And

15  we were actually going to use the water registry because it's

16  already there and it was already one used already.  That was

17  the proposal.

18          And then when the federal government come to try to

19  take them away from us, which they have done by the thousands,

20  then the state would be required to stand up instead of making

21  a poor ranching family stand up on their own.  The state would

22  be required to stand up with all of its resources, with its --

23  with its law enforcement and with the sheriff involved, instead

24  of making a family -- you know, like the Redburn family or like

25  the Hammond family or like the Bundy family -- try to fight

Ammon Bundy - D - By Mr. Mumford

1   these fights on their own because we don't have the resources.

2   We don't have the knowledge.  We simply can't do it against

3   this -- we can't do it against these people.  They're too

4   smart.  They're too strong.  They've got too many resources.

5   There's no way we can fight this battle.  And so we're begging

6   the state and the counties to protect these rights that are

7   ours and that have been in our family for hundreds of years.

8   They're just being ripped way from us and just taken.  And now

9   they're taking it to the next level, where they're prosecuting.

10  My dad and brothers are all in jail right now.  Every single

11  one of them.  (Crying.)  It's wrong.  It's wrong.  Again, I'm

12  sorry.

13  Q.  So how was this -- so -- is this kind of what you were

14  feeling -- when -- when you drove to Harney County that first

15  time?

16  A.  That's exactly what I was feeling.  And that's why I left

17  my family.  I left my business.  I left my orchard.  And why I

18  went to Carson City, the capital of Nevada, and did all we did

19  there.  That's why I spoke at every place that I had an

20  opportunity to speak at.  And that is why I went to Harney

21  County.

22  Q.  What did you do when you got there?

23  A.  In Harney County?

24  Q.  Yeah.

25  A.  Well, on my way there, I knew that -- I found out, through

Ammon Bundy - D - By Mr. Mumford                    163

1    one of the people that sent me some information, that Dwight

2    and Susie, who -- he is 74, and she's, I think, 74 as well.

3    They lived in Burns.  They had to actually buy a home in Burns

4    because so much of this legal battle was going back and forth

5    that they had to have a home in Burns.  So they actually bought

6    a home in Burns and were living there.  And Steven, the son,

7    was out on the ranch.

8             And so I didn't know whether I was going to go to --

9    to Burns or whether I was going to go to the ranch.  But I

10   began to feel very strongly that I was supposed to go out to

11   the ranch, and so I went straight to the ranch.

12   Q.  And who did you meet?

13   A.  I got in the little -- where they -- in front of their

14   house there.  And, ultimately, I met Steven Hammond.  And I

15   recognized him from some pictures.  I don't think he knew who I

16   was.

17   Q.  How did you introduce yourself to him?

18   A.  I just told him who I was.  And he actually -- he did know

19   who I was, or at least about my family.  And so we just began

20   to talk.  But then he was needing -- they were working.  He

21   came and walked over from the shop to meet me.  And said they

22   had to go to another part of their ranch.  And he invited me to

23   go with him, and so got in the back seat of their pickup truck

24   with a ranch hand.  And his ranch hand had his little -- I

25   would say about two-year-old boy with him, maybe three-year-old

Ammon Bundy - D - By Mr. Mumford

1    boy with him.  And we went over to the other part, about 30

2    miles to another part of his ranch.

3    Q.  About -- about -- when you met Steven, did he -- did he --

4    did he seem to recognize you or know who you were?

5    A.  Yeah, he did.  At least he -- he seemed to know my family

6    name.  I don't know that he knew me.  He knew of the Bundy

7    family name.  And, like I said, he invited me.  And we --

8    Q.  And -- and what did you tell him about your purpose in

9    coming to meet him?

10   A.  I didn't tell him anything at that time.  We just talked.

11   I asked him about his ranch, and he explained -- that I was

12   very interested, and he explained his operation to me, the

13   different pieces of land.  And then he began to also open up to

14   me about what his family had been going through over the last

15   several decades.  And he explained different areas.  And I

16   began to get a really good understanding of what they were

17   going through and -- and who they were.

18           And it wasn't until that evening, late after dark and

19   everything, that I -- I told him that I felt I was supposed to

20   come and somehow, in some way help them.

21   Q.  Did anything result from that conversation that you had?

22   A.  Actually, Steven (pause) -- he told me that --

23           MR. KNIGHT:  I object.  Hearsay, your Honor.

24           THE WITNESS:  Okay.

25           THE COURT:  Objection is sustained.

1        Rephrase the question, please, Mr. Mumford.

2   BY MR. MUMFORD:

3   Q.  I think -- did -- what was the outcome of that conversation

4   with -- with Mr. Steven Hammond?

5   A.  I -- I began to understand that he was pretty tired of

6   fighting and he was pretty much broke.  I mean, emotionally.

7   And he just didn't feel like he had much more fight in him.

8   That he was just going to take what was given him.

9   Q.  How did you respond?

10  A.  What's that?

11  Q.  How did you respond?

12  A.  To be honest with you, I felt it wasn't my place to respond

13  to that.  I didn't understand him.  I understood me.  I

14  understood what we had gone through.  But I hadn't understood,

15  really, until I spent about eight and a half months in prison,

16  how he felt.

17  Q.  Come a time you met his -- his -- his father, as well?

18  A.  Yeah.  So I stayed in -- I stayed in Burns that night, a

19  hotel.  And the next morning I got up, and I -- my plan was to

20  meet with Susie and Dwight in town there.  But I -- I hadn't

21  contacted them.

22  Q.  Where did you stay?

23  A.  I stayed at the Silver Spur hotel there, in Burns.

24  Q.  So -- go ahead.

25  A.  And -- and so I got up, but I also wanted to talk to the

166

Ammon Bundy - D - By Mr. Mumford

1   sheriff, so I -- and I didn't -- I figured he probably had a

2   busy schedule, and so forth.  So I called him while I was in

3   the hotel and got ahold of him.  And made an appointment with

4   him that afternoon.

5           And then I went to -- ate a continental breakfast

6   there, and then went over to Susie and Dwight Hammond's home,

7   and just knocked on the door.

8   Q.  How much time did you spend with them -- with them?  So

9   this was November 5th, then?

10  A.  This was the 5th.  Yep.

11  Q.  How much time did you end up spending with them?

12  A.  I -- so I need to back up just a little bit because that

13  night -- before I left, Ryan Payne had called.  I want to get

14  that in there because I want to make --

15  Q.  Explain to me who Ryan Payne is.

16  A.  Ryan Payne was an individual who was also at the Bundy

17  Ranch.  And he was with -- from my understanding, he was with

18  the militia group at the Bundy Ranch.  And I didn't have that

19  much communication with him at the Bundy Ranch or between the

20  Bundy Ranch time and when I went to Oregon.  But he called me

21  because he was -- must have been one of those that got an

22  e-mail.  And he called me, and he says, I'm going to Oregon --

23  or, excuse me, I'm going to California, Northern California,

24  but I want to -- I want to go over and meet the Hammonds as

25  well.

Ammon Bundy - D - By Mr. Mumford

1        And so -- and he says, I'm actually on my way.  And I
2   said, Well, I'm going to go.  If we hook up there, whatever,
3   that's fine.

4        Well, then, I went.  Of course, I went to the ranch
5   alone.  I didn't know where Ryan was.  And then when I got back
6   to Burns, either he called me or I called him.  And I found out
7   that he was in Burns.  And so we -- I already had the hotel,
8   but he ended up staying the night at that hotel, too.  So the
9   next morning he was with me.  I called the sheriff.  And then,
10  together, we went over to Susie and Dwight's house.
11  Q.  Now, you said -- said -- you said Ryan -- Mr. Ryan Payne
12  was associated with a militia group.  Explain what that is.
13  A.  Well, before the whole Bundy Ranch incident, I had really
14  no idea about what that meant.

15       But I began to understand that there's groups out
16  there of people that -- I guess are there as an organized
17  people to -- if needs be, to defend the people.

18       I -- and then, when I began to understand more, I was
19  referred to the Constitution, to the Second Amendment.  And --
20  which reads, "A well-regulated militia, being necessary for the
21  security of a free state."

22       Then it goes on to say, "The right of the people to
23  bear arms shall not be infringed."

24       And so -- because I always thought the Second
25  Amendment was just, "The right of the people to bear arms shall

168
Ammon Bundy - D - By Mr. Mumford

1  not be infringed."  But the first part of that really began to

2  help me understand.  That "A well-regulated militia being

3  necessary for the security of a free state."

4       And so evidently there's -- at the time, that's how I

5  looked at it.  There's groups out there that are organized,

6  and -- and are there to help people defend their rights and

7  defend their property, and so forth.  And that's how I

8  understood it.  And Ryan was affiliated with one of these

9  militia groups.

10 Q.  You say you didn't have experience with him.

11      How did you first encounter them?

12 A.  Well, at the Bundy Ranch, when I went there, it was just

13 our family.  And that's pretty much all that was there.

14      And then this abuse started to happen and they

15 started to collect our cattle and shoot them from the

16 helicopters and from the ground.  And they started running the

17 cattle really hard, and they was leaving baby calves out in the

18 desert and they were dying.

19      And then they took my brother.  He was filming them,

20 and he was standing on the side of the highway -- or I-170, and

21 a whole group of these people from the Bureau of Land

22 Management and other agencies came and beat him up.  They said

23 that he didn't have a right to be there.

24      This is land that we had lived on, my father had

25 lived on, my grandfather, and my great-grandfather had lived

Ammon Bundy - D - By Mr. Mumford

169

1   on.  And they said that.  He didn't have a right to be there.

2   And he was filming them, and they beat him up.  And then they

3   detained him and took him to -- we didn't even know where.

4   And --

5   Q.  So --

6   A.  I'm sorry.  I'm going on --

7   Q.  No, please finish.

8   A.  Well, I -- the answer was -- is how do I -- or the question

9   was, from what I understand, is how did I learn who the militia

10  was.  Right?

11  Q.  Yeah.

12  A.  My point is there was a tremendous amount of abuse that

13  came down upon my family for trying to protect these -- these

14  grazing rights that we own, and a lot of it became -- was

15  filmed.

16          And as soon as that was published -- it wasn't by my

17  family.  But as soon as it was published, they sent it all

18  over.  And people from all over the country started coming,

19  including these militia groups.  And they would come.  And they

20  were from all over.  They were from all the way -- from

21  Connecticut to Alaska, you know, to Arizona; all over.  They

22  came and -- but people came, too, just families.

23          But I guess to get to my point -- or to your point,

24  is I began to understand that there were these people out there

25  and that they were organized and they were there to stand for

Ammon Bundy - D - By Mr. Mumford

1    us if -- if -- you know, if -- if needed.

2    Q.  You -- when you're talking about the Bunkerville or the

3    Bundy Ranch, what kind of a time period would you say that --

4    that covers, then?

5    A.  Well, they began when -- they began on -- get the right

6    days.

7             March 27th, I believe, they began to come in and they

8    built this, like, military-like base right on the range.

9    Right -- about five miles from the house.

10   Q.  Did you know they were coming at that point?

11   A.  Well, we -- we watched them build this -- literally,

12   military base -- right there.  I mean, it had a perimeter.  It

13   had sniper points.  It had a light -- or light towers, radio

14   towers, a headquarters.  That's what they built, five miles

15   from our house.

16   Q.  Do you have an understanding as to why that was?

17   A.  Why they did that?  Yeah, I have a very good understanding

18   to why they did that.

19   Q.  Why is it?

20            MR. KNIGHT:  I'm going to object, your Honor.  He's

21   speculating as to why they --

22            THE COURT:  The objection is sustained.

23   BY MR. MUMFORD:

24   Q.  You said you got an understanding.  How did you come about

25   your understanding?

Ammon Bundy - D - By Mr. Mumford                    171

1    A.  Most of what we were understanding they were doing had come

2    from the Bureau of Land Management website.  And they informed

3    us that -- well, informed the public that they were going to

4    lock down 600,000 acres of land, and anybody who basically went

5    on it was -- was trespassing.

6    Q.  How many acres?

7    A.  600,000.

8    Q.  And were -- what was the -- what was the relationship that

9    your family had to that?

10   A.  Well, our ranch was within that 600,000 acres.

11   Q.  And so they -- so it started roughly sometime in March, end

12   of March.  And then what -- when did it end?

13   A.  Well, then they -- they began to impound the cattle on

14   April 5th, on -- I believe that's a Saturday.  And -- and, I

15   mean, it was -- it was crazy.  It was like a -- a war scene.

16   Meaning, the equipment they had -- I mean, it was just crazy.

17         Helicopters and armed men on all of the roads with

18   surveillance equipment.  There was armed -- or vehicles that

19   were going up and down the road, escorting these contract

20   cowboys, as they -- as they were literally gathering our cattle

21   off the range.

22   Q.  Now, the Court has told the jury that the BLM was there

23   enforcing court orders.  Right?

24   A.  That's correct.

25   Q.  So -- so -- so -- so how did -- how did that turn into

Ammon Bundy - D - By Mr. Mumford

1   this?

2   A.  Well, and that was what I was going to explain but it was

3   objected to.  And the Government would probably like me saying

4   this part.

5           There was a federal court order to remove my father's

6   cattle from the range, and that started clear back in the

7   early, you know, nine -- basically, 2000 -- '98, '99, 2000,

8   right in there.

9           And what happened was -- is the Bureau of Land

10  Management -- or somebody -- put the desert tortoise on the

11  endangered species list.  And then they said that the desert

12  tortoise and the cattle couldn't live together; which they had

13  for hundreds of years.

14          We tried to defend ourselves in court.  We even got

15  specialists.  We spent hundreds of thousands of dollars trying

16  to defend ourselves in court, but it's useless.  If -- you

17  can't defend yourself against these -- they're too good,

18  they're too strong, they've got too many resources, and you

19  just can't do it.

20          I mean, you might -- you might disagree with me, but

21  that was our view.  Because everything we did -- we -- we would

22  hire independent scientists to come out and study the desert

23  tortoise, and they found that wherever there was cattle,

24  there -- the tortoise were thriving because they ate the manure

25  and because the cattle cultivated the land.  And the little

Ammon Bundy - D - By Mr. Mumford

1   grass come up, and they ate that.  These were all things that

2   we bring into court but -- and we would win a few things here

3   and there.  But, ultimately, what it resulted in is -- is the

4   federal government won, and -- and then they ordered our cattle

5   to be removed.

6            And at that time we had been ranching there for over

7   a hundred years.

8   Q.  And so did -- did -- at what point in that did you become

9   involved?

10  A.  Well, I grew up with this.

11  Q.  I know.  But at what point of the Bunkerville -- let's call

12  it the Bunkerville --

13  A.  Standoff?

14  Q.  Standoff.

15  A.  I'm good with that.

16  Q.  Okay.  At what point of the Bunkerville standoff then --

17  first of all, why do you call it a standoff?  And we've got

18  some video, so I don't want you to -- I mean, if you want me

19  to, I can -- I can show that.

20  A.  Well, I mean --

21            THE COURT:  Counsel --

22            THE WITNESS:  -- when it's appropriate --

23            THE COURT:  Hold on.  You need to do the questioning.

24  Don't ask the witness about the showing of the video.

25            MR. MUMFORD:  That's fair.

Ammon Bundy - D - By Mr. Mumford

1          THE COURT:  So let's -- let's get on task here.

2    BY MR. MUMFORD:

3    Q.  At what point did you become involved?

4    A.  I became involved after -- well, of course, I was

5    communicating with my father and my brothers.

6          I was very concerned for the safety of my family

7    because I knew that they were building this.  But I lived in

8    Arizona at the time.  And I -- and I asked my dad, you know, Do

9    you need help?  You know, Is there anything you want me to do?

10          And my dad would say no.  He didn't feel like there

11   was anything that we could do or we should do.

12   Q.  And did that change, at some point?

13   A.  Yeah, that did.

14   Q.  When?

15   A.  After they took and literally beat my brother to the

16   ground, and they took him away.  And we had no idea where he

17   was at.

18   Q.  And so you went to Bunkerville at that point?

19   A.  Well, no, I called my dad again.  I said, Dad, you know, do

20   you want -- do you want me to come?  Do you need me to come?

21   And he actually said no.  I just don't -- he goes, I don't feel

22   like I'm supposed to bring my family together yet.  That's what

23   he said.  And so I waited.  And then about one o'clock in the

24   morning, he called me.  And he said, It's -- it's time --

25          MR. KNIGHT:  Your Honor, I object to hearsay.  We've

Ammon Bundy - D - By Mr. Mumford

1   had a few of these now.

2              THE COURT:  The objection is sustained.

3              Mr. Mumford, the witness's state of mind is the

4   issue.  So please -- please adjust.

5   BY MR. MUMFORD:

6   Q.  Did you -- did you begin making any public statements

7   and -- at Bunkerville?

8   A.  You mean before?

9   Q.  Yeah, before or -- or during.  When you got involved, I

10  guess.

11  A.  No, not -- not before, other than commenting on a few,

12  like, websites, and stuff like that.  But no one knew who I

13  was.  And not until, really -- until after they -- until after

14  I got there, I guess.

15             My dad actually told me -- and I will be brief.  But

16  he just asked me to prepare to feed a lot of people.

17             MR. KNIGHT:  Objection, hearsay.  Brief or not, it's

18  hearsay.

19             THE COURT:  The objection is sustained.

20             Mr. Bundy, you need to stay within the scope of the

21  Court's rulings.

22             Mr. Mumford, you need to frame the questions

23  accordingly.

24             MR. MUMFORD:  Thank you.

25  BY MR. MUMFORD:

Ammon Bundy - D - By Mr. Mumford

1   Q.  Did you -- did you go on -- did you begin at Bunkerville

2   and -- and make -- start making public statements to everyone?

3   Everyone stay -- you know, stay away, don't bring your guns,

4   that kind of thing?

5   A.  No, not exactly that way.  I went there first.  I was asked

6   by my father to feed people.  And I prepared and came to feed

7   people, and that's what I did.  I did that for several days.

8   Q.  And -- and -- and then what, and then how did your role

9   change?

10  A.  Then on Wednesday, I believe -- I think it was the 9th --

11  there was a group of people from the local community, family,

12  friends close by.  And as they were taking our cattle and

13  moving back and forth onto the roads, we would protest them

14  just with our signs, and so forth.  And, you know, tell them to

15  go home, and that type of thing.

16          And then on Wednesday, the 9th, I guess they had had

17  enough of free exercise of speech.  So rather than just driving

18  on by, they stopped and began to confront us, stating that we

19  didn't have a right to protest there.

20          MR. KNIGHT:  I'm going to object as hearsay.

21          THE COURT:  The objection is sustained.

22          Jurors, disregard the question and the answer.

23          Ask a new question.

24          MR. MUMFORD:  Actually, your Honor, it's only hearsay

25  if it's true.

Ammon Bundy - D - By Mr. Mumford                    177

1           THE COURT:  You need to ask the question in a form

2    that makes it admissible.

3           The narrative response didn't call for an admissible

4    answer.  The answer is stricken.  Ask a new question.  If you

5    want to build the foundation for it to be received, you may.

6    But ask it again.

7           MR. MUMFORD:  So is the Government trying to say it's

8    true that they didn't have a right to protest?

9           THE COURT:  Mr. Mumford, I've told you to rephrase

10   your question.  I'm not going to engage in this.  Rephrase your

11   question.  If it's admissible for an admissible purpose, phrase

12   it in that way, to make it clear, please.

13   BY MR. MUMFORD:

14   Q.  Did you -- did you observe some of these encount --

15   physical encounters with the BLM agents?

16   A.  Yes, I did.

17   Q.  And at -- did you -- did you come, at one point to --

18          MR. MUMFORD:  Your Honor, I'm going to show the

19   witness Exhibit 11 -- sorry, 1208, I believe.

20          Just -- this is just a ten-second video.  A clip,

21   here.

22          And I would just ask you, Mr. Bundy, tell us --

23   you -- you've seen this, right?

24          THE COURT:  Is this for the witness only, or for the

25   jury at this point?

Ammon Bundy - D - By Mr. Mumford

1      MR. MUMFORD:  It's for the jury.

2      THE COURT:  You need to lay the proffer.  I've gone

3  through it in advance to let you do that, but you need to

4  proffer it first and then have it admitted.

5  BY MR. MUMFORD:

6  Q.  Thank you, your Honor.

7      You saw this video before -- before taking the stand

8  here today?

9  A.  I can't tell what video it is, right now.

10  Q.  I believe it's the one of your aunt getting thrown to the

11  ground.

12  A.  Yes, I've seen this video.

13  Q.  And can you -- can you just tell the jury what -- what --

14  what -- what this was and how it affected you.

15  A.  Well, again, this was where they were protesting these --

16  these federal agents as they were going onto the road.

17      And do you want me to describe it or --

18  Q.  And did you -- did you -- did you see that at the time?

19  A.  Yeah, I saw -- I saw all of this.  I was -- yes, I did.

20  Q.  And -- and just -- just so we're clear, this -- this has

21  affected the -- the views and the -- and the actions that you

22  took in Oregon, then, as well?

23  A.  I think it does.  It's definitely a piece of it.

24  Q.  Okay.

25  A.  It -- it certainly has affected me, yes.

Ammon Bundy - D - By Mr. Mumford

179

1   Q.   Okay.  So let's --

2            MR. MUMFORD:  Your Honor, can we play it for the

3   jury, and then I'll ask --

4            THE COURT:  Yes.

5            Jurors, this -- this piece of video evidence is

6   coming before you for its effect on Mr. Bundy's state of mind

7   and not for the truth of matters asserted therein.

8            And, Counsel, this will not go to the jury for the

9   jury room.  This is simply to illustrate his testimony.  The

10  evidence is -- is his testimony.

11           So please proceed.

12           MR. MUMFORD:  Thank you.

13           (Pause, video playing with sound.)

14           (Video stopped.)

15  BY MR. MUMFORD:

16  Q.   Who -- who was that?

17  A.   That was my Aunt Margaret.

18  Q.   Where were you when that took place?

19  A.   I was actually behind -- behind the -- so it would be east

20  of them.

21  Q.   And what did you do?

22  A.   I was actually -- so when I saw that they got out to

23  confront the protestors, I was actually up on the slope,

24  probably an eighth of a mile away, completely away from -- I'm

25  actually getting ready to cook hamburgers for all of the

```
 1   protesters.  And when I say they stopped to get out and began

 2   to confront them with their dogs and their Tasers, and so

 3   forth, I became very concerned for them.  So I jumped on a

 4   four-wheeler and I drove down and actually around behind them

 5   and got up.  And there was -- for -- two reasons for that.

 6          There was -- the reason why they were there

 7   protesting was because the vehicles were coming on the road.

 8   But among those vehicles -- there were 14 vehicles, and among

 9   those vehicles was a -- a dump truck pulling a backhoe.

10          And those -- the people there, the protestors wanted

11   to know what was in that backhoe because they -- we knew they

12   had been shooting.  Even though we couldn't get out on the

13   range, we did assume that they were shooting cattle.  We did

14   not know that at the time.  And we thought the -- the dump

15   truck was probably a rendering truck with dead animals in it --

16   our dead cattle in it.  And so --

17   Q.  And so -- go ahead.

18   A.  And so I went with the four-wheeler and went up on the

19   little hill and tried to look down into the back of the dump

20   truck to see what was in it.  And I couldn't see.  I even stood

21   on the back of the four-wheeler and couldn't see it.

22          And then on my way back down, towards the protesters,

23   that's when they threw Aunt Margaret on the ground.

24          And the -- the dump truck started to come onto the

25   road -- this is after -- I mean, there was 14 vehicles.  They
```

Ammon Bundy - D - By Mr. Mumford

1    were like escorting this dump truck and this backhoe, trying to

2    protect what was in it, or at least the -- that was my opinion,

3    anyway.

4            And -- and so I drove my four-wheeler and parked it

5    right in front of the dump truck.  Everybody -- everything was

6    moving really slow.  It wasn't, like, moving very fast.  And I

7    parked my four-wheeler right in front of the dump truck and

8    put -- put it in park and put the brake on to stop the dump

9    truck, with the intention to find out what was in the back of

10   the dump truck.

11           MR. MUMFORD:  And -- and -- and, your Honor, can I --

12   can I show the witness 11 -- Exhibit 1146, please?

13           THE COURT:  For the witness only.

14           (Video playing without sound.)

15   BY MR. MUMFORD:

16   Q.  Mr. Bundy, you've seen this, prior to taking the stand

17   today?

18   A.  Yes.

19           MR. MUMFORD:  Your Honor, can I -- I would move to

20   admit and --

21           THE COURT:  He needs to lay -- you need to lay the

22   foundation, please, as you did with the other.

23   BY MR. MUMFORD:

24   Q.  Can -- and what does this video depict, sir?

25   A.  This video is of -- when you first watch the video, you can

Ammon Bundy - D - By Mr. Mumford

1  see my Aunt Margaret on the ground.  So it's a continuation of

2  the -- what we saw earlier.  And it shows me coming down and

3  park the four-wheeler in front of them.  And then confront

4  them, asking them what is in the backhoe -- or what is in the

5  dump truck.

6  Q.  And -- and -- and what happened to you?

7  A.  They sicced their dogs on me, at first.  And I kicked away

8  the dog and protected myself.  And then they tased me.  And it

9  kind of took over my body, if you will, and it -- and it sent

10  me into convulsions.

11          I was able to pull those Tasers out and continue to

12  confront them.  And they tased me again, and we were able to

13  pull those out.  And we confronted them.  And then they tased

14  me again, and we pulled those out.

15          And then I walked around and got on the dump truck

16  and saw what was in the back of it.

17          MR. MUMFORD:  Your Honor, I would move to publish,

18  please.

19          THE COURT:  You may.

20          Again, jurors, for the purpose of the basis of the

21  defendant's state of mind, not for the merits of this dispute

22  around the Bundy Ranch episode; which is not something you'll

23  be deciding.

24          (Video playing with sound.)

25          MR. MUMFORD:  So pause it.

Ammon Bundy - D - By Mr. Mumford                183

1              (Video paused.)

2    BY MR. MUMFORD:

3    Q.   And so you said this was a continuation.

4              That lady on the ground, then, is your Aunt Margaret

5    then?

6    A.   That's correct.

7    Q.   By the way, do you know who was taking this video?

8    A.   There was several, several versions of it.   By the voice in

9    it, I think it was Pete Santilli, this version, but I am not

10   100 percent sure.

11   Q.   Okay.

12   A.   As you'll see, there's a whole bunch of people filming it

13   because that's what we felt we had to do to protect ourself,

14   was to film -- film what was going on.

15              (Video playing with sound.)

16              (Video paused.   Video resuming with sound.)

17              (Video paused.)

18   BY MR. MUMFORD:

19   Q.   And that was -- that's -- can you point yourself out there?

20   A.   It's hard.   I'm right behind Yolanda, right here.

21              Oh, I guess that thing -- sorry.   I forgot.   I should

22   know.   That's me right there (drawing).

23   Q.   Okay.   And so you just barely pulled up on that --

24   A.   That's correct.   I pulled up on the four-wheeler right

25   here, and I parked right in front of the truck, put it in park.

Ammon Bundy - D - By Mr. Mumford

1    The truck did hit me -- well, drove it -- to me, I guess,

2    really.  And -- and then I stepped off the four-wheeler.

3    Q.  Okay.

4                   (Video resuming with sound.)

5                   MR. MUMFORD:  Stop -- stop it.

6                   (Video paused.)

7    BY MR. MUMFORD:

8    Q.  So what -- what did we just see there?

9    A.  You saw -- again, these are all of the protestors

10   protesting their actions.  You saw them -- me park my

11   four-wheeler in front of them, and they sicced the dog on me.

12   They tased me.

13   Q.  And each time they tased you, that's -- that's that

14   little -- that click that you --

15   A.  That's right.  That little click and click noise that you

16   hear, that's what that is.  And so --

17   Q.  And were you armed?

18   A.  No.  I had a Leatherman, a pocket knife on my side.

19   Q.  Was anyone armed?

20   A.  I really don't know for sure, but I don't believe -- I've

21   seen this video several times.  I've never seen anybody with

22   arms.  And I -- we were accused of picking up rocks and

23   throwing them at them.  I never have saw that or ever did see

24   that, either.

25   Q.  And do you remember what day this was?

Ammon Bundy - D - By Mr. Mumford                185

1    A.    This, I believe, was April 9th, Wednesday.

2    Q.    And so from this point, then, are you going to go up and

3    take a look in the back of the truck?

4    A.    Yeah.  You see me walk around, and I climb up in the back

5    of the truck.  And I thought they were going to probably tase

6    me when I did that.  But I -- the whole reason why I stopped

7    the dump truck was to find out what was in the back of it.

8                And I felt that we had every right to find out what

9    was in the back of it.

10               (Video resuming with sound.)

11               (Video stopped.)

12   BY MR. MUMFORD:

13   Q.    When you're getting tased, why did you keep going back?

14   A.    (Pause.)  Their -- their actions were way out of line.  Way

15   out of line.

16               And, I mean, if they had a court order to fulfill,

17   then fulfill the court order but don't go doing what you do --

18   what they did.  And I -- but it -- it goes beyond that, though.

19               I truly believe and understand that they didn't have

20   a right to be there and that my family has rights to be there.

21   And they were taking them away.  And they weren't just my

22   rights they were taking away.  They were taking away

23   everybody's rights to even access it.

24               And I -- I -- I felt that -- I -- one, is I needed to

25   find out what was in the back of that dump truck and I -- but I

186

Ammon Bundy - D - By Mr. Mumford

1    had a right to be there and a right to do what I did.

2    Q.  Did -- did anyone arrest you at that time?

3    A.  No.

4    Q.  Did you get a citation?  Did they tell you were being

5    detained, or anything like that?

6    A.  No.

7    Q.  After tasing you, did they just simply let you walk away?

8    A.  Well, what happened is I found out what was in there, and

9    then I felt that it was -- there was a definite need to

10   deescalate what was going on.  And they were doing nothing but

11   escalating.  And so I began to raise my hand.  And I said,

12   "Who's in charge here?  Who's in charge here?"  I began to yell

13   that.  And none of them would take charge.  None of them would

14   take responsibility of who was in charge.  And so I just began

15   to yell, "Whoever's in charge here, you need to get your men

16   and get out of here because this isn't going to end well."

17          And I meant end for us.  They're the ones who had the

18   weapons.  They're the ones who were using the weapons and the

19   dogs.  And, actually, they began to listen and they began to

20   kind of assemble and move their way around.  They got in their

21   vehicles, which now was just kind of -- were all over.

22          And as we were standing there in the middle of the

23   road, they began to drive, and they drove off and left us

24   standing right there in the middle of the road.

25   Q.  Did -- did an ambulance come later and evaluate you?

Ammon Bundy - D - By Mr. Mumford                187

1    A.   Yeah, later.   Someone called the ambulance for my Aunt

2    Margaret.   And, yes, they did evaluate me, where I was tased

3    several times.

4          MR. MUMFORD:   Showing this to the witness only.

5    Exhibit 1159, please.

6    BY MR. MUMFORD:

7    Q.   What -- what's this?

8    A.   That is one of the spots that I was tased.   One of the

9    barbs.

10         MR. MUMFORD:   Your Honor, I move to publish, please.

11         THE COURT:   Yes, on the same basis as before, as a

12   basis for the witness's state of mind.

13         Go ahead.

14   BY MR. MUMFORD:

15   Q.   Mr. Bundy, did your experience with the BLM that day affect

16   your views of how to -- how to act with the BLM in -- in the

17   future?

18   A.   Absolutely.

19   Q.   How?

20   A.   Rephrase the question again.

21   Q.   Yeah.   I said, did it affect -- how -- how did it affect --

22   how -- your views of how to interact with the BLM in -- in the

23   future?

24   A.   What -- what I saw and experienced -- remember, it wasn't

25   just this.   They had beat my brother up, taking him all night,

Ammon Bundy - D - By Mr. Mumford

1  paraded him around at their compound, saying we have one of

2  Cliven Bundy's sons, one of Cliven Bundy's sons.  Literally

3  mocking him.

4         And then took him to a facility, interrogated him all

5  through the night, all the next morning --

6         MR. KNIGHT:  I object to the characterization that --

7  there's no foundation and --

8         THE COURT:  The objection is sustained.  I think this

9  would be a good point for an afternoon recess.  And we'll pick

10 up in 15 minutes, ladies and gentlemen.  Please leave your

11 notes on the chair.

12        Remember not to talk about the case.  We'll have this

13 last break, and then we'll be back for the final session of the

14 day.

15        Let's everyone stand for the jurors, please.

16        Thank you for your ongoing attention, folks.  Watch

17 your step.

18        (Jurors exit.)

19        THE COURT:  All right.  Go ahead and take a seat,

20 everybody.

21        So how far have we made it through?  I've lost track

22 of the exhibits that we have vetted, Mr. Mumford.

23        MR. MUMFORD:  It's about to go, your Honor, into the

24 second series of Bunkerville videos, your Honor, that is,

25 approximately -- I think we cut it down further, to -- I think

189

Ammon Bundy - D - By Mr. Mumford

1    it's less than ten minutes.

2           THE COURT:  Okay.  So we're going to take a recess.

3           So Mr. Bundy, Mr. Bundy, and Mr. Fry can leave.

4           I want you to work with Mr. Knight with respect to

5    the reduced proposed presentation.

6           And then when we -- when I come back, I want to hear

7    any objections there plus any other exhibits you think you'll

8    reach this afternoon, so that we don't have to interrupt the

9    jury.

10          MR. MUMFORD:  Okay.  Thank you.

11          THE COURT:  So, Mr. Bundy, you may step down.

12          Mr. Bundy, Mr. Fry, you're free to go.

13          Everybody remain seated, please.

14          (In-custody defendants exit courtroom.)

15          THE COURT:  Okay.  Ten minutes, please, and we'll

16   take up these issues.

17          Yes?

18          Hold on a minute, please.  Mr. Kohlmetz has an issue.

19          MR. KOHLMETZ:  Your Honor, I do have an issue.

20          THE COURT:  Yes, sir.

21          MR. KOHLMETZ:  Over the lunch hour, despite my

22   request for notice and the Court's statement that he would not

23   be testifying today, Mr. Patrick was subpoenaed to testify for

24   this afternoon by Ms. Maxfield.

25          MS. MAXFIELD:  Oh, no, not me.

190

Ammon Bundy - D - By Mr. Mumford

1          THE COURT:  Well, let's do this.

2          Let's -- can we just do this, please.

3          Counsel, whoever subpoenaed Mr. Patrick needs to meet

4   with Mr. Kohlmetz now, over the recess.

5          We'll take it up as soon as I come back,

6   Mr. Kohlmetz, if you have or haven't resolved it.  All right?

7          I need you to talk to the lawyer who subpoenaed your

8   client and -- right now.

9          MR. KOHLMETZ:  Apparently it's not Ms. Maxfield.

10         THE COURT:  Look, I can't read minds.  What I'm

11  saying, Mr. Kohlmetz, is stay where you are.  Whoever

12  subpoenaed Mr. -- Mr. Patrick needs to speak with Mr. Kohlmetz

13  now.

14         And in ten minutes, when I come back -- before I

15  address Mr. Bundy -- I'm sorry, Mr. Mumford and Mr. Knight --

16  we'll deal with your issue.  Okay?

17         MR. KOHLMETZ:  Thank you, your Honor.

18         THE COURT:  Okay.  Very good.  We're in recess.

19         Ten minutes, please.

20         (Recess taken at 3:15 p.m.)

21         (Conclusion of third excerpt.)

22                          -0-

23         (Colloquy reported but not transcribed herein.)

24         (Fourth excerpt.)

25         (Jurors enter at 4:07 p.m.)

Ammon Bundy - D - By Mr. Mumford

1    THE COURT:  Thank you, everyone.  Please be seated.

2    Jurors, we're interrupting Mr. Bundy's direct

3 testimony to take a witness out of order, to -- to take

4 advantage of his presence without another travel obligation.

5    His name is Mr. Rice, and he'll be formally

6 introduced in a moment.

7    Sir, would you face the jury and the deputy there.

8    Raise your right hand to be sworn.

9    THE WITNESS:  I won't swear, but I will --

10    THE COURT:  All right.  You may swear or affirm, sir.

11    THE WITNESS:  My word is my bond.  I will tell the

12 truth under penalty of perjury.

13    THE CLERK:  Okay.  Let me go ahead and give you the

14 oath.

15    THE COURT:  That's adequate, actually, Ms. Stephens.

16    THE CLERK:  Okay.  Thank you.

17    THE COURT:  Go ahead and take a seat, sir.

18    The witness's statement affirming that he will tell

19 the truth under penalty of perjury is sufficient.

20    Sir, bring yourself close to the microphone.

21    Tell us your full name, and spell all of it, please.

22    THE WITNESS:  Yes.  My name is Lee Arthur Rice, II.

23 Capital L, small E-E.  Capital A-R-U-T-H-U-R [sic].  Capital

24 R-I-C-E -- upper, lower case -- the II.

25    THE COURT:  Thank you, sir.

Rice - D - By Ms. Harris

1          Counsel.

2                    <u>DIRECT EXAMINATION</u>

3    BY MS. HARRIS:

4    Q.   Mr. Rice, good afternoon.

5    A.   Hi.

6    Q.   I'm Tiffany Harris.   Thank you for coming.

7             Can you tell us where you're from?

8    A.   Yes, I'm from Boise, Idaho.

9    Q.   And what do you do out there in Boise?

10   A.   Well, I'm a musician, artist.   I ran for Senate last

11   election cycle.

12   Q.   So would you describe yourself as someone who's curious and

13   active in politics?

14   A.   Very much so, yes.

15   Q.   And did that curiosity cause you to follow events at the

16   Malheur National Wildlife Refuge at the beginning of this year?

17   A.   Absolutely, it did.

18   Q.   And how -- how were you following those events?   Were you

19   reading about them on Facebook or reading the newspaper?   Or

20   how -- how was it that you came to be following those events?

21   A.   Mainly through Facebook and then also what I was hearing

22   when I would watch and catch some of the news.

23   Q.   And do you also -- are you involved in journalism in any

24   way?

25   A.   Yes, I am.

Rice - D - By Ms. Harris

1    Q.  Can you describe that, a little bit?

2    A.  Well, I work for a -- it's an online news media, TVOI News.

3    It's one of the -- well, as -- as a correspondent.  And so,

4    yes.

5    Q.  Okay.  And so at some point did you decide to make the trip

6    out there, to the Malheur National Wildlife Refuge here in

7    Oregon?

8    A.  Yes, I did.

9    Q.  Can you tell us when that was?

10   A.  It was around the first part of January.  I can't recall

11   the exact date that I arrived.

12   Q.  How did you get there?

13   A.  Through a friend who was traveling that way.  And so we

14   rode up together.

15   Q.  And tell us when you -- when you first arrived, what --

16   what time of day was it?

17   A.  It was the day -- I think it was around the morning when we

18   got there.  Yes.  Around 10:00.

19   Q.  What did you see when you first pulled in?

20   A.  Well, there was a -- there was a vehicle, a truck.  And we

21   had to show who we were, announce who we were.  And they -- I

22   guess, vetting.  I guess I don't know how else to put that.

23   But we were vetted.  And, you know, we were allowed to go in.

24   Q.  How -- how long a conversation was this?  What was the tone

25   and demeanor of your exchange with the guys in front of the

1  truck?

2  A.  Quite friendly, actually.  So, yeah, there was no issues at

3  all -- at all; that I felt, anyway.

4  Q.  And once you were kind of waved in, what did you do next?

5  A.  Well, just sort of wandering around.  I think I was kind of

6  an oddity up there, being -- adding a little color to the place

7  but -- (laughter.)  Yeah, just wondered around.  And it was

8  just very -- very congenial, very friendly.

9  Q.  Did you -- well, about how many other people did you see

10 circulating around while you were there?

11 A.  You know, that's hard to say.  I mean, in the immediate

12 area that I was in, probably -- gosh, I don't know.  20, 50

13 people.  I don't know.

14 Q.  So did you have a plan, when you first arrived, about

15 whether you would stay or how long you would stay?

16 A.  I didn't really have any set plan in mind.  I just was

17 curious.  I wanted to go and find out for myself as to what was

18 truly going on.

19         I'm just a person who -- yeah, I want firsthand

20 knowledge.  (Laughing.)  And so I took the time out and decided

21 to go check out what was going on.

22 Q.  And at some point did you decide that you would stay for

23 some period of time?  And, if so, can you tell us what your

24 thought process was.

25 A.  Well, I wanted to just hear and see what was happening

Rice - D - By Ms. Harris

1    there at the refuge, but I also wanted to get out in town a

2    bit, so I knew I would be staying longer than a day.  My ride

3    had to be back in town, so I just kind of left and got Tanz

4    (phonetic) to just hang out, and so I did.

5    Q.   While you were at the refuge, were you also -- were you

6    kind of back and forth between the town of Burns and the

7    refuge?

8    A.   Yes, I was.

9    Q.   Were part of your activities while you were at the refuge,

10   did that involve just doing kind of your own research and

11   essentially coverage of the events?

12   A.   Yeah.  I mean, I had -- hadn't really met anyone yet,

13   there.

14        I -- actually, there was a couple of friends that

15   were Facebook friends that came up and recognized me and said,

16   hey, you know.  And so we chatted.

17        But I was pretty much on my own.  Just, you know,

18   laptop in hand.  And just, you know, reporting on what I saw.

19        MS. HARRIS:  Mr. Breton, can you show -- can we pull

20   up Exhibit 1818 for the witness only.

21   BY MS. HARRIS:

22   Q.   Do you recognize this picture?

23   A.   I do, yes.

24   Q.   Okay.  Do you recognize where that was taken?

25   A.   That was at -- I'm not sure exactly what building it was,

Rice - D - By Ms. Harris

1   but that was a Sunday service up there.

2           I tend to travel with my trumpet, and I ended up

3   meeting some musician friends there.  Yeah.

4           MS. HARRIS:  Your Honor, at this point we request to

5   publish this to the jury.

6           MR. GABRIEL:  No objection.

7           THE COURT:  Thank you.  You may publish it.

8           Continue, Ms. Harris.

9           MS. HARRIS:  Sure.

10  BY MS. HARRIS:

11  Q.  So you mentioned your trumpet.  Was that something you took

12  with you to the refuge?

13  A.  Yeah, of all things, you know, that's -- my -- my laptop,

14  my phone, and my trumpet (laughing).

15  Q.  Did you have an opportunity to play it while you were

16  there?

17  A.  I did, yeah, on a couple occasions, yes.

18  Q.  Was it kind of a conversation piece?

19  A.  Well, that and it was just -- it was just the mood of the

20  place.  It was just -- you know, especially before chow or

21  lunch.  You know, basically in the evening, you know.  Yeah.

22          MS. HARRIS:  So I want to -- actually, if I can take

23  a moment.

24          I'm going to have just the witness look at Exhibit

25  1819.

Rice - D - By Ms. Harris

1    BY MS. HARRIS:

2    Q.  Sir, do you -- do you recognize that picture as well?

3    A.  Yes, I do.

4    Q.  Okay.  And is that taken in another location in the --

5    A.  That -- yes.  Yes, it is.  That's in -- where the -- the

6    kitchen area, actually, yeah.

7            MS. HARRIS:  And at this point, I would request that

8    we publish this to the jury, as well.

9            MR. GABRIEL:  No objection, your Honor.

10           THE COURT:  Thank you.  Received.

11           Please publish.

12   BY MS. HARRIS:

13   Q.  And what was the occasion there?  Was that a special

14   occasion or was that sort of a day in the life?

15   A.  It was just a day in the life.  And, actually, I -- I

16   was -- just brings back the memories of actually having --

17   getting the chance to -- to speak with Ammon and the guys.  So,

18   yeah.

19   Q.  Did you get to know Mr. Bundy during the course of your

20   stay?

21   A.  I -- I certainly did.  Yeah.

22   Q.  Did you also get to know the Hammonds?

23   A.  Yes.  That was interesting.  Just -- yeah, we were invited

24   to -- to Susan Hammonds.  We had -- had breakfast there,

25   actually.  May have been a first for her.  (Laughing.)  Sorry.

Rice - D - By Ms. Harris

1  Q.  Is it fair to say -- I mean, did you consider some of these

2  events at the refuge, your breakfast with Ms. Hammond, was this

3  part of a fact-finding mission for you?

4  A.  It was.  I mean, I was hearing -- the stories I was

5  hearing -- you know, in all honesty, I just got tired of not

6  knowing for sure what the truth was, and I wanted to get to the

7  truth.  And, you know, they were being painted to be these --

8            MR. GABRIEL:  I'll object to hearsay.

9            THE WITNESS:  It's not hearsay.  I'm speaking --

10           THE COURT:  Sir, sir, it's a legal context here.  You

11  need to stop when there's an objection.  I'll make a ruling,

12  and then the lawyer will ask another question.

13           So I'm stopping you now.  I'll let the witness's

14  answer stand to where the objection was made.

15           Ask another question.  Ask him for admissible

16  evidence, please.

17           MS. HARRIS:  Sure.

18  BY MS. HARRIS:

19  Q.  It sounded like you -- you went to the refuge out some of

20  sort of curiosity.

21           And were there things about your day-to-day

22  experiences there that were contrary to what you had been

23  hearing?

24  A.  Yes.

25  Q.  What were those experiences, without going into

Rice - D - By Ms. Harris

1   specifically what you were hearing.

2   A.   The experiences were that people were bringing food.   It

3   was a very friendly atmosphere.   There was no -- I don't know

4   how else to put it.   It just felt like being at home and being

5   amongst friends.

6   Q.   Were you present when food or supplies were delivered to

7   the refuge?

8   A.   Oh, yeah.   I saw several times when food and supplies came

9   up.

10  Q.   And about how often would that happen?

11  A.   When didn't it?   It was on a regular basis.

12  Q.   What kinds of things were being delivered?

13  A.   Meats, breads, cakes, clothing.   I mean, yeah, it was --

14  yeah.   I don't know.   Everything (laughing).

15  Q.   So I want to fast-forward a little bit to January 26th.

16          Is that a day that you remember?

17  A.   Yeah.   That was pretty much my last day there.

18  Q.   Walk us through the first part of that day.

19          What -- what were you doing?

20  A.   There was -- there was a bit of an office that I was

21  allowed to sit in.   And as I, you know, would work on my laptop

22  and just kind of take notes.   And so I was busy doing that,

23  trying to put together a bit of a story, something I might be

24  able to share on -- on my pages.   Yeah.

25  Q.   And did you -- did you exit your -- your workspace, at some

1  point, and come upon some news?

2  A.  Yes.  I was getting a bit angry, so I thought I would walk

3  up to the -- the chow hall.  But, on my way there, it was just

4  this eerie feeling.  You know, I could -- it was just -- it was

5  much darker than usual, and so I didn't know what was going on.

6  You know, I had to actually use my phone a bit to kind of light

7  my way because usually, you know, it's pretty lit.  And you can

8  just walk around without much of a problem.  But -- by the time

9  I got to the -- to the chow hall, I could see there was a bit

10 of disarray, and, you know, I'm hearing that LaVoy was

11 murdered.  And I -- yeah, I -- I didn't know what to do.  I

12 just -- I didn't know what to do from there.

13 Q.  How did you first hear that piece of news about

14 Mr. Finicum's death?

15 A.  When I got to the chow hall, they were just saying that

16 people had an opportunity to leave.  That he had been -- and I

17 don't recall who stated it.  It was just that, Didn't I hear?

18 And I was like, no.  You know, I'm just hearing it now for the

19 first time.  And, yeah.

20 Q.  How many people were in the chow hall when you were hearing

21 this and talking it over?

22 A.  Well, it was virtually empty.  You know, there was some

23 people gathering up some things.  But, virtually, it was empty.

24 Q.  Did you see people packing things and preparing to leave?

25 What were -- what were people around you doing?

Rice - D - By Ms. Harris

1   A.   They -- yeah, there was this hurried rush to just leave.

2   And that was pretty much what I -- what I saw.  You know, I

3   didn't really -- nobody was really interested in -- in talking

4   much.  That was --

5   Q.   Did it seem like there was a common plan or organizational

6   structure?  Or was it more of a -- kind of every man for

7   himself sort of feeling?

8   A.   Yeah, there was -- I didn't sense anything structured at

9   all.  It was just like total chaos.  Because the word -- I

10  mean, I -- I didn't know what I was going to do.  I was just

11  stuck there.  I didn't have a ride out.

12          You know, I was -- I -- I just assumed -- I didn't

13  know what was going to happen.  So I just found a place in one

14  of the houses there, sat there.

15  Q.   Did you have the impression that people were afraid?

16  A.   Absolutely.

17  Q.   Were you afraid?

18  A.   Yeah.  I didn't know what was going to go on.  You know,

19  for all -- I had no idea what was going to happen.  You know, I

20  felt that they -- my feeling was that they -- hearing what

21  happened, I didn't know what else was going to take place.

22  Q.   Were you able to make a plan to get yourself out of there

23  that night?

24  A.   No.  I sat there.  And I think, by the grace of God, I got

25  a phone call from Michael Emery, who knew that I was up there.

Rice - X - By Mr. Olson                                202

1    And he had returned.  And I ended up grabbing what few things I

2    had and my laptop, and walking up to the gate.

3    Q.  And did you then catch a -- a ride?

4    A.  Yeah, I got a ride back into town with Michael, with my

5    friend.

6    Q.  And did you remain in Burns or did you head home after

7    that?

8    A.  I actually stayed with a friend there.  And -- for a couple

9    of days.  And we kind of talked about what was happened.  And I

10   didn't want to leave right away, but I certainly didn't want to

11   stay up there.

12          But I -- I -- I was allowed to stay -- I stayed at my

13   friend's home.  And we kind of just hung out.  And I still

14   wanted to do some reporting.  I wanted to find out what

15   happened after that.

16          MS. HARRIS:  Sir, I have no more questions for you.

17   Thank you very much.

18          THE COURT:  Are there questions from the defense?

19   Defendants?  Anyone?

20          Mr. Olson?

21          MR. OLSON:  Yes, your Honor.  Thank you.

22          THE COURT:  Go ahead.

23                        CROSS-EXAMINATION

24   BY MR. OLSON:

25   Q.  Sir, do you remember Mr. David Fry?

Rice - X - By Mr. Mumford

1  A.  Yes, I do.

2  Q.  On that day, the -- the 26th of January, before we had

3  heard about Mr. Finicum being shot, do you recall Mr. Fry -- or

4  asking Mr. Fry for some technical assistance?

5  A.  Oh, absolutely.  That was -- as a matter of fact, I was

6  surprised when he came over because he seems to be -- he was

7  pretty busy.  But he came up, and I was having some issues with

8  my laptop, and he spent quite a bit of time with me up there.

9  Q.  And do you remember approximately what time of day that

10  was?

11  A.  Well, it was during the morning.  It was for a good portion

12  of the morning, yeah.

13  Q.  Okay.  Did you ever -- when you were there at the refuge,

14  did you ever see Mr. Fry walking around with a firearm?

15  A.  No.  More like a laptop, or he was always on his phone.

16          MR. OLSON:  No further questions, your Honor.

17          THE COURT:  Any other questions for the witness?

18          MR. SALISBURY:  No.  Thank you, ma'am.

19          THE COURT:  All right.  Cross?

20          MR. GABRIEL:  No cross-examination.

21          MR. MUMFORD:  Your Honor, I'm sorry.  I have one

22  question.

23          THE COURT:  Yes, Mr. Mumford.  Go ahead.

24                      CROSS-EXAMINATION

25  BY MR. MUMFORD:

Rice - X - By Mr. Mumford

1  Q.  Mr. Rice, this photo of you playing the trumpet, was that

2  part of a religious service that was going on at the refuge?

3  A.  Yes.  Yes, it was.  Yes.

4  Q.  And that was happening in one of the buildings there?

5  A.  Yeah.  And I don't recall whose building -- yes, it was --

6  it was there.  Um-hmm.  It was a service.  It was called --

7  Q.  And do you know --

8          MR. GABRIEL:  I'm going to object.  This is

9  cumulative.

10          THE COURT:  We've already covered all of this,

11  Mr. Mumford.

12  BY MR. MUMFORD:

13  Q.  Ever -- during your time there, ever hear anyone talk about

14  threatening Fish & Wildlife employees or BLM employees?

15  A.  Never.  I -- that was -- naw.  Everyone was welcome, open

16  arms.  That's nonsense.

17          MR. MUMFORD:  Thank you, Mr. Rice.

18          Thank you, your Honor.  No more questions.

19          THE COURT:  Mr. Gabriel.

20          MR. GABRIEL:  One moment, your Honor.

21          (Pause, counsel conferring.)

22          MR. GABRIEL:  No questions, your Honor.  Thank you.

23          (Conclusion of fourth excerpt.)

24          (Conclusion of excerpts.)

25

Rice - X - By Mr. Mumford

1                              --oOo--

2

3    I certify, by signing below, that the foregoing is a correct

4    stenographic transcript of the oral proceedings had in the

5    above-entitled matter this 4th day of February, 2017.  A

6    transcript without an original signature or conformed signature

7    is not certified.  I further certify that the transcript fees

8    and format comply with those prescribed by the Court and the

9    Judicial Conference of the United States.

10             /S/ Amanda M. LeGore

11       _____

12        AMANDA M. LeGORE, CSR, RDR, CRR, FCRR, CE
              CSR No. 15-0433  EXP:  3-31-2018

13

14

15

16

17

18

19

20

21

22

23

24

25