1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF OREGON

3  UNITED STATES OF AMERICA,        )
                                    )  Case No. 3:16-CR-00051-BR
4            Plaintiff,             )
                                    )
5  v.                              )  October 5, 2016
                                    )
6  AMMON BUNDY (1),                 )
   RYAN BUNDY (5),                  )
7  SHAWNA COX (7),                  )
   DAVID LEE FRY (13),              )
8  JEFF WAYNE BANTA (14),           )
   KENNETH MEDENBACH (16),          )
9  NEIL WAMPLER (20),               )
                                    )
10           Defendants.            )
   _____ )  Portland, Oregon

11

12          EXCERPTED TRANSCRIPT OF PROCEEDINGS

13               (Excerpt of Testimony)

14      BEFORE THE HONORABLE ANNA J. BROWN, DISTRICT JUDGE

15

16

17

18

19

20

21

22  COURT REPORTER:        AMANDA M. LeGORE
                           CSR, RDR, FCRR, CRR, CE
23                         U.S. Courthouse
                           1000 SW Third Avenue, Suite 301
24                         Portland, OR  97204
                           (503)326-8184

25

```
 1   APPEARANCES:
     FOR THE PLAINTIFF:        GEOFFREY BARROW
 2                             CRAIG GABRIEL
                               ETHAN KNIGHT
 3                             Assistant U.S. Attorneys
                               U.S. Attorney's Office
 4                             1000 SW Third Avenue, Suite 600
                               Portland, OR  97204
 5                             (503)727-1000

 6

 7   FOR DEFENDANT AMMON
     BUNDY:                    J. MORGAN PHILPOT
 8                             JM Philpot Law
                               1063 E. Alpine Drive
 9                             Alpine, UT 84004
                               (801)810-8369
10
                               MARCUS MUMFORD
11                             Marcus R. Mumford, PC
                               405 S. Main Street, Suite 975
12                             Salt Lake City, UT 84111
                               (801)428-2000
13
     FOR DEFENDANT RYAN
14   BUNDY:                    RYAN BUNDY
                               Pro se
15                             79400-065

16                             LISA LUDWIG
                               Standby Counsel
17                             811 SW Naito Parkway, Suite 500
                               Portland, OR  97204
18                             (503)223-5570

19
     FOR DEFENDANT SHAWNA
20   COX:                      SHAWNA COX
                               Pro Se
21
                               TIFFANY HARRIS
22                             Standby Counsel
                               121 SW Salmon Street, Suite 1420
23                             Portland, OR  97204
                               (503)546-2927
24

25
```

```
 1    APPEARANCES:
      FOR DEFENDANT DAVID
 2    FRY:                      PER OLSON
                                Hoevet Olson Howes, PC
 3                              1000 SW Broadway, Suite 1500
                                Portland, OR  97205
 4                              (503)228-0497

 5    FOR DEFENDANT JEFF
      BANTA:                    ROBERT SALISBURY
 6                              330 South 1st Street
                                PO Box 1272
 7                              St. Helens, OR  97051
                                (503)397-9000
 8


 9
      FOR DEFENDANT KENNETH
10    MEDENBACH:                KENNETH MEDENBACH
                                Pro Se
11                              25795-086

12                              MATTHEW SCHINDLER
                                Standby Counsel
13                              501 4th Street #324
                                Lake Oswego, OR  97034
14                              (503)699-7333

15

16    FOR DEFENDANT NEIL
      WAMPLER:                  LISA MAXFIELD
17                              Pacific Northwest Law, LLP
                                1420 World Trade Center
18                              121 SW Salmon
                                Portland, OR  97204
19                              (503)222-2661

20    ALSO PRESENT:             RUSS BRETON
                                RENA RALLIS
21                              MR. ROOTS

22

23

24

25
```

INDEX


Witness Index

| FOR THE DEFENDANT: | Direct | Cross | ReDirect | ReCross |
|---|---|---|---|---|
| Ammon Bundy | 5 | | | |
| Ammon Bundy | 127 | | | |
| Michele Fiore | 188 | 204 | | |
| Michele Fiore | | 206 | | |
| Michele Fiore | | 207 | | |
| Brandon Rapolla | 209 | 225 | 235 | 236 |
| Brandon Rapolla | | 229 | | |
| Brandon Rapolla | | 231 | | |
| Brandon Rapolla | | 233 | | |
| Brandon Rapolla | | 234 | | |

-oOo-

A. Bundy - D - By Mr. Mumford

1              (The following excerpt of the testimony of Ammon

2              Bundy was held on October 5, 2016, at 9:14 a.m.)

3              MR. BARROW:  No, your Honor.  In light of time, we

4    can take it up at another break.

5              THE COURT:  Mr. Bundy?  Mr. Bundy?

6              Marshals, Mr. Bundy needs to move to the witness

7    stand.

8              All right.  Ms. Graham, please bring in the jury.

9              THE CLERK:  Jurors coming in.

10             (Jurors enter at 9:17 a.m.)

11             THE COURT:  Thank you.

12             Ladies and gentlemen, everyone be seated, please.

13             Good morning, jurors.

14             THE JURORS:  Good morning.

15             THE COURT:  Any exposure to the case at all and

16   anything involving it since we adjourned yesterday?

17             THE JURORS:  No.  No, ma'am.

18             THE COURT:  Then let us proceed and continue with the

19   direct examination of Mr. Bundy.

20             Mr. Mumford.

21             MR. MUMFORD:  Thank you.  Thank you, your Honor.

22                        DIRECT EXAMINATION

23   BY MR. MUMFORD:

24   Q.  Good morning, Mr. Bundy.

25             I think we left off yesterday with the -- I think we

6

A. Bundy - D - By Mr. Mumford

1  called it a standoff in Bunkerville in 2014.

2          Do you recall?

3  A.   Yeah, I think it -- we talked about me getting tased, and

4  that's kind of where we ended it.

5  Q.   Okay.   About how many people do you remember seeing or

6  participating in the protest in Bunkerville in 2014?

7  A.   In total or the first few days or --

8  Q.   Let's talk about, you know -- well, let's talk about what

9  happened in those days after -- or how -- how much longer

10  did -- do we understand the Bunkerville in 2014 to go to?

11  A.   Well, they -- so the incident that we saw with the video

12  and the -- where they tased me and threw my Aunt Margaret on

13  the ground, and all of that, that was on Wednesday.   And --

14  Q.   And then when did it -- when was the standoff resolved,

15  then?

16  A.   On that Saturday.

17  Q.   Okay.

18  A.   There was a few more events in between.

19  Q.   Okay.

20  A.   They --

21  Q.   So let's say from Wednesday to Saturday, then, how many --

22  how many people, total, did you -- did you see participate

23  there?

24  A.   Several thousand people.

25  Q.   And do you remember how long the protest had been going on

A. Bundy - D - By Mr. Mumford

1  prior to those events depicted in those videos that the jury

2  saw yesterday?

3  A.   Yeah.  Pretty much started that Saturday before, but it was

4  very small.  It wasn't until those videos of what they did on

5  Wednesday, where they tased us and threw my Aunt Margaret on

6  the ground and sicced the dogs on us and all of that -- there

7  were several people that took that video, and then they sent it

8  out, all over.  And people from all over the country started

9  coming.  And that's -- that's really what drew everybody there.

10            Before that, there was probably, you know, 50 or

11  60 -- well, probably 30 to 50 people that were there during the

12  day.  And then, in the evening, there would be maybe 100 to 150

13  people after work, and so forth.  They would come and support.

14            But then once the video went out of them tasing and

15  throwing my Aunt Margaret on the ground, then literally

16  hundreds of people from all over started to come.  And that's

17  what drew everybody there.

18  Q.   Do you remember yesterday testifying -- and I'm going to

19  pare -- something along the lines of -- about the BLM?  If

20  you're going to enforce court orders, go ahead and enforce

21  court orders, but this was something way beyond that?  Do you

22  remember saying something like that?

23  A.   I do remember saying that.  And I --

24  Q.   What did -- can you explain what you meant?  What was the

25  BLM doing, in your opinion, that was way beyond that?

A. Bundy - D - By Mr. Mumford

1  A.  Well, I -- I didn't -- I don't want to dispute the fact

2  that there was a federal court order.  I mean, that's a fact,

3  and I'm not denying that.  I don't believe that it -- my

4  personal belief is that it was wrong.  That the agencies have

5  abused the courts again.  And that to remove us after 130-plus

6  years of ranching there, just because they say so, is wrong.

7  But either way, there's -- it's an undisputed fact that there

8  was a federal court order.  But the court order only allowed

9  for the impound of the cattle.  And -- and we were there

10  legally and peacefully protesting that with our signs, saying

11  we did not agree with that.

12          And then they came and began to tase us and abuse us,

13  throw us on the ground, beat us up.  And that's what they began

14  to do.

15          MR. KNIGHT:  Your Honor, I'm sorry.  I'm going to

16  object to the narrative, cumulative description --

17          THE COURT:  The objection is sustained.

18          The last answer stands.  Please ask questions that

19  relate to the defendant's state of mind in Malheur, without

20  narrative.

21          MR. MUMFORD:  Thank you.

22          Showing -- your Honor, showing the witness 1156.  And

23  I don't believe there's any objection.

24          THE COURT:  Is that right, Mr. Knight?

25          MR. KNIGHT:  That's fine, your Honor.

A. Bundy - D - By Mr. Mumford

1    THE COURT:  Thank you.

2    MR. MUMFORD:  So publish.

3    BY MR. MUMFORD:

4    Q.  Mr. Bundy, do you remember testifying yesterday about cows

5    getting shot?

6    A.  Absolutely.

7    Q.  How many times had this cow been shot?

8    A.  I don't know exactly, but over five times.  And one was

9    from the very top, and it would have only been able to be shot

10   from the air.

11   Q.  Do you -- and so this -- this photo was taken following the

12   events of Bunkerville or --

13   A.  Yeah, this is one of the many cattle that they killed.

14   Q.  Do you remember how many additional cows had been killed

15   like this?

16   A.  No.  But to our best estimate, there was around 60 head of

17   cattle that are unaccounted for.

18   Q.  And did you -- at some point, did you -- did -- did -- you

19   previously mentioned a BLM grave for dead cattle?

20   A.  Yes.  They dug a mass grave, and they started just dumping

21   the dead cattle in them.

22   Q.  And -- and it was this kind of knowledge, would you say,

23   that made you so determined to get into the dump truck?

24   A.  That's exactly right.

25   Q.  And, in fact, the video that we saw, it has you pointing to

A. Bundy - D - By Mr. Mumford

1  the dump truck.  Is that right?

2  A.  That's correct.

3  Q.  At the time, had you -- had you said anything threatening

4  to the -- the BLM agents that were depicted in that video?

5  A.  Absolutely not.

6  Q.  Do you remember what -- what it was you said?

7       MR. KNIGHT:  Your Honor, I'm going to object to the

8  line of questioning because it doesn't relate to his state of

9  mind.  He's now describing --

10      THE COURT:  The objection is sustained.  We're going

11 into far too much detail about Bunkerville, sir.

12      MR. MUMFORD:  Okay.

13      THE COURT:  Move on.

14      Jurors, remember, the purpose for this is as it may

15 relate to Mr. Bundy's state of mind concerning the charge here

16 involving the Malheur refuge.

17      So, Counsel, point to that, please.

18      MR. MUMFORD:  Yes.

19 BY MR. MUMFORD:

20 Q.  You mentioned it -- it was resolved on approximately the

21 Saturday of that -- that week.  Is that right?

22 A.  That's correct.

23 Q.  And -- and it -- how did that -- how did -- how did that

24 climax or end of the conflict take -- take -- take place?

25 A.  Well, from the very beginning of this, we were reaching out

A. Bundy - D - By Mr. Mumford                          11

1    to our representatives, to the governor, to our state

2    representatives, to the sheriff, to try to get them to come and

3    protect us and to get them to stop the federal government from

4    doing what they're doing.

5              And other than a comment that the governor made in

6    his discuss about the -- the First Amendment areas that they --

7    that the Bureau of Land Management made, there wasn't a lot of

8    response.  But then, finally, on Saturday, the sheriff agreed

9    to come.  The county sheriff, Sheriff Gillespie, agreed to come

10   and address the people.

11   Q.  And showing you what's been previously marked as Exhibit

12   1161.

13             MR. MUMFORD:  Your Honor, I don't believe there's any

14   objection to this one.  I would ask to show it to the witness.

15             THE COURT:  Stand by, please.

16             (Pause, Mr. Mumford and Mr. Knight conferring.)

17             THE COURT:  Go ahead.

18             (Picture displayed.)

19   BY MR. MUMFORD:

20   Q.  What is this?

21   A.  That's my dad speaking, and this is right before he turned

22   the time over to Sheriff Gillespie.  Sheriff Gillespie is the

23   one just to the left of him.

24   Q.  And is that you behind the -- the sheriff there?

25   A.  Yeah, I'm right behind the sheriff, standing next to the

A. Bundy - D - By Mr. Mumford

1   undersheriff.

2   Q.  Can -- can you just briefly describe what is taking place

3   here.

4   A.  My dad is basically saying the sheriff's finally come.  And

5   at this -- I don't know if this is before he spoke or after,

6   because it's just the picture.  But if it's before, he's

7   basically announcing that the sheriff's here and --

8            MR. KNIGHT:  I'm going to object to hearsay.

9            THE COURT:  The objection is sustained.

10           Don't talk about what's on the video.  It will be

11   shown, to whatever extent it's going to be admitted.

12           Talk about his state of mind, please, so we tie it to

13   this case.

14           MR. MUMFORD:  Yes, your Honor.

15   BY MR. MUMFORD:

16   Q.  Mr. Bundy, is this -- is this podium, here, set up near an

17   area called the -- the wash?

18   A.   It's about three miles from the wash.

19   Q.   Okay.  And -- and what does that mean?  The wash?

20   A.   Well, the Toquop Wash is the name of it.  And that is just

21   down -- well, the wash is where they put in their compound,

22   where they put in their military-type base.

23           And so that's what "the wash" means, and that's, I'm

24   sure, what you're getting at.

25   Q.  And so what -- what did you understand the purpose of

A. Bundy - D - By Mr. Mumford

1    the -- well, you -- you said the purpose of the sheriff being

2    there is -- is -- and what he said to the crowd resulted in

3    what, then?

4    A.   Well, the purpose of the sheriff is we were calling him to

5    protect us from what was happening.   That was his purpose.   And

6    he said that they had had communication with the Bureau of Land

7    Management.

8              MR. KNIGHT:   Your Honor, I object to hearsay.

9              THE COURT:   The objection is sustained.

10             The fact of the communication may be shown.   Let's

11   not get into all of the hearsay.

12             So please, again, focus on Mr. Bundy's state of mind

13   and what this shows to advance that.

14   BY MR. MUMFORD:

15   Q.   Yeah.   So you understood the sheriff had been in

16   discussions with the BLM.   Right?

17   A.   Yes.

18   Q.   And the sheriff was there for the purposes of -- of -- of

19   what, other than protect -- I mean, how did -- how did the

20   sheriff protect your family that day?

21   A.   Well, what happened was the sheriff was there, I guess, to

22   announce -- I'll try not to be hearsay here.   So to announce

23   his communication with the BLM.   And he did announce that.   And

24   we had expected him to basically protect us and to get the

25   cattle back.   And that's -- that's what was going on here.

A. Bundy - D - By Mr. Mumford

1   Q.  Were -- after your father and the sheriff were done

2   speaking to the audience that day, can you describe what

3   happened.

4   A.  So myself and pretty much -- you know, hundreds of other

5   people went up to the wash.  And we were told that the BLM was

6   going to stand down and that they were going to stop gathering

7   the cattle.  And we went up to the wash, where they were at,

8   and we saw something completely -- I saw something completely

9   different than what was being said.

10  Q.  What was that?

11  A.  I saw fully armed and full tactical -- several hundred men,

12  ready to open fire on the American people, and threatening to

13  do so.  Not just -- not just seeing it.  Threatening to do so.

14  Q.  And we've got a short -- a clip of that.

15          Is that -- and so can you describe what -- what we're

16  going to see.

17  A.  Well, if it's a clip, I think it's us basically moving up

18  to those people that were threatening us.

19  Q.  Did you intend to go -- go get -- you were trying to go get

20  your cows?  Is that what you were going to do?

21  A.  At that point we were going to go up to the fence, and we

22  were going to stay there until they left.  That's -- that's

23  what was our objective.

24  Q.  And -- and what -- and how was it -- what happened?

25  A.  Well, we did that, as they were threatening to open fire on

A. Bundy - D - By Mr. Mumford

1   us.  And we -- we did assemble, and we moved up several hundred

2   people, with horses and people on the ground.  And we moved up

3   to the barricade, with them threatening us the whole time.

4              MR. KNIGHT:  Your Honor, I'm going to object to the

5   hearsay characterization.

6              THE COURT:  The objection is sustained.

7              Mr. Mumford, this line of questioning needs to be

8   made specific and in summary, please.

9              MR. MUMFORD:  Shall we just go to the video?

10             THE COURT:  Yes, please.  And then not repeat it.

11  Let's get on with it, please.

12             MR. MUMFORD:  Your Honor, this is marked as 1321.

13             THE COURT:  Again, this is admitted for its

14  state-of-mind value with respect to the charge and only for

15  understanding the witness's testimony now.  It won't be with

16  you in the jury room.

17             Please proceed.

18             (Video playing with sound.)

19             (Video paused.)

20  BY MR. MUMFORD:

21  Q.  Mr. Bundy, now that we have the visual, can you just

22  briefly tell us what we're seeing here.

23  A.  We're down to the bottom of the wash, and we are assembling

24  here.

25             To the -- to the north is -- you'll see, underneath,

16

A. Bundy - D - By Mr. Mumford

1  another bridge there.  You'll see that's where the federal

2  agents are lined up.  And we're basically assembling here and

3  begin to move forward to approach them.

4              MR. MUMFORD:  Go ahead.

5              (Video playing with sound.)

6              MR. MUMFORD:  This is 1322.

7              We'll get set up --

8  BY MR. MUMFORD:

9  Q.  You heard a megaphone in the background.  What was being

10  said, to your recollection?

11              THE WITNESS:  They were --

12              MR. KNIGHT:  Object to the hearsay.  He's asking

13  what's being said on --

14              THE COURT:  Objection is sustained.

15              Again, Counsel, this needs to be limited to state of

16  mind in Malheur.  We cannot go into these details.

17              The objection is sustained.  Ask another question.

18              MR. MUMFORD:  The state of mind, your Honor --

19              THE COURT:  Counsel, ask another question.  Move on.

20  Make it relevant to state of mind.  Move on.

21              MR. MUMFORD:  Again, your Honor, this is 1322.

22              (Video playing with sound.)

23              (Video stopped.)

24  BY MR. MUMFORD:

25  Q.  So the crowd starts to move -- move -- move forward, then?

A. Bundy - D - By Mr. Mumford

1    A.   That's correct.

2    Q.   And then --

3              (Video playing without sound.)

4    BY MR. MUMFORD:

5    Q.   (Speaking while video plays.) And then this is another

6    perspective from behind?  Is that right?

7    A.   That's correct.

8    Q.   Where were you --

9              MR. MUMFORD:  Can you pause it for just a sec.

10             (Video paused.)

11   BY MR. MUMFORD:

12   Q.   Where were you in the crowd at this point?

13   A.   If I remember, I was up here in the (pointing) -- kind of

14   the --

15   Q.   Front?

16   A.   -- front middle of the crowd there.

17   Q.   The stipulation that we read -- that was read about

18   Bunkerville talked about people having arms.  We see an

19   individual here with what appears to be a sidearm.

20             Do you -- do you have a recollection of how many of

21   them were armed?

22   A.   Yeah.  When I look at that picture, it looks like the -- he

23   got a holster that -- that doesn't -- I'm not sure there's a

24   gun in it, but I might be wrong.

25   Q.   That's all right.

18

A. Bundy - D - By Mr. Mumford

1   A.   I just -- to be honest with you, I didn't see very many

2   weapons at all.  I know I didn't have one.  And it's been

3   portrayed many, many times we had lots of weapons, but there

4   just wasn't very many weapons there.

5           MR. KNIGHT:  Your Honor, I'm sorry.  That's contrary

6   to the stipulation about the events that occurred there that

7   day.

8           THE COURT:  The objection is sustained.  The question

9   is stricken, as is the answer.

10          Please move on.

11          MR. MUMFORD:  Oh, but, your Honor, it shouldn't be

12  stricken because the court stipulation allowed us to pre --

13  to -- to present --

14          THE COURT:  All right.  If you're opening up the

15  door, then the Government has the right to bring in its own

16  evidence.

17          MR. MUMFORD:  No, I understand that.  I understand

18  that for sure.

19          THE COURT:  Go ahead.  Move on, for the limited

20  purpose of state of mind, please.

21          THE WITNESS:  It's --

22          THE COURT:  Sir, wait for a question.

23  BY MR. MUMFORD:

24  Q.   So -- and we're about to see you have a discussion with

25  somebody.  Who is -- who is that?

A. Bundy - D - By Mr. Mumford

1   A.   That is the -- Dan Love, the head of operations for the

2   force that was there, I guess.

3         I don't know what his position is.  I know he works

4   for the Bureau of Land Management.  And I guess -- I guess the

5   Bureau of Land Management has now an armed force department,

6   and he's the head of it, I guess; something to that effect.

7   Q.   And then there's another discussion with someone else.  Who

8   is that?

9   A.   Then I have a discussion with the county sheriff, who comes

10  down.  His name is Deputy Tom Roberts.  And he begins to

11  protect the people.

12  Q.   And do you recall what you said to Mr. Roberts that day?

13  A.   I told him that he had the proper authority here.  And that

14  whatever he asked us to do, we will do.

15        And he did take control of the situation as, in my

16  belief, is his duty to do.  And he backed down the federal

17  agents and he asked us to back away as well.

18        And then he -- then we opened up negotiations for

19  them to leave and for us to get back our cattle.  And he

20  facilitated that.  And that's what happened.  The federal

21  agents left -- completely left the whole area and never came

22  back.  And -- and we went in there, and we got our cattle.

23  Q.   Thank you.

24        (Video playing with sound.)

25  BY MR. MUMFORD:

A. Bundy - D - By Mr. Mumford

1    Q.   (Speaking over video) This is Agent Love that you were --

2    A.   That's correct.

3              (Video stopped.)

4              MR. MUMFORD:   And then go to --

5              Your Honor, this is 1324.

6              (Video playing with sound.)

7              MR. MUMFORD:   Pause it.

8              (Video stopped.)

9    BY MR. MUMFORD:

10   Q.   What were you talking about with Deputy Roberts, there?

11   A.   I actually started cutting that sign off the fence.   And

12   he -- I think he thought maybe I was getting ready to open the

13   gate earlier than what we had agreed upon.   And he was like,

14   Hey.   And I said, Oh, I'm just taking the sign off the fence.

15             And so he was like, Oh, okay.   That's good.   So --

16   Q.   Now, these -- what were these fences set up to do, to your

17   understanding?

18   A.   These fences were set up to keep people out.

19   Q.   What do the signs say?

20   A.   The sign said "Area closed."

21   Q.   Go ahead.

22             (Video playing with sound.)

23             MR. MUMFORD:   Pause it.

24             (Video stopped.)

25   BY MR. MUMFORD:

A. Bundy - D - By Mr. Mumford

1   Q.   Do you see on the upper right-hand side of that?

2   A.   Yes.

3   Q.   Who's that?

4   A.   What do you mean?

5   Q.   Is that the deputy that was -- yeah.

6   A.   That there (drawing).

7   Q.   Yeah.

8   A.   I believe that's the sheriff deputy with the county

9   sheriff.   That's correct.

10  Q.   So he just finished talking with them at that point, then?

11  A.   Yeah.   And this group is federal BLM -- I guess -- agents.

12  And there was others up there as well.

13  Q.   Do you have a sense of how many federal agents?

14  A.   Well, and there was further -- more up on top.

15              My estimate with all of them -- including, I think,

16  the contract cowboys -- was around 200 people.

17              (Video resumes with sound.)

18              (Video stopped.)

19  BY MR. MUMFORD:

20  Q.   And then I think we have about 15 seconds of the cows

21  getting let through.

22              There's something that's significant though, here,

23  that we'll see.   Right?   With the cows coming through?

24              Who -- who -- who goes up and gets the cows?

25  A.   These cowboys on this -- horseback, they go up and actually

A. Bundy - D - By Mr. Mumford                 22

1   bring the cattle back down and bring them back to the ranch.

2   Q.  And are they accompanied by -- by law enforcement?

3   A.  Absolutely, by the county sheriff.  They are actually

4   following four vehicles from the county sheriff, up into the

5   compound.  And they retrieve the cattle and bring them back.

6             (Video playing.)

7             MR. MUMFORD:  Your Honor --

8             (Video paused.)

9             MR. MUMFORD:  -- this is 1325.

10            THE COURT:  Yes.  Go ahead.

11            (Video playing with sound.)

12            MR. MUMFORD:  Pause it.

13            (Video stopped.)

14  BY MR. MUMFORD:

15  Q.  In fact, is that -- is there a sheriff -- is there a

16  sheriff's deputy car?

17  A.  That is correct.  That is the county sheriff deputy vehicle

18  there.

19            And this is the very end of the cattle.  Most of them

20  have already gone through.

21  Q.  Mr. Bundy, what effect did this experience have on you?

22  A.  It had a great effect on me.  I was able to see people

23  unite.  I was able to see rights restored.  And I was able to

24  see our local government stand up for the people and restore

25  their rights and protect them; both in harm and in property and

A. Bundy - D - By Mr. Mumford

1    in life.

2            And it was a very significant -- I guess it's -- it's

3    been significant for me and many, many others that have

4    witnessed it or have seen it; even -- even way after the fact.

5    Q.   And how did that contribute to the actions in this case,

6    that -- that you -- in -- in Oregon, with respect to the

7    approach you took with the Hammonds?

8    A.   Well, it wasn't the first time that the county sheriff had

9    stepped in and protected the people against federal agencies,

10   but it was the most significant.

11           And I -- and it was a firsthand witness, to me, of

12   what was truly the purpose of -- one of the purposes of a

13   county sheriff, the sheriff department.

14           And so when I began to understand what happened to

15   the Hammonds, the first place I knew that the Hammonds need to

16   go to is to their county sheriff, and try to get him to stand

17   up for them and to protect them.  And so that's -- that is --

18   that is what we did.

19   Q.   And so -- so -- so moving forward in time -- I believe

20   what -- we kind of left the story off at the Hammonds, right

21   around November 5th, just right before you went home.  Right?

22   A.   Right.

23   Q.   And you had made a phone call to set up a meeting with

24   Sheriff Ward.  Is that right?

25   A.   Yeah.  So I -- the morning of the 5th, before I met with

A. Bundy - D - By Mr. Mumford                24

1    Susie Hammond, I called the sheriff and --

2    Q.  And was -- and was this your first time in contact with --

3    with Sheriff Ward?

4    A.  That's correct.  I had to look him up on the Internet to

5    see who he was, see what his phone number was, and all of that.

6    So I did that, and I called him.

7    Q.  And you -- and you -- and you set up an appointment?

8    A.  I did.  I set an appointment for that afternoon.

9    Q.  And I believe that you had indicated that you and Mr. Payne

10   were going to see Ms. Hammond that day?  Is that --

11   A.  That's correct, yeah.  So we went and met with Susie

12   Hammond.

13          We were hoping Dwight was there.  But Dwight had been

14   working very, very hard to try to pay this fine off before he

15   went to prison.  And so he literally was working, you know, 14,

16   15 hours a day, every day, because he did not want to leave his

17   family, going to prison, without paying this fine.

18          MR. KNIGHT:  I'm going to object to --

19          THE COURT:  The objection is sustained.

20          Mr. Bundy, don't talk about Mr. Hammond's state of

21   mind.

22          Counsel, frame your questions to keep it relevant to

23   this witness's state of mind.  Jurors, disregard the testimony

24   and the last response.

25          Go ahead, please.

A. Bundy - D - By Mr. Mumford

1   BY MR. MUMFORD:

2   Q.  What time did you -- how long did you spend with

3   Ms. Hammond?

4   A.  A couple of hours that morning.  And then it was kind of

5   around lunchtime.  And she had some running around to do.

6   And -- but she wanted us to come back.  So we went to lunch,

7   just at a restaurant there in Burns.  And then we came back and

8   spent probably another hour and a half, or so, with her.  And

9   just -- again, she began explaining more of what was going on.

10              THE COURT:  Stop.  Do not talk about their state of

11  mind.

12              Take it back, again, to this defendant, please.

13  BY MR. MUMFORD:

14  Q.  Moving forward to the afternoon of -- of -- of November

15  5th, then, with -- with Sheriff Ward.

16              Do you remember approximately what -- what time that

17  meeting took place?

18  A.  I don't remember exactly.  I know it was in the afternoon.

19  I -- I think probably around three o'clock, or so.

20  Q.  And Mr. Payne came with you?

21  A.  That's correct.

22  Q.  Can you describe for the jury how you were received by

23  Sheriff Ward?

24  A.  Very well.

25              He had -- he knew who I was, and he accepted us well

26

A. Bundy - D - By Mr. Mumford

1  into his office.  I noticed on his desk he had a copy of the

2  letter that I had wrote a couple of days before.  And so I

3  don't know how he got that, but it was on his desk.

4          And we had a very open, friendly -- I thought a very

5  great meeting.  And that was --

6  Q.  Did he seem -- did he seem interested in the information

7  that you -- that you shared with him?

8  A.  Absolutely.  He was interested in the information of why we

9  were there.  He was also interested in the Bundy Ranch and what

10 happened there.  He was very friendly with us and very open.

11 Q.  Did he seem -- did he seem worried or concerned at all

12 about anything that you -- that you or Mr. Payne said to him,

13 that day?

14 A.  Not at all.  He was a good sheriff.  He -- he wanted to

15 take the concerns that we had and our desire to educate him

16 or -- and to protect the Hammonds.  And again, he was very open

17 with us.

18 Q.  Did he seem to know who you were?

19 A.  He knew who I was, yeah.  I don't know that he knew a lot

20 about me, but he knew who I was.

21 Q.  Did the subject of Bunkerville or the Bundy Ranch come up?

22 A.  Yes, it did.  And he -- he inquired a little bit about it

23 and seemed -- this is my opinion of it.  But seemed very

24 positive about it.

25 Q.  Seem -- so he seemed supportive, then?

A. Bundy - D - By Mr. Mumford                    27

1   A.   I mean, I wouldn't be able to say or make that

2   determination whether he was supportive.  I know he inquired

3   about it and he seemed very positive to me about it.

4   Q.   Now, you've been here in this courtroom when Sheriff Ward

5   has testified.

6           Did it seem to you, as you listened to Sheriff Ward,

7   that he was correctly characterizing --

8           MR. KNIGHT:  Your Honor, objection.

9           THE COURT:  The objection is sustained.

10          No witness may testify, jurors, as to the credibility

11  of another trial witness.  That's for you.

12          Move on, Counsel.

13  BY MR. MUMFORD:

14  Q.   Did you make -- did you make threats to anyone -- did you

15  or Mr. Payne make threats or ultimatums to -- to -- to -- to --

16  to Mr. Ward?

17  A.   What we did was we explained to him what we felt and what

18  our experience has shown he has a duty to do.  And that's

19  pretty much all we did at that meeting.  We wanted him to look

20  into the *Hammond* case and to see what was going on.  And we

21  told him that we would get him more information.  That we would

22  help him do that in whatever way we could.  But our goal was --

23  there was to get him to initiate, I guess, an investigation, if

24  you will; to see what was going on.

25          He had never met the Hammonds, so we asked him to go

A. Bundy - D - By Mr. Mumford

1    meet with the Hammonds.  We actually set that meeting up with

2    the Hammonds, and that did happen.  And our goal was there --

3    was just simply to inform him of what was happening, inform him

4    that we were concerned, some of the reasons why we were

5    concerned, and asked him to get more information to make a

6    determination for himself.

7    Q.  And so yes or no, did you give him any threats or

8    ultimatums that day?

9    A.  No, we did not.

10   Q.  Was there ever a time at this meeting that Sheriff Ward

11   became intense or angry at -- at what you were telling him?

12   A.  Not at all.  Not at all.  And we -- I mean, the last thing

13   we wanted was for the sheriff, that we felt had the authority

14   to make a difference here -- the last thing we wanted to do is

15   to get him upset or, you know, somehow in contrary to us.  I

16   mean, that was the sole reason we were going there, was to help

17   us; not to become adverse with him.

18   Q.  Do you know if Mr. Payne had any separate conversation with

19   Mr. Ward that day that you just didn't know about, somehow?

20   A.  Not that I know of, and I don't see how that would be

21   possible.

22   Q.  Why not?

23   A.  Because I was with Ryan, we stayed at the hotel room

24   together.  And then we went to Susie Hammond's house together.

25   And then we went to the sheriff's office together.

A. Bundy - D - By Mr. Mumford                29

1          And then after the sheriff's office, in the parking

2    lot of the sheriff's office, he went -- you know, he got in his

3    vehicle and headed back to California, which is where he was

4    headed, I guess.  I don't know where he was going exactly.  And

5    I got in my vehicle.  And so unless he would have actually

6    stopped and parked again and went into the sheriff's -- and

7    that could have happened, but I don't believe that that

8    happened.

9    Q.  About how long, total, did you spend with Sheriff Ward that

10   day, November 5th?

11   A.  I would say a little over an hour.  Maybe -- maybe -- I

12   would be surprised if it was an hour and a half.  I would say a

13   little over an hour.

14   Q.  And your recollection as to -- in the meeting, where did

15   you leave things with him?

16   A.  We left with a handshake.  We left with him kind of making

17   a commitment to meet with the Hammonds and with a commitment

18   from us that we would get him more details on a direction that

19   he could go into looking into the matter.

20   Q.  So you -- you -- you walk out.  You get in your truck.

21   Mr. Payne gets in his truck, goes to California.  Where did you

22   go?

23   A.  I went down to the local news, the Burns -- I think it's

24   the *New Times Herald*, I believe, is the name of it.

25          And I gave them a copy of my letter that I wrote to

30

A. Bundy - D - By Mr. Mumford

1  government officials and concerned citizens, I think, is

2  what -- I gave them that letter, and asked them if they would

3  publish it.  And they agreed to publish it, and asked me if I

4  could send it to them digitally later.  And I did do that, and

5  they did publish it.

6  Q.  Did anyone go with you to meet with the -- the newspaper?

7  A.  No, not at that time.  I met with them multiple times, but

8  not at that time.

9  Q.  After -- after your visit to the newspaper, what did do

10  you?

11  A.  I think by this time it was getting evening.  I ate next

12  door, just down the street, at the little Chinese restaurant.

13  And then I went back home to Emmett.

14  Q.  If you remember, about what -- what time of day did you

15  leave the -- Harney County, then?

16  A.  I'm going to guess, you know, five o'clock, or so.

17  Q.  Okay.  Before -- just -- before we move forward here, let's

18  get a few things clear for the -- for the jury.

19        You -- you understand that the Government has alleged

20  that as of -- that day, November 5th --

21        MR. KNIGHT:  Your Honor, this is -- objection,

22  leading.

23        THE COURT:  Just rephrase your question, please, to

24  get to the fact without legally characterizing it.

25  BY MR. MUMFORD:

A. Bundy - D - By Mr. Mumford

1   Q.  Well, you understand the allegations are that you -- your

2   conspiracy began that day, November 5th, in directly preventing

3   Malheur National Wildlife Refuge employees from discharging

4   their duty.  Is that true or not?

5        MR. KNIGHT:  Objection, your Honor.  It's not proper

6   for the witness to offer a legal conclusion in this context.

7        THE COURT:  I'll permit the witness to answer with

8   respect to the facts and the dates.  The legal issues about

9   conspiracy are matters for me to instruct you and for you to

10  decide as it applies to the facts as you find them.

11       So you may answer the question, Mr. Bundy, on factual

12  issues, not the law.

13  BY MR. MUMFORD:

14  Q.  Factually, on November 5th, did you conspire with anyone to

15  prevent Malheur National Wildlife Refuge employees from doing

16  their -- discharging their duties by threat, fear, or

17  intimidation?

18  A.  Absolutely not.

19  Q.  Moving forward.

20       You got back -- you got back home.  Do -- do you

21  remember when?

22  A.  It was late.  It's about a three-hour drive.  It was in the

23  winter, too.  So -- and you have to go up over the pass.

24  You've got to be careful going up over the pass.  So it was

25  pretty late.  I don't remember exactly, but I remember it was

32

A. Bundy - D - By Mr. Mumford

1   late.

2   Q.   And did you stay in contact with the Hammonds?

3   A.   I did.

4   Q.   Did you receive help or -- or -- any help in gathering

5   information from them?

6   A.   Yeah.   I worked very closely with the Hammonds for about

7   two weeks on the details of basically what's happened, kind of

8   what was the beginning of this -- you know, adverse

9   relationship that began with the federal agencies, the U.S.

10  Fish & Wildlife, and the BLM, and why, and how it all

11  transpired.   And I created off of that information a document

12  that I published later but it was intend -- intended for

13  Sheriff Ward, to inform him.   And that was called the facts and

14  events of the Hammonds, the *Hammond* case.   And -- and --

15  anyway.

16  Q.   Yeah.   And do you -- do you remember posting that

17  information to your blog?

18  A.   Yes, I did.

19  Q.   And would that --

20  A.   I e-mailed that out.

21  Q.   Would that have been around --

22         MR. MUMFORD:   Your Honor, can we just show briefly

23  just this 1235, your Honor?

24         THE COURT:   To the witness or to the jury?

25         MR. MUMFORD:   Well, to the jury, if we can.

A. Bundy - D - By Mr. Mumford

1          I'm not going to review it with the witness at all.

2    I'm just going to show it to them.

3               THE COURT:  I don't understand the point of that.

4               MR. MUMFORD:  This is the update that Mr. Bundy --

5               THE COURT:  Why show it, if it's not admissible?

6               MR. MUMFORD:  Just to show them that it's there.

7               THE COURT:  Well, he's testified that it's there.

8               Is there any contest about that, Mr. Knight?  That it

9    was written or published?

10              MR. KNIGHT:  No.

11              THE COURT:  All right.  Move on.

12              MR. MUMFORD:  Thank you.

13   BY MR. MUMFORD:

14   Q.  And -- and do you recall -- can you summarize briefly, what

15   was it that you were summarizing for either your -- the -- the

16   readers, in -- in that post?

17   A.  Say that again, please?

18   Q.  What was -- very briefly, what was it that you were -- what

19   was the purpose of that -- that post?

20   A.  Well, I wanted to lay the foundation of when the Hammonds

21   had purchased their ranch, what was basically their rights and

22   what they did purchase, what they paid money for.  And then

23   some of the things that kind of started spinning off this.  How

24   there was a dispute about water rights with the state versus

25   the refuge, and how the state ruled towards the Hammonds.  And

A. Bundy - D - By Mr. Mumford                34

1   they won that water right.  And then how that started this

2   vindictive behavior that went on for years.

3              And -- and that -- I just began -- and then I went

4   through the different pieces of what happened to them.  How

5   their -- they were restricted from access to private property

6   above the refuge.

7              MR. KNIGHT:  I'm going to object.  This is now

8   nonresponsive.  The question --

9              THE COURT:  The objection is sustained.  The

10  objection is sustained.  The last sentence is stricken.

11             Please ask a question.

12  BY MR. MUMFORD:

13  Q.  At a certain point did you return to -- to Burns and -- and

14  Harney County?

15  A.  I did.  I --

16  Q.  Did you stay -- when was that?

17  A.  I -- I think it was the next week.  And, again, I think I

18  stayed at the Silver Spur.

19             You know, it might have been -- and I apologize.  I

20  don't have a calendar in front of me.  It might have been two

21  weeks before I returned.

22             But I -- and I was in constant communication with the

23  Hammonds.  And when I say that, mostly daily; especially during

24  drafting this.  Actually, I do believe it was -- it was two

25  weeks before I went back because I took a trip to Arizona, as

A. Bundy - D - By Mr. Mumford

1    I -- I did.  And then I came back.  And I think it was two

2    weeks before I went back there.

3    Q.  And did you -- did you remain in contact with Sheriff Ward

4    in that time period?

5    A.  Yes, I did.  And as soon as I felt like I had enough

6    information to send it to him, I sent it to him.

7           But we were actually talking and communicating even

8    during that time of me getting that information together.

9    Q.  Without -- without getting into the substance of those

10   communications, will you say that was consistent with how

11   you -- you -- you've described your November 5th meeting?

12   A.  Very much so.  We talked about principles.

13          We talked about, you know, the right thing to do.  We

14   talked about -- what I mean by that is him expressing and me

15   expressing -- and, actually -- and many times agreeing with

16   what the -- what the proper ways to try to solve problems and

17   issues are with -- with -- with things such as what was

18   happening.  And so those are the type of discussions that we

19   had.

20   Q.  You -- you said it was about two weeks.  Is -- you've heard

21   testimony about a November 19th meeting with Mr. Ward?

22   A.  Yeah.

23   Q.  Is -- was that your next time there in Harney?

24   A.  Well, I need to be refreshed on the meeting.  Like I said,

25   I met with him many times.  And so I'm not quite sure which

A. Bundy - D - By Mr. Mumford

1   meeting you're talking about.

2   Q.  Okay.  The -- well, do you recall a meeting that was

3   attended by others from -- I think, called the Pacific Patriot

4   Network?

5   A.  Yes.

6   Q.  To the best of your recollection, when did that take place?

7   A.  I believe that was on the 19th.  It wasn't the only time I

8   had met with the sheriff, though.  And I had met with him alone

9   and then I talked with him on the phone several times.  Of

10  course, on the phone and in his office.

11  Q.  This meeting in particular, this meeting on November 19th,

12  did you do anything in preparation?

13  A.  Well, I was communicating with a whole group of people -- I

14  mean -- and I'm -- I'm talking -- our e-mail has several

15  thousands.  And I'm getting a lot of response from different

16  people.  So I'm not -- so, yes, I had -- you know,

17  communicating and getting a lot of response back from people

18  that was concerned of what was happening.

19  Q.  Did -- did you know who attended that meeting?

20  A.  Yeah, it was a large group of people.

21  Q.  Did you know them?

22  A.  Yes, I knew -- I knew them.  Some of them I had met just

23  recently because of this.  Actually, most of them I had met

24  just recently because of this.  But others I had known -- like

25  Cliff Gardner and his wife, they're ranchers in Nevada, and

A. Bundy - D - By Mr. Mumford

1  I've known them my entire life.

2  Q.  What was sheriff's -- Sheriff Ward's demeanor and behavior

3  during -- during this meeting?

4  A.  It was good, but he had started to change.  He had informed

5  me that he had been contacted many times --

6          MR. KNIGHT:  I'm going to object to hearsay, your

7  Honor.

8          THE COURT:  The objection is sustained.

9          THE WITNESS:  I understood and knew -- well, I

10 understood that he had been contacted many times --

11         MR. KNIGHT:  I object.

12         THE COURT:  The objection is sustained.  Relies on

13 hearsay, if it's offered for truth.

14         Go ahead.  Ask a question that calls for an

15 admissible answer, please.

16 BY MR. MUMFORD:

17 Q.  Did -- who opened this meeting?

18 A.  Who opened it?

19 Q.  Yeah.

20 A.  I think it was me.  I'm not 100 percent sure, but I think

21 it was me.

22 Q.  And what did you explain to everyone that the purpose of

23 that meeting was, to the best of your recollection?

24 A.  The purpose of that meeting was to -- to talk about and get

25 more details -- I guess get into more of the details about what

38

A. Bundy - D - By Mr. Mumford

1   we were going to do to help the Hammonds.  And what the sheriff

2   was going to do.

3          And we were wanting the sheriff to make a decision:

4   Whether he was going to help the Hammonds or whether he was not

5   going to help the Hammonds.  Because up to this time he had

6   never -- he would never make a decision.  He always wanted to

7   play the neutral party and didn't want to become adverse to us

8   and the people and the federal government.

9          And he was getting a lot of communication from both

10  sides at this time.

11  Q.  During this meeting with Sheriff Ward on the 19th, do you

12  remember anyone mentioning anything about the -- the Malheur

13  Refuge?

14  A.  Absolutely not.  I mean, it was not -- it wasn't anything

15  that we were discussing, had thoughts about.  Nothing --

16  nothing to that sort.  We were there to get the sheriff to

17  stand for the Hammonds.  That was it.

18  Q.  Anything regarding refuge employees at all?

19  A.  Not at all.

20  Q.  About this time, do you remember publishing videos on the

21  Internet about -- relating to your concerns about the Hammonds

22  and the issues?

23  A.  I did.

24  Q.  What -- what was your intent?  What was your intent in

25  publishing those?

A. Bundy - D - By Mr. Mumford                    39

1   A.  Well, again, I published several videos, so I'm not sure

2   which one you're talking about.  But I -- it was, again, just

3   to educate people on what was happening to the Hammonds.  I was

4   keeping them informed about the sheriff and -- and that he had

5   not made a decision yet.  And that's pretty much where -- where

6   we were at.  Just -- just informing people and updating people

7   on -- on what was happening.

8   Q.  Showing you --

9            MR. MUMFORD:  Your Honor, I would ask just to let the

10  witness see this one.  That's 1237.

11           THE COURT:  Yes, for the witness only.

12           Go ahead.

13           (Video playing without sound.)

14  BY MR. MUMFORD:

15  Q.  Sheriff --

16           MR. MUMFORD:  You can stop now.

17           (Video stopped.)

18  BY MR. MUMFORD:

19  Q.  Do you remember recording this video?

20  A.  I do.

21  Q.  What was your purpose, briefly, in -- in recording it?

22  A.  The purpose for this was to inform people of what had

23  happened -- my understanding of what had happened to the

24  Hammonds.  And in recent -- just recent -- in that day.  And to

25  inform them about a conversation that I had with Dwight and

A. Bundy - D - By Mr. Mumford                40

1    Susie Hammond, separately -- Dwight first and then Susie --

2    about threats that were made to them.

3              MR. KNIGHT:  Object to hearsay, your Honor.

4              THE COURT:  The objection is sustained.

5              Jurors, disregard the last part of the witness's

6    answer.

7              Please continue, Counsel.

8    BY MR. MUMFORD:

9    Q.  So you made this video.  What did you do with it?

10   A.  I -- I -- I posted it, and I felt that I needed to post it

11   for my -- my own safety, as well as the Hammonds.

12   Q.  Why did you feel like you needed to post it for your own

13   safety?

14             MR. KNIGHT:  Your Honor, I'm going for the basis --

15             THE COURT:  Go ahead.

16             MR. KNIGHT:  The objection is hearsay.  The basis of

17   the answer that he is about to give is a hearsay statement

18   that's been ruled inadmissible.

19             MR. MUMFORD:  It's state of mind, your Honor.  I

20   asked --

21             THE COURT:  Without stating the reasons, he may state

22   his state of mind.  Not the basis for his state of mind.

23             So you may ask a question about his state of mind,

24   not what other people told him, not what other things

25   contributed to it.  But he may make testimony about his state

A. Bundy - D - By Mr. Mumford                    41

1    of mind.

2    BY MR. MUMFORD:

3    Q.  What was your state of mind this day that you published

4    that November 20th video?

5    A.  Because of the conversation I had with Dwight --

6              MR. KNIGHT:  Your Honor, I'm going to object.

7              THE COURT:  The objection is sustained.

8              Mr. Bundy --

9              MR. MUMFORD:  I --

10             THE COURT:  May I please just make a ruling before

11   you interrupt me.  Have a seat.

12             Mr. Bundy, you may testify about your state of mind

13   but not your reasons for it.

14             Now, ask your next question.

15             THE WITNESS:  I would rather not state about my state

16   of mind if I can't tell the reason for it.  I mean, I had a

17   state of mind because I was --

18             THE COURT:  Mr. Bundy, be quiet, please.

19             Counsel, ask another question.

20             MR. MUMFORD:  He does raise a good point, your Honor.

21   How was he supposed to --

22             THE COURT:  Mr. Mumford.  Mr. Mumford, I am making

23   rulings here.  You don't get to debate them now in the jury's

24   presence.  Ask another question.  We will take this up at the

25   recess.  Move past it now, please.

A. Bundy - D - By Mr. Mumford

1          MR. MUMFORD:  But the jury's --

2          THE COURT:  Mr. Mumford, proceed, please.

3          MR. MUMFORD:  The jury's going to be asked to assess

4    this --

5          THE COURT:  Mr. Mumford, I've made a ruling now.  You

6    need to follow the ruling.  We'll take this up outside the

7    jury's presence.  You may ask a question around which there

8    won't be an objection.  Let's use the jury's time valuably,

9    please.

10         Move on.

11   BY MR. MUMFORD:

12   Q.  (Pause.)  Mr. Bundy, did there come a time when you

13   published further information about reasons why you -- you were

14   in Harney County that day?

15   A.  Yes, I published many things.  I -- I felt that I needed to

16   be very open and very -- shed as much light as I could on what

17   was happening.

18   Q.  Why?  Why?  What was your state of mind in posting these

19   things?

20   A.  I -- I wanted the American people and the people around to

21   see what was happening.  I wanted them to have all of the

22   information that they could possibly have, so that they could

23   make a decision themselves.  And I felt that I could not do

24   anything or -- and not really report and not really show the

25   people what was happening.  That was -- that was my -- that my

A. Bundy - D - By Mr. Mumford

1    mindset on that.

2              I felt obligated, at that time, to be -- be open, to

3    shed the light on what was happening.

4    Q.  You -- again, getting to your state of mind, did -- did you

5    fear for the Hammonds at this point?

6    A.  I did.

7    Q.  Feared enough to post -- post -- post -- post -- post

8    videos?  Post information, then?

9    A.  Yes.

10   Q.  Did you fear for your own -- own safety?

11   A.  I did.  I wasn't really afraid but I -- I needed to get

12   that information out there in case something would happen to

13   myself or my family.

14   Q.  Do -- do you remember at some point during your time in the

15   late November or early December receiving information or

16   evidence about the BLM fires?

17   A.  Yes, I did.

18   Q.  Who -- who gave you that information?

19   A.  I actually received information from a lady that lived in

20   French Glenn, which is in Harney County.

21   Q.  Do you remember -- do you remember her name?

22   A.  You know what, I am sorry.  I don't.  I know that she was a

23   relative to John Witzel, who was the one who recorded the

24   video.

25   Q.  What did you do with that?

A. Bundy - D - By Mr. Mumford

1   A.   I posted it.

2   Q.   Do you remember approximately when that was?

3   A.   It was -- I'm -- you know, middle to the end of December, I

4   believe.

5   Q.   Okay.  And without getting into too many details of it

6   what -- what do you recall that -- what do you recall it was

7   that really struck you about that -- those -- the videos that

8   you obtained from this individual who is related to Mr. John

9   Witzel?

10  A.   Well, one, it was in Harney County.  It was within just a

11  few miles from the Hammonds' ranch and from the refuge.  It was

12  just 12 days from the time the Hammonds were sentenced.  And it

13  was fires that burnt cattle and killed many cattle and put the

14  ranchers' operation in danger.  And in the video were multiple,

15  I guess, videos of the BLM starting fires around the ranchers.

16  Q.   I would like to ask for a little bit of information about

17  this petition of redress of grievances that you published on

18  December 11th.  Do you remember that?

19  A.   I do.

20  Q.   Who -- whose -- whose idea was that?

21  A.   It was mine and -- and, collectively, a lot of -- several

22  organizations.  Probably 11 or 12, maybe a little more,

23  organizations that -- we needed to be able to state our

24  concerns and what our grievances were and what -- what we

25  wanted to be done.

A. Bundy - D - By Mr. Mumford                    45

1          We didn't feel it was right for us to just complain
2    and to say there's something wrong here and not make it clear
3    of what we felt was wrong, or at least what we see at the
4    surface of what was wrong, and then asking what we -- what we
5    felt needed to be done.
6    Q.   Who wrote it?
7    A.   Primarily myself.
8    Q.   Who else was involved?
9    A.   There was several people involved, several groups involved.
10   It was -- I sent it to many different groups, including a
11   fairly significant -- what I mean by that is a large group of
12   elected representatives, who read it and approved it, and along
13   with these other groups such as the Pacific Patriots Networks,
14   the Coalition of Western States, the -- the Constitution --
15   Oregon Constitutional Guard, and these groups.
16          And so after it was drafted, I sent it to each one of
17   them for their approval and for their feedback, and they did
18   give me feedback.  It was changed and added to and adjusted
19   multiple times.  And once we all felt it was good and that we
20   could get behind it, then it was sent to the sheriff and -- and
21   all -- several other elected representatives, and also
22   published.
23   Q.   And you -- you mentioned a Coalition of Western States.
24   What's that?
25   A.   It's a group of elected representatives from the 11 western

A. Bundy - D - By Mr. Mumford

1   states, primarily, that basically have organized in a coalition

2   to address and to unite on -- on standing against a lot of

3   these issues of the federal government overreach.

4   Q.  Do they go by the -- the -- the -- the name COWS?

5   A.  That's correct.  Coalition of Western States, COWS.

6   Q.  What -- what did you do to make sure this petition for

7   redress of grievances was actually delivered to the people it

8   was intended to be sent to?

9   A.  Well, we sent it first to their official e-mails.  And

10  assuming that that was, you know, the correct thing to do

11  initially.  And then we actually had several copies notarized

12  and -- and hand delivered to -- to multiple representatives,

13  including the sheriff and the county commissioners, and so

14  forth.

15  Q.  After all of that, who responded?

16  A.  Not one person.  Not one representative.  Not -- not the

17  sheriff, not the governor, not any representative responded at

18  all.

19  Q.  Did the lack of response have an effect on you?

20  A.  It had a -- it had a large effect on me.  And not just me,

21  others.  We --

22  Q.  Explain.

23  A.  I -- I just -- here we have a large group of people.

24  Thousands, tens of thousands of people are expressing their

25  concern of what's happening.  They've been informed

A. Bundy - D - By Mr. Mumford

1  independently and off of stuff that we have sent them.

2          And we organize, united.  We actually got people

3  to -- through what was called a name card, to actually sign

4  this redress of grievance.

5          We had like 28 -- or 29 pages, double column of names

6  of individuals that signed this notice, redress of grievance.

7  And we added those names with the copies that we sent to the

8  elected representatives to show how much support -- we even

9  showed -- I take that back.  We did not show what county they

10  came from and what state.

11          We knew that because they had collected that

12  information but we didn't show that in the redress; but we did

13  show the names.

14          And we -- in the redress of grievance, what we were

15  simply asking them is to look at all of these things, look into

16  them and to create some kind of evidential hearing board to

17  investigate what has gone on to see if possibly, just possibly,

18  that the federal government has gone over -- overstepped their

19  bounds and actually abused this family and the people of Harney

20  County.

21          That's what we were asking.  We weren't asking them

22  to -- to make some radical, you know, stand, or do anything

23  like that.  We were asking them to simply to look into this, to

24  organize themselves as elected representatives, and to create

25  an evidential hearing board to determine if these things that

A. Bundy - D - By Mr. Mumford

48

1  we listed were possible abuses to the Hammond family.  That's

2  all we were asking.  And we got no response, zero.

3  Q.  Did you ever learn why?

4  A.  What I did learn was that the FBI contacted them and told

5  them not to respond.

6          MR. KNIGHT:  Your Honor, object.

7          THE COURT:  The objection -- the objection is

8  sustained.  This is hearsay.

9          The witness cannot know why people to whom he sent

10  material did not respond.  The fact that there was no response

11  is before the jury and it can be argued.

12          If you have -- if you have direct evidence from

13  people who received it, then they can testify to it but he

14  cannot.

15          The objection is sustained.

16          Mr. Schindler?

17          MR. SCHINDLER:  Your Honor, I'm sorry.

18  Mr. Medenbach --

19          THE COURT:  Would you like to take the morning recess

20  now?

21          MR. SCHINDLER:  If that would be possible.

22          THE COURT:  Would you find a place to break quickly,

23  here?

24          Can we break now or do you need another --

25          MR. MUMFORD:  Just one more.

A. Bundy - D - By Mr. Mumford                    49

1              THE COURT:  One more question.  Certainly.

2              MR. SCHINDLER:  Thank you, your Honor.

3    BY MR. MUMFORD:

4    Q.  Was there something you received that told you why these

5    people weren't responding --

6              THE COURT:  Let's take that up outside the jury's

7    presence, in light of the prior objection.  Then --

8              Stay where you are, sir.

9              And then I'll work on it.

10             All right, Jurors, you get your break.  15 minutes,

11   please.

12             Everybody stand for the jurors.  Remember not to talk

13   about the case.  Watch your step.  We'll be back with you in 15

14   minutes.

15             (Jurors exit at 10:21 a.m.)

16             THE COURT:  All right.  Everyone be seated.

17   Mr. Bundy, you can step down.  Mr. Bundy and Mr. Fry can step

18   on out.

19             We'll take up issues for the record in about ten

20   minutes, once everyone is back.

21             MS. MAXFIELD:  Your Honor --

22             THE COURT:  Just wait one second.  Let Mr. Bundy step

23   on out.

24             (Pause.)

25             THE COURT:  Okay.  We're in recess, and we'll go back

50

A. Bundy - D - By Mr. Mumford

1    on the record in ten minutes.

2                 (Recess taken at 10:23 a.m.)

3                 (Court resumes at 10:38 a.m.)

4                 THE COURT:  Thank you, everyone.  Please be seated.

5                 Marshal, would you close the door, please, to the

6    hallway.

7                 Before we get to the specific exhibits that need to

8    be reviewed again or resolved, Mr. Mumford, can you give me an

9    idea, please, how much longer on direct of Mr. Bundy?

10                THE COURT:  I don't know.

11                THE COURT:  Give me an estimate.

12                MR. MUMFORD:  I do not know right now because --

13   because --

14                THE COURT:  Please don't shout at me.

15                MR. MUMFORD:  What the Court has done this morning is

16   directly contrary to the Court's order last night and -- and

17   the -- the rules of evidence.

18                I can ask -- intent is the central issue here --

19                THE COURT:  Mr. Mumford, please calm down and don't

20   yell at me.

21                Now, tell me your point and give me an estimate,

22   calmly.

23                MR. MUMFORD:  10 is the central issue.

24                THE COURT:  Yes.

25                MR. MUMFORD:  Your Honor has just said, in front of

A. Bundy - D - By Mr. Mumford

1    the jury, that -- that -- that this man can say what his state

2    of mind was but not give them the -- the information (pointing)

3    they need to assess it?

4            First of all --

5            THE COURT:  Please, Mr. Mumford, you need to stop

6    pointing at me and yelling.  Now, be calm and make your

7    argument.

8            MR. MUMFORD:  Well, this is mistrial worthy.  This is

9    mistrial --

10           THE COURT:  I can't hear your argument if you keep

11   threatening me.  Just give me the legal arguments calmly, and

12   I'll do my best to assess them.  Please.

13           MR. MUMFORD:  Your Honor said -- your Honor said last

14   night I was not allowed to use, for example, 1237.  That's the

15   video that Mr. -- Mr. -- Mr. Bundy posted at the time that said

16   what his -- what -- the threats he was receiving.  But what

17   your Honor's assured us at the time is that Mr. Bundy could

18   speak to the contents of that.  That is -- your Honor -- your

19   Honor, that is the purpose of the hearsay rule.

20           THE COURT:  Well, I mistook what you were asking

21   with -- will you please let me finish a sentence before you

22   jump down my throat, as you are about to do.

23           I am trying to understand a proffer.  When there is

24   an objection, I listen and I make a ruling.

25           I need you to be calm.  If you want me to reconsider

A. Bundy - D - By Mr. Mumford                52

1  as to 1237, say so.  Calmly -- calmly state the basis, and

2  we'll go through it again.

3            I cannot carry all of your multiple arguments at all

4  times.  I am a human, too.  I am trying hard to track the

5  multiple veins here.  You need to state your bases -- and I'll

6  consider them -- without yelling at me.

7            MR. MUMFORD:  Your Honor makes mistakes.  I make

8  mistakes.  But they know the rules (pointing) and they --

9            THE COURT:  So tell me what the 1237 issue is.  Let's

10  get to it, we'll move on.

11            MR. MUMFORD:  I don't know how we're going to fix it

12  at this point, your Honor.

13            THE COURT:  Well, for heaven's sakes, Mr. Mumford, if

14  you want to offer 1237 and you think I've made an error in

15  excluding it, then state your basis or move on.

16            MR. MUMFORD:  I think you made an error in --

17            THE COURT:  Then state it.  State now why you want to

18  offer it.  I'll reconsider it outside the jury's presence.

19            MR. MUMFORD:  Mr. Ammon testified --

20            THE COURT:  How about we do it this way.  Why don't

21  you do your offer of proof because it's easier if you just lay

22  it out, and then I can see what you're doing with it.

23            MR. MUMFORD:  Actually, I think I can explain this

24  faster.

25            THE COURT:  Okay.  Go ahead.

A. Bundy - D - By Mr. Mumford           53

1        MR. MUMFORD:  Mr. Bundy testified he was in fear on

2   the day, and that's when he made the video and that's why he

3   posted it.  And then your Honor stopped me before I could get

4   him to -- to explain why.  And --

5        THE COURT:  What I was concerned with was his

6   restating other people's statements.

7        MR. MUMFORD:  And --

8        THE COURT:  And you didn't make a proffer to assert

9   how they were admissible.  This is the problem.  You're

10  skipping around with your evidentiary foundations, and I need

11  now for you to make the full presentation so I can consider it

12  outside the jury's presence.

13       MR. MUMFORD:  And -- and that is the purpose, your

14  Honor, of hearsay.  It is hearsay.  It's an exception to

15  hearsay.  He is entitled to say or show to the jury what those

16  statements of other people were.  It is the exception.

17       THE COURT:  All right.  Let's make it applicable to

18  1237.

19       Tell me what it is you want to do in the jury's

20  presence about 1237, so I can fully understand the argument

21  outside the jury's presence.  And then I'll hear any objection.

22  And we'll take the next issue, through the next round.  But

23  please just do it.

24       MR. MUMFORD:  But I need to better understand and I

25  need the Court to better understand what -- what -- what your

A. Bundy - D - By Mr. Mumford                    54

1    Honor just said in front of the jury.  Because what your

2    Honor's -- my impression of what your Honor's comments were, in

3    front of the jury, was to belittle and -- and call into

4    question the judge's -- your Honor's feeling to the jury

5    about -- about whether -- about what Mr. Bundy was testifying

6    to.

7              THE COURT:  I don't know what you're referring to,

8    sir.  But let me just say this.  When the jury sees both the

9    witness and a lawyer arguing with the judge four times after an

10   objection is sustained, they're going to be drawing

11   conclusions.

12             I'm trying, now, hard to give you a chance to make

13   your 1237 proffer and any others.  Please make them so I can

14   consider them again, outside the jury's presence.  If they're

15   admissible, then they'll come in.  Use the chance now or don't.

16   It's your choice.

17             1237, are you offering it?

18             MR. MUMFORD:  Yeah, I'm going to offer 1237.

19             THE COURT:  So lay the foundation here with the

20   witness now.  Let me hear it so I cannot make a mistake in the

21   jury's presence and not misunderstand your point.

22             MR. MUMFORD:  I -- I would like the Court also to

23   acknowledge that -- that that is not the -- the Court's intent

24   to that.

25             THE COURT:  I don't know what you're saying, but

A. Bundy - Offer of Proof

1    would you just make your proffer, please, so that we can get

2    this on the record and I can make a ruling.

3                            OFFER OF PROOF

4    BY MR. MUMFORD:

5    Q.   Mr. Bundy, do you remember when we were -- we were

6    testifying -- you were testifying -- ah.  You were testifying

7    regarding the video you posted on November 20th?

8    A.   Yes.

9    Q.   And you testified that you -- you -- you were fearful that

10   day for the Hammonds and for yourself?

11   A.   Yes.

12   Q.   What was that based on?

13   A.   It was based on information -- or a conversation that I had

14   with Dwight Hammond, first, when he informed me that he felt

15   threatened by the federal government.

16          And then I called Susie Hammond right after that.

17   And she expressed to me the exact same thing, and also both of

18   them expressed concerns for me and for my family.

19   Q.   And what were the words that they used to express their

20   concerns for you?

21   A.   Dwight used the words such as shooting him, raiding his

22   home.  That was, I believe, his take of it.

23          But he did use specifically that his attorneys told

24   him that they said they would detain him early and put him in a

25   less desirable prison if he did not stop talking with me.

A. Bundy - Offer of Proof

1  Q.  And did they use -- did they caution you that -- about

2  potentially getting shot in the head yourself?

3  A.  Yes.  That is correct.

4  Q.  How did they -- what did they say?

5  A.  What did Dwight say?

6  Q.  Yeah.

7  A.  Dwight -- and I want to be very clear -- or -- and I don't

8  want to say something because this is a serious matter,

9  obviously.  But he said something to the effect that he was

10  worried about getting shot in the back of the head and --

11  and -- and the same thing happening to me.

12          And I really can't remember the details of the

13  conversation.  I don't want to -- and that wasn't what I

14  focused on.

15          I did that video, and I did say that he was afraid

16  for our life.  I did -- while he was telling me the details, I

17  grabbed a piece of paper in the middle of it.  I started

18  writing.

19          What I -- from -- after that video -- and I called

20  the sheriff right after that call.  Right after that call.

21  Q.  And what did you tell the --

22  A.  I was concerned for them, and I told him what had

23  transpired.  And I -- and I wanted him, again, to know

24  because -- because he needed to understand what was happening.

25          And what was happening, in my understanding, was the

A. Bundy - Offer of Proof                57

1   U.S. Attorney's Office had contacted the Hammonds' attorneys

2   and relayed a message.  Dwight took it as a threat.

3             But in that -- or in that -- in that communication

4   was said that if they did not stop talking to Ammon Bundy, that

5   they would detain him early and put him in a less desirable

6   prison.

7             And, you know, those are the exact same conversations

8   that happen in plea deals all the time.  Getting people to

9   plea, scaring people to go into a plea.  So, to me, I didn't

10  understand it.  But I do now, being eight and a half months in

11  prison.  I understand fully that they use these tactics all the

12  time to scare people.

13  Q.  Did you later find a -- a -- additional evidence that

14  the -- well, let's -- let's move forward to -- you recall I was

15  asking you questions about why you didn't receive a response to

16  the -- the petition for the redress?

17  A.  Why didn't --

18  Q.  Yeah.  You recall I was asking you questions about that.

19  Right?

20  A.  Yeah, absolutely.

21  Q.  And -- and you -- and you -- what was your testimony as to

22  what -- what your understanding was as to why you did not

23  receive a response?

24  A.  Well, at the time, I had no idea.  All I know is we were

25  very frustrated that we were not getting any response.

A. Bundy - Offer of Proof

1   Q.  Did you ask why they're not responding to -- did you ask

2   people why -- the individuals that you delivered that redress

3   to, did you ask them why they didn't respond --

4   A.  They wouldn't respond.  They wouldn't answer a phone call.

5   They wouldn't answer an e-mail.  So there was no way I could

6   ask them.

7          But, yes, multiple times we sent e-mails to them.

8   Multiple times we reached out to them by -- in any way that we

9   possibly could.

10  Q.  Did you later come to find out why they had not responded?

11  A.  Yes.  We finally had to literally go to the homes of county

12  commissioners because they would not respond to us.

13  Q.  And -- and approximately when did you go to --

14  A.  This would -- I would say, again, probably the third week

15  in December.

16  Q.  And who -- specifically who were the county commissioners

17  you went to --

18  A.  Pete Runnels was the first one we were able to contact.

19  Q.  And who was the second one?

20  A.  The second one was Dan Nichols.

21  Q.  And what did Mr. Pete Runnels say when you asked him why he

22  hadn't responded?

23  A.  He said -- emotionally -- that he was told not to respond

24  by the FBI.

25  Q.  Did he say what the FBI had told him in -- in that regard?

A. Bundy - Offer of Proof

1  A.  No, he did not give us details, other than they told him

2  not to respond to our petitions.

3  Q.  Did he say when the FBI had contacted him?

4  A.  I don't remember if he did.

5  Q.  But you would have -- you -- do you recall when you

6  delivered those redresses to him?

7  A.  We delivered them to him -- I don't know the exact day, but

8  it would have been a couple of weeks before that.

9  Q.  And the other one was Commissioner Nichols.  Is that right?

10  A.  That's correct.

11  Q.  And what did Mr. Nichols tell you about why he didn't

12  respond?

13  A.  This was after we had gone into the refuge, and he came to

14  visit us.  And he told us the exact same thing.  That the FBI

15  had directed them not to respond to our petitions.

16  Q.  What -- do you remember approximately when that would have

17  been?

18  A.  That would have been the first week of us being in the --

19  in the refuge.

20  Q.  Did Mr. Nichols tell you anything else about that at the

21  time?

22  A.  About them not --

23  Q.  About his conversations with --

24  A.  Not much, and I did not ask him.

25          I mean, knowing -- knowing that was obviously --

A. Bundy - Offer of Proof        60

1   anyway, I -- getting that information was -- I felt was --

2   explained a lot to me of why they hadn't responded.  And I -- I

3   didn't think I needed more than that.

4   Q.  Did you later receive further information corroborating

5   this?

6   A.  Yes.

7   Q.  What was that?

8   A.  Statements from the governor and the governor's letter.

9   Q.  Is this a letter from Ms. -- Ms. -- Governor Kate Brown,

10  dated on or about January 20th, 2016?

11  A.  That is correct.

12          MR. MUMFORD:  And, your Honor, may I approach?

13          THE COURT:  Yes, you may.

14  BY MR. MUMFORD:

15  Q.  And I'll approach.  This is a two-page letter.  Is that

16  right?

17  A.  That's correct.

18  Q.  So I'm just going to be handing you the second page, sir.

19  A.  (Handed document.)

20  Q.  Can you -- can you -- can you read for us, please,

21  Mr. Bundy, what Ms. Kate Brown said at the -- at the -- the --

22  on -- in the letter dated January 20th, as to why -- why state

23  officials and other local government officials had not

24  responded?

25  A.  "The FBI and other federal law enforcement entities are

Colloquy

1          the leaders on any response to it and we

2          appreciate the recognition of their responsibility

3          in this situation.  They asked state officials,

4          including me, to limit our public comments, which

5          I have done with considerable difficulty."

6          THE COURT:  Mr. Bundy, may I see the letter?

7          Thank you.

8          (Judge handed document.)

9          MR. MUMFORD:  This is the second --

10         THE COURT:  I understand this is just the second

11   page.

12         Go ahead.

13         THE WITNESS:  It's the third paragraph, your Honor.

14         THE COURT:  Thank you.

15         (Pause, referring.)

16         (Witness handed document.)

17         THE COURT:  Here you go, Mr. Bundy.  Thank you.

18         Go ahead, Mr. Mumford.

19         MR. MUMFORD:  Does your Honor want --

20         THE COURT:  I want to see if there are questions that

21   need to be asked of the witness by the Government, in light of

22   your offer of proof.

23         MR. MUMFORD:  Your Honor, I can keep going at this

24   point but --

25         THE COURT:  I just -- I'm trying to get to a place

Colloquy

 1  where I can rule, and we can get the jury back.

 2          Mr. Knight, do you want to inquire of the witness on

 3  the offer of proof?

 4          MR. KNIGHT:  No, your Honor.  Thank you.

 5          THE COURT:  All right.  Argument, please, Mr. Knight.

 6          MR. KNIGHT:  Thank you, your Honor.

 7          With respect to the first issue, and that is

 8  attendant to Exhibit 1237, I will note preliminarily that there

 9  actually is testimony in the record in front of the jury, that

10  was unobjected to, that Mr. Bundy did indeed feel threatened,

11  without attribution to anyone in particular.  And that he's

12  concerned for his family as well.  And then he followed up with

13  that he wasn't really scared.  So that now is in front of the

14  jury.  So to the extent that is probative of any issue relating

15  to state of mind, it is there for argument.

16          Secondly, this was already addressed in argument in

17  the context of these videos earlier, in which the Court -- we

18  understand -- ruled about the multiple levels of hearsay

19  related to the Hammonds' attorneys and the Hammonds and what

20  this would entail by way of explanation if we went down this

21  road.

22          So there is a hearsay objection that this is plainly

23  proffered for its truth.  To the extent it's not, there already

24  is ample information in the record to tease out a state of

25  mind.

Colloquy

1        I will say attendant to that, if we're looking at the

2   rules of evidence, the state of mind about the Hammonds and the

3   relationship and statements about their prison sentence are not

4   really relevant to Count 1 or Count 2, and we're certainly

5   getting far afield in the analysis that way as well.  So there

6   are two levels of analysis with respect to the rules in the

7   Exhibit 1237.

8        Next, your Honor, turning specifically to the proffer

9   about the response to the redress of grievances, the witness

10  has already testified at some length about the redress itself,

11  about the manner in which responses were collated and received

12  about the redress of grievances.

13       Now, statements made by commissioners about why they

14  did not respond are hearsay.

15       MR. SCHINDLER:  They're not.

16       MR. KNIGHT:  Excuse me, Mr. Schindler?

17       MR. SCHINDLER:  I'm sorry.  I was just looking at my

18  computer.

19       MR. KNIGHT:  Are hearsay.  They're proffered for the

20  purpose of showing that these commissioners did not respond

21  because the FBI told them not to.  They can subpoena these

22  commissioners and proffer that testimony if it is indeed

23  probative of any point.

24       But the witness saying he had a conversation with him

25  and the reason there was no response is because they told him

Colloquy

1   X, Y, and Z does not go to a relevant state of mind and it's

2   certainly for the truth of the matter.  And that can be teased

3   out through the appropriate means, which is a live witness.

4   And to that end, your Honor, it is our position that that

5   evidence would not be properly before the Court.

6            This letter -- we have not seen -- I don't understand

7   there to be anything really relevant in it from the recitation

8   made to the Court with it.

9            THE COURT:  The third paragraph Mr. Bundy read is

10  proffered as a basis -- a response, in effect, to the redress.

11  And it is some information from the governor along the lines

12  Mr. Bundy described.

13           That the governor is saying this is a federal matter

14  and public statements are being coordinated by the -- by the

15  federal authorities.

16           So -- I'm sorry?

17           MR. KNIGHT:  No, I can respond to that.

18           THE COURT:  Please.

19           MR. KNIGHT:  Well, two issues with that.

20           First, that doesn't mention the redress of

21  grievances, so it's pretty far attenuated from the purpose for

22  which it's being offered today, which is to bolster the

23  argument that the hearsay statements of the commissioner should

24  come in --

25           THE COURT:  It's not about the hearsay statements

1   right now.  Right now I'm trying to figure out if Mr. Bundy and

2   Mr. Mumford can offer the governor's letter as an explanation

3   about the, quote, lack of response and the theory being that

4   it's all being orchestrated by federal authorities and that's

5   why no one is responding.  So may I see the front of the

6   letter?  The whole letter, please?

7            MR. MUMFORD:  Your Honor, it's in the record.

8            THE COURT:  I just need the front page, too.  I need

9   the first lines.

10           MR. MUMFORD:  I just don't have it right now.

11           THE COURT:  Can someone bring it up?  Because we're

12   not showing it to the jury and we're not talking about it until

13   I get to complete this --

14           MR. MUMFORD:  Yes, your Honor.  It's Document

15   No. 1186 in the docket.  It would probably be at -- I'm

16   hoping -- I don't know this filing --

17           THE COURT:  Let's go to the other issue.  I'm not

18   going to keep taking time right now.  Let's go back to --

19           DEFENDANT RYAN BUNDY:  (Standing.)

20           THE COURT:  Please have a seat.  I need to finish

21   what I'm doing.

22           DEFENDANT RYAN BUNDY:  This is part of that.

23           THE COURT:  This is Exhibit 1237 I'm working on, not

24   the letter from the governor.

25           DEFENDANT RYAN BUNDY:  Okay.

Colloquy

1          THE COURT:  1237 is this three-and-a-half-minute

2     video on November 20th, which the witness described posting.

3     And the concern I have had -- and I continue to have -- is

4     the -- not the fact of the jury -- the witness telling the jury

5     that the Hammonds felt threatened but this specific debate

6     within the underlying part of that concerning communications by

7     the Hammonds to their lawyers; the United States attorneys'

8     communication to the Hammonds' lawyers; and the second and

9     third layer of hearsay here; the risk of getting into

10     litigating the *Hammond* case, which we are not going to do here.

11          The witness clearly should be able to testify that he

12     spoke with the Hammonds.  And now I'm persuaded that he should

13     be able to convey that the Hammonds felt threatened, without

14     saying the source of it; and that the Hammonds expressed

15     concern for the witness's safety, without saying the basis for

16     it, for the purpose of explaining the witness's testimony that

17     he was fearful but not afraid on the day he posted the video.

18     But I remain now convinced that the video itself should not

19     come in.

20          MR. MUMFORD:  Can --

21          THE COURT:  I need to finish, please, the ruling.

22          Under Rule 403, the content of the video is too far

23     removed from the issue for which it's proffered.

24          The witness has stated his state of mind.  The

25     witness has said that he posted the video.  The witness has

Colloquy

1    said he was afraid.

2         I have precluded him from testifying about why.  I'm

3    now reconsidering that, and I'm going to allow him to say that

4    he felt this video -- which communicated to the world what the

5    Hammonds had told him but which is not going to be played for

6    the jury -- conveyed concern in the witness's mind as conveyed

7    to them by the Hammonds.

8         He must not say, in the jury's presence, these

9    additional details about being shot in the head and the like.

10   That is not coming in.  It is not coming in.

11        MR. MUMFORD:  (Gesturing.)

12        THE COURT:  Counsel, I'm making a ruling now.

13        And when a ruling is made adverse to a lawyer, the

14   lawyer accepts it and moves on.  We've litigated this, now, for

15   15 minutes.  You can assign it as error on appeal.

16        I am opening the door to allow you to have Mr. Bundy

17   explain a little more about why he was fearful, and I am

18   permitting you to ask him why he was fearful.  And he can say,

19   because based on my conversations with the Hammonds, each of

20   them -- each was afraid personally and conveyed fear for my

21   safety, and so I broadcast to the world what the Hammonds had

22   told me.  You may do that.

23        Now, with respect to this governor's letter, I need

24   to know more about it to see if the underlying foundation is

25   fair from the document, and that is whether it's a response to

Colloquy

1    the redress of grievances or whether it's something else.  That

2    was Mr. Knight's first issue.

3           Can you tell me the foundation, please, Mr. Mumford,

4    about why the governor's letter is responsive to the redress of

5    grievances's issue.

6           MR. MUMFORD:  Yes, your Honor, because it -- it

7    speaks about how -- it -- well, it shows pattern of conduct,

8    your Honor.  And -- and I don't -- like I say, I -- in my

9    hands, I don't have the first page.  It's a letter from

10   Ms. Kate Brown to Loretta Lynch and James B. Comey.

11          THE COURT:  So it's a letter from her, not to

12   Mr. Bundy but to the Attorney General and the FBI director?

13          MR. MUMFORD:  Yes, your Honor.  That's correct.

14          THE COURT:  All right.  So it's not a response to

15   him.  I don't think it can be proffered for that.

16          We'll take more time on the noon hour if you want to

17   go into that issue.  But with respect to Mr. Bundy's direct

18   testimony, that letter does not, by your description, be --

19   qualify as a response to the redress of grievances.

20          MR. MUMFORD:  Okay.

21          THE COURT:  Now, I want to go through what else you

22   want to cover with Mr. --

23          Please have a seat, Mr. Bundy.

24          I'm going to take care of your proffers when your

25   turn comes.

Colloquy

1          DEFENDANT RYAN BUNDY:   (Sitting.)

2          THE COURT:  Right now it's these two.  And I need to

3   get through his direct.  And then when we get to the place

4   where other defendants or defense lawyers want to ask questions

5   of him, I'll speak with you.  But right now I'm focused on him

6   and getting the jury back.  You need to wait.  Your turn will

7   come.

8          So what else do we need to review before the jury

9   comes back with respect to your proffer?

10          MR. MUMFORD:  Well, two things, your Honor.  First of

11   all, does your Honor's ruling mean that I can inquire of

12   Mr. Bundy and have him testify concerning chairman -- the two

13   county commissioners?

14          THE COURT:  Oh, I didn't get there.

15          I'm trying to understand, again -- I've lost that

16   thread.  Would you ask him those questions again.

17          I -- the line of -- being that he sent out the

18   redress of grievances, he was frustrated in not having any

19   responses, he went to visit two county commissioners.  And then

20   ask him what happened there relative to the redress of

21   grievances; again, as to the two.

22          Because the objection is it's being offered for its

23   truth:  That is, in fact, that they did not respond because of

24   outside pressure.  And if that's the case, it's not admissible

25   for truth.

A. Bundy - Offer of Proof                    70

1          So I want to know, again, what the answers would be

2     and then the purpose.  So please replay that for me.

3              MR. MUMFORD:  Okay.  And --

4              THE COURT:  Just ask the questions first.  We'll do

5     the legal after.

6              MR. MUMFORD:  I -- I was.

7              THE COURT:  Okay.

8                        OFFER OF PROOF

9     BY MR. MUMFORD:

10    Q.  The -- the first commissioner, remind me what his name was.

11    A.  Pete Runnels.

12    Q.  Runnels?

13             You went to his house.  He said why -- what did he

14    say about why he didn't respond?

15    A.  I did not go to his house.

16    Q.  Oh, sorry.

17    A.  Ryan Payne did.

18    Q.  Who did?

19    A.  Ryan Payne.

20    Q.  Okay.  And did you ever have a discussion with him about

21    why he didn't respond?

22             THE COURT:  With -- with the commissioners?  I'm

23    sorry.  I need to understand the "him."

24             Is it with Runnels or with Payne?  Your question is

25    confusing.

A. Bundy - Offer of Proof                     71

1   BY MR. MUMFORD:

2   Q.   Runnels.

3   A.   I did not have a direct conversation with Commissioner

4   Runnels.

5   Q.   And did you have a discussion with Ryan Payne about it?

6   A.   Yes, I did.

7   Q.   And what did Mr. Payne say?

8   A.   He informed me that Pete Runnels told him that the FBI had

9   told him not to respond to our petitions.

10  Q.   And -- and do you remember when it was that you -- that --

11  that you learned that from Mr. Payne?

12  A.   It was around the third week, I believe, in December, time

13  period.

14  Q.   Mr. Bundy, did that eventually -- did that eventually

15  affect your state of mind in the actions that you took after

16  that, at that point?

17  A.   Absolutely.

18  Q.   How?

19         THE COURT:   And with respect to the other

20  commissioner, please, Mr. Mumford.

21  BY MR. MUMFORD:

22  Q.   Okay.   Mr. -- Mr. Bundy, the other commissioner you met

23  with directly.   Is that right?

24  A.   That's correct.

25  Q.   And tell me again what his name was.

A. Bundy - Offer of Proof                              72

1   A.   Dan Nichols.

2   Q.   And where did you meet with him?

3   A.   At the refuge.

4   Q.   What did he tell you?

5   A.   He told me the exact same thing as -- that the FBI told him

6   not -- told them not to respond to the people's petitions.

7   Q.   And -- and did that affect your state of mind in the

8   actions that you took after that point?

9   A.   Absolutely.

10  Q.   How?

11  A.   Well, before and after, we were not getting any type of

12  response.  And it created an extreme environment of frustration

13  for all of us and -- including me.  And we've -- you know, felt

14  that we could go to our elected representatives and get a

15  response back and to get them to basically do their job, which

16  is to represent us.

17          And when they wouldn't and they wouldn't respond,

18  we -- at least I -- I need to speak for myself.  I was like,

19  what are we to do?  Are we just supposed to go home and just

20  say, hey, our elected representatives just ignored us, and on

21  such an important issue, when we had tens of thousands of

22  people that were concerned about this issue.  We get no

23  response from the governor, no response from the state

24  representatives, no response from the county representatives.

25  The sheriff now is not responding to us.  Shall we just go home

Colloquy

1    and forget it?  I mean, we couldn't.

2    Q.  You had -- you -- you previously heard some statements from

3    you describing your occupation of the refuge as a hard stand.

4           Is that what you're getting at?  That contributed to

5    the state of mind in -- in making the hard stand and continuing

6    to make the hard stand?

7    A.  Before and after.  Because after, when we were at the

8    refuge -- again, now, knowing that they ignored us, we knew we

9    had to stay there until we got their attention.  We had to.

10   Q.  Thank you.

11          MR. MUMFORD:  Thank you, your Honor.

12          THE COURT:  All right, Mr. Knight, anything else?

13          MR. KNIGHT:  Only that the amplified testimony seems

14   to prove the point that state of mind can be shown from the

15   fact that there was never a response, which has already been

16   testified to.  That was the testimony, not getting any response

17   leads to this understandable frustration.

18          The fact that a double hearsay statement about

19   purportedly why there was no response is relevant is still

20   unclear and doesn't affect state of mind.

21          THE COURT:  (Pause, referring.)

22          So I'm going to start at the back end of the hearsay

23   issues and work forward.

24          I agree with the Government and sustain the objection

25   that the recounted explanation by the two commissioners as to

Colloquy

 1   why they did not respond was because the FBI had told them not

 2   to is in fact hearsay for the purpose of its truth and its

 3   impact on the witness.

 4            If defendants wish to call those witnesses, they may.

 5   However, the defendants' state of mind, the building

 6   frustration with respect to the days going by and his efforts

 7   with respect to this redress of grievances -- and remind me,

 8   Mr. Mumford.  I'm not sure it's actually been received into

 9   evidence yet or not of -- the document itself and all of the

10   signatures.

11            We did clear with the Government that they're

12   ultimately -- they acquiesced that there was no objection to

13   all the signatures; that's 1001.

14            Have you actually put that in, Mr. Mumford?

15            MR. MUMFORD:  I will.

16            THE COURT:  Well, I was just asking.

17            MR. MUMFORD:  I -- I -- I was asking for that

18   information this morning, your Honor.  I haven't got it yet, so

19   I don't know yet.

20            THE COURT:  Ms. Graham, would you check?  Is Exhibit

21   1001 shown as received, or not?

22            In any event, my point is that the witness clearly

23   may testify about the efforts he went to to try to be helpful

24   with this problem he perceived in Harney County.

25            The -- he's already described the work that he put in

Colloquy

1  in generating this redress of grievances, getting the input

2  from people of a variety of associations, and sending it out.

3          He can go back now -- when the jury is back, you can

4  make the point again that, notwithstanding having e-mailed it

5  to all of these people, there was no response.  That the --

6  that fact was very frustrating to the witness.

7          That the witness and others tried to follow up, that

8  they contacted at least two commissioners, and there was still

9  no substantive response.  He may say that.

10          The why they did not respond is not state of mind

11  until it's proved for its truth.  And so those witnesses would

12  need to say that's what happened or there needs to be another

13  admissible way about what -- that happened.

14          You -- clearly, the witness can describe his growing

15  frustration in that time period, the fact of all of the work

16  having gone into the notice, not getting any response, no one

17  talking to him directly.  He's already talked about -- and

18  we've had evidence, at some point, about the sheriff not

19  answering that question directly in one of those meetings, and

20  so forth.

21          So that's how we'll deal with 1237 -- I'm sorry.

22  That's how we'll deal with the issue around the commissioners.

23  The 1237 issue, again, he may testify that he felt threatened,

24  that he spoke with the Hammonds, he felt the need to broadcast

25  to the world what the Hammonds told him.  The actual content of

Colloquy

1   that is not to be repeated.  But he felt threatened because

2   they passed on a threat.  And though he was afraid, he wasn't

3   scared, or whatever that was.

4          So those two things can be done.

5          Now, tell me what's next, so that we can try not to

6   have interruptions in the jurors' presence.

7          DEFENDANT RYAN BUNDY:  (Standing.)

8          MR. MUMFORD:  Your Honor, can I have some

9   clarification on that?

10          THE COURT:  Yes.

11          Please have a seat until I'm finished with

12   Mr. Mumford, Mr. Bundy.

13          DEFENDANT RYAN BUNDY:  I was standing first.

14          THE COURT:  I'm working with them until they're

15   finished.  Your issues have to wait.

16          The clerk has confirmed 1001 has not yet been

17   received.

18          MR. MUMFORD:  Okay.  Your Honor, they -- since to

19   have the witness testify they passed on a threat, can I also

20   ask who the threat was attributed to?

21          THE COURT:  No.  No.  They were afraid.  We're not

22   going to get into this U.S. attorney versus attorney complex.

23          If you can get the Hammonds' lawyers here to waive

24   the privilege, and all of that, that's a whole other deal.  But

25   this witness cannot go into what the Hammonds told him about

Colloquy

1    what their lawyers told them about what the U.S. attorneys told

2    them.

3          He can convey -- I'm persuaded, in light of your

4    argument -- they were -- they felt threatened and now he felt

5    threatened.  And then he broadcast what that was to the world

6    in an exhibit.

7          MR. MUMFORD:  But it does no good if I can't say

8    where the threat is coming from.

9          THE COURT:  Mr. Mumford, you are going to have to

10   take the ruling.  You may have what I've given you, or not.

11   It's your choice.

12         MR. MUMFORD:  Who's threatening him?  The Hammonds

13   are threatening him?  The Hammonds aren't threatening him.

14         THE COURT:  No, no.  Mr. Mumford, you're still not

15   listening to me.

16         The witness may testify that after speaking with the

17   Hammonds, he said they felt threatened.  And he may not explain

18   more.  And they passed on their concern for his safety.  He may

19   say that.

20         If you don't want to go there, don't.  But we're not

21   discussing this any more.

22         MR. MUMFORD:  It's --

23         THE COURT:  I need you to move on now.  I've spent 30

24   minutes on this issue.

25         So what else are you going to offer in the next time

Colloquy

1  period, Mr. Mumford?

2          MR. MUMFORD:  Well, how else is the Court going to

3  correct what just happened in front of --

4          THE COURT:  I'm not saying anything more.  Now, you

5  may go back to the point as I've described it.

6          What else are we going through so that I can know if

7  there is going to be an objection or an issue that I either

8  misunderstood or haven't ruled on?

9          I want to get the jury back.

10          MR. MUMFORD:  Your Honor, I'm --

11          THE COURT:  What's next?

12          MR. MUMFORD:  I believe we're getting into the --

13  the -- there's going to be some additional -- hmm, hold on for

14  a sec.  I'm just looking at my outline.

15          Additional meetings, your Honor, in the end of

16  December, your Honor, I think we're getting into why -- a

17  little bit of just very brief presentation on why he assisted

18  in establishing the committee of safety, your Honor.

19          We're getting into the -- some continued discussions

20  with the sheriff and other local government and why that was

21  important -- the proper channels, your Honor.  Why it was

22  important for Mr. -- Mr. Bundy to respect and take advantage of

23  the channels that were available.

24          And -- and then why -- why he -- sorry.  Why he did

25  not -- why he did not feel like there was a -- a -- why -- why

Colloquy

1    that wasn't -- why -- why those -- to his knowledge and

2    information as to why those efforts were unsuccessful.

3            Then we'll go to the end of December time period,

4    your Honor, and 1st -- January 1st.

5            THE COURT:  Okay.

6            MR. MUMFORD:  This is where we had wanted to play,

7    your Honor, the -- my dear friends, which I understood we could

8    play at the end of the session last night.  Now I'm -- I

9    think -- I think it was your Honor's ruling that I can.  Is

10   that right?

11           THE COURT:  I need to go back to where we were.

12           This was the 19-minute, 27-second version where I

13   told you I perceived the first 14 minutes as being, really, a

14   complete restate of the direct testimony.  And then you pointed

15   out to me that there was a section in there where Mr. Bundy

16   says on the video in more detail than what he said yesterday

17   his -- his -- the evidence -- the evidence about his faith and

18   that role, how it played into his decision.

19           And then I noted that at minute 14 there was what

20   seemed to me to be new material.  And, that is to say, that's

21   why we were moving on.  And it seemed to me, at around minute

22   14, that was new.  And I think I told you you could play the

23   part where he talked about his faith because you told me it was

24   important to develop for the witness and the jury what you

25   described as the religiosity of the thinking and his

Colloquy

1   motivation.

2           So that's where I remember we left it.

3           MR. MUMFORD:  Thank you.  So I'll play that, your

4   Honor, from minute 14 on, then, to the end.  And then I think

5   we're going into --

6           THE COURT:  Hold on a minute.  You may not see it,

7   Mr. Mumford.  Mr. Knight is standing.

8           MR. MUMFORD:  Oh, I didn't.  Sorry.

9           MR. KNIGHT:  Your Honor, that is the video that I

10  think the Court addressed these attributed threats to the

11  Hammonds.  And I believe there -- that is contained in that

12  video as well.

13          THE COURT:  Well, that's the first 14 minutes.

14          MR. KNIGHT:  Okay.

15          THE COURT:  I thought at minute -- up to 14, we're

16  talking about, again, this restatement of how did we get here,

17  and his great upset about how the Hammonds are being treated so

18  badly.

19          We're not going to go into that part in the first

20  part of the video.  First, because it's redundant of the direct

21  testimony directly.  Secondly, because I did note this morning

22  about the Hammonds' double hearsay.  But there is this part

23  about the witness's convictions regarding his faith.  And that

24  part, in the first 14 minutes, can be isolated and played if

25  Mr. Mumford wishes.  At about minute 14, he says to the effect,

Colloquy

```
1    that's sort of -- then we move to the refuge and this is --
2    this is what drove me, kind of thing.
3              MR. KNIGHT:  Sorry, I thought that that material was
4    in the latter part of the video.  I was wrong.
5              THE COURT:  If it is, then you -- then, Mr. Breton,
6    you're going to hear an objection and you need to stop the
7    minute you hear "objection," and we'll deal with it.  Okay?
8              MR. BRETON:  (Nods head.)
9              THE COURT:  Okay.  And then what else then?
10             MR. MUMFORD:  And I think we're getting into the
11   events of January 2nd.
12             THE COURT:  Okay.  I'm sure that will get us to the
13   noon hour.
14             Okay.  Now, let me hear, Mr. Bundy, what it is you
15   have been trying to tell me relative to what Mr. Mumford is
16   doing with the witness.
17             DEFENDANT RYAN BUNDY:  Yes, your Honor.  Yes, madame.
18             I subpoenaed Kate Brown, the governor.
19             THE COURT:  You did?
20             DEFENDANT RYAN BUNDY:  For this very purpose.
21             She made a motion to quash, which you granted her
22   motion, telling us that we could use less-intrusive means to
23   have her testimony come in.
24             Now we've got less-intrusive means in the -- in the
25   means of these letters, and so forth.  So they must be let in,
```

Colloquy

1    or we will have to re-subpoena her to --

2         THE COURT:  Mr. Bundy, when it's your turn to offer

3    evidence, you can make a proffer.  Right now, again,

4    Mr. Mumford and your brother have the floor and we're working

5    through the direct.  When it's your turn to make an offer, you

6    may.  If you have a piece of evidence from Governor Brown that

7    you wish to make an offer, we'll take it up in due course; but

8    not here.

9         DEFENDANT RYAN BUNDY:  We are working together.  This

10   is the purpose.  This here, this offer.

11        THE COURT:  So it's the purpose.  It's not helpful

12   right now because I need to get a jury in to finish your

13   brother's testimony.  So keep working on your points and your

14   time will come when you get a chance to put on whatever

15   evidence is relevant that you're ready to put on.

16        Take a seat, please.

17        DEFENDANT RYAN BUNDY:  This is it.  He's putting it

18   on right here.

19        THE COURT:  Mr. Bundy, I'm not fighting you.  I'm

20   trying to get the jury back now, to get this part of the

21   case --

22        DEFENDANT RYAN BUNDY:  -- trying to get a witness

23   back --

24        THE COURT:  Well, then do your work.  You represent

25   yourself.  You need to get it together.

Colloquy

1    MR. MUMFORD:  Your Honor, can I just understand?  In

2  Mr. Bundy's defense here, he is correct in saying that we -- we

3  understood that we did not need to subpoena because -- a

4  subpoena that would be duplicative of his subpoena.  And so the

5  Court's ruling with respect to that does affect us in exactly

6  the same way that it affects --

7    THE COURT:  There's not been anything presented that

8  affects the Court's ruling with respect to Mr. Bundy's subpoena

9  of the governor, and I adhere to that ruling.

10    Again -- and I don't know how many times I've said

11  it, but I'll note it again for the record.  Every motion made

12  by every defendant is on behalf of all unless that defendant

13  says "I'm out."  So, of course, you're protected by it.

14    But the point is the letter you were referring to

15  does not, by its terms as you describe it, serve as a response

16  to the redress of grievances.

17    So I need to get the jury in now.  We're not going to

18  talk about this any more.  We're going to continue with the

19  direct examination as has been outlined until about noon, and

20  then we'll take the noon recess.

21    Bring in the jury, Ms. Graham.

22    THE CLERK:  Jurors coming in.

23    (Jurors enter at 11:22 a.m.)

24    THE COURT:  Thank you, everyone.  Please be seated.

25    Members of the jury, I apologize for the delay in

84

A. Bundy - D - By Mr. Mumford

1    bringing you back.  I had to address some matters that

2    ultimately will save the time and make this go forward.

3              So thank you for your patience.

4              Everybody ready to continue?

5              All right.  Mr. Mumford.

6              MR. MUMFORD:  Yes, thank you.

7              THE COURT:  Your microphone, sir.

8              MR. MUMFORD:  Yes, thank you, your Honor.

9                   DIRECT EXAMINATION (continuing)

10   BY MR. MUMFORD:

11   Q.  Mr. Bundy, prior to the break, we were talking about

12   this -- this -- this phone call you received from the Hammonds,

13   in November.  Do you recall?

14   A.  Yes, I do recall.

15   Q.  And -- and now you -- you were -- you were explaining to

16   the jury how -- how that call affected you.  How did it?

17   A.  Well, it -- it seemed like an escalation in what was going

18   on.  Kind of a response to my meeting with the Hammonds and all

19   of the meeting with the sheriff and everything that I was

20   doing.  And all of the posting of the -- you know, evidence,

21   and -- and all of the information that I was posting and all

22   the videos that I was sending out to -- I was getting, you

23   know, a lot of people informed and a lot people involved.

24              And there was starting to be quite a commotion that

25   was going on around what was happening with the Hammonds.  And

A. Bundy - D - By Mr. Mumford

1  this --

2  Q.  And -- and -- and did the -- did the Hammonds, in that

3  call, express concerns about their safety?

4  A.  Yes, they did express concern about their safety.

5  Q.  And you understood that was as a result of -- of -- of your

6  efforts on their behalf?

7  A.  That's correct.

8  Q.  Did they express concerns about your safety?

9  A.  They did.  They expressed concerns about my safety, as

10  well.

11  Q.  The -- the petition -- the petition for redress of

12  grievance that we were talking about, I'm going to show you

13  what's been marked --

14          (Pause, Mr. Mumford and Mr. Breton conferring.)

15          MR. MUMFORD:  -- Exhibit 1001, please.

16          And is this being shown?

17          MR. BRETON:  No.

18  BY MR. MUMFORD:

19  Q.  Okay.  Mr. Bundy, can you identify this, please.

20  A.  Yes.  This is the redress of grievance that we sent to --

21  that was signed by all of these groups and thousands of other

22  individuals and was sent to these elected representatives as --

23  as addressed there.

24          MR. MUMFORD:  Than you.

25          Your Honor, I'd move to admit, please.

A. Bundy - D - By Mr. Mumford

1        MR. KNIGHT:  No objection, without the highlighted

2   portions of it.

3        THE COURT:  Yes, without emphasis.

4        There is some highlighting on the document that I

5   have.  So those need to be removed before it's ultimately

6   received for the jury.  But you can use it in the jury's

7   presence now with the highlighting.

8        Jurors, just disregard the highlighting.  It's a work

9   copy, but it will get cleaned up for you.

10       All right.  Go ahead, Mr. Mumford.

11  BY MR. MUMFORD:

12  Q.  Can you tell the jury what -- what -- what they're --

13  they're seeing here.

14  A.  They're seeing an official notice, redress of grievance

15  that was drafted by these groups and individuals that are

16  listed here on the top.

17       And as I said, the continuing names are below.  And

18  we had 29 pages -- I believe 29 pages of individuals.  And that

19  was only after the first three days of having this signed.

20  There was many, many more that came later.

21       And it's basically addressing these elected

22  representatives:  Sheriff David Ward, Commissioner Dan Nichols,

23  Commissioner Pete Runnels, Justice of the Peace Donna Thompson,

24  District Attorney Tim Colahan, Attorney General Ellen

25  Rosenblum, and Governor Kate Brown.

A. Bundy - D - By Mr. Mumford

1  Q.  And those were the individuals that you delivered this --

2  either hand-delivered or -- or -- or made other formal efforts

3  to deliver it to?

4  A.  Yeah.  Judge Steve Grasty was added to that list but was

5  not on the document.  But we did serve him with it as well.

6  And, basically, it's self-explanatory.  But we listed what our

7  intent was, what our concerns were; meaning the evidence that

8  we had and then -- going down through it.

9          And then at -- towards the end of the -- the redress,

10  we asked them to take certain actions, which was basically to

11  assemble an evidential hearing board using the peers of the

12  Hammonds and -- or however they chose to, actually.  But to

13  take this -- these concerns, this grievance, and to get to the

14  bottom of it to see if there was abuses, in fact, to the

15  Hammonds.  And that's all we wanted.

16          We wanted them to basically check and balance the

17  federal government.  To basically look and to see if

18  possibly -- just possibly -- maybe the Hammonds were not dealt

19  with correctly.

20  Q.  You've heard testimony in this case regarding proper

21  channels.  Do you recall that?

22  A.  Absolutely.

23  Q.  And you understand those proper channels, then?

24  A.  I believe so, yes.  I mean --

25  Q.  Did you go -- do you believe you went through the proper

A. Bundy - D - By Mr. Mumford

1  channels with this information in the letter -- or this

2  petition for redress?

3  A.   Absolutely.  I also felt like we have gone through proper

4  channels for 30 years, my family has, and we've been ignored

5  constantly.

6           We even done -- we've even taken legislation to the

7  state.  And the only thing that's ever worked for us is the

8  county sheriff standing and defending us in literally complete

9  protection of us.  But it was -- they -- they continued to

10  ignore us.

11  Q.   Is -- is that why you approached Sheriff David Ward in this

12  case?

13  A.   Absolutely, that is exactly why.

14  Q.   So you wanted Mr. Ward to basically do for the Hammonds

15  what your sheriff in Bunkerville had done for you?

16  A.   Well, it wasn't just all of -- all a sudden I wanted him to

17  do that, you know.

18           First, I wanted him to get informed and look at it

19  and get educated on what was happening, meet the Hammonds, go

20  out to the ranch, see where the fires were, see exactly what

21  happened, see how vast open this is.  And how the

22  accusations -- in my opinion -- of the federal government were

23  ridiculous, when you actually go out and look at the land.

24  Their accusations of all of these things were not accurate.

25  And I wanted the sheriff to go firsthand to go see that and to

A. Bundy - D - By Mr. Mumford

1  see what happened, so he could actually see the -- really, what

2  was going on.  That was it, at first.

3         And then the second part was to begin to somehow

4  assemble his -- the community through efforts like this

5  evidential hearing board to get -- to actually -- somehow to

6  make something official.

7         Meaning the people are saying -- or he is saying --

8  either his office or the people are saying that there's a

9  problem here.  There an issue here.  We have looked into it.

10  We have done a full investigation and we feel that there's a

11  problem here.  That we feel that the federal government is

12  abusing this family and has stepped over -- outside its bounds.

13  That's what we wanted him to do.

14         And then after that, and not before that, then make a

15  stand.  And we weren't asking him to, you know, be crazy about

16  it.  We were asking him to say -- just tell the federal

17  government to hold off a little bit.  Don't take the Hammonds

18  into custody yet.  We have concerns as a county and as a state;

19  and, as a sheriff, I have concerns.  And my duty is to protect

20  these people.  And so I'm telling you to hold off.  You're not

21  going to take these people in -- or not even to that effect, at

22  first.  But to hold off until we could get to the bottom of

23  these things.

24  Q.  Did you make any threats in this petition for redress?

25  A.  Absolutely not.  It says what it is.  It's -- it's -- it is

A. Bundy - D - By Mr. Mumford

1    absolutely not a threat.  It's -- it's an effort to explain

2    what our concerns were and asking them to assemble, either

3    through theirselves or with the people, an evidential hearing

4    board to review the information that we had given them and to

5    determine the facts.

6    Q.  How -- what was the effort you went to -- through to get

7    the six -- the -- the signatures that are on this?

8              Can you scroll for a minute, please?

9              (Mr. Breton complying.)

10              THE WITNESS:  Well, first of all --

11   BY MR. MUMFORD:

12   Q.  Are there -- do you recall how many pages there are of

13   signatures?

14   A.  I believe there's like 29 pages of signatures.

15   Q.  Okay.

16   A.  And I -- at one point we were receiving a signature -- at

17   one point we were receiving a signature every three minutes.

18   And that was about three or four days after I had sent it out.

19              So, to be honest with you, I was arrested before I

20   ever knew how many people actually signed this thing.

21   Q.  And no one -- and none of those individuals on the -- on

22   the front page of this ever responded?

23   A.  You mean the elected representatives.

24   Q.  Yeah.  Can we go back to the first page?  I don't think

25   we've gotten to the bottom.  But let's go ahead and look right

A. Bundy - D - By Mr. Mumford

1   there.

2   A.   No.

3   Q.   So Governor Kate Brown, she never responded?

4   A.   No.

5   Q.   Attorney General Ellen Rosenblum, she never responded?

6   A.   No.

7   Q.   Same with Colahan, or the justice of the peace, or the

8   commissioner --

9   A.   No.

10            And this was not the only petition that we sent.  We

11   sent several.  As the sheriff said himself, he had received

12   thousands of e-mails.  Same with the state representatives, the

13   Senate and the House.  And no response, none, from anybody.

14   Q.   Shortly after putting together the initial version of this

15   petition in December, did you -- in the December 11 letter, did

16   you -- did you organize a town meeting after that?

17   A.   I did.

18   Q.   What was that?

19   A.   It was supposed to be just like a town hall meeting to

20   inform the people of what was going on.  You know, there was --

21   there was a lot happening, so --

22   Q.   Did you end up holding that, then?

23   A.   We did.

24   Q.   Do you remember what -- when it was and what it was called?

25   A.   I don't -- I apologize.  I live in the dark now, and I mean

A. Bundy - D - By Mr. Mumford

1    that with my cell.  It's -- there's no information coming in

2    and out, and it's hard.  So I can't remember the exact date.

3            But I know we held it.  We -- we went to great

4    efforts to inform people.  We passed out -- I believe it was --

5    500 fliers.  And we also asked the newspaper to publish it, and

6    to be honest with you, I don't know whether they did or not.

7    And it -- it was -- it was a town hall meeting.  That's what it

8    was.

9    Q.  And is that the meeting -- you -- you've -- you've been

10   here when -- when we've called individuals such as, I think,

11   Travis Williams, Melodi Molt, Chris Briels; like, yesterday.

12   Is that the December meeting that they --

13   A.  That's correct.  That's the meeting that they seemed like

14   most of them began to get informed on that first meeting, other

15   than just hearsay.

16   Q.  And was it a -- did you ever use the term "committee of

17   safety," in that meeting?

18   A.  Yeah, but it wasn't -- it wasn't until the end, towards the

19   end, because we laid out basically --

20   Q.  I was going to say --

21   A.  Okay.

22   Q.  Can you explain?

23   A.  Yes.  We laid out basically this -- what has been

24   happening.  We laid out how we've been ignored.

25           We laid out all of the different things of evidence

A. Bundy - D - By Mr. Mumford

1    that we had; our concerns; the facts and events of the *Hammond*

2    case, and all of this.  We laid it out the best we could in a

3    public meeting.  And they -- most of the people, in my belief,

4    were there because they had the same concerns.  And they had

5    them a long time before we got there.

6          MR. KNIGHT:  I'm going to object to the

7    characterization of the sentiment of the folks there, your

8    Honor.

9          THE COURT:  The last sentence is stricken.  Move on,

10   please.

11   BY MR. MUMFORD:

12   Q.  Who participated in this meeting?

13   A.  There was mostly people from Harney County.  But there was

14   also people from Ontario County, and from Malheur County, from

15   what I -- from what I understand.

16   Q.  And you say this was a town hall.  Who -- who -- who

17   conducted it?

18   A.  Well, the individual who conducted it was BJ Soper.  And

19   he's -- he lives in Harney County.  He doesn't live in Burns.

20   Well, excuse me, I don't know if he lives in Harney County.  I

21   know he lives in Oregon, in one of those counties that

22   participated.  But to be honest with you, I don't know if he

23   lives in Harney County or not.  But he conducted it and began

24   the meeting, and he was basically running the meeting.

25   Q.  Did -- did people take the opportunity to discuss the

94

A. Bundy - D - By Mr. Mumford

1   *Hammond* case here?

2   A.   Yes, absolutely.

3   Q.   Did they take the opportunity to discuss other things, as

4   well?

5   A.   As far as their concerns?

6   Q.   Yeah.

7   A.   Yes, they did.  They -- they were frustrated with what was

8   going on.  And what -- what it basically came to is that --

9   here we're talking about all of these concerns, these

10  frustrations, what's happened to them, what's happening to the

11  people of Harney County.  And then they literally said -- and I

12  might get accused of hearsay on this, so maybe I shouldn't say

13  it.  But what are we to do?

14  Q.   Did that affect you?

15  A.   Yeah.

16  Q.   How?

17  A.   Because that's how I felt.  That's exactly how I felt.

18  That's how we felt for years and years and years.  That's how

19  the ranching and agricultural community has felt for decades.

20  What are we to do?  And so I -- I made a -- I guess, a

21  proposal.

22  Q.   And what was that?

23  A.   That was to form what -- to form a committee of safety.

24  Q.   What -- had you had previous experiences with the committee

25  of safety?

A. Bundy - D - By Mr. Mumford                95

1    A.  Not personally, other than research and understanding of

2    that's what our founding fathers did.  And they -- and it was

3    effective and it worked.

4    Q.  Explain, briefly.

5    A.  When they were being ignored and abused by the British

6    government and could not seem to get any type of response from

7    them, other than as the Declaration of Independence says -- if

8    I may read it?

9    Q.  Have you got it there?

10             THE COURT:  No.

11             THE WITNESS:  I do.

12             THE COURT:  No.  He gets to just say he got his

13   inspiration as he did.  Now, let's move on, please,

14   Mr. Mumford, to the meeting back in -- back to December,

15   please.

16             MR. MUMFORD:  Can I just have him summarize that,

17   then?

18             THE COURT:  The meeting, he may.  He may go back to

19   the meeting.

20             THE WITNESS:  Okay.

21   BY MR. MUMFORD:

22   Q.  And so you made the proposal.

23             What was the response, without getting into the

24   details?

25   A.  I made the proposal that they should organize a committee

A. Bundy - D - By Mr. Mumford    96

1   of safety.

2   Q.  And what -- what was their response?

3   A.  They were very responsive to that and --

4   Q.  Now, did you try to get yourself elected onto it?

5   A.  No, I -- I wasn't a citizen of the -- Harney County.  And

6   that was -- absolutely not.  I suggested that they should

7   nominate and elect people of their county to -- to form a

8   committee of safety board and to go from there.

9   Q.  Did the -- was there communicated, at some point in the

10  meeting, sort of what the committee of safety would be doing?

11  A.  Absolutely.

12  Q.  What was that?

13  A.  There was multiple purposes for the community -- community

14  of safety.

15          One is correspondence to communicate with the -- the

16  community on what was going on and what the issues were.

17          Then there was another part where they were organized

18  to -- to, you know, make committee -- community decisions, and

19  so forth.

20          And the third part was to -- if there was going to be

21  a militia or a people that were going to organize in a defense

22  or in any other manner, then that would be also the

23  responsibility of the committee of safety to make sure that was

24  done properly and to make sure that they -- they did it in the

25  right responsible way.

97

A. Bundy - D - By Mr. Mumford

1   Q.  So -- so someone -- just -- just -- summarize, if I can,

2   for -- for the jury here, this is as of mid-December 2015.

3   Right?

4   A.  Correct.

5   Q.  And you had -- you had helped the Hammonds document their

6   struggle.  Right?

7   A.  Correct.

8   Q.  You published information on the Hammonds to thousands?

9   A.  Correct.

10  Q.  And you -- you'd -- you'd help to inform the sheriff of

11  Harney County regarding this matter and others?

12  A.  Correct.

13  Q.  You -- you helped draft and circulate a -- and deliver a

14  petition for redress?

15  A.  That's correct.

16  Q.  You got thousands of signatures on that.  Right?

17  A.  Correct.

18  Q.  You helped -- helped the pertinent people of Burns organize

19  a committee of safety?

20  A.  That's correct.

21  Q.  Been involved in helping organize community meetings and

22  discussions in general of awareness in and around Burns?

23  A.  That's correct.

24  Q.  And you continued to publish videos and -- and social media

25  messages regarding the Hammonds?

A. Bundy - D - By Mr. Mumford

1    A.   That's correct.

2    Q.   Did you get paid for any of that?

3    A.   No, I wasn't there to get paid.

4    Q.   Did you have a personal stake in any of that?

5    A.   Other than, in my belief, the future of our beautiful

6    country.

7    Q.   Did you spend time away from your family?

8    A.   Yes, a lot of time.  And away from my business.  And still

9    suffering extremely for that.

10   Q.   Now, you mentioned your beliefs here.

11          Do -- do -- are you a man of faith?

12   A.   Yes, I am.

13   Q.   What -- what faith is that?

14   A.   I'm a member of the Church of Jesus Christ of the

15   Latter-day Saints.

16   Q.   How long have you been there?

17   A.   I was baptized at eight years old, which is -- but I've

18   been a member -- or have been a member my whole life.

19   Q.   You -- you served in your church?

20   A.   I've served in different capacities.  I served as a

21   full-time missionary in Minnesota.  Then I served as other

22   capacities, yes.

23   Q.   Do your religious beliefs inform your duties -- inform

24   your -- your beliefs and understanding as to your views on --

25   on -- on what duties you have as a citizen and a neighbor and

A. Bundy - D - By Mr. Mumford

1   as a -- an American?

2   A.  Absolutely.  But I -- I do want to say that it -- I mean,

3   it's -- it's my belief.  It's not just a religion, something

4   organized.  It's my belief.  But they've been taught by this

5   religion that I enjoy and love, and have been a great blessing

6   to me by this church.

7   Q.  Do your -- you've said a few things about your beliefs

8   on -- your views on the Constitution and your country.

9           Do your religious beliefs inform those as well?

10  A.  Absolutely.

11  Q.  How?

12  A.  It's, as far as I understand, our doctrine in the Church of

13  Jesus Christ Latter-day Saints, we're the only church that

14  actually has a doctrine where we profess that the Constitution

15  is an inspired document and that we are to befriend it.

16  Q.  You say the Constitution is an inspired document, what --

17  what do you mean, and what are you referring to?

18  A.  That our founder -- founding fathers were inspired by the

19  creator of this world to draft that charter for the benefit of

20  mankind.

21  Q.  You're a Mormon; so you identify as a Christian, then?

22  A.  Absolutely.

23  Q.  You believe in the Bible?

24  A.  I believe in the Bible.

25  Q.  Do you believe in additional books of -- of -- of script --

1  scriptures as well?

2  A.   I do.   I believe in the Book of Mormon and also further

3  revelations that have been given to us, compiled in the

4  Doctrine and Covenants and Pearl of Great Price.

5  Q.   Do you have the Doctrine and Covenants up there with you?

6  A.   I do.

7  Q.   Can you please turn to the Doctrine and Covenants, Section

8  101, verses 76 through 80.

9          MR. KNIGHT:  Your Honor, at this point I'll object.

10  I think we --

11          THE COURT:  The objection is sustained to the reading

12  of scripture.

13          Please continue.

14          MR. MUMFORD:  Can I have him review it, please?

15          THE COURT:  He may look at it.  But please ask him a

16  question about the case.  He's described his convictions and

17  faith and history.  We're not reading scripture.

18          Please proceed.

19  BY MR. MUMFORD:

20  Q.   Have you had a chance to -- to review that?

21  A.   And I assume you're going to send me to certain verses of

22  that.  So I am reviewing -- it's a long chapter.

23  Q.   101, 76 through 80.

24          MR. KNIGHT:  Your Honor, I'm objecting because I'm

25  perplexed.  This is not relevant at this point in time.  I

A. Bundy - D - By Mr. Mumford

1    don't know what the witness is now intending to do.

2           MR. MUMFORD:  He doesn't know whether it's relevant

3    or not.

4           THE COURT:  But, Mr. Mumford, I've told you the

5    witness is not going to be reading from scripture to the jury.

6           So please just ask him a question.

7           MR. MUMFORD:  I'm not asking him to read to the jury.

8           THE COURT:  And I'm not -- I need you, Mr. Mumford,

9    to ask the witness a question, please, and move on.

10   BY MR. MUMFORD:

11   Q.  Do you see in those -- in those -- in those words the word

12   "redress"?

13   A.  Yes, I do.

14   Q.  Do you see in those -- those -- those -- those words -- the

15   word "Constitution"?

16   A.  Yes, I do.

17   Q.  And that refers to the Constitution of the United States?

18   A.  That is correct.

19   Q.  And -- and -- and what does your faith scripture say about

20   those men who -- who -- who drafted the Constitution?

21   A.  Well, as I mentioned before, that they were inspired.  And

22   as it is a fundamental doctrine in our church and it has been

23   taught to me -- and I believe it, not because of my church;

24   because of the faith and understanding -- that it is our duty

25   to go to the judge, to go to the representatives, to go to the

102

A. Bundy - D - By Mr. Mumford

1    President, and to plead with them.  To stand up for what is

2    wrong.  And that it is our duty to make sure that they have

3    every opportunity to do what is right.  And -- and that is what

4    that is teaching us.  And I believe that is our duty.  That we

5    are not to act unto ourselves or in any way until that has been

6    done and -- or we are not justified in acting at all.

7    Q.  Did you make a personal covenant to uphold those words?

8    A.  Yes, I did.

9    Q.  And by "personal covenant," who -- who did you make that

10   covenant with?

11   A.  I made them to the Lord.

12   Q.  And now, Mr. Bundy, thank you.  I want to go back to

13   that -- the timeline, if I can.

14          Turning your attention to the end of December 2015.

15          You -- you -- were you involved in planning a parade

16   in Burns?

17   A.  Yes.

18   Q.  How?

19   A.  Along with these other groups that -- most of them, that

20   you see on the heading of the notice, redress of grievance, we

21   organized a rally that was going to take place on January 2nd,

22   where we were going to parade up past the Safeway, past the

23   sheriff's office, up to the Hammonds' home.

24          When we hit -- we were going to the sheriff's office,

25   we were going to take pennies and throw them on the sidewalk

A. Bundy - D - By Mr. Mumford

1  because -- in -- in an effort to protest or show our -- our, I

2  guess, disgust that the sheriff decided to go with those that

3  were abusing, rather than those that were being abused.

4          And then we would walk up.  And we had flowers, and

5  so forth, and we put them on the Hammonds' front yard.  And

6  maybe -- we didn't know if the Hammonds would come out or not.

7  But you know -- and then we walked -- would parade down around

8  to the Main Street, down Main Street, and then back up to the

9  Safeway.

10 Q.  Were you involved in -- in -- in -- in trying to get people

11 to attend this parade in Harney?

12 A.  Absolutely.

13 Q.  What you did you do to try to get them to come?

14 A.  I notified people, you know, through -- through all of the

15 sources of media.  I did a video.

16 Q.  Did you -- did you -- you mentioned a video.

17          Did you post the video at some point called "Stand

18 Up, Not Down"?

19 A.  I did.

20 Q.  Without -- without getting too much into the details of

21 that, can you just explain -- when -- when did you -- when did

22 you post that video?

23 A.  I think it was just -- if it's the one I'm thinking of, it

24 was the day before, I believe.  If not -- because I -- I did do

25 multiple videos.  But I believe it was the day before.

A. Bundy - D - By Mr. Mumford

1   Q.   And when -- when -- when you're saying stand up, stand

2   down, what -- what are you referring to there?

3   A.   Well, there was an effort -- my belief is an effort by

4   certain groups to not get people to respond to this.  And --

5   and I -- and to stand down, to not stand up to this.  And so I

6   did a video to say not to stand down but to stand up.

7          And I guess -- you know, that's my answer, I guess.

8   I don't know if I answered that --

9   Q.   And by "this," what are you referring to?

10  A.   I'm referring to come to Burns and to stand up for the

11  Hammonds.

12  Q.   What was the most important issue to you as of December

13  31st or January 1st?

14  A.   The most important?

15  Q.   Yeah.

16  A.   It was the Hammonds.

17  Q.   Was your brother Ryan Bundy involved in your Harney

18  activities up to that -- that -- that point at all?

19  A.   Absolutely not.

20          From what I understood -- and now he lives in

21  southern Nevada.  I live in Idaho.  So, from what I understood,

22  he had called the Hammonds.  And other than that, I never --

23  never had any communication with him about anything that was

24  going on.

25  Q.   How about your friend LaVoy --

A. Bundy - D - By Mr. Mumford

1    A.    You know, I want -- I want -- I want to be completely

2    honest here because I shouldn't say "any communication."

3              They saw my videos.    They saw what was -- what was --

4    I was doing.    They saw my activity and supported that.    So I

5    don't want to come off like that was not happening.    But as far

6    as -- he knew about the rally and -- I think that's what you're

7    getting to.

8    Q.    Well, and I'm -- thank you for the clarification.    I was

9    talking about your activities in Harney County.

10             Was -- was -- was your friend LaVoy Finicum involved

11   in any of that -- those activities, at all, up to that point?

12   A.    No.

13   Q.    How about Ms. Shawna Cox?    Was she involved in any of those

14   things --

15   A.    No.

16   Q.    Any other defendant here involved in those activities up to

17   that point?

18   A.    No.

19   Q.    And, again, just -- just -- just to be clear, the subject

20   of the refuge employees did not come up at that December 15th

21   meeting at all?

22   A.    No, not at all.

23   Q.    Did it come up in any meeting prior to that point?

24   A.    No, none.

25   Q.    Now, on -- on January 1st, you published another video, I

A. Bundy - D - By Mr. Mumford

1    think.  I believe it's called, "My dear friends."  Do you

2    remember that?

3    A.   I do.

4    Q.   And -- and does this -- can I just get to -- what was your

5    purpose in that -- in posting that video on January 1st, 2016?

6    A.   Again, it was an effort for full disclosure of what I was

7    doing and why I was doing it.

8         I wanted people to know what I was doing and to shed

9    as much sunlight on it as I could.  And so I went pretty much

10   from the beginning of my involvement with the Hammonds and --

11   in this video, and I laid it out.  And then I also -- towards

12   the end of it, I began to explain more of my faith and how I

13   felt it was so important that we do something.  And how I felt

14   for my children and their children and for our nation.  That we

15   do something.  That we act, rather than being acted upon all

16   the time.  And that was my intent.

17        But to be open, to be clear with everybody of why I

18   was there and why I had done what I had done, and why everybody

19   was going to Burns.

20   Q.   Do you remember -- where did you make this?  Do you recall?

21   A.   Yeah, I made it at my house in -- in Emmett, Idaho.

22   Q.   Just -- just across the table from you?

23   A.   That's correct.  It was like a counter there, and I was --

24   Q.   You -- you mentioned a -- a full disclosure.

25        Why was it important to you to share that level of

A. Bundy - D - By Mr. Mumford

1   full disclosure with -- with -- with -- with people?

2   A.   I -- I did not want -- I needed people to understand the

3   reasons why.  I mean, I didn't want to -- to be accused or -- I

4   don't know if that's the right word.

5            I just wanted to be -- you know, sunlight is the best

6   disinfectant.  That's how I feel.  Sunlight is the best

7   disinfectant.  I wanted to be open with them.  I wanted to be

8   clear with them of why -- why I was there, and what was the

9   purpose of it.

10           MR. MUMFORD:  So, your Honor, can I show the witness

11  Exhibit 1174, please?

12           THE COURT:  Mr. Knight, any issues?

13           MR. KNIGHT:  No, not -- other than the parameters

14  we've already set.

15           THE COURT:  All right.  So within those ranges, we'll

16  go forward.

17           Go ahead.

18           MR. MUMFORD:  Thank you.

19  BY MR. MUMFORD:

20  Q.   Mr. Bundy, we're going to pick up this video about 14

21  minutes in.

22           Can -- is it fair to say the first part of the video,

23  the first 14 minutes kind of just did what you just -- you

24  covered, the -- a lot of the material that you've already

25  covered so far?

A. Bundy - D - By Mr. Mumford

1   A.  Yeah, the first part of it talked about how I found out

2   about the Hammonds.  Basically what we've talked about in here,

3   up to that point.

4   Q.  And you remember describing what your motivations and plans

5   were in that -- in that time period from -- from the first time

6   you heard about the Hammonds to January 1st and then?

7   A.  Can you rephrase the question?

8   Q.  Yeah, do you remember talking about what your motivations

9   and your plans were at that time?

10  A.  Yes, absolutely.

11  Q.  And then those are consistent with what you've already

12  testified to?

13  A.  Yes.

14  Q.  From statements in here?  You understand that?

15  A.  Absolutely.

16  Q.  And if they're not, the Government can go back and they've

17  got the whole thing.  Right?

18  A.  I would love for them to show that, if they would, but I

19  don't think they will.

20  Q.  Can we pick it up at -- can we pick it up, your Honor, at a

21  minute and 14, please.

22          THE COURT:  Yes.

23          (Video playing with sound.)

24          MR. MUMFORD:  Is this published?

25          MR. BRETON:  Yeah.

A. Bundy - D - By Mr. Mumford

1    MR. MUMFORD:  Okay.  Thank you.

2    (Video playing resumed.)

3    (Video stopped.)

4    BY MR. MUMFORD:

5    Q.  You said, "The direction that he gave you."  Who is the

6    "he" that you're referring to?

7    A.  I don't know if you want to back up a few seconds before

8    that but --

9    Q.  Okay.  Maybe we can.

10    MR. MUMFORD:  Let's go to 13:45.

11    (Video playing with sound.)

12    (Video stopped.)

13    BY MR. MUMFORD:

14    Q.  Now, in that video, Mr. Bundy, you said you understood the

15    specific steps that needed to be taken; that had become more

16    and more clear.  What did you have in mind?

17    A.  Will you rephrase that, to make sure I --

18    Q.  Yeah, you were talking about the specific steps that you

19    had in mind.  That they had become more and more clear.  What

20    did you have in mind?

21    A.  I had in mind that we would go to Burns, and we would make

22    a hard stand there.

23    Q.  And as -- as of the time of the interview?  I'm sorry.  Of

24    the video here, had you made a decision to occupy the refuge?

25    A.  No, I had not made that decision.

A. Bundy - D - By Mr. Mumford

1  Q.  What -- what -- what do you remember was your objective or

2  purpose in asking people to come and -- and I think you said,

3  participate in the wonderful thing that the Lord has?

4  A.  It -- to come to the rally, first.  And just as I did

5  before the rally, I presented what I felt should happen.  And

6  that's what -- that's exactly what I -- and I -- I assume

7  you're going to get into that.  But that's exactly what I did,

8  and that's -- that's -- exactly how I saw it happening.

9  Q.  And that was the next day?

10 A.  What's that?

11 Q.  That was the next day?

12 A.  That was the next day, yes.

13     THE COURT:  Mr. Mumford -- I'm sorry -- would this be

14 a good point to break for lunch?  Between now and the next day.

15     MR. MUMFORD:  Yeah, just -- just let me ask a few

16 questions here.

17     THE COURT:  Please do.

18 BY MR. MUMFORD:

19 Q.  Just to be clear, as of the time of this video, January

20 1st, 2016, were you in league with anyone else?

21 A.  No.

22 Q.  Had you reached a decision that you were actually going to

23 go occupy the refuge at that point?

24 A.  No.

25 Q.  Were you aware of anyone who was trying or planning to --

Colloquy

1    to try to prevent refuge employees from discharging their duty;

2    by force, threat, or intimidation?

3    A.   No.

4    Q.   Thank you.

5              THE COURT:  All right.  Jurors, we're going to take

6    the lunch break now, and we'll continue this after lunch.

7              Ladies and gentlemen, enjoy your break.  Please don't

8    talk about the case.  Leave your notes on the chair.

9              We'll see you -- let's say 1:25 for you.  So a little

10   bit more than an hour.

11             Enjoy the break.  Stretch your legs.

12             Let's all stand for the jurors.

13             Watch your step, folks.

14             (Jurors exit.)

15             THE COURT:  Thank you, everyone.  Mr. Bundy, you can

16   go ahead and step down.

17             Everybody else be seated.

18             Mr. Bundy, Mr. Bundy --

19             DEFENDANT WAMPLER:  We all love you, Ammon.  Thank

20   you very much for everything you've done.

21             (Applause.)

22             DEFENDANT WAMPLER:  We love you.

23             (Applause.)

24             THE COURT:  Mr. Bundy, Mr. Bundy, Mr. Fry, please

25   step on out for the noon recess.  We'll be back on the record

Colloquy

1    at one o'clock, ladies and gentlemen.

2            MR. MUMFORD:  Your Honor, can I be --

3            THE COURT:  You may.  Marshal, fourth floor, please,

4    for a conference with Mr. Bundy and Mr. Mumford.

5            MR. MUMFORD:  Thank you.

6            THE COURT:  Everyone remain seated, please.

7            Okay.  We're in recess.

8            Counsel, everybody, be back at one o'clock, please.

9            (Recess taken.)

10           THE COURT:  Thank you, everyone.  Please be seated.

11           Bring in the defendants who are in custody.

12           (Court and clerk conferring.)

13           (Pause.)

14           THE COURT:  All right.  Ladies and gentlemen, let us

15   please go on the record.

16           Is everyone here?  Ms. Cox is coming.

17           Everyone's here.

18           All right.  So let's proceed with what's expected

19   next, so we can get through the jury without interrupting

20   presentations.

21           Mr. Mumford?

22           And, Mr. Bundy, come on back to the witness chair,

23   please.

24           MR. MUMFORD:  Your Honor, I believe we're -- I

25   believe we're talking about the remaining exhibits -- excuse

Colloquy

1  me.  The -- your Honor, we're talking about the remaining

2  exhibits.

3          I think your Honor took a -- reserved on some of them

4  from this morning, especially regarding Mr. Finicum.

5          MR. SCHINDLER:  Mr. Mumford, can you speak up,

6  please.

7          MR. MUMFORD:  Yeah.  Sorry about that.

8          I believe, your Honor, that we had raised a few

9  issues.  I think your Honor reserved a few issues regarding

10  Mr. Finicum and those -- the exhibits that we wanted to get

11  into, your Honor.

12          I think that we're at the point where we're talking

13  about --

14          THE COURT:  January 1 is where you left off with the

15  witness at lunch and the presentation he was making just ahead

16  of the January 2 events.

17          MR. MUMFORD:  And so -- and so the questions that I

18  have, your Honor, go to the evidence that we're wanting to get

19  into here from the January 2nd period on.

20          THE COURT:  Okay.

21          MR. MUMFORD:  And I understand, from the Court's

22  rulings this morning, that the Court did not want us to get

23  into 11 -- or, no.  Wouldn't allow us to get into 1175.  That's

24  the evening of January 2nd.  The Court --

25          THE COURT:  Yes, the Government withdrew its

Colloquy

1    objection to 1175.

2              MR. MUMFORD:  That's correct.

3              The Court would allow us, on 1176, to show the -- to

4    show both the initial video, so that Mr. Bundy can make the

5    connection to other videos here, and then show a picture, I

6    believe, is what your Honor said -- a screenshot -- of the

7    ranchers.  Or maybe -- can we show the introduction of the

8    ranchers, then?  Is that okay?

9              THE COURT:  No.  No.  He -- what I said was if you

10   wish to ask him, he may testify that there were many visitors,

11   including ranchers.  And you can put up a screenshot of the

12   rancher who's on the video 1176 because you wanted to show that

13   rancher was in the particular office --

14             MR. MUMFORD:  That's right.

15             THE COURT:  And he can identify the office but not

16   play the video.

17             MR. MUMFORD:  Okay.

18             THE COURT:  So you can do that.

19             Go on.

20             MR. MUMFORD:  And then the Court reserved on -- oh, I

21   think the Court declined our request for the 1178.

22             THE COURT:  Yes.

23             MR. MUMFORD:  Is that right?  From Mr. Finicum?

24             THE COURT:  Yes.  I sustained the objection on 1178.

25             MR. MUMFORD:  And on what ground --

Colloquy

1        THE COURT:  I'm not going to renew it.  Do you have

2  something new?  We need to not repeat everything, Counsel.

3        MR. MUMFORD:  I'm not going to.  I'm not going to.

4        THE COURT:  Go ahead.

5        MR. MUMFORD:  The Court limited us to, I believe --

6  did I say one minute or two?

7        THE COURT:  I said one, then you said a minute 40;

8  and I said go with that.

9        MR. MUMFORD:  Okay.  Thank you, your Honor.  That's

10  1179.  And -- and -- and your Honor -- okay.

11        THE COURT:  I indicated 1181 and 1182 could be

12  played.  And with respect to 1180, the witness could testify

13  about his perceptions about pressures of, and so forth.

14        MR. MUMFORD:  That's right.

15        THE COURT:  But not play it.

16        MR. MUMFORD:  That's right.

17        And then there was the clips that we had from 1184.

18  I believe, your Honor --

19        THE COURT:  I said you could play them, and then

20  Mr. Knight could object as we went.  And Mr. Breton would stop

21  the minute he heard rustling behind him, so that I don't need

22  to take this time to listen to it all in advance.  And I could

23  hear the arguments.

24        And then there are no objections to what you've

25  itemized as No. 39, the clips.

116

Colloquy

1          MR. MUMFORD:  And there was a -- on 1191, we were

2    going to be allowed to show the screenshot.  Is that right?

3          THE COURT:  Yes, and its impact.

4          The witness was talking about his efforts to reach

5    out to elected officials.  That he can talk about reaching out

6    in that vein toward Representative Walden.  And he can be

7    asked, Did Walden make a presentation on the House floor?

8    Answer:  Yes.  Is this a photo of him doing that?  Answer:

9    Yes.

10          MR. MUMFORD:  And then what -- what -- given the

11   foundation that we laid for sending the redress to Governor

12   Brown, your Honor, I would request that we be able to show

13   the -- and admit Ms. Brown's letter.

14          THE COURT:  The letter that you discussed this

15   morning to the Attorney General and the FBI director?

16          MR. MUMFORD:  That's right.

17          THE COURT:  The objection previously made is still

18   sustained.

19          It does not, on its face, indicate that it's a

20   response to a redress of grievances.

21          MR. MUMFORD:  Thank you.

22          THE COURT:  Okay.  About how long, now, do you expect

23   for the continued direct examination of Mr. Bundy?

24          MR. MUMFORD:  Our anticipated is about an hour and a

25   half, I believe.

Colloquy

1    THE COURT:  Okay.  So I would like to review with

2  other defenders -- oh, before I go on, Mr. Mumford, where's

3  Mr. Philpot?

4    MR. MUMFORD:  Ah --

5    THE COURT:  He's supposed to be here.

6    MR. MUMFORD:  He is.  He is -- I believe he's meeting

7  with witnesses, your Honor, just outside the --

8    THE COURT:  He needs -- he needs, like you, to be

9  here when court convenes in the morning.  If he wants to be

10  excused, he needs to make that point.

11    MR. MUMFORD:  To be honest, your Honor, I forgot to

12  look over -- I thought he had come in, and the Court had seen

13  him today.  I'm sorry.  I thought --

14    THE COURT:  So let me be clear again.  Mr. Philpot's

15  part of the team and part of your admission to the Court.

16    MR. MUMFORD:  No, I understand.

17    THE COURT:  And if he needs to be excused, he should

18  arrange for that.

19    I'll assume he's doing what you're doing, and we'll

20  deal with that later.

21    Let me just ask, then, among the defenders:  Who

22  intends to add with examination of Mr. Bundy, and give me an

23  idea about how much time.

24    I'll start with you, Mr. Salisbury.

25    Do you have any questions, do you think, so far?

Colloquy

1    MR. SALISBURY:  Not long.  Probably ten minutes,

2    Judge.

3         THE COURT:  Okay.  And Mr. Olson?

4         MR. OLSON:  I think just a couple of minutes.

5         THE COURT:  All right.  And Mr. Schindler?

6         MR. SCHINDLER:  Half hour.

7         THE COURT:  And Ms. Maxfield?

8         MS. MAXFIELD:  Ten or 15 minutes, your Honor.

9         THE COURT:  And Ms. Cox or Ms. Harris?

10        DEFENDANT SHAWNA COX:  Probably about a half an hour.

11        THE COURT:  All right.  And then, Mr. Bundy, do you

12   want to ask questions?  And where do you want to be in this --

13   this group?  You've been deferring to others going first,

14   before, so I just want to know in what order --

15        DEFENDANT RYAN BUNDY:  I would rather be towards the

16   end, and I'll probably be 15, 20 minutes.

17        THE COURT:  Okay.  We'll see where that leads.

18        And then the Government will have cross.

19        So we'll see if that takes us beyond the afternoon

20   recess or not.  But let me know what's in store once

21   Mr. Bundy's testimony is concluded.

22        What's next?

23        MR. MUMFORD:  I can address that, your Honor.  I

24   believe there are two additional witnesses we have on standby

25   right now.  One is Michele Fiore, who -- as your Honor pointed

Colloquy

 1  out -- was in the courtroom for just a brief moment, I believe,

 2  during Mr. Bundy's examination yesterday and then she was asked

 3  to leave.

 4          She -- I understand she has a flight today.  So we

 5  may need to get her on.  But that is a 15 -- that is a 10 to

 6  15-minute examination, is all.

 7          THE COURT:  All right.  Has that been proffered to

 8  the Government?  Are there any issues I need to address outside

 9  the jury's presence?

10          MR. KNIGHT:  Your Honor, based on our understanding

11  of the limited proffer, we think her testimony would be

12  cumulative.

13          Apparently she was at the refuge for a brief period.

14  Beyond that, we don't understand her to have anything relevant

15  to say.

16          THE COURT:  Can you explain to me, please,

17  Mr. Mumford, the -- the relevance purpose of Ms. Fiore

18  testifying that's not cumulative.  Or, if it is cumulative, why

19  it's needed anyway.

20          MR. MUMFORD:  It -- no, it is our position it's not

21  cumulative, your Honor.  Her testimony is -- as your Honor

22  has -- has heard from Mr. Bundy, he is familiar with the COWS

23  organization.

24          Your Honor, Ms. Fiore is a legislator from the state

25  of Nevada.

Colloquy

1              THE COURT:  And she's a member of that organization?

2              MR. MUMFORD:  Member of COWS.  And she participated

3   in their efforts to go to the refuge.  And understands --

4   has -- has an understanding of what -- the presentations that

5   were given there by Mr. Bundy and what -- and -- and that is

6   important.  And it's an important part of -- the critical story

7   that hasn't been presented to this point.

8              THE COURT:  So the perspective as a member from the

9   COWS organization is not cumulative, and she can testify in

10  that context.

11             What else with your --

12             MR. MUMFORD:  And then, your Honor, it's just -- I've

13  instructed her to be very brief on background with -- how --

14  how she came to work with Mr. Bundy and came to know him.

15  That's all.

16             THE COURT:  Okay.  All right.  Then I'm certain we're

17  going to get to the afternoon recess, though, before you need

18  to call Ms. Fiore.  Is that right?

19             MR. MUMFORD:  I believe so, your Honor.  I would like

20  to have the possibility that we make a judgment call at that

21  point to decide whether or not we need to.

22             THE COURT:  Right.  So what I was going to suggest is

23  that we just continue.  And after the afternoon recess, outside

24  the jury's presence, you can determine whether you want to

25  interrupt this presentation with Ms. Fiore's testimony, and

Colloquy

1    then we'll continue.

2            MR. MUMFORD:  And the other witness that is currently

3    on standby is Brandon Rapolla.

4            THE COURT:  All right.  Has the Government reviewed

5    that?

6            MR. GABRIEL:  Yes, your Honor, we have.

7            He -- as we understand -- will be testifying about an

8    incident on Sodhouse Road, just outside the gate of the refuge.

9    And there's a photograph, Exhibit 110 -- Government's Exhibit

10   110 that the defense wishes to contextualize through him.

11           We've shown Mr. Rapolla and shown the defense what

12   we've now marked as Government's Exhibit 711.

13           Mr. Rapolla recognizes it, and I don't believe the

14   defense has any objection to its admission.

15           There's a defense exhibit that they wish to admit

16   through Mr. Rapolla that does more than show just the events

17   taking place.  There's a separate speaker behind the microphone

18   that we object to on hearsay grounds.

19           THE COURT:  I'll take that up at the afternoon

20   recess, then, in the event we're going to get there.

21           Is there anything -- Mr. Kohlmetz, you're standing.

22   Do you have an issue I need to be aware of?

23           MR. KOHLMETZ:  Mr. Patrick is still under subpoena,

24   your Honor.  I don't believe anyone intends to call him, but I

25   don't want to leave without --

Colloquy

1          THE COURT:  Right.  So where we left this yesterday

2    is I directed Mr. Kohlmetz to be here at one o'clock so that we

3    could resolve, in the parties' presence, the status of

4    Mr. Patrick as a potential witness.

5          Mr. Kohlmetz, what is Mr. Patrick's position as of

6    now with respect to, if called, whether he would invoke his

7    right -- well, let me ask you, Mr. Patrick.

8          As of now, people have been saying things to me all

9    over the board with respect to what your intentions are.

10         Let me be very clear.  You're a defendant in the

11   case.  Right?  Please --

12         DEFENDANT PATRICK:  I'm not a defendant in this case,

13   ma'am.

14         THE COURT:  Pardon me?

15         DEFENDANT PATRICK:  I'm not a member in this case,

16   ma'am.

17         THE COURT:  You're not in this trial, but you've got

18   a trial set in February.

19         DEFENDANT PATRICK:  That's correct.

20         THE COURT:  And as such, you are exposed.  As long as

21   that case is pending, there are issues about it.  So to the

22   extent you give statements, either under oath or not, they're

23   potentially available to be used in the trial, either in your

24   favor or against you.

25         Do you understand that?

Colloquy

1          DEFENDANT PATRICK:  I understand that.

2          THE COURT:  All right.  I've been told that someone

3  among the defense has subpoenaed you as a witness to be called

4  in this trial with these seven defendants.

5          Is that true?

6          DEFENDANT PATRICK:  I understand that to be true.

7          THE COURT:  All right.  You have an absolute right

8  not to testify as to any matter that could incriminate you with

9  respect to the case still pending against you for the February

10  trial or any other matter not yet pending.

11          You have a right not to be called as a witness

12  against your wishes.

13          Do you understand that?

14          DEFENDANT PATRICK:  I understand that right not to be

15  called.

16          THE COURT:  And you have a right -- and even though

17  you've been subpoenaed, which required you to come to court,

18  you have a right to invoke your Fifth Amendment right not to be

19  asked questions that could in any way incriminate you.

20          Do you understand that?

21          DEFENDANT PATRICK:  I understand I have a right to

22  invoke my Fifth Amendment, yes, ma'am.

23          THE COURT:  I'm sorry.  I'm not hearing you.

24          DEFENDANT PATRICK:  I understand I have a right to

25  invoke my Fifth Amendment.  That is correct.

Colloquy

1          THE COURT:  Thank you.

2          Yesterday, Mr. Kohlmetz reported that that was your

3     desire.  That you wished to do that in response to the

4     subpoena.  And then people here on the defense side said no,

5     that wasn't true.  And then Mr. Kohlmetz said it had gone back

6     and forth.

7          In the end, sir, it is not Mr. Kohlmetz's decision,

8     it is yours.  So I need to know from you whether -- if any

9     defendant called you to the witness stand, whether you would or

10    would not invoke your Fifth Amendment rights.

11         DEFENDANT PATRICK:  If I would or -- if I -- excuse

12    me?

13         THE COURT:  I need to know, if you are called as a

14    witness, will you invoke your right under the Fifth Amendment

15    not to be compelled to answer questions?

16         DEFENDANT PATRICK:  I don't plan to invoke my Fifth

17    Amendment right if called, your Honor.

18         THE COURT:  Say again?

19         DEFENDANT PATRICK:  I do not at this time plan to

20    invoke my Fifth Amendment right if called, no.

21         Okay.  So if any defendant intends to call

22    Mr. Patrick, you all need to coordinate with Mr. Patrick and

23    Kohlmetz so that counsel, who is standby to Mr. Patrick, is

24    available in the event Mr. Patrick is called.

25         So it's not happening this afternoon, I know for

Colloquy

1    sure, Mr. Patrick.  So you don't have to be here under your

2    subpoena.

3            If any of the lawyers here -- any of the parties here

4    want you to testify, it's their job to be in touch with you and

5    Mr. Kohlmetz, so that you're here in time to be called.

6            But even though you're representing yourself in the

7    case still pending against you, Mr. Kohlmetz needs to be

8    present on this Fifth Amendment question as it can change.

9            The one thing that can happen -- and I haven't

10   addressed it -- is that sometimes people choose not to invoke

11   their rights.  And then they change their mind in the middle of

12   their testimony.  And that would mean that, if that happened,

13   then everything you had said would be out.  And it would be a

14   complication.

15           So it's one thing you need to know.  Hopefully,

16   Mr. Kohlmetz can help you find out what it is people want to

17   ask you, so that you can assess for yourself -- and if you

18   want, with his help -- whether you are or aren't exposed by

19   saying those things.  Okay?

20           DEFENDANT PATRICK:  You've appointed Mr. Kohlmetz.

21   Mr. Kohlmetz does not speak for me.

22           THE COURT:  I understand that.

23           I'm saying that he's your standby lawyer, and I want

24   him present in the event it would be helpful if issues come up.

25           So all I'm saying is anybody who wants you to testify

Colloquy

1    needs to coordinate with you and him to be sure both are in the

2    room when the time comes.  Okay?

3              DEFENDANT PATRICK:  It appears yesterday there was a

4    misunderstanding.  Mr. Kohlmetz stood for me and spoke for me

5    in court.

6              THE COURT:  I'm -- you're making it very clear he

7    doesn't.

8              He's your standby lawyer, though, and part of your

9    right of self-representation is conditioned on him being

10   involved.

11             You don't have to take his advice, but he has to be

12   present.

13             All I'm saying is the lawyers and the parties,

14   anybody who wants you to testify, need to involve both of you

15   in the scheduling.

16             Do you understand?

17             DEFENDANT PATRICK:  Yes.

18             THE COURT:  Okay.  Does anybody need Mr. Patrick to

19   stay while our trial continues?

20             All right.  Whoever wants him needs to be responsible

21   to work with him and Mr. Kohlmetz to schedule that, so that the

22   jury isn't delayed over that.

23             Is that clear?

24             I think it is.

25             All right.  Sir, you're free to go, if you want, or

127

A. Bundy - D - By Mr. Mumford

1    you're free to stay.

2              DEFENDANT PATRICK:  Thank you.

3              MR. KOHLMETZ:  Thank you, your Honor.

4              THE COURT:  Bring in the jury, please.

5              (Jurors enter at 1:31 p.m.)

6              THE COURT:  Thank you, ladies and gentlemen.  Please

7    be seated.

8              Good afternoon, jurors.

9              THE JURORS:  Good afternoon.

10             THE COURT:  Everyone ready to begin?

11             Okay.  Let us continue, please, with the direct

12   examination Mr. Bundy.

13             Mr. Mumford.

14             MR. MUMFORD:  Thank you, your Honor.

15             I was told I need to speak louder, so I will.

16                        DIRECT EXAMINATION

17   BY MR. MUMFORD:

18   Q.  The -- Mr. -- Mr. Bundy, prior to the break, we were --

19   we -- we were just moving to January 2nd.

20             Do you recall that?

21   A.  Yes.

22   Q.  And did you have a meeting on the morning of January 2nd?

23   A.  I did.

24   Q.  As you went to that meeting -- well, first -- first of all,

25   what -- how did you set up this meeting?

A. Bundy - D - By Mr. Mumford

1   A.   There was a whole bunch of people that were coming to the

2   rally.  And, you know, people were calling me on the phone and

3   where -- Where are you going to be?  Where are you going to

4   meet?  And the only place that I thought of, at first, was a

5   good enough place to meet was in the parking lot of the

6   fairgrounds, actually, because it's pretty open area.

7            So I told -- hey, I -- and it was really pretty

8   impromptu, I guess.  Told to -- everybody to -- to go to the

9   fairgrounds, to the parking lot there.

10            And I thought that maybe on a last-minute thing that

11   we might be able to get into the fairgrounds and meet there.

12   It was really cold.  Because I did want to meet with as many

13   people as I could before the rally.

14            So I went to the fairgrounds, in the parking lot

15   there.  And several people came.  But we were not able to get

16   access to the -- it wasn't being used, or anything, but we

17   weren't able to get access to go into the fairgrounds -- or to

18   the building and meet there.

19            So then I remember that we had met with the sheriff

20   once before, at the Ye Old Castle cafe there as kind of a

21   community meeting.  I don't even know who set that meeting up,

22   but we did meet there.

23            And there was a -- there's a back room.  And they

24   were really accommodating and friendly.  And so I thought,

25   well, maybe we can get that.

A. Bundy - D - By Mr. Mumford

1    So a couple of the people called and then eventually

2  went over there and was able to get permission for them to use

3  the -- use their -- their back room meeting.

4    And so we went over there.  And that's -- and it's

5  right across the street from the Safeway, which is where the

6  rally was going to start.  So that's where it went.

7  Q.  And so you're walking -- you're walking to this meeting on

8  the morning of January 2nd.  What is going through your mind?

9  A.  Well, we had to leave the fairgrounds and drive, though,

10  you know --

11  Q.  Okay.  You're driving --

12  A.  It's not that close.  We had to go over to the fairgrounds

13  and drive.

14  Q.  Thank you.  You're driving over there.

15    As you go into this meeting on January 2nd, what's

16  going through your mind?

17  A.  I -- what's going through my mind is I am wanting to talk

18  to these individuals about what I feel we should do and

19  about -- basically, what -- what we should do.

20    And that's what -- what I meant by "a hard stand,"

21  and what I -- what I felt like we should do.

22  Q.  You mean -- you mean what you meant by "hard stand" in the

23  video that you had posted on January 1st?

24  A.  Yeah.  Yeah.  The -- what I did.

25    And I want to be really clear with everybody about --

A. Bundy - D - By Mr. Mumford

1    I mean, I want to be very clear about all of that.

2    Q.  So when you said "hard stand" in that video on January 1st,

3    what did you mean?

4    A.  I meant going into the refuge.  I did not express that to

5    the people in the video.  I did not make a decision with

6    anybody on that.  But I intended on going to the January 2nd

7    meeting and proposing that that's what we do.

8              And -- and let me just give you a little bit of

9    background on that.

10   Q.  Please.

11   A.  Because I want to be very clear about this.

12   Q.  Please.

13   A.  When we began to get -- when we could see that the sheriff

14   and that -- and that the county representatives and the state

15   representatives were completely ignoring us and we couldn't get

16   any response out of them, at that point -- I wasn't alone --

17   community members, everybody was very frustrated.  And so the

18   question was asked, what are we going to do?

19             And we had -- during these meetings between this --

20   between -- up to December -- or, basically, January 2nd, we had

21   several community meetings with ranchers, with the committee of

22   safety, with different individuals and -- of what we -- what we

23   should do.  And we proposed several different things, talking

24   about it.

25             But the point I want to make very clear is there was

A. Bundy - D - By Mr. Mumford

1   never, ever, a decision on what to do.  We never, ever,

2   concluded on what we should do.  Besides the rally that was

3   going to be happening on January 2nd, there was never a

4   decision on what -- what we were going to do.  And I felt that

5   what needed to happen before the rally was we get together and

6   we decide whether we were going to make a hard stand or not.

7   Q.  Did you have other things in mind -- without getting into

8   them, did you have other things in mind as -- to propose at

9   that January 2nd meeting regarding the hard stand you were

10  going to take?

11  A.  Yeah, there was several proposals that weren't just mine.

12  But, you know, other than -- other than mine, because we talked

13  to several groups.

14           There was ideas such as taking cattle and putting it

15  back on the Hammonds' range without permission from the -- the

16  federal government.  And then just protecting them, so they can

17  graze on their land without -- without getting the permit that

18  the BLM wanted.

19           There was talk about when -- when it was time to do

20  prescribed burns, to go -- as a community, go out there and do

21  the prescribed burns without their permit, without permission

22  for them to do that.

23           And these were among the refuge -- going into the

24  refuge and getting the land back to the people, these were the

25  types of things that we were discussing to do.  That we -- we

A. Bundy - D - By Mr. Mumford

1  would make a hard stand on these type of -- these type of

2  actions.

3  Q.  Now, I want to back up just for a second, before we get

4  into the substance of the January 2nd meeting.

5           Prior to this time, you had been involved in -- and

6  you had been involved in political activity related to these --

7  these federal land issues.  Is that fair?

8  A.  Yeah, my family has been forced to be involved, yes.

9  Q.  And, well -- and, in fact, that was the purpose of the

10  proposed legislation that they proposed --

11  A.  That's exactly what the legislation was about.

12  Q.  Now, without -- without giving a -- a -- a -- without

13  giving the explanation too long, can you just tell the jury a

14  summary overview of your -- of your views related to the

15  Constitution on that issue?

16  A.  Yes.  So my views of the Constitution on -- in Article I,

17  Section 8, Clause 17, it lays out the rules that the federal

18  government must follow in order to own and control land inside

19  the state.

20           And those rules are that -- that the federal

21  government must first get consent from the state legislature --

22  legislatures.  They have to purchase it.  And they can only use

23  it for the erection of forts, magazines, arsenals, dockyards,

24  and other needful buildings.  And that's the rules, under my

25  understanding of the Constitution, when it comes to the federal

133

A. Bundy - D - By Mr. Mumford

1   government owning and controlling land inside a state.

2   Q.   And -- and what, in your mind, did this have to do with

3   your -- well, with -- with -- with -- with the Hammonds?

4   A.   Yeah, it's because of the violation of this clause in the

5   Constitution that's put all of these families and these

6   ranchers and loggers, and so forth -- it's my belief --

7              MR. KNIGHT:   Your Honor, I object.

8              THE COURT:   Stop, please.   Let me hear the objection.

9              MR. KNIGHT:   The objection is relevance at this point

10  in time.   He's already testified about his belief and state of

11  mind as to the Constitution.   Now he's opining about these

12  ranchers and what happened to them vis-a-vis the Constitution.

13             THE COURT:   Members of the jury, I've allowed

14  Mr. Bundy -- as I've previously explained to you -- to testify

15  about his understanding of the law.   And I'm going to overrule

16  this objection, consistent with that understanding.

17             You must take it for the bearing you find as you

18  weigh the evidence at the end of the case with respect to his

19  state of mind, but he is not stating the law.

20             This is here before you for your consideration of the

21  issues of his state of mind relative to the crime charged

22  against him -- crimes charged against him.

23             The objection is overruled.

24             Go ahead.

25             MR. MUMFORD:   Thank you, your Honor.

A. Bundy - D - By Mr. Mumford                    134

1       Your Honor, given that objection and given that

2   instruction, can I have Mr. Bundy read the Constitution?  He's

3   got one there in his pocket.  Just that Clause 17.  That's --

4   that's the only one.

5       MR. KNIGHT:  Your Honor, I'm going to object to that

6   request.

7       THE COURT:  That objection is sustained.

8       He's -- he's testified about his understanding about

9   that part of the Constitution.  Please take that testimony now

10  to where we were and why he was doing what he was doing.

11  BY MR. MUMFORD:

12  Q.  What did this -- what did this issue have to do with the

13  other aims and objectives in Harney County at that -- at

14  that -- at that time?

15  A.  This issue is the issue.  This is the reason why we

16  believed the Hammonds were being abused.  This is the reason

17  why we went into the refuge and did what we did.  This is the

18  reason why we stood at -- at the Bundy Ranch.  This is the

19  problem.  This is the -- the reason.  And so to minimize this

20  as something that has nothing to do with this case is

21  completely out of balance.

22      This is the case.  This is the reason why we did what

23  we did.  And I'm not alone in this.  It's not like I'm some

24  person out in the middle of the ocean --

25      THE COURT:  Excuse me, Mr. Bundy, you're free to talk

A. Bundy - D - By Mr. Mumford

135

1   about your state of mind.  Please don't go beyond that.

2              THE WITNESS:  Your Honor, may I respond to that,

3   please?

4              THE COURT:  Just please -- no, you may not.

5              Mr. Mumford, ask a question that talks about his

6   state of mind and not the state of mind of others.  Let's move

7   on.

8   BY MR. MUMFORD:

9   Q.  Okay.  Is this -- and you had given seminars and

10  presentations to others on -- on this issue?

11  A.  Yeah, and -- and I had -- there has been a tremendous

12  amount of research and information and -- from myself and many,

13  many others.

14             There's -- this is not something that is my idea.

15  And -- and it's something that needs to be answered and it

16  hasn't been.

17  Q.  And did you give a similar presentations on this issue at

18  the refuge during the occupation, then?

19  A.  Absolutely.

20  Q.  As -- as part of your standard -- it was better to say you

21  have a standard presentation, then?

22  A.  Yeah, I would say that's fair.  Absolutely.

23  Q.  And as part of that standard presentation, you cover

24  three -- three -- three methods?  Or how do you believe and

25  understand property rights can be established?

A. Bundy - D - By Mr. Mumford

1  A.  Established?  But, actually, you're probably talking about

2  transfer.  Because there's only two ways they can be

3  established.  There's three ways that they are transferred to

4  somebody else.

5  Q.  Can you just briefly explain your understanding there.

6  A.  Yeah.  So my understanding is once a property right has

7  been established -- and that is through like homesteading,

8  prior appropriation, beneficial use -- then they can be

9  transferred to somebody through trade.  So someone can sell it

10  or trade for it or barter for it.  Right?

11          They can be transferred to somebody by them -- as a

12  gift or as an inheritance.  And the third is they can be

13  transferred to somebody through what's called adverse

14  possession.  A legal method to be transferred.  What's called

15  adverse possession.

16  Q.  Showing you what -- what was marked in the Government's

17  case as Government Exhibit 116, page 4.

18          MR. MUMFORD:  This has been received into evidence

19  here, your Honor.

20          THE COURT:  Thank you.

21  BY MR. MUMFORD:

22  Q.  Can we -- you remember this was the photo of -- of -- of

23  Linda Beck's office, taken after the Government had gone

24  through it and stuff.  Right?  I want to zoom in on that white

25  board, please.

A. Bundy - D - By Mr. Mumford

1    How does -- what does this show in respect to your --

2  the presentation that -- that we're talking about?

3  A.  Well, if you look at the top here, it talks about -- this

4  is a -- us listing how rights are established.  This is here,

5  how they're transferred.

6    And that's where you see traded, bartered, sold.  And

7  then the second is gift or inheritance.  And the third would be

8  taken.  And then adverse possession is right there.  So --

9    MR. MUMFORD:  I'm going to go back in and ask -- ask

10  Ms. -- Mr. Breton here to pull that back out a little bit

11  better.  Almost --

12    THE WITNESS:  Yeah, it's hard to see.

13    (Pause.)

14  BY MR. MUMFORD:

15  Q.  Okay.  Is that better?

16  A.  Yeah.

17  Q.  So -- so you -- part of the presentation, then, it's --

18  you -- it's -- you -- you teach or instruct that property

19  rights can be -- you know, sale -- sold, traded, gifted, or

20  taken.

21    I want to focus on -- on part of the take method

22  there, if I can.

23    Do you regularly discuss in this -- in this

24  presentation a concept called adverse possession?

25  A.  Absolutely.  Every time.

A. Bundy - D - By Mr. Mumford

1   Q.   And is adverse possession something that you discussed

2   while at the refuge with -- and gave presentations on?

3   A.   Yes, every time we gave a presentation.

4   Q.   What -- what do you understand to be the concept of adverse

5   possession and -- and -- and how did you explain it to others

6   then?

7   A.   So my understanding of adverse possession is -- is a legal

8   way in which someone that has title disputes can go in and

9   actually possess the property.   And as long as they can

10  maintain it long enough and follow the legal laws with the

11  state or the federal government over a period of time, they can

12  quiet title.

13  Q.   Explain what you mean by "quiet title."

14  A.   They can actually have title transferred over to -- to

15  them, and -- and it becomes their property.

16  Q.   Have you ever heard this referred to as the legal way to

17  possibly steal property?

18  A.   It's called adverse possession for a reason.

19  Q.   And the first -- you said "go in" and -- and then you said

20  hold it and then perfect it.   Right?

21  A.   That's correct.

22  Q.   What do you understand the concept of going in and

23  establishing a claim of adverse possession in the first

24  instance to entail?

25  A.   Well, you have to go in and you have to take it over and

A. Bundy - D - By Mr. Mumford

1    show your presence.  You can't do it covertly.  You have to be

2    open about it.  You have to go in and show your presence and

3    actually show that you're -- your intent, your intent to take

4    the property.

5    Q.  And you understand the laws of the state of Oregon protect

6    this?

7    A.  Absolutely.  If you do this in the state of Oregon seven

8    years, is all -- you have to maintain that adverse possession

9    for seven years and then that becomes -- you can quiet title

10   or -- or perfect title on it as well; is another way to be

11   said.

12          In Nevada, it's -- in Nevada, it's five years.  And

13   with the federal government, it's 20 years.

14   Q.  So -- and is there a -- do you understand there's a way for

15   the -- let's -- for the proper owner to -- to resist a claim of

16   adverse possession, then?

17   A.  Yeah.  If the -- if the titled owner -- because, remember,

18   it's usually done under dispute, meaning there is a dispute

19   over whose property it is.

20          So if there's -- if there is a title -- because

21   there's not always a title on a property.  If there is a title,

22   that titled owner can dispute this adverse possession by going

23   to legal -- the legal authority and filing a trespass.

24          And then if the legal -- if the court sees that --

25   deems fit, then there will be an eviction notice that will be

A. Bundy - D - By Mr. Mumford

1   issued, and they'll be served with an eviction notice.

2   Q.  Did this -- did this concept of adverse possession come up

3   in the January 2nd meeting?

4   A.  Yes, it did.

5   Q.  So let's go back to that, if we can.

6           How many -- how many people are at this January 2nd

7   meeting at ye old tavern in Burns?

8   A.  Ye Old Castle.

9   Q.  Castle, sorry.

10  A.  I figured -- I estimated -- we never got a full -- a solid

11  count, but I thought it was right around 30 people.

12          Now, I've heard witnesses say it was less, others

13  that have said it was more.  But my -- I believe there was

14  right around 30 people.

15  Q.  Do you have -- do you have a recollection of everyone who

16  was there?

17  A.  No, I don't.

18  Q.  Do you have a recollection of some who were there?

19  A.  Yes.

20  Q.  Who?

21  A.  I want to get it right.

22  Q.  As best you can -- best you can.

23  A.  I don't want to -- I don't want to say Jason Patrick was

24  there, but I think he was there.  But, anyway, my brother was

25  there, I know.  LaVoy Finicum was there.  Brian Cavalier was

A. Bundy - D - By Mr. Mumford

1   there.  Cliff Gardner was there.  His wife was there.  I know

2   my good friend that I grew up, her -- her -- a couple of her

3   family was there.  Rosella Teerlink (phonetic), Kaleb Teerlink.

4           I hope I'm not making a list for the Government's

5   next Indictment.

6           (Audience laughter.)

7           THE COURT:  All right.  Everybody be quiet, please.

8           Mr. Bundy --

9           THE WITNESS:  I'm sorry, your Honor.

10          THE COURT:  -- this is serious enough.

11          THE WITNESS:  I know it is serious, and I am

12   concerned about that.

13          THE COURT:  Then stop with the extra comments.

14          Your testimony may continue.

15          THE WITNESS:  Well, that -- I'm sorry.  That's what

16   happens.

17          THE COURT:  Jurors, disregard this interchange with

18   Mr. Bundy.

19          Continue your answer or let Mr. Mumford know you need

20   a new question.

21          THE WITNESS:  Okay.  I do apologize, your Honor.

22          Jon Ritzheimer was there.  Ryan Payne was there.

23   There was a sheriff's deputy there.  And I didn't know his name

24   at the time.  But I believe his -- his name now is McLain.

25   Officer McLain or Deputy McLain.


A. Bundy - D - By Mr. Mumford

1   BY MR. MUMFORD:

2   Q.  And in fact Deputy McLain has testified in this trial.

3   Right?

4   A.  He has.

5   Q.  Do you recall when you saw him take the stand, what you

6   told me?

7   A.  Yeah, I do recall that.

8           MR. KNIGHT:  Your Honor, that's an improper question.

9           THE COURT:  Hold on.  What's the basis?

10          MR. KNIGHT:  Object to the form of the question and

11  hearsay.  He's asking --

12          THE COURT:  The objection is sustained.

13          If the witness had an impression, he can testify to

14  his impression, not his communication to counsel.

15  BY MR. MUMFORD:

16  Q.  What was your impression when you saw him?

17  A.  I said, That's the man that was at the meeting.

18  Q.  Meaning that was the sheriff --

19  A.  January 2nd, that was the sheriff's deputy that was at the

20  meeting.

21  Q.  The sheriff -- the Harney County sheriff's deputy that was

22  at the January 2nd meeting?

23  A.  That is correct.

24  Q.  You went into this meeting expecting to explain your

25  proposal.  Right?

A. Bundy - D - By Mr. Mumford

1   A.   That's correct.

2   Q.   How did it go?

3   A.   It started off we were kind of more just chitchat talking,

4   you know.  I think the cafe employees there brought us some

5   coffee, and stuff.  And so everybody was kind of talking, and

6   so forth.

7            Then we started the meeting.  I -- I do believe that

8   we -- we started the meeting with a prayer.  And then there was

9   some conversation -- and I don't really remember a lot of it.

10           Some people talked, spoke, and just kind of -- get

11  some foundation on what we were doing and what was going on.

12  But it was more like just conversation.

13           And then, eventually, I was able to speak.  And I

14  began to speak to them -- or talk to them, I guess.  I did

15  stand up and talk to them.

16  Q.   Now, what -- what -- just -- can you summarize for us what

17  you told them?

18  A.   I explained to them a lot of what was in that -- almost

19  exactly what was in that video that we watched.  And I know the

20  jury didn't see the first part of it.  But explained how --

21  again, why I -- why I felt I was supposed to get involved.  And

22  how -- how, actually, I was reluctant to get involved, at

23  first.  Very reluctant.

24           And then -- and how it went from there.  I explained

25  to them how I felt that this urge, this desire -- and couldn't

A. Bundy - D - By Mr. Mumford

1  really explain why.  But I knew that I was supposed to do

2  something.  I was supposed to do something for the Hammonds.

3  And -- and I explained what had happened and what had gone on.

4  Just basically went through that.

5          And then I got to the point where explaining how we

6  tried to get the sheriffs and everybody -- elected

7  representatives to respond to us and how they've not.  And a

8  lot of this -- you know, they already knew.  They understood.

9  They shared the -- they shared the frustration with me.

10         And then I told them what I felt we should do.

11  Q.  And what was -- what was the response?  Without -- without

12  getting into the specifics of it, what -- what was the

13  response?

14  A.  Well, I want to make it clear that at that time I proposed

15  to them that we go to the refuge and that we basically take

16  possession of it and get these lands back to the people.

17         And -- I mean, I want to be clear about that.  I

18  proposed that to them.  Everybody in that room.

19  Q.  And you talked about this sheriff's deputy.  You understood

20  he was a sheriff's deputy at the time the meeting was ongoing.

21  Right?

22  A.  Absolutely.

23  Q.  You just didn't know his name?

24  A.  I didn't know his name.  I had never met him before.  I had

25  seen him before.  And there was others that knew him better

A. Bundy - D - By Mr. Mumford

1    than I did, in the room.

2    Q.  And -- and -- and so was -- was -- was he -- was he wearing

3    anything that -- you know, that would indicate that he was a

4    sheriff's deputy?  Or you just knew that from seeing him

5    before?

6    A.  He -- I don't know if he had a uniform, or not.  But he had

7    a Carhartt coveralls with him, with a Carhartt jacket.

8          And then later, I -- I saw him in the parking lot and

9    he had his radio.  But it -- there was no -- there was no doubt

10   who he was.  I mean, it was open.  We openly said the sheriff's

11   deputy is right here.  We openly said that in the meeting.  And

12   he didn't -- I mean, he didn't -- he just sat there.

13   Q.  Did you know you were proposing an illegal conspiracy at

14   the time?

15   A.  We weren't.  We never have.

16   Q.  And you -- your basis for saying that?

17   A.  Because we were following the law, both constitutionally

18   and through adverse possession with our actions.  And -- and we

19   did it in the open.  We did not hide what we were doing.  We

20   were not ashamed of what we did.  And we -- I still believe

21   today, very strongly, that what we did was the right thing.

22   And it was legal.  Completely legal.

23          MR. KNIGHT:  Your Honor, I'm going to object at that

24   point and ask for at least an instruction to the jury regarding

25   the law and the state of mind of the defendant.

A. Bundy - D - By Mr. Mumford

1      There's been a lot of discussion and testimony about

2  what he believes and what is legal and what is not.

3      THE COURT:  The jurors know from my previous

4  descriptions that the statements of the law applicable to the

5  case come from the Court, not from the witness stand.

6      Mr. Bundy's entitled to express to you his opinions

7  as they affected his state of mind.  His statement just now

8  that the actions were legal is not a statement of law.  It has

9  no effect, and you cannot consider it in that context.

10      You may consider his statements only for their

11  bearing on his state of mind with respect to what he was

12  attempting to do and in the context of all of the evidence at

13  the end of the case.

14      The objection is sustained.

15      MR. MUMFORD:  And with that instruction, your Honor,

16  is not attempting to suggest to the jury that Mr. Bundy's view

17  of the law is in error.  Is that correct?

18      THE COURT:  We're not going to take this up in the

19  jury's presence, Mr. Mumford.  Take a seat.

20      MR. MUMFORD:  Well, that's --

21      THE COURT:  Take a seat.

22      If you want me to make a ruling now, without you

23  having an opportunity to make a record, I will.  But I'm not

24  going to do it.

25      You take a seat.  Ask your questions.

A. Bundy - D - By Mr. Mumford

1          Jurors, the ruling stands.

2          Mr. Bundy's statements about whether it is legal or

3   not are his opinion.  You may consider them as such.

4          Move -- counsel, move on.

5          MR. MUMFORD:  The Government --

6          THE COURT:  Counsel, move on now.  Move on.

7          If you want to take this up later, you may.

8          MR. MUMFORD:  They don't tell us what the law is.

9   That's my point.

10          THE COURT:  Mr. Mumford, I've told the jury now three

11   times this point:  Mr. Knight's objection is sustained.

12          Mr. Bundy's entitled to his opinion for purposes of

13   state of mind relevant to the charge against him, not for any

14   other purpose.

15          MR. MUMFORD:  I would ask that the -- that the --

16   that the Court instruct the Government to limit their comments

17   in -- in -- in -- in -- on this issue during Mr. Bundy's

18   testimony in --

19          THE COURT:  I'm not going to make any more

20   instructions.

21          If an objection or a question is objectionable as to

22   form, then counsel may so state their position and I'll make a

23   ruling.

24          Please proceed.

25   BY MR. MUMFORD:

A. Bundy - D - By Mr. Mumford                     148

1   Q.  You -- you -- you proposed this idea.  It was received.

2   A.  Yes, it was.

3   Q.  Did everyone -- did everyone stand up and say, Yeah, let's

4   do it?

5   A.  No, not at all.

6   Q.  Were there some that walked away at that point?

7   A.  Yeah, the majority -- in my -- from what I -- again, I

8   didn't take count or numbers.  But the majority of the room

9   seemed to be the majority.  And it was just -- I would say the

10  room was about split.  So on -- on whether that was something

11  that we should pursue to do or not.

12  Q.  And so those who -- who -- who -- who agreed with you to do

13  it, what -- what did you do next?

14  A.  Well, I didn't -- it didn't happen -- basically, what

15  happened was -- is my brother stood up, and he also agreed that

16  that's what we should do.  And this was the first time he had

17  heard about it.

18  Q.  In fact, how soon -- how -- how soon before had Mr. Ryan

19  Bundy even come to Burns?

20  A.  He just -- he met me in the -- him and LaVoy Finicum, and

21  others, came in the same vehicle, and they met me in the

22  fairground parking lot.  And that was the first time they had

23  been to Burns or -- or just to come --

24  Q.  Just a few hours before?  Or an hour or two before?

25  A.  Yeah.  Not even an hour, probably.

A. Bundy - D - By Mr. Mumford                    149

1   Q.  And then -- so -- so you said Mr. Ryan Bundy agreed with

2   you.  Anyone else?

3   A.  Yeah.  LaVoy Finicum stood up, and he shared his experience

4   about his ranch and -- in Arizona, and also sustained that

5   action as well.

6   Q.  How -- how was it -- how was it decided to execute this --

7   this -- this -- is it fair to call it a plan at that point,

8   then?

9   A.  Yeah.  I mean, it was -- it was very -- I guess, maybe

10  informal and organized.  I don't know want you want to call it.

11  But we just decided to go up there.

12          But we knew there was a lot of people that come to

13  the rally that might want to continue the protest up there as

14  well.

15          So the plan was, at that point, that those who were

16  in the meeting would go up there.  And then I would stay, go to

17  the rally.  And then, afterwards, I would inform everybody that

18  we were going to go continue the protest at -- at the refuge,

19  which was about -- well, as we know, it's about 35 miles out of

20  town.

21  Q.  Was -- was there any discussion as to how you would go

22  about staking the claim, so to speak?

23  A.  In the meeting?

24  Q.  Yeah.

25  A.  Well, I mean, other than just versus going in there and

A. Bundy - D - By Mr. Mumford

1  occupying it, that was basically the first part of what we

2  talked about.  And it wasn't a lot of discussion of how we were

3  going to do that or even much further than that at all.

4  Q.  Now, can -- can you -- just -- just so we have your

5  complete testimony here, to the best of your recollection, can

6  you share with the jury what you said to those who -- who --

7  who ended up occupying and -- at that meeting, and what the --

8  the substance of what you pro -- proposed at that time.

9  A.  Could you rephrase the question?  I want to make sure I

10  understood it right.

11  Q.  Just so we have your complete testimony on what was -- what

12  did you share and what was -- what did you propose?

13  A.  Well, I shared that we had been ignored.  And I shared that

14  when -- whenever something really important has happened, there

15  had to be some -- a hard stand.  I think I used that term.

16  There had to be a hard stand.

17          I mean, when Martin Luther King stood, he had to make

18  a hard stand.  When -- any time something significant has been

19  changed in this country, it's because somebody made a hard

20  stand and said enough is enough and brought enough attention to

21  it that -- that people would start to look and start to ask and

22  start to get involved.  And the momentum would start to

23  continue until the change happened.

24          And I expressed to them that that is what we have to

25  create.  Otherwise, we're going to go to a rally, as good as it

A. Bundy - D - By Mr. Mumford

151

1   was.  And they were all going to go home, and the Hammonds were

2   going to be completely forgot about.  And the next family down

3   the street, or down the road, or the next ranch was just going

4   to experience the exact same thing; or whatever it was.

5           We had to make -- or whoever it was, I should say.

6           We had to make a stand.  And get enough attention and

7   make the stand correctly and make it peacefully, to get -- to

8   get that attention.

9   Q.  You used the word -- you know, in referring to the people

10  at the parade, who -- who you hoped would join you, continue

11  the protest.

12          Are you aware of any other circumstances where

13  protesters occupied a -- a federal wildlife refuge?

14  A.  I am.  Absolutely.

15  Q.  What are those that you are aware of at the time?

16          MR. KNIGHT:  Your Honor, I object to the relevance of

17  this.

18          THE COURT:  What is the purpose for which this is

19  offered, Counsel?

20          MR. MUMFORD:  It's to show -- to show, your Honor,

21  the defendant's state of mind and understanding and corroborate

22  his -- his -- his testimony.

23          THE COURT:  You need to establish when he had this

24  knowledge and lay a foundation.  Then I'll consider the

25  objection again, if counsel wishes.

A. Bundy - D - By Mr. Mumford

1  BY MR. MUMFORD:

2  Q.  Did you have this knowledge, regarding this other -- other

3  instance, at the -- going into the January 2nd meeting?

4  A.  I did not.

5          THE COURT:  The objection is sustained.

6  BY MR. MUMFORD:

7  Q.  What -- was there a time that you came to understand it?

8  A.  Yes, there was.

9  Q.  When was that?

10  A.  It actually wasn't until I was arrested.

11          THE COURT:  The objection is sustained.

12          Don't go there.  Move on.

13  BY MR. MUMFORD:

14  Q.  Perhaps -- perhaps coming to -- to one of my most important

15  questions.

16          What -- can you explain to the jury what you hoped to

17  accomplish?  What was your ultimate objective in -- in

18  proposing, at this meeting, that -- the occupation of the

19  refuge?

20  A.  Could you restate the question?  I'm sorry.

21  Q.  Yeah.

22          What did you hope to accomplish by proposing and

23  deciding to occupy the refuge?

24  A.  I hoped to get a -- a mass amount of media attention to

25  what happened to the Hammonds, first.

153

A. Bundy - D - By Mr. Mumford

1              And then what was happening to other people in Harney

2    County and across the western United States with these federal

3    land issues, second.

4              And then I had planned on using adverse possession to

5    take possession of the -- of the refuge and transfer title over

6    to the people of Harney County, so that they can begin using

7    the land and resources the way that I believe the Constitution

8    charters our federal government and the states.

9    Q.   Did you hope or expect any personal gain?

10   A.   No.

11   Q.   Was -- was any part of -- of your agenda or objective

12   intentionally focused on the refuge employees or preventing

13   them from completing their duties by force, intimidation?

14   A.   No.  And that's been extremely frustrating to all of us

15   that are involved in this.  Because this is so much bigger than

16   just even me, even any of the defendants.  It's so much bigger

17   than -- than the employees of the refuge or the BLM employees.

18   This is an issue that is -- has caused, for many decades, a

19   tremendous amount of people to lose their homes, their

20   livelihoods.  This is so much bigger than just the refuge

21   itself.

22   Q.   Were you ever charged with criminal trespass for doing what

23   you did?

24   A.   No.

25   Q.   Were you ever charged with vandalism?

A. Bundy - D - By Mr. Mumford

1          MR. KNIGHT:  Your Honor, I object to the relevance of

2   this line of questioning.

3          THE COURT:  The objection is sustained.  It's

4   argumentative.

5          Please move on.

6          THE WITNESS:  Can I state my intent on that?

7          THE COURT:  No, sir.  You need to wait for a

8   question.

9          THE WITNESS:  Thank you.

10  BY MR. MUMFORD:

11  Q.  Mr. Bundy --

12         MR. MUMFORD:  Hold on for a second here, your Honor.

13         Sorry.

14         (Pause, referring.)

15  BY MR. MUMFORD:

16  Q.  You -- you -- what -- there was a -- you'll recall a few

17  days ago -- several days ago, last week, there was that call

18  with the FBI negotiator.  Do you recall that?

19  A.  Yes.

20  Q.  I believe -- you know -- and I'm not going to quote it.

21  But I believe there's something on that call when you talked

22  about if you left the refuge at that point, they would -- the

23  federal employees would return and enslave the people, or

24  something like that.  Right?

25  A.  Yeah, something like that.

A. Bundy - D - By Mr. Mumford

1  Q.  So explain -- explain to me how can you say that and say at

2  the same time that you didn't -- that it was no part of your

3  objective to intentionally focus on preventing the refuge

4  employees from performing their duties with -- through fear,

5  threat, or intimidation?

6  A.  I'm going to have to have you rephrase that one.

7  Q.  Okay.  I'm -- I'm asking you --

8  A.  I want to make sure I'm clear.

9  Q.  Thanks.

10        I'm asking you, sir, to explain to the jury how can

11  you say you -- that you did what you did to keep the federal

12  employees from enslaving the people and, at the same time, tell

13  this jury that you had no intent to -- to intentionally prevent

14  federal employees from performing their duties by fear, threat,

15  or intimidation?

16  A.  I have -- especially since I've been incarcerated, I have

17  heard and been told, many, many, many times --

18        THE COURT:  Excuse me, Mr. Bundy.

19        THE WITNESS:  This -- got to let me --

20        THE COURT:  Excuse me.

21        MR. KNIGHT:  Object on hearsay.

22        THE COURT:  This is not a question of what the

23  witness has been told since he's been incarcerated.

24        The question Mr. Mumford's asking has to do with a

25  statement the witness made to the FBI negotiator.  So he needs

156

A. Bundy - D - By Mr. Mumford

1  to explain that statement at that time, not based on things

2  that have happened since.

3          So, Mr. Mumford, please rephrase the question to

4  bring it to his state of mind in the context of that

5  explanation that you're asking -- or that statement that you're

6  asking him to explain.

7          MR. MUMFORD:  Thank you.

8  BY MR. MUMFORD:

9  Q.  You -- your testimony is that you did not intend -- at this

10  time or any point -- that -- to prevent federal employees from

11  doing their duties through fear, threat, or intimidation.  Is

12  that right?

13  A.  That's correct.

14  Q.  How -- how do you reconcile that with the statement to --

15  to FBI Agent Luh during the occupation where you told him, if

16  we leave, the federal employees will just keep -- come and

17  enslave the people?

18  A.  It wouldn't matter who it was.  It's not -- the problem is

19  not happening on the level of a refuge employee.  That's not

20  where the problem is.  So it doesn't matter who is on the level

21  of the refuge employee or the BLM employee level.  They're

22  not -- that's not where the problem is.

23          The problem is up above them, what's happening in

24  those decisions.  And they won't listen to us.  They won't

25  respect us.  They won't even consider that we have rights.

A. Bundy - D - By Mr. Mumford                    157

1           This has nothing to do with refuge employees and

2    their duties or BLM employees and their duties.  Nothing to do

3    with them.

4           In fact, in many cases, they're as much of a victim

5    as we are.  Their towns are also losing their economies and

6    their states are getting taken over as well.

7           MR. KNIGHT:  Excuse me.  I'm sorry to interrupt.  I'm

8    going to object that it's now unresponsive to the question,

9    asked three times, to explain the inconsistency in the call.

10          THE COURT:  The last part of the witness's statement

11   is stricken with respect to the perspectives of refuge

12   employees.

13          Ask another question, please.

14   BY MR. MUMFORD:

15   Q.  So is it your testimony that those statements of yours are

16   inconsistent or not?

17   A.  No, they're not inconsistent.

18   Q.  Why not?

19   A.  Be --

20          MR. KNIGHT:  Objection, asked and answered.

21          THE COURT:  Overruled.  He may explain.

22          THE WITNESS:  Because it is not on the employee level

23   where the problem is.

24   BY MR. MUMFORD:

25   Q.  Were any of your efforts in proposing to take the refuge on

A. Bundy - D - By Mr. Mumford

1    January 2nd directed to the employee level, as you -- as you've

2    explained it here today?

3    A.   Absolutely not.  On the --

4    Q.   Go ahead.

5    A.   They -- they have rights, just like we do.  This land is

6    theirs, just like it is ours.  And absolutely not.

7    Q.   What -- what happened -- what happened after this meeting?

8    A.   January 2nd?

9    Q.   Yeah.

10   A.   We separated, and I went over to the parking lot, the

11   Safeway, and the rest of them went to the refuge.

12   Q.   Do you have an understanding, as you sit here today, how

13   the others went to the refuge?

14   A.   I know they just -- they drove there.  I know there was --

15   because they weren't planning on it, there was, you know, a lot

16   of -- you know, I've got to go over here and get this.  And

17   some didn't have vehicles.  And some of them didn't even have

18   coats, or anything.  And so there was a lot of that and -- you

19   know, going on.  And I know it took them a couple of hours to

20   get there, or close to.

21   Q.   Did -- did anyone drive your -- your truck out there?

22   A.   Yes.

23   Q.   Who?

24   A.   I believe it was either my brother Mel or brother Ryan.

25   Q.   So you didn't leave with the first group to head out to

A. Bundy - D - By Mr. Mumford

1  the --

2  A.  No.

3  Q.  -- refuge?

4       At some point did you leave to go out there?

5  A.  Yeah.  I had -- after the rally.

6  Q.  So you went to the rally, then.  Right?

7  A.  Correct.

8  Q.  And is that where you made a statement at the rally,

9  encouraging people to go out to --

10  A.  Yeah, that was after the rally.  So we went up, you know,

11  and did what I explained earlier.  And went to the Hammonds,

12  and then come back around.  And then, you know, everybody was

13  kind of standing around.  And I stood up on a snowbank there.

14  And -- and I think there's a video of it.  I don't know if it's

15  been shown or not.  But -- and I just basically said, those

16  that want to continue to protest and make a hard stand, we're

17  going to the Malheur National Wildlife Refuge, and we're going

18  to make a hard stand.

19  Q.  At this point, as far as you know, did anyone, including

20  yourself, have any other agreement, goal, or objective for

21  occupying the refuge besides -- besides what you have stated

22  here -- here today?

23  A.  No.

24  Q.  Do you remember later that night, on January 2nd, making

25  statements to a reporter at the refuge?

A. Bundy - D - By Mr. Mumford

1  A.  Yeah, I -- I mean, I talked to a lot of reporters.  But I

2  do remember that, yes.

3  Q.  And you spoke openly about your motivations and what

4  your -- your plan was?

5  A.  Yes.  Everything we did was out in the open.

6          MR. MUMFORD:  Your Honor, I would move to -- I would

7  like to show the witness and move into evidence 1175.

8          THE COURT:  Subject to the previous discussion, you

9  may proceed.

10          MR. MUMFORD:  Yes.

11          (Pause, Mr. Mumford and Mr. Knight conferring.)

12          MR. MUMFORD:  So, your Honor, can I play it for --

13          THE COURT:  Yes.  I said you may proceed.

14          MR. MUMFORD:  Thank you.

15          (Video playing with sound.)

16          (Video stopped.)

17  BY MR. MUMFORD:

18  Q.  That individual speaking at the end, who was that?

19  A.  LaVoy Finicum.

20  Q.  Your statement started with the concept of using land as

21  free men.  What were you getting at?

22  A.  I'm getting at the very core of the issue.  People being

23  able to use the land and the resources under local control

24  where, first, they can use it for the intended purposes, for

25  the benefit of the people -- of the local people.  But then if

1   there's an issue that arises where -- say an environmental

2   issue or something happens where something needs to be worked

3   out, it's done among the local people who understand the

4   customs and cultures of those people, who understand the land,

5   who understand the -- the -- the -- the -- who understand the

6   people.

7           And -- and that's what I mean by that.  The land and

8   the resources being free to the people under local control.

9   Where if they have an issue, they can go to the -- and vote a

10  county representative out, vote even a state representative

11  out.  But there is no way, right now, that they -- they have

12  any type of say of what goes on in their own backyards.  None.

13  And that's what I mean.

14  Q.  You mentioned, in this -- this video a desire -- an intent

15  to do something with unconstitutional land transactions.

16          Again, without getting into it too far, just explain

17  briefly, what do you mean by those -- when you refer to undoing

18  the unconstitutional land transactions?

19  A.  Well, I hesitate saying this.  But there's no dispute, I

20  believe that at one time the refuge was private property.

21  Meaning, it was private and -- to the people's hands.

22          And then over a period of time -- now it's primarily

23  owned -- well, the refuge is all owned by the U.S. Government,

24  and it's the jewel of Harney County.

25          It's what -- it was the heartbeat.  It's what

162

A. Bundy - D - By Mr. Mumford

1  provided their economy.  If you look at the -- if you look at

2  the Harney County seal -- I wish we still had the sign in here.

3  It has a bull, a cow on one side.  And it has trees, forests on

4  the other side.  Because that is what drove their economy.  The

5  forestry industry and the ranching industry.  And the refuge

6  was a huge part of that.  And when they lost that, it -- it

7  destroyed their economy and it's never recovered.

8          And so I guess what I'm saying is we have to take and

9  go back and say, Look, where did it go wrong?

10          And where it went wrong, in my belief -- according to

11  the Constitution -- is when it was transferred

12  unconstitutionally, in my belief, from the -- or from private

13  property to the federal government.  Because our charter, in my

14  belief, doesn't allow that to happen.

15  Q.  When you say our charter --

16  A.  It's -- I'm sorry.

17  Q.  Go ahead.

18  A.  And I say the reason it doesn't allow it to happen is

19  because, in my belief, the founders understood that if it was

20  allowed for an entity like the federal government to go into a

21  county or into a city, or anything, and with all of the

22  resources of the people, take and buy it all up, it would

23  destroy the people.  They have to have the land and the

24  resources.

25          MR. KNIGHT:  Your Honor, I'm going to object at this

A. Bundy - D - By Mr. Mumford

1   stage.  This is now highly cumulative and irrelevant.

2          THE COURT:  Well, we've leave it at that.

3          Ask another question.

4   BY MR. MUMFORD:

5   Q.  There's a mention in this video about guns.  Were you --

6   were you wearing a gun at the time?

7   A.  No, I wasn't.

8   Q.  Do you recall -- do you recall ever wearing a gun during

9   the occupation?

10  A.  No.

11  Q.  Why not?

12  A.  I didn't need to.

13  Q.  Did others at the refuge wear guns?

14  A.  Yes, absolutely.

15  Q.  Did they hold them?

16  A.  Yes.

17  Q.  They carry them around?

18  A.  Absolutely.

19  Q.  To your knowledge, what -- what did they do with them?

20  A.  They carried them around.

21  Q.  Do you have any -- did you have any -- any understanding as

22  to anyone using a gun to threaten somebody or point at somebody

23  or shoot somebody?

24  A.  Absolutely not, and it would not have been tolerated.  If

25  anything like that would have happened, they would have been

A. Bundy - D - By Mr. Mumford

1  asked to leave.

2  Q.  How can you say that for sure?

3  A.  Well, I guess I can't because it did not happen.  But

4  that's -- I would have asked them to leave.

5  Q.  Did you -- I -- I think we've seen video of the next day,

6  where you're asking people to come.  And to -- and I think --

7  the statement you make is to bring your guns.  Right?

8  A.  Correct.

9  Q.  Why did you say that?

10  A.  So I might explain the whole gun thing.

11  Q.  What are you talking about?  What do you mean by "the whole

12  gun thing"?

13  A.  Well, I had a -- we -- I'll just say I had a very

14  interesting experience, to say the least, at the Bundy Ranch.

15  Q.  You mean in 2014?

16  A.  Correct.  And when we tried to peacefully protest -- and

17  they're literally shooting our cattle, and we're peacefully

18  protesting with signs on public property.  And then they began

19  to take aggressive -- in my opinion, extreme aggressive action

20  against us for doing this.  And they physically beat us up.

21      And I began to understand that the only way that we

22  were going to be able to get this message out is if they

23  respected us a little bit.

24      And -- and, honestly, I believed that if -- if -- I

25  still believe, to this day, if we would have just gone in there

A. Bundy - D - By Mr. Mumford

1    and protested without our Second Amendment rights, without

2    bearing arms, they would have brought their paddy wagons in and

3    zip-tied us up with zip-tie handcuffs and hauled us off.  And

4    we would never have been able to tell people why we were there.

5    We never would have got the media attention that we got.  We

6    never would have been able to say what was going on and what

7    happened to the Hammonds.  And we never would have been able to

8    communicate this problem with the western lands and the

9    federal -- federal government.

10   Q.  You mentioned the Second Amendment.

11        How did you see what -- what you and -- and your

12   supporters did at the refuge as an exercise of the Second

13   Amendment?

14   A.  Well, the Second Amendment says that we have the right to

15   bear arms.  And that it shall not be infringed.  And we also --

16   the First Amendment states that we have a right to assemble, we

17   have the right to speech, the right to the media.  We have a

18   right to redress grievances to our government.

19        And we felt, under this circumstance, that there was

20   no way that they were going to express our -- they were --

21   there was no way that the FBI and the federal government was

22   going to allow us to express our First Amendment rights to

23   speech, to assemble, to media, to redress grievance -- or to

24   grievance our government.  That there was no way that we were

25   going to be able to do that unless we expressed our Second

A. Bundy - D - By Mr. Mumford

1    Amendment right, the right to bear arms.

2    Q.  From your -- during the occupation from January 2nd through

3    to the day you were arrested on January 26, how -- how many

4    people would you say -- would you estimate came to the refuge?

5    A.  I would -- I would say, you know, probably a little over a

6    thousand people.

7    Q.  What -- what -- what kind of people came?  Would you -- can

8    you characterize that?

9    A.  Yeah.  All kinds.  Families, ministers, the local people,

10   including families and ministers.  People from out of state.

11   People from out of the county.  Media.  Protesters against us.

12   People that were worried about their -- feeding the birds.

13   People that wanted to know if they were going to be able to

14   have their bird-watching events.  People that were highly

15   concerned about the environment, ranchers, all groups of

16   people.  Old, young, children.  All kinds of people.

17   Q.  Did -- did families come?

18   A.  Absolutely.

19   Q.  Did -- did political -- or elected officials come?

20   A.  Absolutely.

21   Q.  Do you recall from -- from where?

22   A.  From -- from Oregon, from Washington state, from Idaho,

23   from Nevada, from Utah.  I know for sure those states.

24   Q.  What -- do you recall what they did when they arrived?

25   Excuse me.  Can you recall what they did when they arrived

A. Bundy - D - By Mr. Mumford

1  there?

2  A.  It seemed like most of them were, first, very interested on

3  what was going on.  Like -- and because of the media, what was

4  happening.  And so they would mostly just start asking

5  questions, look around.  And, you know, try to get themselves

6  oriented with what was happening.

7  Q.  What did you tell them about what you were doing there?

8  A.  Well, if they were interested and wanted to learn more,

9  then we usually asked them to join one of our presentations.

10  And that's when we gave the presentation that you saw the white

11  board on.

12        And that presentation fully explained what we were

13  doing there and why we were doing it and why we felt it was

14  right and just -- and we were justified to -- to be there and

15  to do it.

16  Q.  Did you -- did you get an understanding as to -- as to what

17  their -- what they did in -- in response, at all?

18  A.  Well, I know a lot of them went back to their communities

19  and began to articulate what we presented.  And I know that

20  because many of them organized community meetings in their

21  communities and scheduled with us to give that same

22  presentation.

23        And we did some of that by Skype.  But then we also

24  scheduled actual physical meetings with some of the people

25  in -- in, you know, the closer-by areas, closer counties, and

A. Bundy - D - By Mr. Mumford

1    so forth.

2    Q.  Were you in -- were you in touch with any, you know,

3    federal elected officials while were you there?

4    A.  Yeah.  So at the -- I think it was just a few days after we

5    were in there and we were getting a lot of media attention,

6    representative Greg Walden -- which is a congressmen -- a U.S.

7    congressmen that represents Oregon and Harney County -- he gave

8    a speech on the Congress floor.

9            And he -- in reference to what we were there for.

10   And we were also in contact with his office after that.

11           MR. MUMFORD:  Can we -- can we show the witness just

12   a screenshot, if we can, of Exhibit 1191, please.  And to the

13   jury, too.

14   BY MR. MUMFORD:

15   Q.  This was the -- this was the talk, then, that you --

16   A.  Yeah, this is it.

17   Q.  And, now, in this talk, did you -- did you -- you found out

18   about this talk after the fact?

19   A.  That's correct.

20   Q.  How long after the fact?

21   A.  I think it was probably the same day.  It was just -- I

22   didn't watch it as he gave it.

23           I don't even know if we could watch it as he give it,

24   but I didn't watch it as he gave it.

25   Q.  And do you have an understanding of what date this would

A. Bundy - D - By Mr. Mumford

1  have been on the floor of the house?

2  A.  I want to say the 5th, but I'm not exactly sure.

3  Q.  Okay.  So somewhere -- one of the first several days that

4  you were there.  Right?

5  A.  Yeah.

6  Q.  And did -- did Mr. Walden ever say he agreed with what you

7  had done?

8  A.  No, he didn't.

9  Q.  Did you have an understanding that he -- but did you have

10  an understanding of what -- what he said regarding what you

11  were trying to accomplish?

12  A.  Yes.  He made -- he articulated it very, very well.  He

13  understood the issue.  And, in fact, he was extremely

14  frustrated himself because he had made laws --

15          MR. KNIGHT:  Your Honor, I'm going to object now to

16  the characterization --

17          THE COURT:  The objection is sustained.  Stop there.

18  Disregard the last sentence.  You can get into the witness's

19  frustration but not the congressman's.

20          Go ahead.

21  BY MR. MUMFORD:

22  Q.  And, Mr. Bundy, did you view his -- Mr. Walden's comments

23  that day as supportive?

24  A.  I did, absolutely.

25  Q.  Why?

A. Bundy - D - By Mr. Mumford

1  A.  Because he was articulating, in my view, exactly how I

2  felt.  And being a representative -- U.S. representative,

3  standing on the Congress floor, I began to understand that what

4  we were doing was working.  That it was working.  They were

5  actually starting to listen.

6          And he's on -- he's on the -- he -- the floor,

7  articulating these -- these issues and these pains.  It was

8  working.

9  Q.  Did that encourage you to stay?

10  A.  Absolutely.

11  Q.  And how -- how -- how -- how many -- how much

12  communication -- how much communication would you say you had

13  had with Congressman Walden, or other elected officials'

14  office, while were you at the refuge in January 2016?

15  A.  Are you talking about state -- all of that --

16  representatives?  Or just --

17  Q.  Let's take them separately.  Federal?

18  A.  I would say -- I would say at least four conversations.  At

19  least four conversations.

20  Q.  And those were with Congressman Walden's office, then?

21  A.  That's correct.

22  Q.  How about with a state or local officials?

23  A.  I couldn't count those.  We had many.

24  Q.  Now, at some point at the refuge, did -- was the -- was --

25  was -- was the -- was the sign changed?

A. Bundy - D - By Mr. Mumford

1   A.   Yes.

2   Q.   Why?

3   A.   Because that was one of the requirements to begin to

4   implement adverse possession.

5   Q.   You say one of the requirements.

6           What are you referring to there?

7   A.   My understanding is you have to go in and make it known

8   what your intent is.

9           Make it known what your -- what you're planning on

10  doing.  And you need to take claim of it.  You have to show

11  that you're taking claim of it.

12          And we felt the best way to do that was to take the

13  front sign into the entrance of the refuge and to put a new --

14  put -- and claim it.  And we renamed the refuge as the Harney

15  County Resource Center.

16  Q.   Was there a discussion as to why that name?

17  A.   Absolutely.

18  Q.   Why?

19  A.   Well, we -- we -- one is we're in Harney County and this is

20  for the people.  It's a local -- it's the local people's.  We

21  were here to get the resources back into the people's hands.

22  And we felt that this facility, the -- these buildings, and so

23  forth, would make a wonderful place to encourage and to assist

24  the people in using, claiming, and even defending their rights

25  to the resources.  The -- to the land and resources.  And so

A. Bundy - D - By Mr. Mumford

1    that was our determination of -- to rename it.

2    Q.  Did -- did you take other -- because of how you approached

3    this from a mindset of, hey, we're going to go in and adversely

4    possess this refuge, did you take other steps to -- that you

5    understood were the legally required steps?

6    A.  Yeah, we did.

7    Q.  What were those?

8    A.  Well, the -- to control the egress and -- the egress of the

9    entrance.

10   Q.  And how did you did do that?

11   A.  We did that by taking a vehicle and putting it in the

12   entrance.  There was no gate.  Otherwise, we would have just

13   done it with the gate.  There was no gate there.  There was a

14   fence but not a gate.  So we did it that way.

15   Q.  Okay.  Well, what were -- what were some of the other

16   requirements that you understood there were in staking claim?

17   A.  And we had people there, at -- at the entrance, to

18   basically ask them why -- you know, what they were doing, and

19   let them in.

20          Also, we flew the American flag high.  We climbed up

21   on top of that large tower, fire tower, and we put up the

22   American flag, and flew it as high as we possibly could.

23          We also began to change the signage on the vehicles.

24          And anything pretty much that had the U.S. Government

25   emblems on it, we, through adverse possession -- again, the law

A. Bundy - D - By Mr. Mumford

1  requires that we take claim of it, and we began to do that.  We

2  also went and contacted the utility companies and expressed our

3  desire to transfer the utilities over into our name.

4          And -- and also we wanted to pay the bill, and made

5  sure that they understood that we were there and intended to

6  pay for those services.

7          And we also opened up a post office box and -- I

8  guess, address, I should say, to -- under our name, with --

9  under that address.

10          And these are all parts of taking claim of -- of --

11  of a -- of a land in an effort to distinguish title through --

12  or extinguish title through -- quiet title through adverse

13  possession.

14  Q.  Now, you know the federal -- the post office is a federal

15  post office.  Right?

16  A.  I do know that.

17  Q.  Why did you think you could go and open -- open up -- you

18  know, get mail there with the post office?

19  A.  We did.  We went and got mail back and forth.  They did

20  open up, you know, an address for us.  And they were very

21  friendly, and we were very friendly to them.  And the reason

22  for that is because that is one of the constituted authorities

23  that the people give the federal government to administrate.

24          So the Constitution allows the federal government to

25  have post offices.  And isn't it a wonderful, beautiful thing

A. Bundy - D - By Mr. Mumford

1   that we all enjoy is our post offices?  And that's one of the

2   things that -- that the people give the federal government the

3   authority to do.  And so, obviously, we had no problem with

4   that.

5   Q.   Now, you -- you say, you tried to get the power put in your

6   name?

7   A.   That's correct.

8   Q.   Were you successful in that?

9   A.   We actually weren't.

10  Q.   Did you use the vehicles?

11  A.   Yes.

12  Q.   And why -- why did you do that?

13  A.   Well, we needed them, and we were taking claim of them.

14  Q.   Okay.  Well, did you take steps to care -- and take care of

15  the property while you were there?

16  A.   Absolutely.

17  Q.   Why?

18  A.   Well, one is it was rundown, and it needed maintenance and

19  it needed cleanup.  And so we began to do that but we did it as

20  our property.

21          We have to -- in order to take claim of it under

22  adverse possession, you have to beneficially use it and you

23  have to improve it.  You have to show that you're improving it.

24  And we did that.  And we -- we continued to do that.  And had

25  even greater plans to do even more.

A. Bundy - D - By Mr. Mumford

1   Q.   There was testimony about the fuel tanks.

2            Do you remember that?

3   A.   Yes.

4   Q.   And I believe there was some testimony about -- pointing

5   out that there were some -- some -- some -- some black lines

6   that were -- that were made there.   Right?

7   A.   That's correct.

8   Q.   And did -- did you understand that those black lines were

9   made on that -- those tanks at the time so that you could make

10  sure and keep track of any fuel that -- that were used?

11  A.   That's correct.   Yeah.   We went and took and dipped all of

12  the tanks and found out the level of the fuel, and we marked it

13  on the outside.   And that was the level of the fuel when we

14  came into the refuge.

15  Q.   How were you going to pay for it?

16  A.   What do you mean?

17  Q.   How were you going to pay for the fuel that you used?

18  A.   We were going to -- if we needed them filled up, it was

19  going to be our bill.   If we were going to use it, it was going

20  to be our bill.

21  Q.   If -- if someone had come and said, Hey, that's my fuel in

22  those tanks that you guys are using, what were you going to do?

23  A.   I didn't really know that.   I never -- I never even thought

24  that far, to be honest with you.   We never -- we did mark where

25  they were at but it was just not a thought that I had.   I knew

A. Bundy - D - By Mr. Mumford

1    that if we needed to fill them up, though, of course that would

2    be our -- our responsibility, our bill to do that.

3         We were taking responsibility to take care of the

4    facility and to treat it correctly as responsible individuals

5    should.

6    Q.  Do you understand that you were making improvements, then?

7    A.  Absolutely.

8    Q.  Was that important?

9    A.  Yes, absolutely.

10   Q.  Why?  Why?

11   A.  Again, it's part of -- we have to improve the property.  We

12   have to show we're improving it, show that we're making it

13   better, show that we're beneficially using it.

14   Q.  You say you have to do it.  Why do you have to do it?

15   A.  Because that's the law.

16   Q.  That's the law of what?

17   A.  That's my belief of the law.  That you have to improve the

18   property in order to claim adverse possession in order to quiet

19   title.

20   Q.  Now, do you have an understanding -- I guess what -- did

21   you believe you had to do the -- what did you think at the time

22   that the Government would do to address your adverse possession

23   claim?

24   A.  I thought that they would do what everybody else was

25   required to do.

177

A. Bundy - D - By Mr. Mumford

1  Q.  Which was?

2  A.  If they wanted to dispute our claim on the property, that

3  they would go to the courts and try to trespass us and serve us

4  with -- with -- with -- serve us with an eviction notice.

5  Q.  Did you -- did you want to invite that?

6  A.  Yes, I did.

7  Q.  Why?

8  A.  Because then what it would do is it would put us in a civil

9  court where we could dispute the title and these land issues.

10  Where we can say, look, this is why we don't believe that it's

11  yours.

12          That's -- it was -- it was driven to accomplish what

13  we came to accomplish.  But if they did get a court to trespass

14  us and evict us, then it would put us in the court of law,

15  where we can dispute all of these things that they have been

16  ignoring us; where we can talk about Article I, 8, 17, and

17  dispute it in a court of law; where we can talk about the title

18  disputes with the refuge in the court of law, and where we can

19  get these things straightened out.  And so we did welcome it,

20  yes.

21  Q.  Fair to say -- fair to say you wanted to force the federal

22  government to prove that they owned it legitimate --

23  legitimately?

24  A.  Absolutely.  We were prepared for that, and we have been

25  prepared for that.  But they continue to ignore us, continue to

178

A. Bundy - D - By Mr. Mumford

1   do what has happened to us now, where they -- they get us

2   (pause) basically, here we are arguing whether we impeded a

3   federal officer's duty, when the whole argument should have

4   been whether this is their land in the first place.  And we

5   tried to create that.  And then what they did is they just used

6   their guns on us one more time.

7          And they killed my friend and fellow rancher, LaVoy

8   Finicum.

9          MR. KNIGHT:  Object to that as nonresponsive.

10         THE COURT:  The last sentence is stricken as

11  nonresponsive.

12         Please continue, Mr. Mumford.

13  BY MR. MUMFORD:

14  Q.  You weren't doing this in -- you weren't -- were you

15  staking claim to this property in your personal name?

16  A.  No.

17  Q.  What name?

18  A.  Harney County Resource Center.

19         Or, I mean, we did it -- we formed an organization.

20  Q.  And what was that organization that you formed?

21  A.  We called it Citizens for Constitutional Freedom.

22  Q.  How did you come about that name?

23  A.  We felt that it represented who we were.  And -- and we

24  needed to have a unified name so that we could begin to

25  articulate, you know, all that we were doing.

179

A. Bundy - D - By Mr. Mumford

1        And -- and so that's -- that's -- I mean, I think the

2   name for itself, Citizens for Constitutional Freedom, is -- is

3   pretty self-explanatory.

4   Q.  How were -- how were the date -- day-to-day affairs at the

5   refuge managed while you were there from January 2nd to January

6   26?

7   A.  You mean like decisions and stuff?  Or --

8   Q.  Sure.

9   A.  Pretty much every morning, any -- anybody who wanted to, we

10  got together as a group and we discussed things that needed to

11  happen, things that needed to be done.  They were thrown on the

12  table.  And typically someone volunteered .to do it.  And --

13  I'll do that or I'll do this or I'll do that.  And so then we

14  made note of who volunteered that -- it to be done, and they

15  would go out and do it.

16        And then the next day we would come together again,

17  and we would follow up about how it went, if they got it done.

18  And we would discuss further about what should be done, what

19  needs to be done, and throw it on the table again.  And most of

20  the time someone would volunteer, I'll do that or I'll do that.

21  And that's mainly how the decisions were made.

22  Q.  What was -- how would you characterize your role?

23  A.  I think I was one of those that kept track of who

24  volunteered to do it.  We would always pray before, and --

25  and -- and so a lot of times I would say, "Let's pray," or

180
A. Bundy - D - By Mr. Mumford

1   something, you know.  And, I guess, initiate the meeting.

2   Meaning, okay, who -- who has -- what needs to be done?  And

3   so, yeah, that's -- but it --

4   Q.  Now, you've been described as a leader of this.

5        Is that how you would describe yourself?

6   A.  Yeah, but I need to clarify that I don't tell other men

7   what to do.  I -- I don't do that.

8        I believe, as taught by someone much wiser than me,

9   that you teach a person correct principles and you let them

10  govern themselves, and that's how I believe.  And so -- and I

11  have found that to be, in my life, the most effective way to

12  help people to do what they feel is right.  You teach them

13  correct principles, and you let them govern themselves.

14  Q.  Was -- was there -- there were -- there were regular press

15  conferences.  Is that right?

16  A.  Yeah.  Every -- every day, at 11 o'clock, we had a press

17  conference out by the entrance of the refuge.

18  Q.  Did you make -- did you attend most of those -- all of

19  those, I guess?

20  A.  Not all of them but most of them, yeah.

21  Q.  Did you speak on behalf of the Citizens for Constitutional

22  Freedom at those?

23  A.  I did, yeah.

24  Q.  Was there anyone else who would speak on behalf of the

25  Citizens for Constitutional Freedom at those?

A. Bundy - D - By Mr. Mumford                181

1   A.   Yeah, I -- it's -- it's very tiring to continue to be

2   pressed by so much media.  And LaVoy was always there.  And he

3   was, I think, even more articulate than I was.  And we decided

4   that LaVoy would be a great spokesman for us.

5            And so he began to take on those press conferences,

6   and -- and did very well.

7            THE COURT:  Excuse me.  Excuse me, Mr. Mumford.

8   Please find a logical place for a break for the afternoon

9   recess.

10           MR. MUMFORD:  Okay.  Just one -- one more question

11  here.

12  BY MR. MUMFORD:

13  Q.   Did -- were you elected to be a spokesperson at all?

14  A.   No.

15  Q.   What -- what was it that sort of made you and Mr. Finicum

16  sort of assume that role of spokespersons?

17  A.   I think most -- mostly our ability to articulate the

18  issues, which I would say come from our understanding of them.

19  And -- and I had been involved with the Hammonds, you know,

20  from -- and driven to do all that I said and have testified

21  here that I did.  And -- and so -- and -- and LaVoy understood

22  those.  And Ryan also articulated those well.  And there was

23  others.  It wasn't that there was only one, and no one else

24  could.  I mean, as you've seen, certainly not that.  And that's

25  not how we -- we didn't feel that it was our authority to

Colloquy

1    restrict people from speaking.

2            We just did most of it through LaVoy.

3    Q.   You -- you miss your friend?

4    A.   Yeah, I do.

5            MR. MUMFORD:   Thank you, your Honor.

6            This is a good time for a break.

7            THE COURT:   Ladies and gentlemen, 15 minutes, please.

8            I wanted to acknowledge that I did get your message

9    that you're willing to have tomorrow run till about 3:00, 3:30,

10   so thank you for that.   We'll plan accordingly.

11           Please leave your notes on the chair.   Please do not

12   discuss the case.

13           We'll be back with you in about 15 minutes.

14           Everyone stand, please, for the jurors.

15           Watch your step, folks.

16           (Jurors exit at 3:03 p.m.)

17           THE COURT:   All right.   Everyone be seated, please,

18   while Mr. Bundy, Mr. Bundy, and Mr. Fry leave.

19           And then we'll take about a ten-, 12-minute recess.

20           We'll clear what the afternoon plan is.

21           I need to know, when we come back, Mr. Mumford,

22   whether you wish to interrupt the continued direct to put on

23   Ms. Fiore.

24           MR. MUMFORD:   Thank you.

25           THE COURT:   We'll discuss that in ten.

Colloquy

```
 1            MR. MUMFORD:  I'm sorry, your Honor.  I'm just in
 2   pain.
 3            THE COURT:  Okay.  Ten minutes, please.
 4            (Recess taken at 3:04 p.m.)
 5            (Court resumes at 3:16 p.m.)
 6            THE COURT:  All right.  Please be seated, everyone.
 7            Can someone bring Mr. Olson and Mr. Salisbury in from
 8   outside, please.
 9            MR. MUMFORD:  Go ahead.
10            THE COURT:  We're still waiting for Mr. Olson and
11   Mr. Salisbury.
12            Can someone get them in, please.
13            MR. MUMFORD:  I'll go get them.
14            (Pause.)
15            THE COURT:  Hold on a minute.  We need Mr. Banta.  We
16   need Ms. Ludwig, please.
17            MS. LUDWIG:  I'm present, Judge.
18            (Pause.)
19            THE COURT:  All right.  Is everyone here?
20            Yes, including Mr. Philpot.
21            MR. PHILPOT:  Yeah.  Your Honor, I apologize for not
22   having presented myself prior.  I have been here all day.  I've
23   been in the adjoining room with witnesses, trying to
24   streamline -- as your Honor has requested -- and make sure
25   we're not wasting time or -- and so I would like to continue
```

Colloquy

1    with that, if that's all right.  Otherwise, I can also be here.

2    But I'm in constant communication with our legal team.

3            THE COURT:  That's fine.  You are, however, the key

4    to Mr. Mumford having the status to even proceed.  And not

5    appearing and then both of you being 20 minutes late this

6    morning is not acceptable.

7            MR. PHILPOT:  Yes, your Honor.  I understand.

8            THE COURT:  All right.  So, Mr. Mumford.

9            MR. MUMFORD:  Yes, your Honor.  Thank you.

10           At this point, your Honor, in Mr. Bundy's

11   examination, we -- we would like to request a -- a convenience

12   to put on two witnesses, your Honor.

13           The first one may be Ms. Michele Fiore.  Ms. Michele

14   Fiore has a preexisting flight out of town tonight.  So I

15   believe -- as I told, your Honor, I believe my examination is

16   ten minutes.  I do not believe -- if -- it -- well, there may

17   be some examination, but it's not very long at all.

18           The next one, your Honor, that we want to get on

19   today is Mr. Rapolla.  It turns out I was wrong in what I told

20   the Court previously, simply because Mr. Rapolla thought we

21   were going to be able to call him on Monday.  And when it was

22   explained to him that Monday is a holiday, then it became a

23   conflict for his schedule.  So we would like to get him on the

24   stand.  I think Ms. Tiffany Harris is going to take the lead in

25   putting him on.

Colloquy

1          THE COURT:  So what are the issues with respect to

2    Mr. Rapolla, from the Government's perspective?

3          MR. GABRIEL:  Yes, your Honor.

4          The video that the defense would like to play through

5    Mr. Rapolla contains statements that are not from any of the

6    defendants or from Mr. Rapolla himself.

7          We believe that they're hearsay, and we don't know

8    that the -- we just don't know the intent for offering them.

9          MS. HARRIS:  I could make this fast and say that we

10   would be happy to play it without volume.

11         THE COURT:  Okay.  What's the purpose of showing the

12   video at all?  What's the proffer here?

13         MS. HARRIS:  Sure.  Mr. Rapolla is going to be

14   talking about the events and the situation surrounding

15   Government Exhibit 110.  That's an individual who's standing on

16   the side of the road.  He's got a semiautomatic weapon or

17   rifle.  He's got sort of a bushy beard.  This exhibit was shown

18   during Mr. Karges' testimony.

19         And so Mr. Rapolla, who was there when that photo was

20   taken, can explain who that person is, what they were doing,

21   why he was there, how long he was there; in that fashion.  And

22   what was taking place at the refuge while he was there.  And

23   so --

24         THE COURT:  So what day is this that the --

25         MS. HARRIS:  January 9th.

                                                            186
                            Colloquy

1           THE COURT:  All right.  So Mr. --

2           MS. HARRIS:  Sorry.

3           THE COURT:  Mr. Gabriel, does the Government have any

4  objection to the witness giving percipient testimony about what

5  he knows about that person in that photo, without -- or that

6  video, without there being any sound?

7           MR. GABRIEL:  No.  No objection to that, your Honor.

8           THE COURT:  So, see, if there had been some

9  communication, again, we wouldn't have had to spend two minutes

10 here to do this.

11          Are we clear, also, on Ms. Fiore?

12          MR. KNIGHT:  Yes.  I mean, I --

13          THE COURT:  As previously discussed?

14          MR. KNIGHT:  Yes.

15          THE COURT:  All right.  Mr. Mumford, are you ready?

16          MR. MUMFORD:  Yes, your Honor.

17          THE COURT:  All right.  Someone please bring

18 Ms. Fiore in.

19          MR. MUMFORD:  Your Honor --

20          THE COURT:  Just a minute.  I can't talk to two

21 people at once.

22          (Pause, Court and clerk conferring.)

23          THE COURT:  Yes, Mr. Mumford.

24          MR. MUMFORD:  Yes, thank you, your Honor.

25          Judge, just when the jury gets in, perhaps just a

187

Colloquy

1   brief explanation that Mr. -- Mr. Bundy's [sic] off to

2   accommodate witnesses.

3              Thank you.

4              THE COURT:  Ms. Fiore, would you come here, please,

5   to the witness chair.  You can walk up along the front of the

6   jury box there.

7              Please watch your step coming on up.

8              THE WITNESS:  Thank you.

9              THE COURT:  Go ahead and make yourself comfortable.

10  Take a seat.

11             When the jurors come in, all of us will stand, and

12  then I'll indicate people who should be seated.

13             I'll need you to remain standing.  At that point,

14  I'll have you face the jurors and the deputy, who will be over

15  to your right, to take an oath.  And then we'll begin your

16  testimony.

17             THE WITNESS:  Thank you.

18             THE CLERK:  All right.  Please bring the jury in,

19  Ms. Stephens.

20             Everybody, please stand for the jurors.

21             (Jurors enter at 3:24 p.m.)

22             THE COURT:  All right.  Thank you, everyone.  Please

23  be seated.

24             Jurors, welcome back for your last session today.

25             You'll see a different witness here before you.  This

188

Fiore - D - By Mr. Mumford

1   is defendants' next witness, Michele Fiore.

2           We're interrupting Mr. Bundy's continued direct

3   testimony in order to accommodate a schedule here.

4           Ma'am, would you please face the jury and the deputy

5   there, and raise your right hand to be sworn.

6           (Witness sworn.)

7           THE WITNESS:  I do.

8           THE CLERK:  Please have a seat.

9           THE COURT:  Bring yourself close in to the microphone

10  there, please.

11          Tell us your full name and spell all of it.

12          THE WITNESS:  My name is Michele Fiore, and I spell

13  it M-I-C-H-E-L-E.  F, as in flower, I-O-R-E.

14          THE COURT:  Thank you.

15          Mr. Mumford.

16          MR. MUMFORD:  Thank you, your Honor.

17                      DIRECT EXAMINATION

18  BY MR. MUMFORD:

19  Q.  Ms. -- Ms. Fiore where do you live?

20  A.  I live in Las Vegas, Nevada.

21  Q.  What do you do there?

22  A.  I'm an assemblywoman, a lawmaker for the state of Nevada

23  for district four.

24  Q.  How long have you served in that capacity?

25  A.  Two terms.

189

Fiore - D - By Mr. Mumford

1   Q.   Since when?

2   A.   To -- my first election was 2012.

3   Q.   Are you involved with a -- an organization with the

4   initials C-O-W-S?

5   A.   I am.

6   Q.   What is that?

7   A.   That's the Coalition of Western States.

8   Q.   It goes by COWS then?

9   A.   It goes by COWS.

10   Q.   What's -- what's -- what's the role of COWS?

11   A.   The role of COWS is we have a couple of divisions, the

12   elected official division.  We -- our goal is to promote and

13   secure liberties against tyrannical government.

14   Q.   When did COWS -- when did COWS come into existence?

15   A.   April of 2014.

16   Q.   What -- what -- are you familiar with the origins there?

17   A.   I am familiar with what happened in April of 2014, in

18   Nevada.

19   Q.   What was that?

20   A.   Bunkerville.

21   Q.   Did you know an individual named Mr. Ammon Bundy?

22   A.   I met Ammon in April of 2014.

23   Q.   The -- this individual sitting next to me?

24   A.   That individual sitting right next to you.

25   Q.   You went to Bunkerville?

Fiore - D - By Mr. Mumford

1   A.   I did.

2   Q.   Briefly describe.   What -- what was your purpose in going

3   to Bunkerville?

4            MR. KNIGHT:   Your Honor, I'm sorry, but I'm going to

5   object as relevant.

6            THE COURT:   The objection is sustained.

7            Let's please get to the issues related to this case,

8   Mr. Mumford.

9            MR. MUMFORD:   I thought I was, your Honor.

10  BY MR. MUMFORD:

11  Q.   The -- did you meet Mr. Bundy at Bunkerville?

12  A.   I did.   I was called as an elected official for my state,

13  when my constituents call me and there's an issue.

14           A lot of my constituents were calling me, explaining

15  there was a problem with the federal government in Bunkerville.

16           I didn't believe them, so I went to Bunkerville.

17  Kind of like a mom.   When your kids say there's a monster under

18  the bed and you don't think so.   So I wanted to go there, to

19  show them there was no monster under the bed.   But there was a

20  big monster.

21  Q.   Without getting into the specifics, Ms. -- Ms. --

22  Ms. Fiore, is it fair to say your views changed as a result

23  of --

24  A.   Huge.

25  Q.   -- Bunkerville?

Fiore - D - By Mr. Mumford                191

1   A.  As --

2           THE COURT:  Excuse me, Ms. Fiore, you just need to

3   just answer the question and not elaborate, and counsel will

4   direct you.

5           THE WITNESS:  Sorry.

6           THE COURT:  We need to -- we need to keep it on track

7   here.

8           Ask your question again, please.

9   BY MR. MUMFORD:

10  Q.  Thank you.

11          Did you -- did you -- how much time would you say you

12  spent with Mr. Ammon Bundy at Bunkerville?

13  A.  In April, I was on the ground for 14 days, going back and

14  forth.

15  Q.  Did you -- after -- after the resolution, were you there

16  when the resolution took place?

17  A.  On April 14th?

18  Q.  Yeah.

19  A.  I was in Bunkerville, yes.

20  Q.  We saw -- the jury saw a -- a -- a video of the -- sort of

21  the standoff there.

22          Were you -- were you there when -- when the standoff

23  took place?

24  A.  I was in Bunkerville.  I wasn't in the wash.

25  Q.  Were you --

Fiore - D - By Mr. Mumford

1    A.   I was above the wash.

2    Q.   You -- did you remain in -- in contact with Mr. Ammon Bundy

3    after the events of April 2014?

4    A.   Absolutely.   We immediately began working on the next

5    legislative session to create laws so this would never happen

6    again in our state.

7    Q.   Was that -- was that -- was the legislation that came out

8    of your joint efforts AB408?

9    A.   Yes.

10   Q.   And you remained in -- in touch with Mr. Bundy through the

11   end of 2015 and beginning of 2016?

12   A.   Absolutely.

13   Q.   Did -- did there -- did there come a time when you helped

14   organize a -- a -- a legislative visit to the -- the -- the

15   refuge in January of 2016?

16   A.   Yes, I did.

17   Q.   Approximately when did that take place?

18   A.   It took place January 9th.   I missed my flight.   I couldn't

19   make it, so I attended that meeting via phone.

20   Q.   And you say you had attended the meeting.   Was that the

21   meeting at the refuge or -- or was there -- were there meetings

22   in advance?

23   A.   No, the Coalition of Western States took our elected

24   official division and met with the Harney County elected

25   officials, FBI, some of the sheriffs, a judge, to discuss

Fiore - D - By Mr. Mumford

1    basically if there were any state or federal laws broken.  And

2    as of that meeting, there were none.

3              MR. KNIGHT:  I'm going to object, your Honor; the

4    witness's characterization whether the law was broken.

5              THE COURT:  The objection is sustained.

6              The jurors can keep the answer in the record for

7    purposes of just what this witness's purpose was there.  But,

8    again, these issues about laws and their -- whether they're

9    broken or not are questions that are for you, subject to the

10   Court's instructions on the laws here.  This has to do with

11   simply the purpose for which she was going.

12             Move on, please.

13             MR. MUMFORD:  Thank you, your Honor.

14   BY MR. MUMFORD:

15   Q.  So this is the -- explain -- explain what the purpose of

16   trying to organize a visit to the refuge was in January 2016.

17   A.  The purpose of the visit to the refuge was to make sure

18   that fellow Nevada constituents and constituents of the western

19   United States, there were no laws broken for the state or the

20   federal.  And that purpose was verified in that meeting with

21   the Oregon state elected officials --

22             MR. KNIGHT:  Your Honor, I'm going to object again.

23             THE COURT:  The objection is sustained.

24             Jurors, disregard the question and the answer.

25             Counsel, please just keep it to what you know to be

Fiore - D - By Mr. Mumford

1    relevant here.

2              MR. MUMFORD:   Thank you.

3    BY MR. MUMFORD:

4    Q.   Did the legislative team end up going to the refuge after

5    that meeting that you're talking about?

6    A.   Yes, they did.

7    Q.   And do you recall who -- who -- who -- who was part of

8    that?

9    A.   There were several members present at the meeting.

10             I know from the elected official division of

11   Coalition of Western States, a representative of Washington, an

12   attorney, Matt Shea, had went to the refuge, along with Idaho

13   representative Heather Scott and along with Idaho

14   representative Judy Boyle.

15             There was an Oregon state representative.   I believe

16   his name was Dixon (phonetic).   Please verify.   There were a

17   couple of other Washington legislatives that have not been

18   indoctrinated into COWS.   However, there were other lawmakers

19   that I'm not familiar with coming along with some of our COWS

20   representatives.

21   Q.   And did -- did -- did the legislative team meet with

22   Mr. Ammon Bundy at the refuge in January of 2016, then?

23   A.   Yes, they did.

24   Q.   And without -- without giving a lot of detail here, did

25   Mr. Bundy give a presentation?

Fiore - D - By Mr. Mumford

1  A.  Yes, he did.

2  Q.  Did you understand that presentation?  One of the issues

3  discussed was why they were there?

4  A.  Yes, according to my reps, when I spoke with them when they

5  left, absolutely.

6          MR. KNIGHT:  I'm going to object to this line of

7  questioning.  Basis of knowledge, your Honor.  The last answer

8  suggested the witness was not present for the presentation.

9          THE COURT:  The objection is sustained.  The question

10  and answer are stricken.

11          Please rephrase your question to elicit this

12  witness's personal knowledge, not based on what others have

13  told her.  Please move on.

14          MR. MUMFORD:  Sure.  I was trying to -- I thought I

15  was following the Court's instruction there.

16  BY MR. MUMFORD:

17  Q.  The -- you were part of the team that organized this trip

18  to the refuge.  Right?

19  A.  Yes, I was.

20  Q.  And, in doing so, you wanted to figure out for

21  yourselves -- see for yourselves what was happening there.  Is

22  that fair?

23  A.  That is very fair.

24  Q.  And without -- without getting into the substance of what

25  was said, what -- what actions -- what actions did COWS take as

Fiore - D - By Mr. Mumford

1   a result of their time on the refuge?

2   A.  We continued to reach out to the Oregon legislators.

3           Once our elected team of COWS verified that no Oregon

4   state laws were broken --

5           MR. KNIGHT:  I'm going to object your Honor.

6           THE WITNESS:  -- we made sure.

7           THE COURT:  Excuse me, Ms. Fiore.

8           THE WITNESS:  Sorry.

9           THE COURT:  Stop making statements about breaking the

10  law.

11          Jurors, disregard the statement.

12          Ask the question again and please --

13          (Pause, witness speaking inaudibly to the Court.)

14          THE COURT:  Ms. Fiore, don't express your opinion

15  about whether laws were broken or not, period.

16          THE WITNESS:  Okay.

17          THE COURT:  Ask a new question, please.  Say again.

18  BY MR. MUMFORD:

19  Q.  Without expressing your opinion, Ms. Fiore, as to whether

20  laws were broken, is it -- does the COWS organization have a

21  practice of going and talking to people who are breaking the

22  law?

23  A.  No.  We don't want to talk to people that break the law.

24  Q.  And so is it fair to say you would have done your due

25  diligence --

Fiore - D - By Mr. Mumford

1      MR. KNIGHT:  Your Honor --

2      THE COURT:  The objection is sustained.  This is a

3  line of questioning I've told you not to pursue.  Please get to

4  the relevant matters so that the witness can make her flight,

5  as you requested.

6  BY MR. MUMFORD:

7  Q.  And you went -- and your team went to the refuge.  Right?

8  A.  Yes.

9  Q.  And Ms. -- Ms. -- Ms. -- Ms. Fiore, did there come a time,

10  even prior to that, where after having a conversation with

11  Mr. Ammon Bundy, you called up the local sheriff of Harney

12  County?

13  A.  I did.  I got to have a pleasant conversation with Sheriff

14  Ward.

15  Q.  Approximately when?

16  A.  I believe it was the latter part of December.

17  Q.  Approximately how long?

18  A.  A long conversation.  About 30 minutes.

19  Q.  Without getting into what he told you, what did you tell

20  him?

21  A.  I expressed what happened in Nevada.  I expressed that

22  thank goodness, because of our sheriff -- Doug Gillespie at the

23  time -- we have a new sheriff.  That our sheriff -- all

24  sheriffs are in control of their counties.  And he was

25  absolutely in control of his county.  He could absolutely deny

Fiore - D - By Mr. Mumford

1   the Bureau of Land Management to proceed --

2           MR. KNIGHT:  Your Honor, I'm going to object.  This

3   is irrelevant and nonresponsive.

4           THE COURT:  The objection is sustained.

5           Ask a question that's admissible, please.

6           MR. MUMFORD:  It's not unrelevant, given Mr. Ward's

7   testimony in this matter.

8           THE COURT:  All right.  Tell me the purpose for which

9   you're seeking to offer this.

10          MR. MUMFORD:  It's impeaching his testimony.  Because

11  Mr. Ward testified that one of the reasons why he took the

12  actions that he did or didn't, in this case, was because he --

13  he -- he did some research, he said, on the Internet --

14          THE COURT:  Mr. -- Mr. Mumford, this witness may

15  testify about statements Sheriff Ward made to her that are

16  inconsistent with his direct testimony.  That would be

17  impeachment.  But she may not testify about statements she made

18  to him.

19          Now, the -- if you're calling her for an impeachment

20  purpose as to Ward, you have to have her testify with respect

21  to a statement that he made inconsistent with his trial

22  testimony.

23          So go there.

24          MR. MUMFORD:  And -- and, your Honor, I was getting

25  there by covering what --

Fiore - D - By Mr. Mumford

1          THE COURT:  Then don't cover inadmissible material.

2    I am not going to permit this.

3          Please ask the question about what it is Mr. Ward

4    told her that you contend is inconsistent with his direct

5    testimony.

6    BY MR. MUMFORD:

7    Q.  Did -- did Sheriff Ward tell you anything that would

8    suggest that Mr. Bundy had given him threats, ultimatums,

9    improperly before -- before that time that you spoke with him?

10   A.  No.  Actually, Mr. Ward --

11         MR. KNIGHT:  Your Honor, I'm going to object to the

12   form of the question.  This is not proper impeachment.  It is

13   our position that a basis and a foundation has not been laid.

14         THE COURT:  I agree.  I agree.

15         The witness -- there has to be laid a foundation that

16   Sheriff Ward -- excuse me.  Mr. Bundy, be quiet.

17         There has to be laid a foundation that Sheriff

18   Ward --

19         (Pause, Mr. Mumford and Defendant Ammon Bundy

20         conferring.)

21         THE COURT:  There has to be laid a foundation that

22   Sheriff Ward made a statement to the jury in his testimony that

23   you contend is to be impeached by the witness testifying that

24   he said something else.  So lay that foundation and move on,

25   otherwise --

Fiore - D - By Mr. Mumford

1        MR. MUMFORD:  Okay.  Thank you.

2   BY MR. MUMFORD:

3   Q.  So you spoke with Sheriff Ward during this call about

4   Bunkerville?

5   A.  Yes.

6   Q.  Did he express concern or alarm about what Mr. Bundy had

7   done in Bunkerville?

8   A.  No.

9   Q.  In fact, what did he say about -- what -- what did he say

10  about Bunkerville at that time?

11        MR. KNIGHT:  Your Honor, I'm sorry.  I'm going to

12  object.  This is being done backwards.  There is no foundation

13  with respect to the direct testimony that would allow this

14  line --

15        THE COURT:  This is the foundation I'm pointing to,

16  Mr. Mumford.

17        You need to lay the foundation as to what the sheriff

18  said to the jury that this witness will impeach.

19        Please make your foundation.  Move on.

20        MR. MUMFORD:  (Standing.) Your Honor, I'm sorry

21  (laughing).  I'm sorry, your Honor.  I thought I was -- at one

22  point, I was probably a better lawyer than I am now.  I --

23        THE COURT:  Mr. -- Mr. Mumford, if you contend the

24  sheriff said something in his testimony, point to it.  And then

25  ask the witness if he said to her something different.

Fiore - D - By Mr. Mumford

1    MR. MUMFORD:  Hold on.

2        (Pause, referring.)

3    MR. MUMFORD:  Your Honor, I'm referring to the

4  testimony that Sheriff Ward gave where he said --

5    THE COURT:  Speak up, please, so we can all hear you.

6    MR. MUMFORD:  I was referring, your Honor, to the

7  testimony that -- that Mr. -- that Sheriff Ward gave where he

8  said he had researched some of the events that had gone on in

9  Bunkerville.

10    THE COURT:  So if the witness can say he had not

11  researched it, then that is an impeaching statement.  That's

12  the point.

13        You need to take whatever the sheriff testified to,

14  that statement.  If the witness says the sheriff said something

15  different, like, "I did not research it," that's an impeachable

16  statement.

17        Please move on.

18    MR. MUMFORD:  Thank you, your Honor.

19        I'm referring to the testimony where Sheriff Ward

20  said --

21    THE COURT:  And, as I say, if this witness says the

22  sheriff denied doing that, that's impeaching.

23  BY MR. MUMFORD:

24  Q.  Did the -- Sheriff Ward, in your conversation, say that he

25  was -- it scared the heck out of him, what happened at

Fiore - D - By Mr. Mumford

1    Bunkerville?

2    A.   No.

3          MR. KNIGHT:   I'm sorry.   I'm not understanding the

4    foundation, given the preceding statement about the context of

5    the testimony.

6          THE COURT:   Please try again with your foundation.

7    The objection is sustained.

8    BY MR. MUMFORD:

9    Q.   Page 159.

10          THE COURT:   And don't quote from a rough.   You can

11   paraphrase, remember.

12          MR. MUMFORD:   That's what I'm doing.

13          THE COURT:   Okay.

14   BY MR. MUMFORD:

15   Q.   Did Mr. -- Mr. Ward tell you that it scared the hell out of

16   him?

17   A.   Mr. Ward said complimentary things about Ammon, and he was

18   not fearful of Ammon.

19          MR. KNIGHT:   That's --

20          THE COURT:   That's not impeaching.   The objection is

21   sustained.

22          Jurors, disregard the question and the answer.

23   BY MR. MUMFORD:

24   Q.   In speaking with him, did Bunkerville come up in the

25   context of talking about Ammon?

Fiore - D - By Mr. Mumford

1    A.   Yes.

2    Q.   How?

3    A.   Mr. Ward -- I explained to him that Ammon and Cliven was

4    working with our sheriff and our sheriff backed down the BLM so

5    there wasn't any bloodshed.

6             And Mr. Ward seemed to be accepting -- receptive to

7    that and excited, and told me that his meetings and

8    conversations with Ammon have been pleasant.

9             MR. MUMFORD:  Thank you, your Honor.  No more

10   questions.

11            THE COURT:  All right.

12            MR. KNIGHT:  Your Honor, I'm sorry.  Can we move to

13   strike that last piece as nonresponsive?

14            THE COURT:  It's also not inconsistent with the

15   sheriff's testimony, so let's just let it be what it is.

16            Mr. Bundy, do you have questions of Ms. Fiore while

17   she's here?  Please ask them now, if you do.

18            Or do you want to wait?

19            DEFENDANT RYAN BUNDY:  I want to wait.

20            THE COURT:  Okay.  Mr. Olson, do you have questions

21   of her?

22            MR. OLSON:  No, your Honor.

23            THE COURT:  Thank you.

24            Mr. Salisbury?

25            MR. SALISBURY:  Yes.  Thank you, your Honor.

Fiore - X - By Mr. Salisbury

1          THE COURT:  Go ahead.

2                    CROSS-EXAMINATION

3  BY MR. SALISBURY:

4  Q.  Good afternoon, Ms. Fiore.

5          I was curious about your -- did you say that you met

6  with the FBI and local law enforcement in Burns during the

7  occupation?

8  A.  Via phone, yes.

9  Q.  Okay.  And do you remember when that was?  Was that prior

10 to the LaVoy Finicum killing?

11 A.  It was prior to LaVoy's murder, yes.

12          MR. KNIGHT:  Your Honor, I'm going to --

13          THE COURT:  The objection is sustained.

14          Ms. Fiore, do not characterize Mr. Finicum's death,

15 period.

16          THE WITNESS:  Okay.

17          THE COURT:  Jurors, disregard the reference for the

18 reasons I've told you several times.

19          Mr. Salisbury, ask questions in a form that don't

20 invite witnesses who haven't been here for five weeks to go

21 into matters that I've already addressed as outside the scope

22 of the trial.

23          Ask another question.

24          MR. SALISBURY:  Thank you, your Honor.

25 BY MR. SALISBURY:

Fiore - X - By Mr. Salisbury

1   Q.   Was that meeting -- do you recall when that meeting was?

2   A.   Around January 9th.

3   Q.   January 9th.

4        Was everyone talking about a peaceful resolution?

5   A.   Yes.

6   Q.   Okay.  Now, I think you mentioned about the Coalition of

7   Western States, which you're a member of that group.

8   A.   I am.

9   Q.   And that -- is that group trying to assist ranchers with

10  issues with the Bureau of Land Management?

11  A.   We are.

12  Q.   What -- what is -- how does COWS do that?

13       MR. KNIGHT:  I'm going to object to the relevance of

14  this line of questioning.

15       THE COURT:  It's already been covered on direct, so

16  please move on.

17       Talked about working with her legislative partners in

18  other states --

19       MR. SALISBURY:  I can ask another question.  Thank

20  you, your Honor.

21       THE COURT:  Yes, please do.

22  BY MR. SALISBURY:

23  Q.   Is part of that in restoring property rights for the

24  ranchers?

25  A.   Yes, it is.

Fiore - X - By Mr. Schindler

1    Q.  And I -- I've seen this term "constitutional public land

2    management."  What does that mean?

3                MR. KNIGHT:  Now I object on relevance grounds, your

4    Honor.

5                THE COURT:  The objection is sustained.

6                Please, with respect to this witness, keep your

7    questions as to this case and the charges against your client

8    and the other defendants.

9                MR. SALISBURY:  Okay.

10   BY MR. SALISBURY:

11   Q.  And is that -- is the COWS group dedicated to peaceful

12   actions in doing so?

13   A.  Without a doubt.

14               MR. SALISBURY:  Thank you.  No further questions.

15               THE COURT:  Mr. Schindler, any questions?

16               MR. SCHINDLER:  Yes, please.  Thank you, your Honor.

17                          CROSS-EXAMINATION

18   BY MR. SCHINDLER:

19   Q.  Good afternoon, Ms. Fiore.

20               How long did you spend at the refuge?

21   A.  The Oregon refuge?

22   Q.  Yes.

23   A.  As long as it took for the BearCat to get myself and

24   Reverend Graham to go get our fabulous four out.

25   Q.  During all of the time that you have met with or spoken to

Fiori - X - By Ms. Harris

1    Mr. Bundy, did you ever hear him make any threats to BLM

2    employees, Fish & Wildlife employees, or other government

3    officials?

4    A.   No, never.

5               MR. SCHINDLER:  Thank you.  No -- nothing further.

6               THE COURT:  Ms. Maxfield, any questions?

7               MS. MAXFIELD:  No questions, your Honor.  Thank you.

8               THE COURT:  Ms. Harris or Ms. Cox, any questions?

9               MS. HARRIS:  If I may just have one moment, your

10   Honor.

11              THE COURT:  Certainly.  We can sit at ease for a few

12   minutes.

13                        CROSS-EXAMINATION

14   BY MS. HARRIS:

15   Q.   Good afternoon, Ms. Fiore.  Did you travel here with

16   anyone?

17   A.   Can you repeat that?

18   Q.   Did you travel here with Mr. Cliven Bundy?

19   A.   I didn't.  Mr. Cliven Bundy missed his flight.  He was

20   supposed to be with me, though.

21              MR. KNIGHT:  Your Honor, object to the relevance of

22   that.

23              THE COURT:  The objection is sustained.

24              Please ask material that's relevant.

25              MS. HARRIS:  I don't have any more questions for you.

Fiori - X - By Ms. Harris

1    Thank you for coming.

2            THE COURT:  Mr. Bundy, did you have any questions of

3    Ms. Fiore?

4            DEFENDANT RYAN BUNDY:  No, I do not.

5            THE COURT:  All right.  Cross-examination?

6            MR. KNIGHT:  No questions.  Thank you.

7            THE COURT:  Thank you, Ms. Fiore.  You're free to

8    step down.

9            Next witness, please.

10           We're going to take one more witness out of order at

11   the defendants' request.

12           MS. HARRIS:  That's Brandon Rapolla.

13           THE COURT:  Thank you.

14           Mr. Rapolla, sir, would you come here, please, to the

15   witness chair.  There's a path along the front of the jury box.

16           Please watch your step coming all the way up, and

17   remain standing.

18           Please face the jury and the deputy.

19           Raise your right hand to be sworn.

20           (Witness sworn.)

21           THE WITNESS:  Yes, ma'am.

22           THE CLERK:  Thank you.

23           THE COURT:  Go ahead and take a seat, sir, and bring

24   yourself around close to the microphone.

25           When you're situated there, please tell us your full

Rapolla - D - By Ms. Harris

1   name, and spell all of it.

2            THE WITNESS:  Brandon, B-R-A-N-D-O-N.  Jerome,

3   J-E-R-O-M-E.  Rapolla, R-A-P-O-L-L-A.

4            THE COURT:  Thank you.

5            Ms. Harris.

6                    DIRECT EXAMINATION

7   BY MS. HARRIS:

8   Q.  Good afternoon, Mr. Rapolla.

9            Can you tell us where you're from?

10  A.  Springfield, Oregon.

11  Q.  What do you do for a living?

12  A.  I do con -- concrete consulting for restoration repair

13  materials and previously self-employed doing -- doing that as a

14  contractor.

15  Q.  Do you have any history of military service?

16  A.  Yes, ma'am.

17  Q.  And what is that, briefly?

18  A.  United States Marine Corps, I did security forces, 8152,

19  and I was 0311.  I was a scout with the first --

20            THE COURT REPORTER:  I'm sorry I need you to speak

21  slower, please.

22            THE COURT:  You really do need to slow down for us,

23  sir.

24            (Laughter.)

25            THE WITNESS:  Sorry.  Okay.

Rapolla - D - By Ms. Harris

1          THE COURT:  It's been a long day, and we're trying to

2   listen.  So speak slowly.

3          Go ahead, back over the military experience.

4          THE WITNESS:  You bet.

5          So from '92 to '96, I was 8152 security forces,

6   marine barracks, Japan.  Counterterrorism, riot crowd, crowd

7   control, top secret facilities.

8   BY MS. HARRIS:

9   Q.  Thank you.

10  A.  And then was a scout with light-armored recon battalion.

11  Q.  And are you a member of the Pacific Patriot Network?

12  A.  Yes, ma'am.  I'm one of the founders.

13  Q.  Okay.  So I'm going to show you what's already been

14  admitted into evidence.  It's Exhibit 110.

15          And do you know this guy?

16  A.  Yes, ma'am.

17  Q.  Who is he?

18  A.  Kevin Rhodes.

19  Q.  Is he also a member of the Pacific Patriot Network?

20  A.  Yes, ma'am.

21  Q.  Where is he standing?

22  A.  He's standing at the front of the gate of the road coming

23  into the refuge.

24  Q.  Were you with Mr. Rhodes that day?

25  A.  I'm actually right behind -- you see, right -- Brandon

Rapolla - D - By Ms. Harris

1    Curtis is in the black --

2    Q.  No, that screen -- you know, I'm sorry to interrupt.  That

3    screen, is that interactive?  That's -- you can actually --

4    A.  I can actually --

5    Q.  You can mark --

6    A.  Okay.  You can see my pant leg right here, and then that's

7    my camouflage hat (drawing) and my black coat.

8    Q.  Great.  Thank you.

9            Do you know when this photo was taken?

10   A.  It was January 9th, time.

11   Q.  And do you know who took this photo?

12   A.  No, I don't, ma'am.

13           MS. HARRIS:  Mr. Breton, could you pull up Exhibit 2,

14   page 6.

15           And, Mr. Rapolla, I'm going to have you now take a

16   look at a map of the refuge.

17           I think there's a page with a closer-up view.

18           THE COURT:  Page 2 or 3, I believe.

19           MS. HARRIS:  Yeah.

20           THE WITNESS:  I could have went to the previous one.

21   BY MS. HARRIS:

22   Q.  Let's try page 6.

23   A.  (Laughing.)

24   Q.  Do you -- can you tell from looking at this map where

25   Mr. Rhodes was standing?

Rapolla - D - By Ms. Harris

1   A.   Yeah.   Right in this corner right here (indicating).

2   Q.   Okay.   And on that day, January 9th, was there also a press

3   conference being held that you attended?

4   A.   Yes, ma'am.

5   Q.   Can you show us on this map where the press conference was

6   happening?

7   A.   Right in this area (drawing).

8   Q.   Great.

9   A.   It's a staged area that was designated.

10  Q.   Um-hmm.   Okay.   Designated for things like press

11  conferences?

12  A.   Yes, ma'am.

13  Q.   And can you tell us -- can you --

14          MS. HARRIS:   Go back to Exhibit 110, Mr. Breton.

15  BY MS. HARRIS:

16  Q.   Can you tell us, sir, what's going on in this photo here?

17  A.   So, as founding members, we saw that things weren't coming

18  to a resolution or coming to a conclusion of what's -- you

19  know, no parties were communicating very well with each other.

20          So, as founding members, we put together an articles

21  of resolution.   And this morning time, we came to the refuge to

22  give the articles of resolution to Ammon Bundy, the FBI, and

23  also Sheriff Ward.   And so this is our convoy of people within

24  the Pacific Patriots Network.

25          Now, myself, Brandon Curtis, Joseph Rice, and also BJ

Rapolla - D - By Ms. Harris

1    Soper is in that -- in there.  Us being the founding members,

2    we came together in that convoy.  We ended up having a

3    potential threat.  It was talked about harming us, within the

4    founders.

5              So I, myself, organized making sure that we had armed

6    security as a buffer between people, just so that nobody would

7    get too close to us during that morning.

8    Q.  Okay.  So let me sort of break some of that down.

9              Thank you for that.

10             You mentioned an articles of resolution.

11             What is that?

12   A.  That was to get the -- all of the leadership within the

13   different entities of Ammon, the FBI, and also Sheriff Ward to

14   get to the round table and communicate with each other because

15   there -- there was a lot of stonewalling that was happening and

16   things just were not -- at the -- being there for the week,

17   it's like there needs to be communication between leadership,

18   and we wanted to assist in that.

19   Q.  And so was this articles of resolution, was this like a

20   written document that you -- that the Pacific Patriot Network

21   produced?

22   A.  Yes, ma'am.

23   Q.  And was this document something that you then delivered to

24   these three parties that you mentioned?  The refuge -- or the

25   folks at the refuge, Mr. Bundy, the FBI, and then Sheriff Ward

Rapolla - D - By Ms. Harris

214

1    and the local authorities?

2    A.   Yes, ma'am.

3    Q.   Was your first stop, along this delivery route, the refuge?

4    A.   Yes, ma'am.

5    Q.   And is that what's -- what's happening here, in Exhibit

6    110?

7    A.   Yes, ma'am.

8    Q.   And then you also mentioned -- well, let me -- let me

9    ask -- let me ask you something else.

10             Were you in Burns, on and off, during the month of

11   January?

12   A.   Yes.

13   Q.   When you would travel around Burns, would you typically

14   have Mr. Rhodes, like, stand near you or tail you or act as an

15   armed security person?

16   A.   No, I don't.  It was specifically only to this day because

17   people, through the grapevine, were just like -- there was some

18   threats against some of the founders of Pacific Patriots

19   Network.  And so we're going to take that serious.  And it's my

20   job -- or my position to take that serious and say, "Okay, I

21   want to have some armed security initially."  Because we don't

22   know who's who.  In a press conference, we don't know -- you

23   know, there's a lot of the people that are around.  And

24   initially giving these articles -- we need to present these

25   articles.

Rapolla - D - By Ms. Harris

1   Q.   Is this -- this -- this gun or rifle that Mr. Rhodes has,

2   is that -- to your knowledge, is that something that is legal

3   to possess?

4   A.   Absolutely it's legal.

5   Q.   And the road that you're standing on, are you -- was it

6   your intent, in this picture, to block access to that road?

7   A.   No, there's no blocking the access.  As you see, we pull

8   off to the side of the road.  We had a lead security vehicle.

9   Then we had the four founders' vehicles and then another

10  security vehicle behind us.  And then we had our very rear

11  security of the whole convoy.  And it was a directive of

12  everybody's going to park this side, stay within near their

13  vehicles, while us founders go speak to the press first and

14  then go on and meet with Ammon and present him the articles of

15  resolution.

16  Q.   The group of folks that are standing there, you mentioned

17  some of them by name.

18       Were they on their way to the press conference?

19  A.   Yeah.  We just, at that point in time, exited our vehicles,

20  allowed the security to come forward.  And then helped create

21  that buffer, so we can -- they were escorting us to the -- to

22  the press conference staging area.

23  Q.   So were you planning -- just to make sure I understand.  So

24  you were not planning to gather or spend an extended period of

25  time in this road here?

Rapolla - D - By Ms. Harris

1   A.   No, ma'am.

2   Q.   Okay.

3   A.   That's just us trying to gather and go to the press

4   conference.

5   Q.   Got it.

6            How far away was the place where you're standing to

7   the staging area where the press conference was being held?

8   A.   Less than a hundred feet.

9   Q.   Oh, okay.  When you were circulating around Burns or

10  visiting the refuge, did you, yourself, carry a weapon?

11  A.   Yes, ma'am.

12  Q.   And what -- typically what type of weapon is that?

13  A.   Either -- I have two of them.  As far as my sidearm,

14  whether it's two pistols, whether it's my -- a Glock 20 or an

15  FX 45.

16  Q.   So you're talking you would bring one of the two?

17  A.   Yeah, my conceal carry.  Just depends on what I want to

18  wear for the day.  Kind of like what I'm dressing with.

19  Q.   And do you have a concealed carry permit?

20  A.   Yes, ma'am.  I'm also an instructor for teaching conceal

21  carry classes for Oregon and Utah.

22  Q.   Got it.  Thank you.

23            And did you attend the -- the press conference that

24  day?

25  A.   Yes, ma'am.

Rapolla - D - By Ms. Harris

1        MS. HARRIS:  Mr. Breton, could you go to our defense

2    exhibit -- which you were kind enough to give me the number

3    for, and I promptly forgot.

4            (Mr. Breton and Ms. Harris conferring.)

5            MS. HARRIS:  1821, please.

6            And I'm going to ask -- this can be received without

7    objection.

8            I'm going to ask, though, Mr. Breton that you show it

9    without the sound.

10           (Video playing without sound.)

11    BY MS. HARRIS:

12    Q.  (speaking as video plays) And, Mr. Rapolla, is that

13    someone -- well, first of all, is that you off to the left in

14    this --

15    A.  Yes.  Yes, ma'am.  That's Joseph Rice speaking, BJ Soper

16    behind him and then Brandon Curtis next to him, to the right.

17    Q.  So these are all members of your group there?

18    A.  Part of the members of -- the founding members of PPN.

19           MS. HARRIS:  Can you pause the action there?  Thank

20    you.

21           (Video paused.)

22    BY MS. HARRIS:

23    Q.  And was the purpose of your press conference to discuss the

24    articles of resolution that you were delivering that day?

25    A.  Yes, ma'am.

Rapolla - D - By Ms. Harris

1   Q.  And is that what's taking place in general terms in this --

2   in this --

3   A.  Absolutely.  And then also answering questions of the press

4   and what -- whatever they have of us, what our role is, and

5   what our -- what our goals are.

6   Q.  And were there questions for the group?

7   A.  Absolutely.

8         MS. HARRIS:  And, Mr. Breton, we -- I got ahead of

9   us.  But can you play the -- start playing the remainder of the

10  video there.

11        (Video playing resumed.)

12        MS. HARRIS:  Can you jog ahead to about 1:30 or --

13        (Pause, Mr. Breton and Ms. Harris conferring.)

14        MS. HARRIS:  Okay.  Can you pause there.

15        (Video paused.)

16  BY MS. HARRIS:

17  Q.  And is that Mr. Rhodes again there?

18  A.  Yes, ma'am.  And that's me right behind him.

19  Q.  Okay.  And is this -- you know, this is a video that was

20  produced, I think, by a third party.

21        But is this before the group had convened at the

22  press conference or is this after?

23  A.  This is before us coming out and -- coming out and giving

24  direction.  Getting like where the media is at, staging.  Media

25  would try to -- come, all, and bombard us.  And we're like, no,

Rapolla - D - By Ms. Harris

1  you guys, we're going to meet with you at this meeting at the

2  media place that's designated.

3          And then coordinating with people to say, let Ammon

4  know that we're here and we would like to talk to him.

5          MS. HARRIS:  Okay.  And, Mr. Breton, can you go back

6  to Government Exhibit 110.

7  BY MS. HARRIS:

8  Q.  And that -- is that the same -- that's the same event but a

9  little bit earlier, when -- when you folks are just arriving --

10  A.  It's within the same time frame of us exiting the vehicle

11  and coming out to that area.

12  Q.  Okay.  About how long, total, was Mr. Rhodes standing on

13  the roadside at -- in that location?

14  A.  Probably no longer than 15 minutes.  It's between getting

15  people out and then trying to get the conference -- the media

16  people to stand back.  And then communicating with people at

17  the -- on the refuge, to say, hey, we're here, and we're going

18  to talk to the media.  And then we're going to come on -- we

19  would like to come on down and talk to Ammon.

20  Q.  And after the press conference concluded, did Mr. Rhodes

21  leave with the rest of the group?

22  A.  He -- no, he came down and escorted with us, down into the

23  refuge.

24  Q.  Oh, for purposes of the meeting that you had --

25  A.  Yeah, exactly.

Rapolla - D - By Ms. Harris

1  Q.  That you were a part of?

2          And about how long did that meeting take?

3  A.  Maybe less -- probably less than an hour.

4          I can't honestly -- 30 minutes, an hour, hour and a

5  half.  Nothing.

6  Q.  Was the purpose of that meeting to discuss in further

7  detail the articles of resolution?

8  A.  Presenting the articles of resolution --

9          MR. GABRIEL:  Your Honor, I'm going to object as

10  cumulative.  We've gone over this part.

11          THE COURT:  We have.  Objection sustained.

12          Let's move on, please.

13          MS. HARRIS:  Sure.

14  BY MS. HARRIS:

15  Q.  So after the group left this location, did you make another

16  stop along the way to -- to drop off another copy of the

17  articles of resolution?

18  A.  Yes, ma'am.  Then we went to the FBI staging area at the

19  airport.

20  Q.  And after that, did you make another stop?

21  A.  Yes, ma'am.  We went to Sheriff Ward, at -- at where he was

22  gated up.

23  Q.  Is that -- the area near the courthouse, in town?

24  A.  Yes, ma'am.

25  Q.  Did Ammon Bundy ask the Pacific Patriot Network to station

Rapolla - D - By Ms. Harris

1   Mr. Rhodes out there in that location with that gun?

2   A.   No, ma'am.  That's personally my doing.

3            Like, I'm the tactical team leader for Pacific

4   Patriots Network.  And any time there is a security threat or

5   anything I administer, I explain what we're going to do and how

6   we're going to do it.  Nobody dictates to me, however, on my

7   security.

8   Q.   Sure.  And this -- the decision to stage the -- the press

9   conference that day, about the articles of resolution, whose

10  idea was that?

11  A.   That press conference was already going to happen.  There's

12  randomly press conferences happening, so --

13  Q.   But whose idea was it for the Pacific Patriot Network to

14  make the appearance and take the stage to discuss the articles

15  of resolution?

16  A.   Oh, that's us within the founding members.  All of us, as

17  we saw things weren't -- whether with the FBI or Sheriff Ward,

18  there was no communication or attempt of them trying to

19  communicate.  It was complete demands on their end.  We were

20  like this is not what leadership does.  So there needs to be

21  communication between --

22            MR. GABRIEL:  Your Honor, I'm going to object again.

23  This is cumulative.

24            THE COURT:  The objection is sustained.

25            The question and answer are stricken.

Rapolla - D - By Ms. Harris

1          Please focus the question and the witness on new

2    matter.

3    BY MS. HARRIS:

4    Q.  As far as you know, did Mr. Rhodes ever return to that

5    location with that firearm?

6    A.  No, ma'am.

7          And, quite honestly, after we were done, out of

8    there, I got on the radio and I said, hey guys, that's no

9    reason -- we don't need to alarm the FBI or the sheriff.  It's

10   not going to have any issues out there.  So we don't need to

11   have our rifles.  And you guys will still -- you know, people

12   will still be out there, but it will be only the founding

13   members who will approach the FBI.

14          MS. HARRIS:  Mr. Breton, can you put up Government

15   Exhibit 712.

16          I'm sorry, 711.

17          (Pause, Mr. Breton and Ms. Harris conferring.)

18          (Video with audio playing.)

19   BY MS. HARRIS:

20   Q.  Is this another view of the same event?

21          THE COURT:  (Talking over video.)  Would you cut the

22   sound, please, Mr. Breton.

23          MR. GABRIEL:  We're -- the parties have stipulated

24   the sound is okay on this, your Honor.

25          THE COURT:  But I thought the point was just for

Rapolla - D - By Ms. Harris

1  viewing.

2         MS. HARRIS:  I'm fine with that.

3         THE COURT:  Do we need the sound?

4         MR. GABRIEL:  Yes, your Honor.

5         THE COURT:  Go ahead.  Sorry.  Run it back.  Play the

6  sound.

7         MR. GABRIEL:  From here on with sound.

8         (Video playing resuming with sound.)

9         MS. HARRIS:  Can you pause, it Mr. Breton.

10        (Video paused.)

11 BY MS. HARRIS:

12 Q.  Mr. Rapolla, were you there during this portion of the

13 events?

14 A.  Yes, ma'am.

15 Q.  Were the people who were approaching Mr. Rhodes, to your

16 knowledge, were any of them fish or wildlife employees?

17 A.  No, they -- those look like media.

18 Q.  Were they attempting to take pictures?

19 A.  They're fine in taking pictures.  But to bombard us, we

20 explained to them there were threats, and we have a security

21 team here.  And we will answer any and all questions at the

22 location of where the meeting -- which is literally less than a

23 hundred feet away.  But to come bombard us when we're getting

24 out of our vehicles is not okay.

25 Q.  And --

Rapolla - D - By Ms. Harris

1          MS. HARRIS:  I'm actually done with that.

2     BY MS. HARRIS:

3     Q.  Is this -- did you remain on and off in this area

4     throughout the month of January?

5     A.  Yes.

6     Q.  Did the area that we've been looking at and the pictures

7     and the videos, did that area look that way at any other time

8     when -- when you were there?

9     A.  No.  From there, it's -- you're -- we didn't have that many

10    people.

11          MR. GABRIEL:  Objection, your Honor.  If he didn't

12    return, he doesn't know what the area looked like.

13          THE COURT:  Ms. Harris?

14          MS. HARRIS:  Can I just ask a different question?

15          THE COURT:  Ask a clarifying question, please.

16          MS. HARRIS:  Sure.

17    BY MS. HARRIS:

18    Q.  About how many times would you say you were in that area

19    during the month of January 2016?

20    A.  Probably five, six different times, if not eight.

21          It's random.  Sometimes I would go through either

22    daytime or later on in the day just to observe and talk to the

23    front gate and just radio in and say, "Hey, you guys,

24    everything okay?"  And then head back to Burns.

25    Q.  And so during -- on those occasions, did you ever see that

225

Rapolla - X - By Defendant Ryan Bundy

1  area look the way it did in the photo and the videos that we've

2  been looking at?

3  A.   As far as vehicles being aligned like that?

4           No, there is no -- that was us doing that.  So, from

5  there, it's only one or two vehicles.  And if I would come into

6  the refuge and speak with Ammon during the day time, and -- it

7  would only be a handful of vehicles, maybe, or just myself, or

8  maybe another PPN member, so another representative.

9           MS. HARRIS:  I have no further questions.

10          Thank you.

11          THE COURT:  Other questions by defendants?

12          Mr. Bundy?

13          DEFENDANT RYAN BUNDY:  Yeah.

14                      CROSS-EXAMINATION

15  BY DEFENDANT RYAN BUNDY:

16  Q.   Brandon, how are you doing today?

17  A.   How's it going man?  Good seeing you too.  Thanks for

18  wearing purple.

19          DEFENDANT RYAN BUNDY:  Can we put 110 back up -- on,

20  please.

21  BY DEFENDANT RYAN BUNDY:

22  Q.   So -- Mr. Kevin Rhodes here and that whole line up of cars,

23  you testified that is -- that is you and the patriot -- Pacific

24  Patriot Network Group.  Correct?

25  A.   Yes, sir.

Rapolla - X - By Defendant Ryan Bundy

1  Q.  Are -- are you guys a member or -- of the Citizens for

2  Constitutional Freedom?

3  A.  No.

4  Q.  Did you --

5  A.  We support -- I mean, we know you guys, but we are our own

6  entities.

7  Q.  Gotcha.  You're not -- you're not a member.  You're not the

8  same group?

9  A.  No, ma'am -- I mean, no, sir.

10  Q.  Yeah, that's --

11  A.  (Laughing.)

12  Q.  Did you ever spend a night there at the refuge?

13  A.  No, sir.

14  Q.  I did have some other questions.  Let's see.

15        When you were in Burns during the occupation, where

16  did you stay?

17  A.  Either, one, in my truck; or, two, at the -- one of the

18  hotels in town.

19  Q.  Was there a -- a -- a government presence there in the

20  area?

21        MR. GABRIEL:  Objection, your Honor, to relevance.

22        THE COURT:  The objection is overruled.

23        Go ahead and answer.

24        THE WITNESS:  Yes, sir.

25  BY DEFENDANT RYAN BUNDY:

Rapolla - X - By Defendant Ryan Bundy

1   Q.   Okay.   What did you see taking place at the airport?

2   A.   You had the FBI tac team that was there.   You had armored

3   vehicles.   You had armored S.U.V.s.

4          And you had -- eventually you ended up having blow

5   up -- their stuff you see in Afghanistan, Iraq, the blow-up

6   buildings that are -- whether they're chow halls or they're

7   living quarters to increase -- you know, I mean, they had their

8   comms vehicles that will -- being able to interrupt any

9   communications or pick up any communications out in the air.

10          There's also their drone, which they're -- I forget

11   which drone it is.   But we observed their drone and them

12   working on it.

13   Q.   Gotcha.   But the military compound set up there.   Correct?

14   A.   Yes, sir.

15          MR. GABRIEL:   I'm going to object to the

16   characterization of this.   I mean, I think we've exhausted the

17   relevance.

18          THE COURT:   The objection is sustained.

19          Move on to a new topic, please.

20   BY DEFENDANT RYAN BUNDY:

21   Q.   Referring back to your military background, did you -- how

22   many years have you been involved with the military?

23   A.   I was active duty for four years.   I was deployed in the

24   WESTPAC in 1996.   I was in the infantry unit.

25   Q.   And you've been involved with militia-type groups since

Rapolla - X - By Mr. Salisbury

1    or --

2    A.  On and off.

3    Q.  So militarily speaking, is 18,000 rounds a lot of

4    ammunition for 20 or 30 guys?

5    A.  No.  (Laughing.)

6    Q.  You can --

7    A.  That's not very much at all.

8    Q.  Can you go through that in practice pretty fast or --

9    A.  Yeah.  On average, when I -- when I teach people and train,

10   you know, your -- per caliber, you need about three to 5,000

11   rounds per caliber, whatever weapon system you have; whether

12   it's a firearm, a shotgun, a medium-range gun or a long-range

13   gun.  So it just kind of depends on your purpose, whether

14   hunting or self-defense, home defense.  And you need to be able

15   to -- you know, different rounds to use for different reasons.

16   Q.  Okay.  And you said you support -- or you support the

17   Citizens for Constitutional Freedom but you don't take

18   directions from them?

19   A.  No.  No, sir.

20           DEFENDANT RYAN BUNDY:  All right.  I have no other

21   questions.

22           THE COURT:  All right.  Mr. Olson.

23           MR. OLSON:  No, thank you, your Honor.

24           THE COURT:  Mr. Salisbury?

25           MR. SALISBURY:  Yes.  Thank you, your Honor.

Rapolla - X - By Mr. Salisbury

1                          CROSS-EXAMINATION

2    BY MR. SALISBURY:

3    Q.  Sir, you've already mentioned that you're a veteran of the

4    U.S. military?

5    A.  Yes, sir.

6    Q.  Thank you.

7              I'm curious, in your testimony that you just

8    mentioned about the 18,000 rounds --

9    A.  Um-hmm.

10   Q.  -- I didn't hear you say -- how many rounds would you

11   estimate you would go through in a typical session?

12             MR. GABRIEL:  Your Honor, I'm going to object to

13   relevance now.

14             THE COURT:  The objection is sustained.

15   BY MR. SALISBURY:

16   Q.  Now, you did mention in your testimony earlier that -- I

17   think you said the reason that you went out there to the refuge

18   was because there was no communication.  Was that your

19   testimony?  No communication with law enforcement?

20             THE WITNESS:  The --

21             MR. GABRIEL:  I'm going to object as cumulative.

22             MR. SALISBURY:  Well --

23             THE COURT:  You can clarify what you understand his

24   direct testimony to be, but he spoke at length about his

25   concerns and why he presented the resolution to various

Rapolla - X - By Mr. Salisbury

1  parties.

2  BY MR. SALISBURY:

3  Q.  Can you do that, sir?  Clarify that -- the lack of

4  communication as the reason you went there?

5          THE COURT:  Well, that's just repeating what I said.

6  And he's already talked on direct and there's an objection to

7  it being cumulative.  So if you need a new question, ask it,

8  please.

9  BY MR. SALISBURY:

10 Q.  Sure.  Is that something that the Pacific Patriot Network

11 typically does?

12 A.  So the role --

13         MR. GABRIEL:  I'm going to object to relevance on

14 this, your Honor.

15         THE COURT:  No, he can explain the purpose of his

16 agency.

17         Go ahead, sir.

18         THE WITNESS:  So Pacific Patriots Network is

19 citizens, like your neighborhood watch.  People who are --

20 whether we're prepping communications, food, water, security,

21 and anything that happens, whether it's a Cascadia event,

22 whether it's a flooding event, or -- in this instance, we had

23 Ammon Bundy and the people at the refuge that, you know, we

24 were concerned for their safety and we were concerned, you

25 know, that nothing happens to them.  And that we were there

Rapolla - X - By Mr. Schindler

1  as -- as assistance, like, in any way we can be.  And we're

2  concerned for -- for them.

3  BY MR. SALISBURY:

4  Q.  Why were you concerned for their safety?

5  A.  It's very clear, in history --

6          MR. GABRIEL:  I'm going to object, your Honor.

7  Relevance.

8          THE COURT:  The objection is sustained.

9          Move on.

10          MR. SALISBURY:  I have no further questions.

11          THE COURT:  All right.  Mr. Schindler, do you have

12  questions?

13          MR. SCHINDLER:  Yes, please, your Honor.  Thank you.

14          THE COURT:  Let's move on, please.

15                        CROSS-EXAMINATION

16  BY MR. SCHINDLER:

17  Q.  Mr. Rapolla, why wasn't the Pacific Patriots Network

18  participating in this protest?

19          MR. GABRIEL:  I'm going to object to relevance, your

20  Honor.  Why they weren't participating is not relevant to

21  these --

22          THE COURT:  The objection is sustained.

23          THE WITNESS:  -- defendants' state of minds.

24          THE COURT:  The objection is sustained.  Please get

25  to the charges here and the -- and the issues that he can offer

Rapolla - X - By Mr. Schindler

1   that might be of help to the jury that have not already been

2   covered.

3           MR. SCHINDLER:  Okay.

4   BY MR. SCHINDLER:

5   Q.  How long did you spend speaking with Mr. Bundy?

6   A.  Say again, sir.  I can't hear you.

7   Q.  How long did you spend speaking with Ammon Bundy?

8   A.  Sometimes on a daily basis, sometimes maybe not till three

9   or four days from the time -- it just would kind of depend on

10  where I was at; whether I was back at home or back out at the

11  refuge or, you know, out in Burns.

12          I made a point, though, if I did come back into town,

13  to try to make communication with Ammon.  I respect Ammon, and

14  I would consider us as being friends and --

15  Q.  You spoke to him many hours over that period of time?

16  A.  Yes, sir.

17  Q.  And at any point during those many hours of conversation,

18  did he ever threaten any Fish & Wildlife officials?

19  A.  If he had threatened anybody, I want to be there.

20          And, quite honestly, that's the roles of why I

21  support Ammon is because he's not a violent person.  None of

22  the Bundys are, from meeting their family.

23          Their concerns are what's happening in -- to other

24  people and what's happened to the Hammonds.  And there's a big

25  issue here, and that's why I'm here.

Rapolla - X - By Mr. Mumford

1    MR. SCHINDLER:  Thank you, your Honor.  I have no

2 further questions.

3    THE COURT:  Ms. Maxfield?

4    MS. MAXFIELD:  No questions.  Thank you.

5    THE COURT:  Ms. Harris or Ms. Cox?  I'm sorry.

6 Ms. Harris or Ms. Cox?

7    Oh, you started.  I'm sorry.  It is late.

8    Mr. Mumford, your turn.

9                    CROSS-EXAMINATION

10 BY MR. MUMFORD:

11 Q.  So these articles of resolution were being presented by

12 you.  Right?

13 A.  By PPN.  Not just myself, but all of the founders.

14 Q.  By PPN, to try to encourage communication between Ammon

15 Bundy, in this instance, constitutional freedom over here, and

16 the FBI and -- and the police over here.  Right?

17 A.  Yes, sir.

18    MR. MUMFORD:  And Exhibit 110, please.

19 BY MR. MUMFORD:

20 Q.  And this individual stood in this location about 15

21 minutes, then?

22 A.  At -- whatever it took us to organize and go to the --

23 Q.  On January 9th?

24 A.  Yes, sir.

25 Q.  And someone had -- had -- and someone happened to take his

Rapolla - X - By Mr. Gabriel                       234

1   photo?

2   A.   Yeah, all of the media are sitting right there.

3            If you were to take -- stand back ten feet, you would

4   see the line of media that was in front.

5   Q.   When you talked about the intelligence you had received

6   about a threat --

7   A.   Um-hmm.

8   Q.   -- did you have any -- did you have any information that

9   the -- to fear Mr. Bundy or his group at all?

10  A.   No.  It was specifically directed to us.

11  Q.   And when you went in to meet with Mr. Bundy, there --

12  the -- the -- basically, the threat had been taken care of by

13  that point because it's not in the refuge.  Right?

14  A.   Right.  We -- they -- we just got escorted down there.  The

15  security waited outside while we went inside.  And, like

16  normal, just go and sit down and have a pow-wow with Ammon and

17  other people there.

18  Q.   All right.  Thank you.  Thank you very much, Mr. Rapolla.

19            No more questions.

20  A.   Yes, sir.

21            THE COURT:  Mr. Gabriel, any questions?

22            MR. GABRIEL:  Yes, just one.

23                      CROSS-EXAMINATION

24  BY MR. GABRIEL:

25  Q.   Mr. Rapolla, I'm Craig Gabriel.  I'm one of the prosecutors

Rapolla - ReD - By Ms. Harris

1   in the case.  You recognize Government Exhibit 711?  That was

2   the video with the --

3   A.  Yes, sir.

4   Q.  Okay.  I would like to play that for you.  We just saw a

5   portion of it.

6            (Video playing with audio.)

7            MR. GABRIEL:  I have no further questions, your

8   Honor.

9            MS. HARRIS:  Briefly on redirect, Judge.

10           THE COURT:  Yes.

11                    REDIRECT EXAMINATION

12  BY MS. HARRIS:

13  Q.  Mr. Rapolla, you were there for this exchange?

14  A.  Yeah, I was in that video.

15  Q.  Okay.  And about how long did that interaction with the

16  press and Mr. Rhodes and your people -- about how long did that

17  last?

18  A.  On the side of the road?  15, roughly 15 minutes.  And then

19  we spoke at the press conference, and that was however long

20  that took to answer their questions.  And maybe 30, 45

21  minutes -- and, actually, LaVoy Finicum first spoke.

22  Q.  And -- that's fine.

23  A.  Okay.

24  Q.  And were you -- were you in that scene?  Were you and your

25  Pacific Patriot Network, were you asking to receive questions

Rapolla - ReX - By Defendant Ryan Bundy

1  and deal with the press at the staging area, where the press

2  conference was --

3  A.  Yes, ma'am.

4  Q.  Okay.  And, again, what was the reason why you were asking

5  them to give you space?

6  A.  Well, we first had a threat and from that point, if we're

7  going to move, we want to move to an area that's designated.

8  And also to get us off the road.  It's -- (laughing).

9  Q.  And while you were there, did you see any U.S. Fish &

10  Wildlife Service or BLM vehicles being blocked on that roadway?

11  A.  No, absolutely not.

12          MS. HARRIS:  I have nothing else.

13          DEFENDANT RYAN BUNDY:  I have redirect.

14          THE COURT:  Pardon me?

15          DEFENDANT RYAN BUNDY:  I said I have some redirect.

16          THE COURT:  Yes, Mr. Bundy.  Go ahead.

17                    RECROSS-EXAMINATION

18  BY DEFENDANT RYAN BUNDY:

19  Q.  Again, from that -- from that video, those who were putting

20  up the perimeter, guards, they were all PPN members?

21  A.  Yes, those are our members.

22  Q.  Gotcha.  Were there any of those there that were members of

23  the Citizens for Constitutional Freedom?

24  A.  No, sir.

25          DEFENDANT RYAN BUNDY:  No further questions.  Thank

Colloquy

1    you.

2              THE COURT:  All right.  Thank you, sir.  You may step

3    down.

4              Thank you.  Watch your step.

5              THE WITNESS:  Thank you, ma'am.

6              THE COURT:  And in light of the day, ladies and

7    gentlemen, you will too.

8              Please leave your notes on the chair.  Thank you,

9    again for another day of attentive participation.  The parties

10   and the Court very much appreciate your work.

11             Tomorrow, same time, nine o'clock.  We'll be ready

12   for you.

13             Enjoy the evening.  Do not discuss the case with

14   anyone or allow anything about it to cross your path.

15             Have a good evening.  Let's all stand for the jurors.

16             (Jurors exit at 4:25 p.m.)

17             THE COURT:  All right.  Please be seated.

18             Let us chart the course for tomorrow.

19             Mr. Mumford, how much longer on direct for Mr. Bundy?

20             MR. MUMFORD:  Thank you, your Honor.

21             I believe, you know -- hold on.

22             May I -- may -- may -- can I have -- you come back to

23   me on this, your Honor?  Because I can just scroll through --

24             THE COURT:  You're sort of the direct examiner,

25   Mr. Mumford.

Colloquy

```
 1          MR. MUMFORD:  I understand that, your Honor --
 2          THE COURT:  According to my notes, we left off with
 3   Mr. Bundy talking about the formation of the citizens
 4   constitutional -- for constitutional freedom.  He was asked
 5   about the management of day-to-day activities, the morning
 6   meetings.  He was asked whether he was a leader.  But he
 7   described -- he wasn't telling others what to do.
 8          That's about where you left off.
 9          MR. MUMFORD:  I -- and, yeah, thank you.  Thank you
10   for that, you -- your Honor.
11          I believe most of the day tomorrow is -- sorry, is
12   going to be -- sorry, the -- the -- I would say the -- the
13   majority of the examination day tomorrow is -- is --
14   constitutes the rest of the information that we anticipate we
15   can get in through Mr. Bundy.  And I believe that's
16   approximately -- I can't -- I can give the Court a better
17   estimate after I get a chance to add it up.  But your Honor
18   will recall there's that last 15-minute clip that is the one
19   that we -- we compromised with the Government on.  And then
20   there's the intermittent clips that we have.
21          I think, in addition to those -- those -- those
22   clips, I believe we have about 30 -- 30 -- 30 to 45 minutes of
23   it.
24          THE COURT:  So what does that total?  About 90
25   minutes?
```

Colloquy

1          MR. MUMFORD:  Yeah.  Less than that, I think, but

2    let's say that, just to be safe.

3          THE COURT:  All right.  Now, defendants, I know, have

4    also arranged other witnesses for tomorrow.

5          The -- your doctor?

6          MR. OLSON:  No.

7          THE COURT:  Not for tomorrow?  That's next week?

8          MR. OLSON:  Yeah.

9          MR. SCHINDLER:  (Laughing.)

10          THE COURT:  I'm sorry.  Mr. Schindler?

11          MR. SCHINDLER:  Oh, no, I'm just laughing because

12    poor Mr. Olson has been asked 19 times about whether or not his

13    doctor is testifying.

14          THE COURT:  Well, because I keep being told different

15    things.  And I'm trying hard -- I'm trying hard now.  Would you

16    just leave the laughter for later?

17          MR. SCHINDLER:  Sure.

18          THE COURT:  Does anybody have any witnesses they need

19    to put on tomorrow that would affect Mr. Bundy's direct

20    testimony?

21          MR. MUMFORD:  No, your Honor.  But me and -- and

22    Mr. Ryan Bundy's team are coordinating with respect to the

23    expert, Mr. Stephenson.

24          THE COURT:  All right.  What time of day is that

25    expected to happen?

Colloquy

1          MR. MUMFORD:  I believe we anticipate in the

2     afternoon.

3          THE COURT:  In the afternoon?

4          MR. MUMFORD:  Yes, I believe so.

5          THE COURT:  All right.  So then the plan is to go

6     forward with Mr. Bundy tomorrow, to continue his direct.

7          All defendants will ask their direct exams and then

8     we'll get to cross tomorrow, in the morning; maybe.

9          MR. KNIGHT:  Maybe.  Okay.

10         THE COURT:  All right.  I would like everybody here

11    at eight o'clock, on time, please, so we can clear through any

12    issues that are planned for tomorrow and make good use of the

13    jury's time.

14         And then I'm going to ask, do defendants need to

15    confer as a group at all tonight before the marshal takes the

16    defendants back?  Yes?

17         MR. MUMFORD:  Yes, your Honor.  Thank you.

18         THE COURT:  Okay.  Marshals, how about 20 minutes.

19    Can you do that without --

20         THE MARSHAL:  Yes, your Honor.

21         THE COURT:  -- a staffing problem?

22         All right.  Everybody in the back of the courtroom

23    needs to leave.  Everybody who is not a member of this defense

24    team needs to leave.

25         Mr. Patrick, you need to leave.  Mr. Patrick, you

Colloquy                                241

1   need to leave now.  This is only for the defense team for this

2   trial.

3              Please leave.

4              (Court adjourned.)

5              (Conclusion of excerpt.)

6

7

8                              --oOo--

9

10  I certify, by signing below, that the foregoing is a correct

11  stenographic transcript of the oral proceedings had in the

12  above-entitled matter this 4th day of February, 2017.  A

13  transcript without an original signature or conformed signature

14  is not certified.  I further certify that the transcript fees

15  and format comply with those prescribed by the Court and the

16  Judicial Conference of the United States.

17
           /S/ Amanda M. LeGore
18        _____

19        AMANDA M. LeGORE, CSR, RDR, CRR, FCRR, CE
            CSR No. 15-0433  EXP:  3-31-2018
20

21

22

23

24

25