IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,                    3:16-cr-00051-BR

        Plaintiff,                       **FINDINGS OF FACT AND
                                             CONCLUSIONS OF LAW**
v.                                           **FINDING RESPONDENT
                                             GARY HUNT IN CIVIL**
AMMON BUNDY, *et al.*,                        **CONTEMPT**

        Defendants,

GARY HUNT,

        Respondent.


**BROWN, Judge.**

This matter comes before the Court on the Court's Order
(#1901) to Show Cause in which the Court directed Respondent Gary
Hunt to show cause why he should not be held in civil contempt
for his failure to comply with this Court's Order (#1691),
Protective Order (#342), and the Supplement to Protective Order
(#1692).


**PROCEDURAL BACKGROUND**

On January 6, 2017, the government filed a Motion (#1680) to


1 - FINDINGS OF FACT AND CONCLUSIONS OF LAW FINDING RESPONDENT
    GARY HUNT IN CIVIL CONTEMPT

Enforce Protective Order in which it alleged Respondent Gary
Hunt, a 71 year-old man residing in Los Molinas, California, was
publishing on a public internet website material that is
protected from public disclosure by the Court's Protective Order
(#342) issued in this case on March 24, 2016.

By its January 11, 2017, Order (#1691), the Court granted in
part the government's Motion to Enforce Protective Order,
directed Respondent to remove all protected material from his
website, and enjoined Respondent from any further dissemination
of material covered by the Protective Order.  That same day the
Court issued a Supplement to Protective Order (#1692) making
clear that "[a]ny individual or entity that obtains materials
protected by the Court's Protective Order (#342) is prohibited
from disseminating those materials or any information derived
therefrom to any other individual or entity by any means."  The
Court directed the government to serve Respondent personally with
a copy of the Protective Order (#342), the Supplement to
Protective Order (#1692), and the Court's Order (#1691).
Pursuant to that directive, the government filed on January 12,
2017, a Certification of Service of Court Orders (#1697) in which
the government certified it had completed personal service on
Respondent.

On January 30, 2017, the government filed a Motion (#1788)
for Order to Show Cause together with the Affidavit (#1789) of

2 -  FINDINGS OF FACT AND CONCLUSIONS OF LAW FINDING RESPONDENT
     GARY HUNT IN CIVIL CONTEMPT

FBI Special Agent Ronnie Walker in which the government sought an order directing Respondent to appear before this Court to show cause why he had not yet complied with the Court's Order (#1691). At the Court's direction the government filed a Supplemental Memorandum (#1840) on February 7, 2017, in which it made a preliminary showing that Respondent was subject to this Court's jurisdiction and that Respondent's conduct was not protected by the First Amendment. On February 16, 2017, the Court granted the government's Motion and issued an Order (#1901) to Show Cause that required Respondent to appear at a show-cause hearing in Portland, Oregon, on March 10, 2017. In that Order the Court advised Respondent that he could either appear in person or by telephone and provided him with instructions on how to contact the Court to arrange to appear by telephone. Order (#1901) at 1-2. In addition, the Court offered to assist Respondent with appointment of *pro bono* counsel in the event that he wished to be represented by counsel and lacked the financial means to retain an attorney. Order (#1901) at 2.

Respondent, however, failed to appear at the show-cause hearing and failed to contact the Court in response to the Order (#1901) to Show Cause. As a result, on March 10, 2017, the Court issued a warrant for Respondent's arrest. *See* Order (#2017).

Respondent was arrested near his home on March 30, 2017. A Magistrate Judge in the United States District Court for the

3 - FINDINGS OF FACT AND CONCLUSIONS OF LAW FINDING RESPONDENT
    GARY HUNT IN CIVIL CONTEMPT

Eastern District of California conducted a first appearance,
detained Respondent, and directed the United States Marshal to
transport Respondent to the District of Oregon.  After it
appeared to this Court that transport could not be conducted on a
sufficiently expedited basis, the Court conducted a telephone
hearing on April 6, 2017, in the District of Oregon at which
Respondent was represented on a interim basis by the Office of
the Federal Public Defender in the Eastern District of
California.  At that hearing and at Respondent's request, the
Court appointed separate Oregon counsel to represent Respondent.

During the April 6, 2017, hearing, it became clear that
Respondent had ignored the Court's orders to appear because he
believed the Court did not have jurisdiction to compel his
appearance and that he had erroneously concluded compliance with
such orders or appearing in response to the Court's orders would
waive those arguments.  After the Court explained the process of
a "special appearance" to challenge jurisdiction without
submitting to jurisdiction, Respondent agreed to appear for court
proceedings on these matters in Portland, Oregon, if he was
released from custody in Sacramento.

For the reasons stated on the record at the conclusion of
the April 6, 2017, telephone hearing, the Court granted
Respondent's Motion (#2055) for Revocation of Detention Order and
directed that Respondent be released from custody based on his

personal assurance that he would appear at a hearing on May 9,
2017, at the United States District Court Courthouse in Portland,
Oregon, to address as a preliminary matter Respondent's challenge
to the Court's jurisdiction over him and the Court's authority to
take action regarding his publication of material that is the
subject of the still-existing Protective Orders.

With the assistance of court-appointed counsel, Respondent
filed a Memorandum of Law (#2077) in which he contended this
Court lacked personal jurisdiction over him in these civil-
contempt proceedings, the government filed a Response (#2079) in
which it set forth its arguments in support of a finding that
this Court has personal jurisdiction over Respondent, and
Respondent filed a Reply Memorandum (#2085).

As he promised, Respondent appeared personally and with
court-appointed counsel at the May 9, 2017, hearing, and the
Court heard the parties' oral arguments on the jurisdictional
issues.  By its Order (#2095) issued May 11, 2017, the Court
concluded the jurisdictional questions were inextricably
intertwined with disputed factual issues underlying the merits of
the civil-contempt matter, and, therefore, the Court directed the
parties to brief their positions in anticipation of an
evidentiary haring to resolve these issues.

The government filed its Memorandum in Support of Civil
Contempt (#2126) on June 12, 2017; Respondent filed his

Memorandum of Law in Opposition (#2173) on July 21, 2017; and the government filed a Reply Memorandum (#2189) on August 4, 2017.

On August 23, 2017, Respondent again appeared personally and with court-appointed counsel for an evidentiary hearing and oral argument on the merits of these civil-contempt proceedings.

The record for these show-cause issues is now complete, and, based thereon, the Court issues the following Findings of Fact and Conclusions of Law.


## FINDINGS OF FACT

It is undisputed that the government must meet its burden of proof for these civil-contempt proceedings by clear and convincing evidence. Accordingly, based on the record regarding this contempt matter and the Court's knowledge derived from presiding at the underlying criminal proceedings, the Court finds the following facts by clear and convincing evidence:

1.  Respondent is a 71 year-old resident of Los Molinas, California, who, since 1993 and following the events at Waco, Texas, has been writing publicly about matters that he views as "federal government overreach," including concerns that the federal government has been "spying on our people like East Germany and Russia." Although his writings have taken various forms, since 2009 Respondent has maintained a website with a blog entitled "Outpost of Freedom" that contains his writings.

6 - FINDINGS OF FACT AND CONCLUSIONS OF LAW FINDING RESPONDENT
    GARY HUNT IN CIVIL CONTEMPT

2.     In the months before the occupation of the Malheur
National Wildlife Refuge (MNWR), Respondent was a member of the
Operation Mutual Defense Advisory Board together with, among
others, Ryan Payne and Jon Ritzheimer, who were two of the
leaders of the occupation of the MNWR and two of the 26
Defendants in this criminal case.  This Board, including
Respondent, was focused on deciding whether and how to take
action to prevent the compelled return of Dwight and Steven
Hammond to federal prison to serve the remainder of their
mandatory-minimum sentences for arson convictions after the
government's successful appeals of lesser sentences.  *See* Gov't
Ex. 3 at 5.

3.     In the course of this extended multi-count criminal
case against the 26 Defendants and pursuant to this Court's
Protective Order (#342), the government provided to Defendants as
part of discovery redacted versions of confidential human source
(CHS) reports compiled by FBI agents investigating the MNWR
occupation.  The government also inadvertently provided
Defendants with un-redacted versions of some of the CHS reports.

4.     The Court's Protective Order (#342) explicitly
prohibited dissemination of the CHS reports (and other discovery
materials not at issue in these contempt proceedings) to anyone
who was not a named party, an attorney for a named party, or a
member of a named party's legal team.  In addition, each of the

CHS reports produced to Defendants in discovery was stamped with markings that stated "Dissemination Limited by Court Order" and stamped with Bates numbers that the government used to track and to reference discovery.

5.     Respondent is not and was not a person entitled to receive discovery under the terms of the Court's Protective Order (#342).   Nevertheless, in late summer or fall 2016 when the Court and the parties to this criminal case were preparing for and then trying the first jury trial that began on September 7, 2016, Respondent received in his mailbox at his California residence an envelope with a thumb drive inside and a note warning him not to share "this information" and to "get rid" of the drive.   When Respondent opened the thumb drive, he saw it contained numerous CHS reports stamped with markings that stated "Dissemination Limited by Court Order" and bearing specified Bates numbers. Respondent, therefore, was immediately aware there was a Court Order that prohibited both his receipt of and ultimate dissemination of the CHS reports.

6.     There is not any basis to find (and, in addition, it is highly improbable) that the thumb drive was provided to Respondent by anyone associated with the prosecution team.   The only other source for the information on that thumb drive is a Defendant or someone serving on a Defendant's legal team.   Under these circumstances the Court finds at least one of the 26

Defendants and/or at least one person on a Defendant's legal team intentionally provided the CHS reports to Respondent either directly or indirectly through a third person.

7. Moreover, it is undisputed that Respondent had a longstanding public blog critical of the federal government and, in particular, critical of what he perceived to be the government's surveillance of Americans, and that Respondent was already publicly associated with at least two Defendants for the purpose of assisting Dwight and Steven Hammond even though Respondent was not himself a defendant in this case. In light of these facts the Court finds one of the purposes of providing these reports to Respondent was for Respondent to publish them even though a Defendant or Defendant's representative was explicitly prohibited from doing so and for Respondent thereby to attempt to aid Defendants in identifying one or more of the CHS individuals so they could be called as witnesses at the trial set to begin February 14, 2017.

8. Respondent testified he did not know the source of these CHS reports. Although the Court is skeptical that this statement is true, the Court, nevertheless, does not find it necessary to determine whether Respondent actually knew the identity of the person(s) who left the thumb drive in his mailbox. It is sufficient for these proceedings that the Court finds Respondent knew the protected information on the thumb

drive originated with at least one Defendant and/or at least one member of a defense team.

9.    The Court emphasizes the Protective Order (#342) prohibited any dissemination of the materials provided to Respondent, including, in particular, any content from the CHS reports.  Nevertheless, as early as November 15, 2016, which is after the acquittals of seven Defendants in the first jury trial, and continuing through January 2017, which immediately preceded the beginning of the second jury trial, Respondent extensively quoted and "cut-and-pasted" from the CHS reports in several posts on his internet blog.  Respondent's published excerpts from the CHS reports varied in length from a few sentences to several paragraphs.

10.    With respect to Respondent's intended purpose(s) in posting the materials from the CHS reports, the Court notes the content that Respondent published is consistent with his longstanding interest in writing about matters that Respondent views as "government overreach" in general and law enforcement's use of informants in particular.  Indeed, the Court finds Respondent wanted to "out" the CHSs consistent with that interest.

11.    The Court, however, is not persuaded that was Respondent's only purpose in publishing this protected information.  In particular, the Court finds Respondent also

specifically intended to assist the defense in the second trial by publishing the CHS reports and trying to identify the CHSs. The Court reaches this conclusion notwithstanding Respondent's denial of such an intent and his argument that any assistance Defendants may actually have received from his publication of the CHS reports was an unintended consequence of his intended discussion of "government overreach." The Court finds this distinction is, at best, a *post hoc* rationalization to avoid accountability in this matter.

12. Instead, as explained in further detail below, Respondent's previous association with at least two Defendants on issues inextricably intertwined with the merits of the criminal case, his ongoing coordination with individuals who were involved in the occupation of the MNWR even after the occupation ended, his vehement disagreement with the Court's Order (#1453) in October 2016 regarding unredacted CHS reports, and his recorded statements to Schuyler Barbeau all support the Court's finding that Respondent published information in violation of the Protective Order to assist the Defendants who were explicitly subject to the Order.

13. Concerning his efforts to identify one particular alleged CHS, Respondent stated in his November 25, 2016, blog post:

When I obtained access to the "CHS Reporting Documents"

> (form 1023), it was simply a matter of matching dates,
> statement [*sic*], etc., to determine which of those
> reports were from [CHS]. This required communication
> with those who were at the Refuge, though not still in
> custody, to verify certain things that became key to
> unlocking the necessary proof of [CHS]'s role as an
> informant.

Gov't Ex. 4 at 3. Thus, in his effort to identify CHSs publicly

after he received the reports, Respondent coordinated with

individuals who occupied the MNWR and who, based on Respondent's

use of the phrase "though not *still* in custody," appear to have

been Defendants in this case.

14. Moreover, it is undisputed that Respondent disagreed

vehemently with this Court's October 18, 2016, Order (#1453) in

which, after the parties made their positions clear on the record

and the Court conducted an *in camera* review, the Court declined

to order the government to disclose to Defendants in the first

trial the unredacted versions of the CHS reports. As was noted

on the record at the time of that Order, the Court concluded the

redacted versions of the reports disclosed all potentially

exculpatory information that the Court could identify on the

existing record. *See* Gov't Ex. 1 at 2-3; Gov't Ex. 2 at 2-3.

Nevertheless, although it appears Respondent may to some extent

have misinterpreted the meaning of the Court's October 18, 2016,

Order and the circumstances that led to that Order, it is clear

from his writings that he definitely intended to circumvent that

Order by attempting to identify the CHSs through the publication

12 - FINDINGS OF FACT AND CONCLUSIONS OF LAW FINDING RESPONDENT
     GARY HUNT IN CIVIL CONTEMPT

of the CHS reports in violation of the Protective Order and
thereby to identify the CHSs so that Defendants could call them
as witnesses at the second trial.  The Court notes its orders and
rulings in this case did not prohibit any party from calling CHSs
as witnesses at trial,[1] but any attempt to identify CHSs by
publicizing the CHS reports was clearly prohibited by the
Protective Order.

15.  As established at the August 23, 2017, evidentiary
hearing, during a recorded telephone call on November 18, 2016,
with Schuyler Barbeau, who was in jail at the time on somewhat
related charges, Respondent stated:  "Right now I'm focused on
exposing these informants because that's going to help the
February trial."   The Court notes Respondent does not dispute
the call took place nor that he made this statement.  Instead
Respondent testified he made the statement to Barbeau in an
effort to lift Barbeau's spirits, but Respondent maintains the
statement did not reflect his actual intentions in publishing the
protected CHS reports.  The Court finds Respondent's explanation
is not credible and, instead, Respondent's statement to Barbeau
was an accurate reflection of one of his purposes in publishing

---

[1] Indeed, Defendants called two CHSs as witnesses in the
trial that began September 7, 2016, and one CHS as a witness in
the trial that began February 14, 2017.  The Court assumes
Defendants, their counsel, and legal teams identified those
witnesses without any help from Respondent and consistent with
the Court's orders.

the CHS reports.

16.    FBI Special Agent Matthew Catalano provided Respondent with a copy of the Protective Order on January 5, 2017, together with a cease-and-desist letter from the United States Attorney's Office for the District of Oregon.

17.    Notwithstanding being served with court orders as noted above, Respondent has not removed any of the CHS reports from his website nor taken down any of the blog posts that contain excerpts of the CHS reports.

## CONCLUSIONS OF LAW

### I.    Standards

"A party moving for civil contempt must prove that the non-moving party has violated a court order by clear and convincing evidence." *Ahearn ex. rel. Nat'l Labor Relations Bd. v. Int'l Longshore & Warehouse Union*, 721 F.3d 1122, 1129 (9th Cir. 2013). *See also In re SK Foods, L.P.*, Nos. 15-16806, 15-16807, 2017 WL 2992237, at *1 (9th Cir. Jul. 14, 2017)(quoting *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999)("'The standard for finding a party in civil contempt is well settled:  The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court.  The burden then shifts to the contemnors to demonstrate why they were unable to

comply.'").

Ordinarily civil-contempt proceedings are brought against a litigant who violates a court order. A nonparty, however, "may also be held liable for knowingly aiding and abetting another to violate a court order." *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 945 (9th Cir. 2014).

This principle also applies to nonparties to the original action. "'[T]o be held liable in contempt, it is necessary that a non-party respondent must either abet the defendant [in violating the court's order] or be legally identified with him,' . . . and that the non-party have notice of the order." *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1324 (9th Cir. 1998) (quoting *NLRB v. Sequoia Dist. Council of Carpenters*, 568 F.2d 628, 633 (9th Cir. 1977)). Accordingly, in order to find a nonparty in civil contempt for aiding and abetting a party to a court order in the violation of such an order, the court must find (1) the "nonparty [knew] of the judicial decree, and nonetheless act[ed] in defiance of it" and (2) "the challenged action [was] taken for the benefit of, or to assist, a party subject to the decree." *Goya Foods, Inc. v. Wallack Mgmt. Co.*, 290 F.3d 63, 75 (1st Cir. 2002). Moreover, a mistaken assessment of the applicability of a court's order is not a defense to civil contempt for violating that order. *Id.* ("When a legitimate question exists as to the scope or effectiveness of a court's

order, those who know of the decree, yet act unilaterally, assume the risk of mistaken judgments.").

As noted in the Court's May 11, 2017, Order (#2095), the test for whether this Court has jurisdiction over Respondent in this civil-contempt action is the same as the test for determining whether Respondent aided and abetted a party to this action in the violation of the Court's Protective Order. In other words, if there is clear and convincing evidence that Respondent aided and abetted a party to this matter in the violation of the Court's Protective Order, personal jurisdiction over Respondent exists in this District. *See Reebok Int'l Ltd. v. McLaughlin*, 49 F.3d 1387, 1391 (9th Cir. 1995)*. See also Waffenschmidt v. MacKay*, 763 F.2d 711, 714 (5th Cir. 1985).

## II. <u>Conclusions of Law and Analysis</u>

For the reasons that follow, the Court concludes Respondent aided and abetted at least one Defendant in the violation of the Court's Protective Order (#342) based on the above Findings of Fact and reasonable inferences arising from those facts.

As noted, to support the conclusion that Respondent aided and abetted a Defendant in the violation of the Protective Order, the Court must find (1) the "nonparty [knew] of the judicial decree, and nonetheless act[ed] in defiance of it" and (2) "the challenged action [was] taken for the benefit of, or to assist, a party subject to the decree." *Goya Foods*, 290 F.3d at 75.

As noted in the Court's Findings of Fact, Respondent had notice that the Protective Order prohibited the dissemination of the CHS reports at least by the time Respondent received the reports in late summer or fall 2016. Moreover, Respondent had notice of the entirety of the Protective Order no later than January 5, 2017, when Special Agent Catalano served him with a copy of that Order. Nonetheless, Respondent knowingly disseminated the contents of the CHS reports when he repeatedly posted the substance of those reports on his website.

In addition, the Court has found Respondent publicly posted the substance of the CHS reports with the specific intent of assisting the defense and, in particular, the Defendants who were set to begin trial in February 2017.

When Respondent set out to identify and to publicize the court-protected identities of CHSs so that he could help Defendants in the February 2017 trial call those CHSs as trial witnesses, the Court concludes Respondent's actions exceeded any First Amendment privilege protecting a journalist or commentator and crossed over into being a voluntary and active participant in the defense.

On this record, therefore, the Court concludes Respondent intentionally aided and abetted at least one Defendant and/or a member of a defense team in the violation of the Court's Protective Order (#342).

17 - FINDINGS OF FACT AND CONCLUSIONS OF LAW FINDING RESPONDENT GARY HUNT IN CIVIL CONTEMPT

To the extent that Respondent alleges he did not know he could be subject to the Protective Order as an aider-and-abettor, that is not a defense in this civil-contempt proceeding. *See Goya Foods*, 290 F.3d at 75 ("When a legitimate question exists as to the scope or effectiveness of a court's order, those who know of the decree, yet act unilaterally, assume the risk of mistaken judgments."). In any event, the Court notes Respondent neither sought relief from nor clarification of the Protective Order despite the Court's offers to permit Respondent to make a telephonic or written presentation and to provide Respondent with counsel. Accordingly, because the Court concludes Respondent aided and abetted at least one party to the Protective Order (#342) in the violation thereof, it follows that this Court has personal jurisdiction over Respondent in this civil-contempt proceeding. *See Reebok Int'l Ltd.*, 49 F.3d at 1391.

Respondent, nonetheless, contends this Court's Protective Order (#342) and Supplement to the Protective Order (#1692) constitute impermissible prior restraints on free speech and, therefore, are invalid. As an initial matter, the Court need not rely on the Supplement to the Protective Order (#1692) in these civil-contempt proceedings, and, therefore, the Court need not determine whether Respondent's violation of the Supplement's broader prohibition on third-party dissemination of protected discovery materials is a basis to hold Respondent in contempt.

With respect to the initial Protective Order (#342), the Court concludes that Order does not amount to a prior restraint on Respondent's free speech in violation of the First Amendment. The Supreme Court has made clear that "an order prohibiting dissemination of discovered information before trial is not the kind of classic prior restraint that requires exacting First Amendment scrutiny." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984). The Court reasoned: "[S]uch a protective order prevents a party from disseminating only that information obtained through use of the discovery process," and, therefore, "the party may disseminate the identical information covered by the protective order as long as the information is gained through means independent of the court's processes." *Id.* at 34. *See also Ground Zero Ctr. for Non-Violent Action v. United States Dep't of Navy*, 860 F.3d 1244, 1258 (9th Cir. 2017)("[C]ourts have significant discretion to constrain litigants from disseminating information obtained through litigation."). In *Ground Zero* the Ninth Circuit noted "[p]rotective orders safeguard the interests of litigants who have no choice but to turn over sensitive information to the other party." *Id.* at 1259. The Ninth Circuit pointed out the *Seattle Times* Court "emphasized that restrictions on litigants' use of discovery documents are permissible because 'restraints placed on discovered, but not yet admitted, information are not a restriction on a traditionally public

source of information.'"  *Id.* (citations omitted).

This rationale from *Seattle Times* and *Ground Zero* applies
with at least equal force to the Protective Order (#342) in this
criminal case.  As with civil discovery, information provided to
litigants in criminal discovery but not admitted at trial is not
a "traditionally public source of information."  *See id.*
Moreover, the public interest in enforcement of criminal laws
together with criminal defendants' due-process rights to
discovery relevant to their defense weigh heavily in favor of
permitting protective orders to limit the public dissemination of
sensitive discovery information, while, at the same time,
granting criminal defendants access to information relevant to
their defense.  In light of the government's substantial interest
in protecting the identities of CHSs from public disclosure, such
protection is clearly appropriate for CHS reports.  *See United
States v. Napier*, 436 F.3d 1133, 1136 (9th Cir. 2006)(noting the
government's important "interest in keeping confidential the
identity of an informant").  Moreover, as in *Seattle Times*, the
Protective Order in this case did not prohibit any party or any
other person from disseminating information that was obtained
outside of the discovery process.  *See Seattle Times*, 467 U.S. at
33.  Finally, because the Court concludes Respondent knowingly
aided and abetted a party in the violation of the Protective
Order, Respondent's status as a nonparty does not render the

20 - FINDINGS OF FACT AND CONCLUSIONS OF LAW FINDING RESPONDENT
     GARY HUNT IN CIVIL CONTEMPT

Protective Order (#342) invalid or preclude its enforcement against Respondent.

On this record, therefore, the Court concludes the Protective Order (#342) is valid and that Respondent knowingly aided and abetted a Defendant and/or a member of a defense team in the violation of the Protective Order. Accordingly, the Court finds Respondent in civil contempt for that conduct.

**SANCTION**

At the August 23, 2017, evidentiary hearing Respondent assured the Court while under oath that he would comply with the Court's final Order in this civil-contempt proceeding. In light of Respondent's assurance, the fact that Respondent has already spent one week in custody, and Respondent's compliance with the Court's orders to appear since his release from custody, the Court concludes Respondent should be given an additional, but final, opportunity to comply with this Court's Order to remove the materials posted in violation of the Court's Protective Order before the Court employs other coercive sanctions.

The Court, therefore, orders Respondent to take the following steps **no later than Noon, Wednesday, September 13, 2017**:

1.    The Court directs Respondent to remove all excerpts and references to the substance of the CHS reports from his website.

2.    The Court directs Respondent to destroy all remaining copies of the CHS reports that he retains in either physical or electronic form subject to the single exception below.

3.    The Court directs Respondent to certify his compliance with Steps 1 and 2 with a statement under oath filed in the record of this matter by the same deadline.

4.    If, notwithstanding Respondent's assurances to the Court of his intent to comply with this Order, Respondent intends to appeal this Order, Respondent must, nevertheless, timely comply with Steps 1, 2 and 3.  He may, however, also provide a single copy of the CHS reports to his counsel to preserve pending appeal.  Unless and until an appellate court issues an order to the contrary, however, counsel may not return that copy of the CHS reports to Respondent or otherwise disseminate any of the contents of those reports.  If this Order is affirmed after Respondent exhausts all appeals or if Respondent elects not to pursue an appeal, counsel must promptly destroy the single retained copy of the CHS reports.

If Respondent fails to comply timely with this Order, the Court will consider the government's request for additional

coercive sanctions.

IT IS SO ORDERED this 7th day of September, 2017.


/s/ Anna J. Brown

_____
ANNA J. BROWN
United States Senior District Judge